Jon M. Sands
Federal Public Defender
Cary Sandman (AZ Bar No. 004779)
Kelly L. Culshaw (OH Bar No. 0066394)
407 W. Congress St., Suite 501
Tucson, Arizona 85701-1310
(520) 879-7622
cary_sandman@fd.org
kelly_culshaw@fd.org
(520) 622-6844 facsimile

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Montenegro Cruz,<br><br>          Petitioner,<br>     vs.<br><br>Charles L. Ryan, et al.,<br><br>          Respondents. | No. CV-13-389-TUC-JGZ<br><br>DEATH-PENALTY CASE |

## PETITION FOR WRIT OF HABEAS CORPUS
### 28 U.S.C. § 2254

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Introduction..................................................................................................1

  I.   Facts and Procedural History...............................................2

    A.   Mr. Cruz's Personal History ................................... 2

    B.   Case H`istory Allegations..................................... 25

      1)  The Offense.................................................. 25

      2)  What the Prosecution and Mr. Cruz's counsel learned about Mr. Cruz in the immediate aftermath of the offense. ................................. 26

      3)  Pre-trial and pre-sentencing proceedings and related defense counsel activities. ........................................... 29

      4)  Guilt-phase proceedings. ................................... 53

      5)  Sentencing-phase proceedings............................ 57

      6)  Direct appeal proceedings. ................................ 76

      7)  State postconviction proceedings. ....................... 79

        (a)  Summary of Mr. Cruz's postconviction evidence ........... 82

        (b)  State's response to petition for postconviction relief ...... 92

        (c)  State court's postconviction decision ................. 94

        (d)  Petition for Review to Arizona Supreme Court .............. 96

      8)  Federal Habeas Proceedings ............................. 97

  II.   State Court Presumption of Correctness. ..................... 138

  III.  Exhaustion........................................................ 138

  IV.  The AEDPA is unconstitutional ............................... 139

    A.   The AEDPA suspends the writ of habeas corpus............... 140

    B.   The AEDPA violates the separation-of-powers doctrine ......... 141

    C.   Conclusion ............................................... 142

  V.   Federal Constitutional Claims ............................... 142

Claim One....................................................................... 143

  Mr. Cruz was denied effective assistance of counsel at his sentencing in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ............................................ 143

I.    Preface .................................................................................... 143

II.   Introduction............................................................................ 145

III.  Deficient Performance .......................................................... 147

      A.  Trial counsel presented a specious non-responsibility defense
          during the guilt phase which carries strong risks for imposition of
          a death sentence in the penalty phase. ................................. 147

      B.  When trial counsel presented a specious non-responsibility
          defense during the guilt phase, without providing advice to Mr.
          Cruz regarding the ineffectiveness of the strategy for the
          sentencing phase, counsel's conduct was constitutionally
          deficient............................................................................... 149

      C.  Counsels' decision to parlay the specious trial defense into
          decision to foreclose investigation of Mr. Cruz's mental state at
          the time of the offense was constitutionally deficient and
          objectively unreasonable..................................................... 151

      D.  Trial counsel failed to investigate and present all reasonably
          available mitigation evidence; or to explain the significance of
          such evidence. ..................................................................... 156

          1)  The Duties of Capital Counsel. ..................................... 156

          2)  Trial counsels' near obsession with asserting Mr. Cruz's
              speedy trial rights spiraled into forfeiture of their duty to
              thoroughly investigate Mr. Cruz's background and to provide
              relevant information concerning his background to the mental
              health experts. ............................................................... 162

IV.   Prejudice................................................................................ 170

      A.  Mr. Cruz was prejudiced by counsel's deficient performance
          where fallacies went uncorrected by the defense. ............... 171

      B.  Mr. Cruz was prejudiced where trial counsel's deficient failure to
          investigate and discover facts as well as their failure to divulge
          information to defense experts, rendered mental health evaluations
          incomplete and ultimately inaccurate. ................................. 175

      C.  Mr. Cruz was prejudiced by counsel's deficient performance
          where trial counsels' failure to investigate left them powerless to
          explain Mr. Cruz's "choices.".............................................. 179

      D.  Mr. Cruz was prejudiced by counsels' deficient failure to explain

the combination of issues that both contributed to his drug addiction, and prevented him from successfully battling it. Moreover, counsel failed to alert the jury to the fact that the John Cruz who killed Officer Hardesty on May 23, 2005 was very different from the man who existed prior to his methamphetamine addiction............................................................................................ 183

E.  Mr. Cruz was prejudiced by counsel's deficient failure to investigate his mental state at the time of the offense and to thus establish a causal nexus between Mr. Cruz's mitigation case and Officer Hardesty's death. ................................................................. 185

F.  Mr. Cruz was prejudiced by counsels' encouragement and ultimate presentation of a denial defense at penalty. .......................... 188

G.  Conclusion ........................................................................................ 188

Claim Two .......................................................................................................... 189

Mr. Cruz presented a colorable claim in the state postconviction court that he was denied effective assistance of counsel at his sentencing in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.................................................................................................. 189

I.    Review Standards ........................................................................................ 189

II.   The summary of evidence presented in state court. .................................... 192

III.  The state court decision regarding the alleged deficiencies in trial counsel's performance was based on an unreasonable determination of the facts, and separately its decision was contrary to *Strickland*. ........ 195

IV.  The state court's prejudice determination was also based on an unreasonable determination of the facts and was also decided contrary to *Strickland*.................................................................................................. 198

Claim Three ........................................................................................................ 200

Mr. Cruz was denied his right to a fair trial, impartial jury, and reliable sentencing proceedings as a result of biased jurors serving on his jury......... 200

I.    Jurors 136, 150, 169 and 178 should have been stricken for cause. ......... 200

A.  Juror 136 ........................................................................................ 200

B.  Juror 150 ........................................................................................ 201

C.  Juror 169 ........................................................................................ 201

D.  Juror 178 ........................................................................................ 202

iii

E.   Counsel was forced to use peremptory challenges on Jurors 136, 150, 169, and 178. ................................................................ 204

F.   Jurors 62, 123, 127, and 193 should have been removed from Mr. Cruz's jury. They were not stricken for cause, and Mr. Cruz had no remaining peremptory challenges to ensure their removal. ......... 204

G.   Juror 62 ............................................................................... 204

H.   Juror 123 ............................................................................. 205

I.   Juror 127 ............................................................................. 206

J.   Juror 193 ............................................................................. 206

II.   Mr. Cruz was denied his right to an unbiased and impartial jury. ........... 207

Claim Four .................................................................................... 210

Improper restraints during his capital trial deprived Mr. Cruz of his rights to due process, a fair trial and fair sentencing proceedings. ......................... 210

I.   Mr. Cruz was improperly restrained during the trial court proceedings. . 210

II.   The shock belt used on Mr. Cruz was an excessive restraint and deprived him of his Sixth and Fourteenth Amendment rights. ................ 214

III.  Conclusion ........................................................................... 218

Claim Five ..................................................................................... 218

Mr. Cruz's right to due process was violated when the trial court admitted prejudicial testimony in violation of Arizona's disclosure rules that amounted to evidence of bad character. This testimony was also improper opinion testimony. ................................................................... 218

I.   Frank Powell offered highly prejudicial opinion evidence that deprived Mr. Cruz of due process. ............................................. 220

II.   Frank Powell offered an improper expert opinion. ................................. 222

Claim Six ...................................................................................... 223

The trial court's preclusion of relevant mitigating evidence deprived Mr. Cruz of a fair sentencing proceeding and reliable sentence in violation of the Eighth and Fourteenth Amendments. ....................................... 223

I.   Belcher's testimony was a factor that could have led the jury to impose a sentence less than death and thus was relevant mitigating evidence. ............................................................................ 224

Claim Seven .................................................................................. 226

iv

Misconduct by the state's attorney violated Mr. Cruz's rights to due process and protection against cruel and unusual punishment. ..................... 226

I.   Sentencing phase misconduct. ................................................................ 226

  A.   The prosecutor improperly argued that Mr. Cruz needed to demonstrate a causal nexus between his mitigation and the crime. .. 226

  B.   The prosecutor improperly argued that the manner and circumstances of the offense were to be weighed as aggravation. ..... 229

II.   Conclusion ........................................................................................... 230

Claim Eight ..................................................................................................... 231

Mr. Cruz was deprived of his rights to a fair and impartial jury, a fair sentencing proceeding, and a reliable sentence when the trial court provided coercive instructions during the penalty phase of his capital case. .. 231

I.   The trial court's instruction coerced the jury's verdict in violation of Mr. Cruz's Sixth and Fourteenth Amendment rights. ............................... 233

II.   Conclusion. ............................................................................................ 237

Claim Nine ...................................................................................................... 238

The A.R.S. § 13-751(F)(10) aggravating circumstance is unconstitutional because fails to narrow the class of death-eligible offenders by double counting a factual element to establish first degree murder and to make a capital defendant death eligible. ..................................................................... 238

I.   Mr. Cruz was made death-eligible based on the same set of facts that served to support a finding of first degree murder. .................................. 238

II.   A.R.S. § 13-751(F)(10) unconstitutionally fails narrow the class of death-eligible offenders ........................................................................ 239

Claim Ten ....................................................................................................... 241

The death penalty is categorically cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. ......... 241

Claim Eleven .................................................................................................. 242

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it affords the prosecutor with unbridled discretion to seek the death penalty. ................... 242

Claim Twelve .................................................................................................. 243

Arizona's capital sentencing scheme discriminates against poor, young,

and male defendants in violation of the Fourteenth Amendment. ................. 243

Claim Thirteen ........................................................................................... 244

Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it denies capital defendants the benefit of proportionality review of their sentences. ...................................................................................... 244

Claim Fourteen .......................................................................................... 245

Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it does not require the State to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances .. 245

Claim Fifteen ............................................................................................. 247

Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. ................. 247

Claim Sixteen ............................................................................................ 248

Eighth, and Fourteenth Amendments to the United States Constitution because it does not require the State to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. ............................................................................. 248

Claim Seventeen ........................................................................................ 249

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently channel the discretion of the sentencing authority. ..................... 249

Claim Eighteen .......................................................................................... 250

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant. ..................... 250

Claim Nineteen .......................................................................................... 252

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a defendant to affirmatively prove that the sentencing body should spare his life.       252

Claim Twenty .................................................................................. 253

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. ................. 253

Claim Twenty-One ......................................................................... 254

The failure of Arizona's capital sentencing scheme to include independent review violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution  depriving capital defendants, including Mr. Cruz, of their rights to due process and equal protection amounting to cruel and unusual punishment. ....................................................... 254

Claim Twenty-Two ........................................................................ 256

Arizona's requirement that mitigating factors be proved by a preponderance of the evidence unconstitutionally prevents the jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.............................................. 256

Claim Twenty-Three ...................................................................... 257

Mr. Cruz will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. .......................................................... 257

Claim Twenty-Four ........................................................................ 259

Mr. Cruz was denied his right to the effective assistance of counsel in his state court trial proceedings. .......................................................... 259

I.   Trial counsel's failure to object and to preserve issues for appellate review. ................................................................................... 260

    A.  Trial counsel failed to request a hearing in order to investigate and present evidence demonstrating excessive security precautions were being employed during Mr. Cruz's trial. .................................. 260

    B.  Trial counsel failed to challenge Juror 193 for cause. ...................... 261

    C.  Trial counsel failed to lodge a timely objection to Frank Powell's prejudicial testimony........................................................ 262

    D.  Trial counsel failed to object to prosecutor misconduct................... 263

II.  Trial counsel failed to make a compelling argument for a sentence less than death during their penalty phase closing arguments. ........................ 264

III. Conclusion ................................................................................ 265

Claim Twenty-Five ............................................................................. 265

    Mr. Cruz was denied his right to the effective assistance of appellate counsel on direct appeal of his capital conviction. .......................................... 265

    I.    Appellate counsel was ineffective for failing to raise meritorious claims. ......................................................................................... 267

        A.   Appellate counsel failed to argue any reason that Juror 127 should have been removed from Mr. Cruz's jury. ........................................ 267

        B.   Appellate counsel failed to argue that the shock belt Mr. Cruz wore during his capital proceedings was visible to his jury. ............. 267

        C.   Appellate counsel failed to fully and completely challenge Frank Powell's improper testimony. ........................................................... 268

        D.   Appellate counsel failed to raise claims of prosecutor misconduct. . 269

        E.   Appellate counsel failed to Federalize Mr. Cruz's coerced verdict claim. .......................................................................................... 270

        F.   Appellate counsel failed to argued that Arizona's statutory requirement that mitigating factors must be proved by a preponderance of the evidence unconstitutionally precludes the jury from considering mitigation      evidence. ................................. 271

        G.   Appellate counsel failed to challenge the lack of independent review and the restriction of the Arizona Supreme Court's review in his case to an abuse of discretion standard. .................................. 272

    II.   Conclusion ............................................................................. 272

Claim Twenty-Six ............................................................................. 273

    The numerous errors committed during Mr. Cruz's re-sentencing proceedings cumulatively produced a proceeding that was fundamentally unfair and violated his due process. ................................................................. 273

Claim Twenty Eight ............................................................................. 275

    Mr. Cruz's rights to a fair trial, reliable sentence, and a fair and impartial were violated by improprieties the jury either committed or was exposed to during the trial and sentencing phases of his capital trial. ........................... 275

    I.    Repeated improprieties involving Mr. Cruz's jury occurred during Mr. Cruz's capital trial and sentencing proceedings. ........................................ 275

        A.  Mr. Cruz's jurors violated their admonition. ..................................... 276

        B.  Jurors observed a State's witness hugging members of the

1

Hardesty family................................................................. 277

C.  Jurors were exposed to media coverage during the trial. .................. 278

D.  Conversation overheard by defense witness Tara White demonstrated that the jurors were biased prior to sentencing. .......... 280

II.   Conclusion ..................................................... 282

Prayer for Relief ....................................................... 282

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Pursuant to 28 U.S.C. § 2254, Petitioner John Montenegro Cruz, through counsel, respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondent, pursuant to the judgments and sentences of an Arizona state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of his rights under the United States Constitution.

Petitioner is in the custody of the Arizona Department of Corrections (hereinafter "ADOC"), incarcerated on a sentence of death for his 2005 conviction for the first-degree murder of police officer Patrick Hardesty.

**I.  Facts and Procedural History**

   **A.  Mr. Cruz's Personal History[1]**

   1.   John Montenegro Cruz, born February 13, 1970, is the only child of Juan de Dios Cruz (Cruz Sr.) and Julie Montenegro. (PR Appx. at 1198, PCR Pet. Ex. 41 at ¶27.) His parents married right after Cruz Sr. graduated from high school; according to Mr. Cruz's aunt Romelia Holguin, Julie was already a month pregnant with Mr. Cruz by the wedding date.  (PR Appx. at 1140, PCR Pet. Ex. 36 at 21.)

*A damaged mother*

   2.   Mr. Cruz's mother, Julie, grew up with a violent, alcoholic father who beat his wife and children, and sexually abused Julie for 15-16 years. (PR Appx. at 1199-1200, 1030, 948; PCR Pet. Ex. 41 at 15-16; PCR Pet. Ex. 32 at 4; PCR Pet. Ex. 22 at 1; Tr. Mar. 1, 2005 at 80.) The violence and sexual abuse damaged Julie long-term, both mentally and emotionally. She suffered from chronic psychological

---

[1] There are three separate dockets for the state court proceedings. For purposes of this petition, the dockets will be cited in the following manner:

   1.   Trial proceedings for the Pima County Superior Court are docketed under CR2003-1740. References to this docket will correspond to the Pima County Superior Court Index of Record on Appeal and, henceforth, will be cited as "ROA." However, postconviction proceedings following Petitioner's sentencing were not assigned an ROA number. Accordingly, any citation to postconviction pleadings will refer to by the appropriate pleading by name and date of filing.

   2.   Docket Number CR-05-0163-AP identifies the direct appeal of Petitioner's death sentence to the Arizona Supreme Court. This docket will be referred to as "Ariz. Sup. Ct. Doc. No."

   3.   The Arizona Supreme Court docket for Petitioner's petition for review from the Pima County Superior Court's denial of his petition for postconviction relief is Docket Number CR-12-0529-PC and will be referred to as "PR Doc. No." The Appendix to the Petition for Review will be referred to as "PR Appx."

Transcripts will be cited as "Tr.", followed by the date of the transcribed proceeding.

disorders from late childhood—anorexia, bulimia, depression, anxiety, and post-traumatic stress disorder—as well as substance abuse and dependence with alcohol, prescription drugs, marijuana, and cocaine. (PR Appx. at 1200, PCR Pet. Ex. 41 at 16; Tr. Mar. 1, 2005 at 82.) According to her treating psychiatrist, Julie suffered from post-traumatic stress disorder, but also fit the criteria for dissociative disorder and borderline personality disorder.

3.   The result—Julie was "a very damaged person with profoundly limited emotional capabilities and relationship instincts." (PR Appx. at 1210, PCR Pet. Ex. 41 at 26.) Put simply, Julie was a self-absorbed woman who did not recognize her son's emotional needs; she failed to nurture Mr. Cruz or to show him affection. (PR Appx. at 1200, PCR Pet. Ex. 41 at 16.) She never really bonded with him. (PR Appx. at 1209, PCR Pet. Ex. 41 at 25.)

4.   Julie's neglect of Mr. Cruz stemmed from the fact that she did not know how to be a good mother. (PR Appx. at 1032, PCR Pet. Ex. 32 at 6.) Julie's ability to mother Mr. Cruz only got worse as she began nursing school and work; she was gone long hours. (PR Appx. at 1215, PCR Pet. Ex. 41 at 31.)  Mr. Cruz would cry when his mother left, asking why she did not love him. (*Id.*)

5.   But even before his birth, Julie failed Mr. Cruz by abusing alcohol during her pregnancy. (PR Appx. at 1205, PCR Pet. Ex. 41 at 21.) Mr. Cruz's aunt, Romelia Holguin recalls the party following Julie's marriage to Cruz Sr. was rowdy with a lot of drinking, including then-pregnant Julie. But this was not a one night event for Julie; instead, Mr. Cruz's aunt Ana Montenegro reports that Julie regularly drank during her pregnancy causing what would become irreparable neurocognitive damage to Mr. Cruz. According to Dr. Robert Smith, the psychologist retained by habeas counsel to evaluate Mr. Cruz, the deficits resulting from fetal alcohol effects made Mr. Cruz highly susceptible to the depression that would develop during his childhood. And, in an effort to fight those symptoms, Dr. Smith concluded that Mr. Cruz would turn to a variety of substances as a young boy, which only served to

3

exacerbate the damage done to his brain in utero.

*A brutal father*

6.   Like Julie, Cruz Sr. grew up with a violent, drunken father. (PR Appx. at 1201, 989-90, 994, 1134-39, 1029; PCR Pet. Ex. 41 at 17; PCR Pet. Ex. 31 at 8-9, 13; PCR Pet. Ex. 36 at 15-20; *see also* PCR Pet. Ex. 32 at 3.) He responded in his marriage by being psychically and verbally abusive towards Julie. (PR Appx. at 1202, 1213-14, 1028-29, 940; PCR Pet. Ex. 41 at 18, 29-30; PCR Pet. Ex. 32 at 2-3; Tr. Mar. 1, 2005 at 101; *see also* PCR Pet. Ex. 20 at 2; Trial Ex. GF at 2.) Cruz Sr. first hit Julie the day after they were married—because he did not like the way she had prepared potatoes. (Tr. Mar. 1, 2005 at 97.) He beat her regularly—if she failed to do what he asked, if she forgot something, if she left a door unlocked. (*See* Tr. Mar. 1, 2005 at 105.) Mr. Cruz was witness to the horrific violence his father inflicted on his mother. (Tr. Mar. 1, 2005 at 104.) And, the abuse did not stop once the couple divorced. Following the divorce, Julie described how Cruz Sr. harassed her, broke into her home, and even raped her.

7.   Mr. Cruz described in detail to Dr. Smith how he and his father were never close. They did not spend time together as a father and son. Rather, Cruz Sr. seemed to Mr. Cruz to be both distant and uninvolved. Cruz Sr. also was often gone for weeks at a time to work. (Tr. Mar. 1, 2005 at 99.)

8.   While Cruz Sr. was distant and often absent, Mr. Cruz was not spared his father's violence—Cruz Sr. was verbally abusive towards his son and he beat him. (*See* PR Appx. at 1213, 1032, 966, 1070-71; PCR Pet. Ex. 41 at 29; PCR Pet. Ex. 32 at 6; PCR Pet. Ex. 27 at 3; PCR Pet. Ex. 33 at 23-24; Trial Ex. GF at 2; Tr. Mar. 1, 2005 at 102, 104.) Cruz Sr. beat Mr. Cruz and Julie both regularly. (PR Appx. at 1219, 1028-29; PCR Pet. Ex. 41 at 35; PCR Pet. Ex. 32 at 2-3.) Mr. Cruz suffered injuries at his father's hands virtually every week. (PR Appx. at 1030, PCR Pet. Ex. 32 at 4.)

9.   Mr. Cruz's mother vividly recalled a particularly severe beating inflicted

on Mr. Cruz when he was around eight years old. Cruz Sr. hit Mr. Cruz 60 to 80 times. (Tr. Mar. 1, 2005 at 103.) He beat him all over his body with a belt—"his little face, his head, on his back, shoulders on his arms, everywhere on the body, big huge marks with a belt[.]" (Tr. Mar. 1, 2005 at 102.) Julie tried to console her son when the violence occurred, but she was not able to, and she could not stop the violence. (PR Appx. at 1031, PCR Pet. Ex. 32 at 5.)

10. The many beatings Mr. Cruz received from his father stayed with him into adulthood. He described to his wife a beating when he was about 10 years old; Mr. Cruz was left bloodied and welted after a particularly severe beating with a belt. (PR Appx. at 1071-72, PCR Pet. Ex. 33 at 24-25.) The horrors of the violence he suffered as a child also recurred in his adult dreams. (PR Appx. at 1074, PCR Pet. Ex. 33 at 27.)

11. The violence in the Cruz home only escalated, which ultimately led Julie to flee with her son when he was around 8 years old. (*See* Tr. Mar. 1, 2005 at 104.) The day she left Cruz Sr., Julie ran to the car with her son; Cruz Sr. followed them outside and pointed a loaded rifle at them. (Tr. Mar. 1, 2005 at 104.)

12. Julie and Cruz Sr. divorced in 1979. The proceedings were contentious and Mr. Cruz was put in the middle; an evaluator described how Mr. Cruz was torn apart by his parents' custody battle.

***An unwanted child***

13. Mr. Cruz's childhood was defined by his mother's detachment, her emotional and supervisory neglect, and her regular abandonment of him. (PR Appx. at 1216, PCR Pet. Ex. 41 at 32.) The legacy of Julie's parenting was Mr. Cruz's belief that he was unlovable. (*Id.*) Mr. Cruz felt alone and abandoned. (PR Appx. at 1077, PCR Pet. Ex. 33 at 30.)

14. Mr. Cruz did not just *feel* alone and abandoned as child. He was regularly abandoned by Julie to others. Julie frequently asked Mr. Cruz's Aunt Susan to spend time with him rather than do so herself. Aunt Susan described that Mr. Cruz wanted

5

his mother. Often, Julie's disappearances from Mr. Cruz's life were not brief. When he was around four or five years old, Julie left Mr. Cruz with her mother-in-law and sister for nearly a year while she took care of her dying father. (Tr. Mar. 1, 2005 at 88.) The consequences to Mr. Cruz of his mother's near year-long disappearance never crossed Julie's mind. (Tr. Mar. 1, 2005 at 88.)

15. Truly, Mr. Cruz was alone most of his life. Even when he was living with both Julie and Cruz Sr., as early as five years of age, Mr. Cruz described to Dr. Smith coming home to an empty house. Cruz Sr. and Julie worked long hours. While Dr. Smith concluded that while Mr. Cruz had food, clothing, and shelter, he lacked supervision. His Aunt Susan's evaluation truly captures this time in Mr. Cruz's life—he was lost.

16. Even more so after the divorce, Mr. Cruz's life followed a path of shifting caretakers, which only increased his feelings of abandonment. (PR Appx. at 1207, PCR Pet. Ex. 41 at 23.) Julie had custody of Mr. Cruz following the divorce, but he was passed from home to home—his mother's, his father's, his Aunt Susan's, and his maternal grandmother's home. (PR Appx. at 1215, PCR Pet. Ex. 41 at 31.) His mother abandoned him for extended periods. (*Id*.) Julie would leave Mr. Cruz for "days, weeks months" with his Aunt Susan. (Tr. Mar. 1, 2005 at 136.) Mr. Cruz missed the very critical experience of a "sustained and stable relationship to the same parent figure." (PR Appx. at 1222, PCR Pet. Ex. 41 at 38.) In California, Mr. Cruz spent a great deal of time with his cousin, Irma Dominguez. Irma notes that as a child, Mr. Cruz, no matter where he went, never felt that he was wanted or that he fit in. And still he shuffled back and forth between Julie, Cruz Sr., his aunt, and his maternal grandmother in the years immediately after the divorce. (Tr. Mar. 1, 2005 at 141.) The result Aunt Susan saw was a sad little boy.

17. When Mr. Cruz was about 12 years old, Julie completely abandoned him when she moved to California in 1982. Mr. Cruz lived with his father until January 1985. During this time with his father, Mr. Cruz got a new stepmother, Lydia, when

6

he was approximately thirteen. (PR Appx. at 1202, PCR Pet. Ex. 41 at 18.) Lydia herself was just a 16-year-old child, only a few years older than Mr. Cruz, when she married Cruz Sr. (PR Appx. at 1223, 1038; PCR Pet. Ex. 41 at 39; PCR Pet. Ex. 32 at 12.) So young, Lydia was ill-prepared to parent a child nearly her own age. Instead, Lydia was both mean and rejecting towards Mr. Cruz. (PR Appx. at 1202, PCR Pet. Ex. 41 at 18.) She would lock Mr. Cruz outside of the home when Cruz Sr. was not home, sometimes overnight. (PR Appx. at 1215, 1219, 949; PCR Pet. Ex. 41 at 31, 35; PCR Pet. Ex. 22 at 2; Tr. Mar. 1, 2005 at 111; Tr. Mar. 1, 2005 at 148; Tr. Mar. 2, 2005 at 86.)

18. Mr. Cruz lived in his maternal grandmother's home off and on from the time he was 11 until he was an adult. (PR Appx. at 1225, PCR Pet. Ex. 41 at 41.) His maternal grandmother worked long hours while Mr. Cruz was in her home; his uncles were in the home constantly, both abusing and selling drugs. (PR Appx. at 1215, 980, 969, 940, 948, 962; PCR Pet. Ex. 41 at 31; PCR Pet. Ex. 30; PCR Pet. Ex. 28 at 2; PCR Pet. Ex. 20 at 2; PCR Pet. Ex. 22 at 1; PCR Pet. Ex. 26 at 2; Tr. Mar. 1, 2005 at 61; Tr. Mar. 1, 2005 at 141; Tr. Mar. 3, 2005 at 126.)  In this den of drug abusers and drug dealers, Mr. Cruz was not embraced. Mr. Cruz's cousin, Albert Montenegro, describes how Mr. Cruz's uncles and cousins teased him, including telling him he was not a Montenegro, telling him in essence that he was not a member of the family. Mr. Cruz was reminded he did not truly belong anywhere, only increasing those early childhood feelings of loneliness and abandonment. Cousin Albert saw Mr. Cruz as an outcast, even when he lived with his grandmother. And, this was yet another home where those who were entrusted with nurturing and caring for Mr. Cruz met that task through violence. Mr. Cruz described to Dr. Smith how his uncles hit and beat him, in order to "toughen" him up.  Other witnesses corroborate these beatings.  (PR Appx at 939-41, 943-46, 1048-1113, PCR Pet. Exs. 20, 21, 33.)

19. Mr. Cruz's uncles sold crack cocaine out of the home. (PR Appx. at 1225.

PCR Pet. Ex. 41 at 41.) Mr. Cruz's aunt recalled there was in essence a drive-through window for drugs at the home; she recalled sleeping on the sofa under this window in an attempt to prevent the drug sales. (PR Appx. at 1225, 980; PCR Pet. Ex. 41 at 41; PCR Pet. Ex. 30.) The neighborhood itself, Barrio Hollywood, was known for substance addiction, including heroin and rock cocaine. (PR Appx. at 1226, PCR Pet. Ex. 41 at 42; Tr. Mar. 1, 2005 at 58.)

20. Mr. Cruz's mother would also remarry several years after the divorce from Cruz Sr. After living together for a couple of years, Julie married Steve Lingenfelter in 1986, when Mr. Cruz was approximately 15-16 years old. (PR Appx. at 1202, PCR Pet. Ex. 41 at 18; Tr. Mar. 1, 2005 at 109.) Prior to the marriage, according to his Aunt Susan, Mr. Cruz was shuffled between Julie and Steve's home and his grandmother's home.

21. Steve was a professional, a hospital pharmacist. But Steve was not a man to whom Mr. Cruz could look up to. Rather, Steve was like every other adult male in Mr. Cruz's life—a violent alcoholic and drug abuser. So Steve and Julie's home was yet another setting where the young Mr. Cruz found his home filled with drugs and violence.

22. Julie and Steve abused drugs and alcohol early in their relationship. Mr. Cruz's Aunt Susan describes the couple as partying, sometimes all night. Steve often drank alcohol, and would get "blackout drunk," according to Julie's treating psychiatrist. Both Mr. Cruz's Cousin Irma and Aunt Susan observed that Steve used cocaine and alcohol regularly. Steve fed Julie drugs, supporting her habits, including supplying her with cocaine. (PR Appx. 1202, 941; PCR Pet. Ex. 41 at 18, 27; PCR Pet. Ex. 20 at 3.) Aunt Susan was very clear that Mr. Cruz was exposed to the extensive drug usage in their home. Julie did not merely set a poor example for her son; she was never equipped to parent Mr. Cruz, so damaged was she from the horrors of her own childhood. But, what little capacity she might have had surely was lost to the cloud of drugs and alcohol that consumed her from the mid-eighties

until her death on 2012.

23. Julie's psychiatric records reveal that violence was part of her marriage to Steve, just as it had been with Mr. Cruz's father. Julie told her treating psychiatrist of her fears of Steve's rages. And, Julie's mental health continued to deteriorate during the marriage as evidenced by her psychiatrist. Records reveal that after her marriage to Steve, Julie began binging and purging. Mr. Cruz's hopes at a caring and nurturing mother were most certainly lost to Julie's own addiction and increasing mental health symptoms. Julie had not been able to take care of herself for a long time; she could not even hope to care for Mr. Cruz as she fell deeper into the stupor of addiction and mental illness.

24. Steve's violence extended to Mr. Cruz whom he also physically abused. (*See* PR Appx. at 1219, PCR Pet. Ex. 41 at 35; PCR Pet. Ex. 33 at 31.) While abusers do not need a reason to abuse, Steve always had a strong dislike for Mr. Cruz. (PCR Pet. Ex. 41 at 39.) Mr. Cruz's Aunt Susan indicates that Steve did not want Mr. Cruz around from the start of his relationship with Julie. Moreover, Aunt Susan reveals that Steve always talked negatively of Mr. Cruz. It was not enough to beat him; Steve had to break down Mr. Cruz mentally as well.

25. Violence and drugs were a constant in Mr. Cruz's childhood. But so were loneliness and abandonment. Julie and Steve were frequently gone: both Aunt Susan and Cousin Irma agree Steve and Julie worked nights and, when they were home, they slept during the day. As a young teen Mr. Cruz was without adult supervision and parental guidance in Julie and Steve's home. (PCR Pet. Ex. 41 at 31.) [2]

26. As a young teen living in California with Steve and Julie, Mr. Cruz spent more time with his cousin Irma Dominguez than with anyone else. Irma was about four years older than Mr. Cruz. Irma recalls that she had a car and would pick Mr.

---

[2] Page 31 from Exhibit 33 of the Amended Petition for Postconviction was not submitted to the Arizona Supreme Court with the filing of the Petition for Review Appendix.

Cruz up, or Mr. Cruz would take the bus to her home. Julie would also come to visit Irma's family with Mr. Cruz; Irma remembers how Julie left Mr. Cruz behind. Mr. Cruz would stay with Irma's family, sometimes for weeks.

27. Irma describes that while Mr. Cruz lived with his mother and Steve, he had a place to sleep but not much else. Other witnesses related that Julie and Steve would give Mr. Cruz money to get rid of him. (PR Appx. at 1037, 1080; PCR Pet. Ex. 32 at 11; PCR Pet. Ex. 33 at 34.) Mr. Cruz, still just a child, according to Irma, would wander the streets; he never felt as if he truly belonged. Irma remembers that Mr. Cruz had gadgets, but he did not have what he needed, either emotionally or mentally, to belong. Irma also noticed the strange ways Julie interacted with Mr. Cruz, always detached.  Julie did not touch Mr. Cruz, hug him, or kiss him. (Tr. Mar. 1, 2005 at 92.) And, if she tried to show him affection, Irma noted it always came across as awkward.

28. From her frequent interactions with Mr. Cruz and Julie, Irma observed that Mr. Cruz was an inconvenient obligation to his mother. It was not long before Julie and Steve moved Mr. Cruz out of their home, because Steve did not want Mr. Cruz there, so they sent Mr. Cruz into a separate apartment downstairs. (PR Appx. at 1215, 1223, 1040; PCR Pet. Ex. 41 at 31, 39; PCR Pet. Ex. 32 at 14.) Julie eventually discarded Mr. Cruz entirely, putting him up in an apartment in Tucson; he was approximately sixteen at the time. (PR Appx. at 1215, 970, 1142, 1040; PCR Pet. Ex. 41 at 31; PCR Pet. Ex. 28 at 3; PCR Pet. Ex. 36 at 23; PCR Pet. Ex. 32 at 14.)

29. Mr. Cruz's earliest memories are of a home filled with violence. His father beat both him and his mother mercilessly. When his father was not beating them, he was distant. His mother, lost in the depths of her own childhood horrors, failed at the most basic of her tasks, to love and nurture her son. She could not even be there for him physically or emotionally, regularly abandoning him to others.

30. Mr. Cruz shifted to his father's home, where his step-mother tormented

him. He found no love or affection in that home. He was left locked outside looking in—abandoned and alone again.

31. After his father passed away, Mr. Cruz was shuffled back and forth between various drug-addled adults—his mother and her new husband, or his grandmother's home overrun by drug-dealing and drug-abusing uncles. Violence filled these homes, not hugs and affection. Everywhere he turned, during his most impressionable years, Mr. Cruz only saw adults using violence and abusing drugs. Mr. Cruz never developed a feeling of belonging.

**_Struggling in school, not finding his place_**

32. Mr. Cruz's struggles with school began in second grade. (PR Appx. at 1207, PCR Pet. Ex. 41 at 23.) Mr. Cruz labored at a very young age with school, and his poor academic performance continued throughout his education. (*Id*.) Julie realized Mr. Cruz was having difficulties learning, but indicated no one told her that he had a learning disability. (PR Appx. at 1034, PCR Pet. Ex. 32 at 8.)

33. By third grade, Mr. Cruz's teacher recommended he be tested for a learning disability. (PR Appx. at 1207, PCR Pet. Ex. 41 at 23.) Dr. Smith notes this teacher was the first to see the signs of what is a significant neurocognitive impairment. Records reveal that Mr. Cruz was diagnosed learning disabled and moved into adaptive education classes in fifth grade.

34. His neuropsychological deficits were apparent in elementary school, and possibly earlier, according to neuropsychologist Dr. Ken Benedict. Mr. Cruz's brain impairment was only compounded by the violent and chaotic environments that Mr. Cruz was shuffled through. What Mr. Cruz needed was consistent identification and intervention to address his impairments. Instead, records reveal Mr. Cruz attended thirteen different schools over twelve grades.

35. This constant shifting from home to home also meant that Mr. Cruz was not making friends. Mr. Cruz describes how he never formed any enduring friendships at school. He certainly could not be expected to do so; he switched

schools on a regular basis, robbing him of the chance to have a supportive peer group that might have helped to meet the needs of a lonely, abandoned child.

36. Mr. Cruz did not graduate from high school, but later did earn his GED. (PR Appx. at 968, PCR Pet. Ex. 28 at 1.)

***The depths of a childhood depression***

37. With a history of violence and abandonment, struggling and failing at school, and few if any real friends, Mr. Cruz was a lonely child and teen. He was depressed and in tears a lot as a child. (PR Appx. at 962, PCR Pet. Ex. 26 at 2.) Mr. Cruz was ill-equipped to deal with the problems he faced; his neurocognitive deficits and a lack of treatment only served to exacerbate his depression. And, the adults who were supposed to support and guide him were violent drug abusers. But really, at its most basic, no one took responsibility for Mr. Cruz—no one wanted him. As a result, no one took the time to guide and help him.

38. Starting at age 12, Mr. Cruz lived with Cruz Sr. for approximately three years, from 1982 to 1984, before moving back to California with his mother. (Tr. Mar. 1, 2005 at 111.) About a month later, In January 1985, Mr. Cruz's father died when Mr. Cruz was 14 years old. (PR Appx. at 1223, PCR Pet. Ex. 41 at 39; Tr. Mar. 1, 2005 at 111.) Mr. Cruz was devastated. (PR Appx. at 1223, PCR Pet. Ex. 41 at 39.) Mr. Cruz described to Dr. Smith how, by the time he arrived at the hospital, his father was unconscious and on life support. Resultantly, Mr. Cruz was not able to say goodbye. Mr. Cruz recalled being overwhelmed by his grief at his father's funeral. But there was no once there to help him through this horrific moment in his life. His mother was not there for him, Mr. Cruz indicated. Even today, Mr. Cruz reacts emotionally to discussing his father, overwhelmed by sadness and grief—and his recognition that he will not have the opportunity to build a relationship with his father. Despite the horrific abuse inflicted by Cruz Sr., the now-adult Mr. Cruz still is searching for that sense of family, of belonging, and suffers at the recognition that it will never be.

12

39. Mr. Cruz sunk deeper into his depression after his father's death. (PR Appx. at 1224, 1230, 962; PCR Pet. Ex. 41 at 40, 46; PCR Pet. Ex. 26 at 2; Tr. Mar. 1, 2005 at 114; Tr. Mar. 2, 2005 at 148.) He turned inward. (PR Appx. at 1035, PCR Pet. Ex. 32 at 9.) Mr. Cruz describes feeling as if he had fallen into a black hole. Mr. Cruz's cousin Albert recalled that Mr. Cruz stayed in his room, he would not go outside nor have friends over. After his father's death, Julie sent Mr. Cruz to a psychologist at Westchester Family Mental Health Clinic. (Tr. Mar. 1, 2005 at 115.) This did little good and was quickly discontinued. Mr. Cruz recalls that Julie became dissatisfied with the therapy sessions because she felt the psychologist was painting her in a negative light.

40. Mr. Cruz's depression only worsened when his stepmother sold all of his father's belongings, as well as any of Mr. Cruz's belongings that remained in their home, and refused to give Mr. Cruz a single memento of his father. (PR Appx. at 1223, PCR Pet. Ex. 41 at 39; Tr. Mar. 1, 2005 at 143.)

41. Following his father's death, Mr. Cruz continued living with Julie and Steve for a period, but was again shuffled around. (Tr. Mar. 2, 2005 at 120; Tr. Mar. 1, 2005 at 117; *see also* Tr. Mar. 2, 2005 at 88.) In California, around the age of fifteen, Mr. Cruz spent more time at his Cousin Irma's home. Mr. Cruz felt like he was in the way and was not wanted by Julie and Steve, according to Cousin Irma. Irma described how she and Mr. Cruz began using drugs, often. Reflecting back, Irma realizes Mr. Cruz was covering up his depression with his drug use. The depression was not surprising to Irma because Mr. Cruz felt unwanted and unloved by his mother. (*See also* PR Appx. at 1036, PCR Pet. Ex. 32 at 10.)

42. Julie ultimately discarded Mr. Cruz, deciding Mr. Cruz could not live with her anymore—although he was not really living with her at the time; he was living in a downstairs apartment separate from Julie and Steve. (Tr. Mar. 1, 2005 at 117.) Mr. Cruz returned to Tucson. (Tr. Mar. 1, 2005 at 117.)

43. When he returned to his grandmother's home, Mr. Cruz's cousin, Albert,

13

described how he only left his room to eat. Mr. Cruz did not want to talk to anyone and locked himself inside his room. (Tr. Mar. 2, 2005 at 149.) This lasted for years. (Tr. Mar. 28, 2014 at 2; Tr. Mar. 2, 2005 at 149.) He even tried to take his own life by hanging himself in his closet at the age of 16. (PR Appx. at 1230, 1093; PCR Pet. Ex. 41 at 46; PCR Pet. Ex. 33 at 47.)

44.  The death of his father followed Mr. Cruz into adulthood; he would awake from dreams as an adult talking and crying. (PR Appx. at 1073, PCR Pet. Ex. 33 at 26.) Mr. Cruz was also under the mistaken impression that his father had died from a genetically inherited Circle of Willis aneurysm that would similarly take his life at a young age. (PR Appx. at 1229-30, 1074; PCR Pet. Ex. 41 at 45-46; PCR Pet. Ex. 33 at 27; Tr. Mar. 2, 2005 at 120.) Mr. Cruz wanted an MRI done to know if he suffered from this same "condition," but his mother refused and failed entirely to address his concerns of a shortened future. (PR Appx. at 1229, PCR Pet. Ex. 41 at 45; Tr. Mar. 1, 2005 at 115-16.)  Unbeknownst to Mr. Cruz, his father did not die of an aneurysm. Mr. Cruz grew up believing a falsehood about his father's death, one which led him to despair that he would suffer the same fate.

***Drugs to mask the pain***

45.  The events of May 26, 2003, are integrally connected to Mr. Cruz's significant neurocognitive deficits and childhood depression, both of which had gone untreated since childhood. His brain impairments and persistent depression led him down a path of drug addiction, ultimately contributing to the subject offense.

46.  Mr. Cruz turned to drugs to mask the pain of his childhood depression and his impaired brain. This is not an uncommon pattern. Mr. Cruz's life was filled with violence, chaos, dysfunction. He developed psychiatric symptoms that he would "self-medicate." Of course, this was the Montenegro way—really, the way of almost every adult Mr. Cruz was exposed to since the age of twelve. As he shifted from home to home, Mr. Cruz was tutored in the art of drug abuse. It was no accident that Mr. Cruz turned to drugs as his childhood became more and more painful, his

impaired brain only exacerbating the depression.

47. As he moved from home to home, Mr. Cruz was exposed to numerous family members using, and abusing, alcohol and drugs. (PR Appx. at 1210-11, PCR Pet. Ex. 41 at 26-27.) His mother and step-dad were using, as well as his uncles and cousins.

48. From approximately twelve years of age forward, Mr. Cruz observed drug use in the home and was using drugs himself. (PR Appx. at 1225-26, PCR Pet. Ex. 41 at 41-42.) Mr. Cruz began smoking marijuana in middle school. (PR Appx. at 1228, PCR Pet. Ex. 41 at 44.) Mr. Cruz's "'choice' to begin substance abuse was made as a pre-adolescent child with the deficient reasoning and judgment that accompanies that developmental stage, and carrying the legacy of a dysfunctional family context of violence, alcohol abuse, perverse sexuality, and inadequate supervision." (PR Appx. at 1229, PCR Pet. Ex. 41 at 45.) At its most basic, when Mr. Cruz "chose" the path of drugs, he was a child in pain, a child whom not a solitary adult stepped up to care for and nurture.

49. As a teenager, in his maternal grandmother's home, Mr. Cruz was invited into the fold and began partying and abusing drugs with his uncles and other family members. (Tr. Mar. 2, 2005 at 149.) Using drugs, Mr. Cruz belonged, or at least using masked the pain and loneliness that was the constant reminder that he truly did not belong anywhere, to anyone. Cruz was using marijuana and LSD by high school, as well as cocaine, on a near daily basis. (*See* PR Appx. at 1228, 969; PCR Pet. Ex. 41 at 44; PCR Pet. Ex. 28 at 2; Tr. Mar. 2, 2005 at 148.) He also used mushrooms. (Tr. Mar. 2, 2005 at 148.) Mr. Cruz described to his Cousin Irma "peaking" on the LSD, staying on it continuously.

50. Later, he regularly abused ecstasy, mushrooms, LSD and cocaine. (PR Appx. at 1228, PCR Pet. Ex. 41 at 44.) He became an intense crack user by his twenties. (*Id.*) Smoking crack caused Mr. Cruz to be extremely paranoid, so much so that he would not let his girlfriend into the home. (PR Appx. at 969, PCR Pet. Ex. 28

at 2.)

51.  Mr. Cruz followed the path of every adult role model he had been exposed to since his father's death, he abused drugs—extensively. Mr. Cruz's Uncle Henry probably said it best, "I don't think Johnny had a chance at all with everything that he had going on[.]" (PR Appx. at 1021, PCR Pet. Ex. 31at 40.)

52.  The drugs served their purpose—temporarily masking the pain. When Mr. Cruz used drugs, he describes how he felt better, especially when he used acid, ecstasy, opium, weed, meth, or mushrooms. His use was extensive; he recalled sometimes using 20 to 30 sheets of acid at a time. When he felt empty, lonely, or depressed, Mr. Cruz indicated he got high. Mr. Cruz also described trying to fill this void by buying things, like his mother had done for him as a child; it worked for a short time.

53.  In his teen years, deep in depression, Mr. Cruz depicted a pattern of risky behavior that went beyond drug abuse; he took dangerous actions without a care for whether he survived. Mr. Cruz tells how he would ride his motorcycle at excessive speed. Mr. Cruz recalls taking huge amounts of drugs, mixing all kinds of things together.

54.  Despite the depression and drugs, or maybe because of them, Mr. Cruz began trying to find "normal," to be a part of a normal family. Mr. Cruz met Lora Galioto in 1985, when he was fifteen. (Tr. Mar. 3, 2005 at 120.) Lora was Mr. Cruz's first significant girlfriend. Lora became pregnant and the couple moved in together. (Tr. Mar. 3, 2005 at 126.) They lived together off and on for about a year after the couple's son was born in December 1989. (Tr. Mar. 3, 2005 at 120.) But Mr. Cruz was just a teenager, 18-19 years of age and ill-equipped to handle the pressures of the relationship and parenthood; he began using more drugs. (Tr. Mar. 3, 2005 at 126-27.) Drugs ruined the relationship. (Tr. Mar. 3, 2005 at 127, 131.)

55.  Mr. Cruz's described to Dr. Smith that his next relationship was with Crystal Keller. The two have a son together. The couple did not live together and

really did not get along. There was no real semblance of normalcy there.

56. The depression he suffered in childhood never left Mr. Cruz, but followed him into adulthood. (PR Appx. at 1066-69, 1075, 1082; PCR Pet. Ex. 33 at 19-22; 28; 36; Tr. Mar. 2, 2005 at 112.) Mr. Cruz's wife, who spent more than a decade with him, observed Mr. Cruz's depression as an adult firsthand. He was sad and withdrawn. (PR Appx. at 1067, PCR Pet. Ex. 33 at 20.) Mr. Cruz would sleep for days. (PR Appx. at 1076, 1082, PCR Pet. Ex. 33 at 29, 36.) Mr. Cruz spoke of killing himself when he first met his wife Tara, "[h]e knew that he was going to die." (PCR Pet. Ex. 33 at 46.) And, the now-adult Mr. Cruz continued to dull the pain with drugs.

***Almost…***

57. Things changed for Mr. Cruz in the early nineties, when he met Tara White. (PR Appx. at 1049, 1052, PCR Pet. Ex. 33 at 2, 5.) The change was not immediate. But with Tara, Mr. Cruz would fight his addictions, fight for sobriety, until his untreated depression took hold and his world fell apart.

58. Mr. Cruz described to Dr. Smith that Tara was his only serious relationship. The two were together from 1992. The couple moved in together about one and a half years after they met. In 1995, they moved to Ohio and then married in 1996. (PR Appx. at 1050, 1053, PCR Pet. Ex. 33 at 3, 6; Tr. Mar. 2, 2005 at 107.) They had a son in December 2005. (Tr. Mar. 2, 2005 at 108.)

59. Mr. Cruz's addiction and dealing caught up with him shortly after the marriage and he pled guilty to cannabis trafficking in September of 1997, only a few months after he and Tara married. (Tr. Mar. 2, 2005 at 113.) Mr. Cruz went to prison in Illinois on these drug charges. (PR Appx. at 1054, PCR Pet. Ex. 33 at 7.) Prison records reveal he was enrolled in a residential substance abuse program during his incarceration there—and, for the first time, Mr. Cruz saw some success.

60. The couple moved to Zuni, New Mexico upon Mr. Cruz's release from prison in 1999. (PR Appx. at 1056, PCR Pet. Ex. 33 at 9; Tr. Mar. 2, 2005 at 115.)

For the first time since he was 12 years old, Mr. Cruz was drug free and really trying to beat his addictions. He actively participated in the Gateway Foundation program during his incarceration where records reveal he showed "a sincere desire to change his addictive and criminal behavior patterns." And, he was successful for a time. Mr. Cruz was clean the entire time he was in Zuni, about 2 1/2 years. (PR Appx. at 1056, PCR Pet. Ex. 33 at 9) Clean and sober, Mr. Cruz was productive, helping to run the White's family business. (Tr. Mar. 2, 2005 at 116.)

61. Still, his depression remained. (PR Appx. at 1087, PCR Pet. Ex. 33 at 41.) In a police interview, Tara revealed that the depression Mr. Cruz suffered from was an extreme form. Tara had difficulty putting it into words, but indicated Mr. Cruz would lose it, sinking into a deep depression. Mr. Cruz, Tara was clear, was never violent with her. But his depression was debilitating at times. Mr. Cruz kept the blinds and curtains closed. (*Id.*) He would not move; he slept all the time. (*Id.*) Tara described to authorities how Mr. Cruz stayed in his room most of the time. He had mood swings, which would trigger his sleeping for days. (PR Appx. at 1076, PCR Pet. Ex. 33 at 29.) Then, he would be up for days worrying about something trivial. (*Id.*) He would sleep for seventeen hours, get up, eat, and then go back to bed. (*Id.*) Tara described Mr. Cruz to the police as a crazy person at times from the depression, not seeming like himself. He spoke of suicide since the day he and Tara met. (PR Appx. at 1092, PCR Pet. Ex. 33 at 46.) He felt worthless. (*Id.*) Tara also informed the police that she was so concerned that she asked him to see a doctor. But, just as his depression went untreated as a child, it went untreated in adulthood.

***An addiction spiraling out of control***

62. Mr. Cruz's relationship with Tara helped him hold his life together for a period. Despite the depression, he fought hard to control his addictions. But his untreated depression remained. When his relationship began to fall apart, he returned to what he knew—using drugs to dull the pain.

63. After seeing some success in New Mexico, for close to two years—

18

sobriety, responsibility, a job—infidelities in the marriage occurred. (PR Appx. at 1057, PCR Pet. Ex. 33 at 10.) Mr. Cruz recognizes he did not know how to be a faithful husband or father, telling Dr. Smith he did not understand what a healthy family was supposed to be. The pressure Mr. Cruz felt was heavy and after nearly two years of sobriety after his release from prison, he fell back into his addictive habits. (Tr. Mar. 2, 2005 at 130, 132.)

64.   After his marriage fell apart, Mr. Cruz returned to Tucson in mid-2001 to his drug-involved maternal family. He initially lived with his cousin and uncle. Back in Tucson, Mr. Cruz did not just return to his family, but also returned to other old friends—cocaine showed up in his system in June 2001. (Tr. Mar. 2, 2005 at 150; PR Appx. at 1228, PCR Pet. Ex. 41 at 44.) He was using again. Records reveal Mr. Cruz had tested positive the following month, in July 2001—cocaine again.

65. Mr. Cruz admits he had returned to his hold habits and was using cocaine, LSD, mushrooms and ketamine when he returned to Tucson. He describes mixing all of these drugs, as well as drinking. These were the old familiars, the drugs that had gotten Mr. Cruz through his years of depression. There is no question, these were mind altering substances. Mr. Cruz knew he would feel better after using—it took away the depression, the emptiness, the loneliness. While using these old familiar "friends" Mr. Cruz remained himself—Cousin Irma recalls a "very warm, sweet and loving," and sensitive person. Friend Natasha Rose remembers Mr. Cruz as caring and affectionate to his friends. Friend Julia Wheatley describes Mr. Cruz as "calm, wise, funny, protective and understanding."

66.   Friends who observed Mr. Cruz at the time recall that his drug use was extensive, but he was not using methamphetamine. He urged his friends to do the same. He even took in a friend, Julia, and tried to help her get clean from the methamphetamine. He pulled Julia from a meth house, and talked to her for hours about not using. All the while, he struggled with his own addictions; Julia saw that Mr. Cruz  really wanted to be clean and sober and was upset when he fell off and

used.

67.   But then Mr. Cruz began dating Jennifer Morse. It was Morse, in 2001 or 2002, friends and relatives describe as bringing Mr. Cruz into the methamphetamine lifestyle and he began using very heavily. (*See also* ROA 58, Ex. 6 at 14.) And, everything changed. Mr. Cruz succumbed nearly immediately to a methamphetamine addiction that transformed him into someone unrecognizable to his friends and family.

68.   Scott Larabee had known Mr. Cruz for about three years prior to the present offense. Larabee noticed Mr. Cruz changed around 2001 or 2002. Mr. Cruz was jittery and paranoid. Mr. Cruz was disoriented and unable to follow his train of thought. His behavior was bizarre. Larabee began avoiding him when he came into the car dealership where Larabee worked. Mr. Cruz did not used to be this way, he was a normal guy. But, as Mr. Cruz succumbed to methamphetamine, those who knew him before saw the significant change. Larabee saw the depths of the destruction, describing the meth-addicted Mr. Cruz as "nuts."

69.   That significant change Larabee described was evidence of the immediate and powerful effects meth had on Mr. Cruz. Mr. Cruz's reaction to meth was far from typical. He was not like other users according to those around to witness his downfall—his decline and deterioration from the potent substance occurred within a matter of weeks of beginning his use. People noticed a change in Mr. Cruz, including a heightened level of paranoia.

70.   Mr. Cruz's use of methamphetamine was not casual from the outset, but extensive—friends and relatives describe how he would stay up using for days. They noted, the more he used, the more his paranoia increased. He suffered delusions, hallucinations, and lost touch with reality. The "calm, wise, funny, protective, and understanding" man was gone—lost to an addiction to a drug unlike any he had used before. Methamphetamine changed Mr. Cruz.

71.   Mr. Cruz was using methamphetamine heavily, deep into his addiction,

20

but he was conflicted. Mr. Cruz did not enjoy the use. Mr. Cruz described to Dr. Smith how he felt horrible if he did not use methamphetamine and cocaine, but he was agitated, upset, and depressed when he did.

72. His relationship with Morse truly was a turning point; Mr. Cruz was never the same after he started dating her and using methamphetamine. As the relationship continued, his Cousin Albert noted that Mr. Cruz was using more and more methamphetamine. Mr. Cruz's cousin would see Mr. Cruz and Morse using methamphetamine; he would return a few days later to find them still using and not having slept.

73. Morse's former boyfriend, Frank Eppler, was not happy with the relationship between Mr. Cruz and Morse—friends noted he was jealous. Natasha Rose indicated that Eppler drove around with another guy and a gun, looking for Mr. Cruz and Morse. To friends, Eppler appeared obsessed with Mr. Cruz. But, Eppler continued to drop off methamphetamine to Morse, and they renewed their sexual relationship.

74. Compounded with Mr. Cruz's methamphetamine use, friends noticed this situation with Eppler and Morse only increased Mr. Cruz's emotional distress and paranoia. Friend Julia Wheatley observed that Mr. Cruz slept a lot and would stay in his room for days at a time. His depression was tinged with an obsession over Morse. His cousin found Mr. Cruz in his home in 2002, crying over Morse and with a gun to his own head.

75. Cousin Albert noted significant impairments that Mr. Cruz suffered as a result of his heavy methamphetamine usage around this time. Mr. Cruz experienced blackouts and memory difficulties. His paranoia grew during this time period, and he seemed increasingly out of touch with reality. Mr. Cruz went so far as to place cameras outside of his home. Mr. Cruz's cousin recalled an incident where he claimed that someone was outside waiting for him. This was in the broad daylight, and no one was there. His cousin played a joke on him, going outside and pretending

he was being pulled behind a dumpster; Mr. Cruz "came flying out of the house thinking [he] was being attacked."

76.  This volatile situation culminated in a July 2002 struggle during which Eppler was shot and Morse was allegedly kidnapped. Mr. Cruz had been using methamphetamine with Jeremiah Johnson about a week prior to the incident; Johnson reports that each man consumed staggering amounts of methamphetamine—about two ounces of methamphetamine a day during that period. Neither man slept.

77.  Johnson recalls the day, describing how Mr. Cruz fell apart after the shooting. Morse came out of Eppler's home after the shooting and Mr. Cruz put her in the car with himself and Mr. Johnson. Mr. Cruz's behavior became more erratic. He held a gun to his head and threatened to kill himself and Morse. He seemed out of touch with reality. Johnson thought he was going to kill himself, but he was able to talk Mr. Cruz into giving up the gun. Mr. Cruz was delirious and unable to drive because he had been up for days at this point. Mr. Cruz remained angry, continued to cry and shake.

78.  Mr. Cruz was arrested shortly thereafter in July 2002 on attempted murder and other charges. He was represented by Brick Storts and Mr. Cruz was incarcerated during the pendency of the Eppler case.  The charges were ultimately dismissed in February, 2002, as evidence of self-defense surfaced.

***Events leading up to the offense***

79.  Mr. Cruz soon faced a federal weapons charge related to the Eppler case, but in March of 2002, Mr. Cruz's family bonded him out.

80.  Once back on the streets, Mr. Cruz was still being stalked. Just weeks before Officer Hardesty's death, someone shot at Mr. Cruz from the end of the driveway with a machine-type gun. (Tr. Mar. 4, 2005 at 7-8.) Mr. Cruz was scared for his life, the witness to the shooting indicated. Roughly three days later, another shooting was directed at Mr. Cruz, this time with a handgun. (Tr. Mar. 4, 2005 at

10.)

81. Mr. Cruz described to Dr. Smith how these events kicked him into survival mode. Cousin Albert, in regular contact with Mr. Cruz, observed that Mr. Cruz was using methamphetamine and cocaine almost constantly between March and May 2003. Mr. Cruz smoked methamphetamine during the day and then used the cocaine at night to allow him to stay awake for long periods of time. Mr. Cruz recalled being terrified, afraid to go to sleep.

82. The shootings would only increase Mr. Cruz's paranoia. Friends noticed a change, Mr. Cruz felt like someone was out to get him. And, friend Natasaha Rose recalls that Mr. Cruz's level of paranoia was not the normal paranoia associated with methamphetamine use; he would hallucinate and suffer from delusions that people were out to get him. Of course, the two shootings were evidence to the paranoid Mr. Cruz that the threats he faced were real.

83. His family observed his deterioration in those final days preceding Officer Hardesty's death. Mr. Cruz was using meth and cocaine almost constantly, mixing the two mind-altering substances. Mr. Cruz's cousin, Albert, saw him every few days—his lack of sleep, extreme paranoia, and heavy meth use was apparent.

84. Mr. Cruz showed up on his aunt's doorstep one late evening in May. (PR Appx. at 1121, PCR Pet. Ex. 36 at 2.) Mr. Cruz was limping, and his face was bruised. (PR Appx. at 1121-22, PCR Pet. Ex. 36 at 2-3; Tr. Mar. 2, 2005 at 96.) His aunt recalls him as upset and agitated. Mr. Cruz's behavior was out of character from his aunt's prior observations; he seemed to be like he was out of touch with reality. He also appeared sad, depressed, and withdrawn. (Tr. Mar. 2, 2005 at 95.) To his Aunt Romelia, it seemed he had come to say goodbye. (PR Appx. at 1122, PCR Pet. Ex. 36 at 3.) Just a day or so before the shooting, Mr. Cruz became so paranoid, that he refused to tell his cousin where he was, even as he asked for him to pick him up.

*May 25-26, 2003*

85.  As May 25, 2003 approached, Mr. Cruz was abusing extensive quantities of methamphetamine. He had been up for weeks. His paranoia, already enhanced by use of meth, was amplified exponentially by two shootings and his resultant fear. Entering that holiday weekend, Mr. Cruz presented as sleep-deprived and paranoid, and he was dumping significant quantities of mind-altering substances on his already impaired brain.

86.  Mr. Cruz encountered another meth user, Myra Moore, the evening before Officer Hardesty's death. The couple stayed up all night, drinking and using methamphetamine. (Tr. Feb. 3, 2005 at 246; Tr. Feb. 4, 2005 at 54.) The drug toxicology performed on Mr. Cruz following his arrest confirms Moore's version of events: Mr. Cruz tested positive for both cocaine and amphetamines.

87.  The morning of May 26, Mr. Cruz was involved in a traffic accident from which he fled. Officers Patrick Hardesty and Benjamin Waters came to Moore's apartment investigating the crash. Mr. Cruz fled the apartment, and the officers pursued, Officer Hardesty on foot. In that fateful moment, Mr. Cruz— neurocognitive deficits already intensified by weeks of sleep deprivation and extensive methamphetamine use only hours earlier—shot and killed Officer Patrick Hardesty.

88.  Mr. Cruz's neurocognitive deficits, exacerbated as they were by drugs and a lack of sleep, primed Mr. Cruz for difficulty encoding the events of May 26. Mr. Cruz was robbed of a clear recall of the car accident and the events that resulted in Officer Hardesty's death. With no memory of the offense, Mr. Cruz wanted to believe that he did not kill Officer Hardesty.

89.  Away from the drugs, and presented with the compelling nature of the state's case for guilt, Mr. Cruz now accepts that there is no other explanation save that he shot and killed Officer Patrick Hardesty that fateful day in May 2003. And, clean from methamphetamine for more than decade, Mr. Cruz has returned to

himself. He feels the weight of his actions, the pain he caused to his own family and especially to Officer Hardesty's family. In a single moment, he says, it is like he killed them all. He carries the heavy burden of his own belief that there are no amends he can make, that accepting responsibility and apologizing for the life he took from Officer Patrick Hardesty, simply is not enough.

**B. Case History Allegations.[3]**

    **1)    The Offense**

90.  The Arizona Supreme Court provided the following summary of the facts sustaining the verdict:

> On May 26, 2003, Tucson Police Officers Patrick Hardesty and Benjamin Waters responded to a hit-and-run accident. The investigation led the officers to a nearby apartment. The apartment was occupied by two women and Appellant Cruz, who fit the description of the hit-and-run driver. The officers asked Cruz to step outside and identify himself. Cruz said he was "Frank White." Officer Hardesty contacted police dispatch to verify the identity and was told that no Frank White with the birthdate given by Cruz was licensed in Arizona. Hardesty asked Cruz for identification and Cruz replied that he had left it in the car.

> As Hardesty and Cruz approached the car, Cruz leaned in as if retrieving something, then "took off running." Officer Hardesty chased Cruz on foot, while Waters drove his patrol car around the block in an attempt to cut Cruz off.

> When Waters turned the corner, he saw Cruz throw a gun on the ground. Officer Hardesty was nowhere in sight. Waters radioed Hardesty that Cruz had a gun, then got out of his car and drew his service weapon on Cruz, who stated, "Just do it.... Just go ahead and

---

[3] The case history includes a summary of the procedural history but it also includes allegations concerning the work product and case-related activities of Mr. Cruz's trial counsel, which will be relevant to one or more of Mr. Cruz's claims that he was denied his Sixth Amendment right to the effective assistance of counsel.

kill me now. Kill me now. Just get it over with." Waters apprehended Cruz after a brief struggle.

Officer Hardesty's body was discovered immediately. He had been shot five times: Two bullets were stopped by his protective vest, two bullets entered his abdomen below the vest, and a fifth bullet entered his left eye, killing him almost instantly. Four of the five shots were fired from no more than twelve inches away.

The handgun thrown down by Cruz, a .38 caliber Taurus revolver, holds five cartridges. All five cartridges had been fired, and forensic examiners determined that the five slugs recovered from Hardesty's body and vest were fired from that Taurus revolver. Five unfired .38 cartridges that matched the cartridges fired from the Taurus were found in Cruz's pocket when he was apprehended.

*State v. Cruz,* 181 P.3d 196, 202-03 (2008).   Later, at the terminus of the state postconviction proceedings, the state postconviction court found that there was "absolutely no doubt that defendant killed Police Officer Patrick Hardesty" and that "the evidence [of guilt] presented at trial was insurmountable."  (PCR Min. Entry, Jan. 12, 2012 at 3, 11.)

### 2)    What the Prosecution and Mr. Cruz's counsel learned about Mr. Cruz in the immediate aftermath of the offense.

91.   Once Mr. Cruz was arrested, he reported chest pain, and paramedics from the Tucson Fire Department were called to respond. One of the responders, Rand Tavel, described Cruz as rambling about being beaten up in the desert the day prior and saying that a man named Arturo Sandoval, who was forcing him to do things, had killed the police officer. (Rand Tavel Interview Trial Defense Exhibit FO May 26, 2003 at 2-3; Tr. Feb. 18, 2005 at 67.) Tavel described Mr. Cruz as very agitated, talking incessantly, constantly, non-stop, and unable to hold still or stop fidgeting. (Rand Tavel Interview Trial Defense Exhibit FP Nov. 12, 2004 at 12, 13, 14, 25, 26; Tr. Feb. 18, 2005 at 68.) Tavel transported Mr. Cruz to Tucson Heart Hospital for further evaluation. (*Id.* at 10.) Officer Michael Merrill spent two hours with Mr.

Cruz at Tucson Heart Hospital. He said Mr. Cruz denied doing the shooting and described Cruz as "just so hard to understand . . . he wouldn't focus on anything . . . he kept rolling his eyes back."  (Michael Merrill Interview May 26, 2003 at 3-5.) Another officer, Wayne Inman, also observed Mr. Cruz at Tucson Heart Hospital; he described Cruz's speech as incoherent and noted that Mr. Cruz's answers to questions were not understandable.  (Report of Officer Inman dated May 27, 2003 at 2-3; Tr. Feb. 4, 2005 at 74-75.) Later, when Officer Russell Pope transported Mr. Cruz from the hospital to the Tucson Police Department, Mr. Cruz related he did not remember what happened. Mr. Cruz tested positive for both cocaine and amphetamines at Tucson Heart Hospital.

92.  In the immediate aftermath of the offense, Tucson police detectives reported on their discovery of several witnesses who had relevant knowledge of Mr. Cruz's deteriorating mental state in light of his addiction to methamphetamines. On May 27, 2003, Scott Larrabee, a used car dealer whom Mr. Cruz knew, reported that before Mr. Cruz began using meth, he had been a normal guy. However, the last time Larrabee had seen him, not long before the offense, Mr. Cruz was using crystal meth and was disoriented, acting bizarre and not able to follow a train of thought. Larrabee was puzzled about the utter transformation of Mr. Cruz's behavior after he started using meth; he thought Mr. Cruz had gone "nuts."

93.  Also on May 27, police detectives interviewed Mr. Cruz's wife, Tara White. Ms. White reported that Mr. Cruz suffered from depression, but not normal depression. She said his depression turned him into a crazy person; that his depression took him overboard, causing Mr. Cruz to lose it. She said that despite all of this, Mr. Cruz was a good person who had never been violent with her.  Mr. Cruz's underlying character (before his recent meth addiction) is notable for lack of aggression, hostility or violence.

94.  On June 4, 2003 police detectives also interviewed Jennifer Morse. As explained below, it was through his relationship with Ms. Morse that Mr. Cruz

developed his serious addiction to methamphetamines about a year prior to the subject offense.  During her June 4 police interview, Morse corroborated what Ms. White had said about Mr. Cruz's serious depression, when she warned that Mr. Cruz was fully capable of killing himself. Ms. Morse also informed police that Mr. Cruz had been using meth, which she said left him in a state of paranoia; she also told police that she had always thought Mr. Cruz was "not all there."

95. Meanwhile Pima County Jail detention officers and mental health professionals began recording their own observations of Mr. Cruz. On June 6, 2003, a mental health evaluator at the jail noted that Mr. Cruz had just awakened from a long sleep just 3 days prior, meaning that Cruz had slept from May 27-June 3.  Mr. Cruz did not know the year when asked by the evaluator.  Mr. Cruz also reported a number of prior head injuries with loss of consciousness, he described his depression, and he reported feelings of hopelessness during the last 2 1/2 years. Several days later, a mental health examiner reported that Mr. Cruz was reporting symptoms of depression and describing seeing shadow people and hearing voices. The examiner also documented Mr. Cruz's report that there was a contract out on him. The examiner's assessment concluded with the finding that Mr. Cruz suffered from a mood disorder (commonly understood to signify clinical depression) and noted the possibility of dysfunction in the temporal lobe of Mr. Cruz's brain. The evaluator placed Mr. Cruz on Tegretol (a drug with anti-psychotic properties used for treatment of seizure disorders and bipolar disorder) and Zoloft, an anti-depressant.

96. Just a few weeks later, Mr. Cruz had a telephone call with a friend described in the record transcript as a person named Cletus.  During the recorded phone call (the transcript of which was provided to Mr. Cruz's trial counsel), Mr. Cruz was heard to deny shooting the police officer, but he was quick to report he had no memory of the crime:

> I don't remember – like somethin' happened to my head.  I have a big ol' mark on my head too.  I was like tripping real bad . . . you know, I don't remember anything bro.  I don't remember what the fuck happened.  I don't even remember being in the car accident, bro.  I don't know.  It's just that they said I was in an accident and fuckin' I don't know.

97.  In a follow-up conversation that police detectives had with Mr. Cruz's wife, Ms. White, on July 29, 2003, she amplified on the level of his depression, noting that he would stay in his room all of the time and that his mother was trying to get him to seek treatment and medication. The detectives also learned and documented in their reports that Mr. Cruz's mother had told them that his depression dated back into his childhood. In their July 29 meeting with Ms. White, the detectives shared with her the clear evidence they had compiled: that Mr. Cruz's life swirled out of control after he became addicted to methamphetamines.

### 3)   Pre-trial and pre-sentencing proceedings and related defense counsel activities.

98.   On June 5, 2003, Mr. Cruz was charged by indictment with first degree murder of a police officer pursuant to A.R.S. § 13-1105(A)(3). On July 21, 2003, the state filed a notice of intent to seek the death penalty, citing the murder of a police officer as the sole death eligibility aggravating circumstance, under A.R.S. § 13-703(F)(10).  Initially, the Pima County Public Defender was appointed to represent Mr. Cruz. However, on July 29, 2003, the Public Defender filed a motion to withdraw citing Mr. Cruz's dissatisfaction and his desire that attorney Brick Storts be appointed to represent him.[4] (ROA 33.) Mr. Cruz would report to Mr. Storts that the Public Defenders had never visited with him at the Pima County jail; but the visitor logs associated with Mr. Cruz's detention demonstrate this was another

---

[4] As explained above, Mr. Storts had represented Mr. Cruz in connection with the Frank Eppler episode.  The criminal charges associated with that matter were dismissed a few months before the instant offense.

example of Mr. Cruz's impaired memory.

99.     During a hearing on August 3, 2003, the state court judge (Honorable Patricia Escher) granted the Public Defender's motion to withdraw, and she appointed Brick Storts and David Basham to represent Mr. Cruz. (ROA 36.) However, there was an admonition. Judge Escher indicated that after much thought, she had recently decided that in all capital cases she "ha[d] an affirmative obligation to ensure that the defendant is receiving appropriate representation consistent with the American Bar Association Guidelines, Rule 6, and Wiggins versus Smith." (Tr. Aug. 4, 2003, at 9.) Judge Escher referenced Guideline 6 of the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February 2003 (the "ABA Guidelines").[5] That Guideline emphasizes the critical role of the court in the monitoring of counsel's performance to ensure that counsel "provide each client with high quality legal representation in accordance with [the] Guidelines." 31 Hofstra L. Rev. 913, 965 (2003). The commentary to Guideline 6 also provides that the courts should monitor counsel's performance in accordance with Guideline 7.1, which in turn provides that the court should intervene when "there is evidence that an attorney is not providing high quality legal representation." *Id.* at 969-70.

100.   As noted, in addition to her reference to the ABA Guidelines, Judge Escher made reference to *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the United States Supreme Court found counsel's performance during the sentencing stage of a death penalty case to be deficient under *Strickland v. Washington*, 466 U.S. 668 (1984), when counsel's investigation for mitigation evidence "did not reflect reasonable professional judgment" and was "not consistent with professional standards" or the ABA guidelines.   *Wiggins*, 539 U.S. at 533-34. The Court

---

[5] The full compendium of the ABA Guidelines is contained in 31 Hofstra L. Rev. 913 (2003).  All further citations will be to the Hofstra compendium.

emphasized in *Wiggins* that its decision rested on *Strickland*'s "limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* at 533 (quoting *Strickland*, 466 U.S. at 690-91).

101.   After citing her perceived responsibilities under the ABA Guidelines and counsel's investigative duties under *Wiggins*, Judge Escher went on to inform Mr. Storts and Mr. Basham that she would "periodically be making inquiries to counsel . . . to [ensure their] familiarity with the guidelines [and whether counsel had] done sufficient investigation to assure [their decisions were] consistent with these guidelines." (Tr. Aug. 4, 2003 at 9.) Mr. Storts responded with assurances that he had received some 8-10 hours of training on the ABA Guidelines and that he received a copy of the Guidelines when he signed his Pima County indigent defense contract. (*Id.* at 10-11.) Parenthetically, the Pima County indigent defense contract in capital cases required that counsel's professional services conform to the performance standards in the noted ABA Guidelines. There is no question in this case but that trial counsel understood that the *constitutional* adequacy of their performance would eventually be measured against the prevailing national professional norms articulated in the ABA Guidelines.

102.   In the week following the August 4 hearing, on August 11, Mr. Storts filed a copy of the ABA Guidelines with the court, affirming that he, co-counsel David Basham, and paralegal/attorney Ian Tomlinson had all reviewed the Guidelines and would comply with them.  (ROA 40.) As explained below, the promise to "comply" with the Guidelines would be honored in the breach. In the same submission, Mr. Storts also assured the Court, "Counsel for the Defendant avows that the defense team presently in place representing the Defendant in the instant case meets all of the qualifications as specified in the [ABA] Guidelines,

1  with the exception of obtaining of a mitigation expert to be a member of the defense
2  team. *Counsel for the Defendant will examine the propriety of obtaining a*
3  *mitigation expert* to be involved in the representation of the defendant at such time
4  as same becomes necessary and/or appropriate." (*Id.*) (Italics added.) Mr. Storts'
5  expressed reservation with respect to "the propriety of obtaining a mitigation
6  expert" was itself contrary to ABA Guideline 10.4.C, which provides that lead
7  counsel should assemble a defense team, including "at least one mitigation
8  specialist . . . [a]s soon as possible . . . ." During a hearing on August 22, 2003, Mr.
9  Storts told the trial court that he filed the August 11 avowal that the defense team
10 was qualified and would comply with the ABA Guidelines in response to an article
11 in the Tucson Citizen newspaper that suggested the team was unqualified. (Tr. Aug.
12 22, 2003 at 3.)

13      103.   Despite his clearly expressed reservations about associating with a
14 mitigation specialist, on August 28, 2003, trial counsel filed a Motion for
15 Appointment of Mitigation Specialist, citing the ABA Guidelines in support of his
16 request. (ROA 48.)   On September 3, 2003, Caryn Caramella of the Pima County
17 Office of Court Appointed Counsel e-mailed David Basham to provide the names
18 and phone numbers of seven possible mitigation specialists, noting that she could
19 provide more names if these did not work out. The list included Mary Durand, but
20 Ms. Caramella noted that she did not think Ms. Durand "particularly likes Indigent
21 Defense because of our budget issues." Trial counsel called her anyway. In response,
22 Ms. Durand wrote to Mr. Storts on September 8, 2003, and enclosed a boiler-plate
23 declaration summarizing what she thought would be required. She promised to "put
24 together the mitigation team" if she were appointed. On September 9, 2003, Mr.
25 Storts reported to Ms. Caramella that they planned "to use Mary Durand as our
26 mitigation expert."

27      104.   On September 25, 2003, the defense lawyers filed a Motion to Nominate
28 Mitigation Specialist with a declaration from Ms. Durand attached. (ROA 76.) In her

declaration, Ms. Durand indicated that the case would require "up to 1500 hours," but without knowing anything about what such investigation would require, Mr. Storts advised the Court, "[t]hese hours obviously are estimates and naturally the defense team will work to minimize the hours and still supply the Defendant with complete, adequate and proper representation." (*Id.*)

105.   As of early October 2003, the defense team lacked the services of a mitigation specialist and no investigation for sentencing had commenced. Therefore, it would have been literally still unknown what needed to be investigated for sentencing purposes, how long such investigation would take, or what additional investigations might need to be done in light of Judge Escher's citation to *Wiggins*' admonishment that "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 533 (internal quotations and citations omitted).

106.   Nevertheless, without any supporting evidence with respect to the demands of the yet-to-begin mitigation investigation, or the time that would be necessary to complete such effort, Mr. Storts was concentrated on getting the case to trial as quickly as possible. This rush-to-trial strategy was playing out in a setting where Mr. Cruz was seen running away from the scene of Officer Hardesty's fatally wounded body, and then dropping the murder weapon right before Officer Waters' eyes, under circumstances where, in the words of the state court trial judge, "there [was] absolutely no doubt that [Mr. Cruz] killed Officer Hardesty on May 26, 2003" and the evidence against Mr. Cruz "was insurmountable." (PCR Order, Oct. 31, 2012 at 3.)  In other words, the rush to trial was occurring in a context where Mr. Cruz was going to be found guilty, and the only question would be whether Mr. Cruz was deserving of a life or death sentence.  Mr. Cruz's fate would ultimately rest on the outcome of the sentencing proceedings.

107.   If Mr. Cruz *agreed* with defense counsel's recommended strategy to impose trial deadlines in a context where the sentencing phase would be crucial, there

33

is no evidence that Mr. Cruz's decision-making was *informed* by counsel's advice with respect to the extraordinary risks to the sentencing outcome caused by rushing to trial without a full and complete sentencing investigation in a case where there was insurmountable evidence of guilt. As explained below, Mr. Cruz never received any advice from his counsel with respect to such risks to the speedy trial strategy.

108.   At a hearing on October 6, 2003, Mr. Storts urged the Court to change venue, in which case the defense "could have it ready to go to trial in the middle to late summer." Despite not knowing what the forthcoming sentencing investigation would involve or demand, Mr. Storts said "[t]hat's a realistic plan." (Tr. Oct. 6, 2003 at 9.) He said that Ms. Durand would be in Tucson the following week "with the entire file. She'll make copies of that and she'll be able to begin putting the package [together] as far as the sentencing phase of it." (*Id.*) Mr. Storts also advised the court that he had largely abdicated his role in the sentencing phase and that Mr. Basham would deal with sentencing "if we have to come to that. My job is going to be the actual trial itself." (*Id.*) Mr. Storts defined the "actual trial" very simply:  "The only real issue in the instant case . . . is the perpetrator's identity." (ROA 150 at 3.) As emphasized below, the "real issue" in the case was permanently miscast in an objectively unreasonable manner. The identity of the perpetrator was not a legitimate issue and never would be.

109.   Meanwhile a Pima County Jail mental health record dated September 30, 2003 reported that Mr. Cruz was having auditory and visual hallucinations and that a medication called Geodon (used to treat schizophrenia and bipolar disorder) was making the hallucinations worse than they were before he took this medication. On the same date a preliminary IQ screening report completed by Dr. Thomas Fischer revealed that Mr. Cruz had cognitive deficits particularly in the area of processing.

110.  On October 9, 2003, Mr. Storts filed and therefore endorsed the substance of another Declaration of Mary Durand, where Ms. Durand explained the

standard of care for mitigation investigation in capital cases and estimated it would require 1,500 hours to meet this standard in Mr. Cruz's case. (ROA 88.) Based on multiple decades of experience, Ms. Durand estimated that it would take no less than 200 hours to "interview, review and consult with the client," Mr. Cruz, and 500 hours to "identify, locate and interview lay and expert witnesses . . . ." (*Id.*) Mr. Storts expressed no contemporaneous disagreement with the mitigation investigation standards spelled out in Ms. Durand's Declaration, or the time requirements to fulfill them.

111.   On October 27, Judge Escher finally approved the appointment of Ms. Durand and authorized her (and her assistants) to begin the first 800 hours of mitigation investigation. (ROA 109; Tr. Oct. 27, 2003 at 3, 5-6.) As matters stood, little or no mitigation investigation had ensued by the end of October 2003, some 5 months into the proceedings.

112.   Nevertheless on October 27, 2003, the court conducted a pre-trial conference, where among other things, the scheduling of a trial date would be discussed.  (Tr. Oct. 27, 2003.)  During the hearing, Mr. Storts revealed something about his level of understanding about mitigation in capital cases.[6]  Although no mitigation investigation had begun, and the needed scope of such investigation remained completely unknown, Mr. Storts told the court that Ms. Durand would not be allowed to get as much time as she said she needed; "it isn't going to happen." (*Id*. at 18.)  He discussed the proposed mitigation investigation as though it was simply to be delegated:

> I'd like to tell the Court I understand all we're doing on this mitigation business. Sounds to me like these other folks over here know one heck of a lot more about it than I do. But I'm, I'm not sure

_____

[6] As explained below, prior to Mr. Cruz's case, Mr. Storts had <u>never</u> participated in a capital sentencing proceeding before a judge or jury.  Mr. Cruz's case is the first and last case where Mr. Storts had actual experience in a capital sentencing proceeding.

how we begin to start disclosure [of mitigation], what we're going to be doing. The mitigation people – till their mitigation expert tells us exactly what we, where they're going and what they're doing, what I am doing in that regard, I will ask probably for a little extra time in that to decide what we're disclosing or not disclosing, but that's my only problem with that.

(*Id.* at 16-17.)

113.   With Mr. Storts' encouragement, the court set a five-week jury trial to begin on September 7, 2004. (ROA 109 at 2). The court authorized the services of Ms. Durand "for 300 hours at the rate of $75.00 per hour with leave to request additional time" plus 500 hours for an assistant at $25.00 per hour, also with leave to request additional time. (*Id.* at 1.) Mr. Storts forwarded the Minute Entry to Ms. Durand on November 1. Three days later, he sent her another letter, enclosing the same Minute Entry, but commenting, "You do need to get moving as the trial date of September 7, 2004, will be here before we know it" and emphasizing that he had uncompromisingly settled on a timetable without knowing what the mitigation investigation would entail, he issued his edict, stating: "*I will be going to trial on that date.*" (italics added.)

114.   On December 16, 2003, mental health notes in the Pima County Jail records indicate that Mr. Cruz still reports hearing voices and seeing shadows; his mood is described as depressed, and he has hypersomnia.

115.   In January 2004, Mr. Storts learned that there had been a hung jury in a capital sentencing proceeding involving the shooting of a police officer, where the defendant was methamphetamine intoxicated.  Mr. Storts directed Ian Tomlinson, one of the attorneys in his office, to contact John Schaus, the defense attorney in the Pinal County case to inquire about that case, which had obvious similarities to Mr. Cruz's case. Tomlinson discussed the case with Schaus and reported back to Mr. Storts that the case indeed involved a police shooting that was meth related. Schaus attributed the successful outcome in the sentencing phase to a strategy that

36

humanized the defendant during the guilt and sentencing phases of the proceedings and their ability to present a lot of mitigation related evidence during the guilt phase of the proceedings.

116.   What Mr. Schaus described to Mr. Tomlinson was a classic application of an integrated defense in a death penalty proceeding; a procedure that is repeatedly emphasized in the ABA Guidelines as fundamental to heightening the probability for a life-saving sentencing outcome. Guideline 10.10.1 provides that ". . . trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." 31 Hofstra L. Rev. at 1047.  The commentary to Guideline 10.11 similarly provides that:

> During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime.[7]

*Id.* at 1059.  Mr. Schaus ultimately obtained a second hung jury and his client, Neven James Garcia, is serving a life without parole sentence rather than a death sentence.[8]

---

[7] The commentary to ABA Guideline 4.1 also emphasizes that the mitigation specialist plays a critical role in this process and "insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case . . . ." 31 Hofstra L. Rev. at 959. And see commentary to Guideline 1.1 remonstrating that a sentencing presentation in a capital case will not be "persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) links the evidence offered in mitigation to the specific circumstances of the client."

[8] *State v. Garcia*, No. S-1100-CR-200100510 (Pinal Sup. Ct. 2004).

117.   Meanwhile on January 21, 2004, Judge Escher was reassigned to duties at the Juvenile Court, and Mr. Cruz's case was reassigned to the Honorable Ted Borek. On February 2, 2004, the court conducted another pre-trial conference to address disclosure of mitigation. (Tr. Feb. 2, 2004.)   During this hearing, although the mitigation-gathering tasks had only recently begun and Ms. Durand had represented in her Declaration, (ROA 88), that a minimum of 500 hours would need to be expended to locate and interview potential sources of mitigation information, and an additional 200 hours would be needed to interview and work personally with Mr. Cruz, Mr. Storts noted apologetically that he had not yet disclosed the mitigation witnesses to the prosecutor.  He stated, " . . . I still need time on that, because I haven't gotten anything really definitive back from my mitigation expert, *quote, unquote*, Ms. Mary Durand." (Tr. Feb. 2, 2004 at 26-27) (italics added). Despite the fact that Ms. Durand had <u>not</u> communicated that she could be prepared to meet a hastily established deadline, at Mr. Storts' request, the court ordered the defense to "provide the mitigation report to the prosecutor not later than April 30, 2004." (ROA 172 at 3.)

118.   On February 5, 2004, Ms. Durand submitted her first bill, covering 46.6 hours of her own time (at $75.00 per hour) and 49.6 hours of her assistant, Linda Fergus, who gathered life-history records at $25.00 per hour. No witnesses had been interviewed. Not surprisingly, Mr. Storts sent a memo to co-counsel David Basham and his paralegal Ian Tomlinson on February 10, 2004, seeking their comments on Ms. Durand's bill: "Frankly, I am inclined to believe I have to sign the bill but I would like your thoughts on this as there does not seem to be any end or results to date."

119.   On February 16, 2004, Ms. Durand e-mailed Caryn Caramella and copied Mr. Basham.  Ms. Durand was about to meet with trial counsel, but she offered in advance her idiosyncratic excuse for not contacting any witnesses:

> As to discovery being turned over to the prosecutor by April, I am prepared to testify that's not possible, nor practical. We cannot give up what we don't have and we don't even have all the records yet. The

38

> records are the baseline for mitigation investigation. Once we have all
> the records, we locate and interview family members and key
> informants. Once that's done, we can select experts that are appropriate
> to the case and attendant issues. Once the experts are on board and have
> reviewed the social history and have made their evaluations, we will
> know who and what we are going to present to the prosecutor. To do it
> otherwise is, in my opinion, not constitutionally competent. If this is a
> problem, we need to address it right now.

Ms. Durand advised that she wanted to educate the judge and the prosecutor about "what real competent mitigation is."

120.   On March 22, 2004, the court held a hearing on defense motions to dismiss the death penalty. Mr. Storts eventually turned to the April 30 deadline for disclosure of mitigation to the prosecution and vented his frustration: "The practical problem we're having is with the mitigation expert. And in one sense, it's like trying to herd a school of jellyfish. I can't seem to get anybody tied down to tell us exactly, you know, what it is we are waiting on to get presented, and I would hope to have some further information. In fact, I will have some further information for the Court at the hearing on April 26th." (Tr. Mar. 22, 2004 at 40.)  Mr. Storts then suggested having Ms. Durand present "to possibly give the Court and counsel the benefits of where it is we are as far as what we're accomplishing with the mitigation work." (*Id.*) Mr. Storts indicated that Mr. Basham was also frustrated, but he blamed everything not on Ms. Durand but on the standards that forced them to work with a mitigation specialist in the first place: "Then we're also in the Catch-22 that the ABA says we have to have one. So if we have to have – we have to, we've got one. Now we've got to get the one we got to do what it is she does to proceed today with the case." (*Id.* at 41.) The Court agreed that it would be good to hear from Ms. Durand directly at the April 26 hearing. (*Id.*)

121.   Before the April 26 hearing, on April 19, 2004, trial counsel filed a Motion Re: Notification of Speedy Trial Rights. (ROA 206.) This motion joined Mr. Cruz's speedy trial rights (i.e., Mr. Cruz's right to a trial prior to December 14, 2004

under Rule 8.2, Arizona Rules of Criminal Procedure) with his change of venue motion, while simultaneously seeking a continuance of the trial date from September 7 to mid-October in order to have "all of the required mitigation testimony" available. As trial counsel explained, "The principle [sic] reason is the Defendant is putting the court on notice, as to his speedy trial rights, is that, if the trial commences on October 18, 2004, and a fair and impartial Pima County jury cannot be seated, the Defendant will expect the State to be able to commence the trial in another jurisdiction, on or before December 14, 2004."[9]  (*Id.*)

122.   After the aforementioned April 19, 2004 Notification of Speedy Trial Rights was filed, two days later on April 21, 2004, trial counsel filed a Motion to Continue Trial seeking to move the September 7 trial date to October 18, 2004.

---

[9] As explained below, counsel's designed strategy to leverage Mr. Cruz's speedy trial rights to further support the change of venue motion was ill-conceived and objectively unreasonable under prevailing professional norms for a variety of reasons. First, there was no factual basis to support a belief that pre-trial publicity in Mr. Cruz's case was such that a jury could not be selected from a venire population of nearly 1,000,000 people; but really, that is beside the point. Advising Mr. Cruz to insist on his speedy trial rights to support a change of venue application was an empty threat for the simple reason that even if a fair and impartial jury could not be seated in Pima County, and for that reason his speedy trial time limit rights expired before the trial could be moved to another county, then at best Mr. Cruz could hope to earn the right to a dismissal <u>without</u> <u>prejudice</u> under Rule 8.6 of the Arizona Rules of Criminal Procedure. No court would dismiss <u>with</u> <u>prejudice</u> Mr. Cruz's first degree murder capital case for the killing of officer Hardesty, were the court not able to seat a jury on the first occasion to do so. Thus any impairment to Mr. Cruz's speedy trial rights would have resulted in nothing more than his re-indictment; an outcome that would provide no benefit to him. What is more, moving the case out of Pima County would not solve an inestimable problem: there was insurmountable evidence of Mr. Cruz's guilt. Ultimately, among the questions presented below is this: whether counsel's "speedy trial" strategy – which could provide no measurable benefit to Mr. Cruz under any circumstances – contributed to counsel's lack of adequate preparation and to their constitutionally inadequate performance during the capital sentencing proceedings. We will demonstrate below that it did.

40

(ROA 207.) Trial counsel explained that he needed more time to investigate and develop mitigation:

> "Defendant will need additional time to obtain the necessary mitigation data, experts and information. Counsel for the Defendant has not been able to obtain this information, as quickly as hoped. Counsel for the Defendant is moving forward, however, with the mitigation investigation, but is not yet in a position to obtain all the appropriate material and/or supply the State a list of mitigation witnesses for the sentencing phase, if required of Defendant's trial. The Defendant anticipates being in a position to supply the majority of the mitigation information and witnesses to the State on or before June 18, 2004.

123.   In their Reply in Support of the Motion to Continue Trial, trial counsel clarified that although they sought the continuance to fulfill their responsibilities under *Wiggins*, they would not waive speedy trial rights in the event that the change of venue motion was denied. Trial counsel stated their belief that the Court should not be able to change venue later if it was unable to find a fair jury in Pima County.[10] (ROA 214.)  Thus, while giving lip service to their constitutional duty to thoroughly investigate mitigation conformant to *Wiggins*, trial counsel also signaled that their "speedy trial - change of venue strategy" would trump everything and anything. This was given paramount importance even though Cruz's insistence on his Rule 8 speedy trial rights could have no tangible benefit to him.[11]

---

[10] Of course, as explained above, Mr. Cruz's speedy trial rights would not prevent a later change of venue; for even if his Rule 8 speedy trial rights were violated, he could and would be reindicted.

[11] All the while, as we explain below, there is no evidence that Mr. Cruz had an informed understanding of the risks of counsel's speedy trial strategy; particularly in terms of how it would thwart the necessary, thorough investigation and development of mitigation. And to be clear: trial counsel never explained the risks of the strategy to Mr. Cruz, and Mr. Cruz had no independent understanding of such risks. More to the point, there is no evidence that trial counsel ever explained to Mr. Cruz why it might be inadvisable to accelerate a trial date in a case with insurmountable

124.   When the April 26, 2004 hearing finally took place, Mr. Storts expressed frustration that the time being taken for the mitigation investigation was interfering with his desire to have the case tried as soon as realistically possible. (Tr. Apr. 26, 2004 at 57.)   He then invited Ms. Durand to explain to the court the "logistics that are involved and the potential timeframes . . . so that we're in a realistic basis to proceed forward with the mitigation portion of the trial should that become necessary." (*Id.*)

125.   Ms. Durand outlined her method: obtaining documents and interviewing the client first, then interviewing witnesses. (Tr. Apr. 26, 2004 at 58.) Ms. Durand said that she usually has eighteen months to complete a mitigation investigation, involving 800 to 1,500 hours of work. (*Id.* at 61.) She said she thought the trial should be set for April 2005. Mr. Storts interrupted: "But as I pointed out, Judge, we've explained to Ms. Durand that is not acceptable." (*Id.* at 62.) While Mr. Storts was pressing to do mitigation disclosure in June, in order to go to trial in October, Ms. Durand insisted that she could not comply with *Wiggins* in that time frame: "no way anybody's having anything this summer"; and she "would be surprised to have anything by the end of the year." (*Id.* at 66.) The court suggested that Ms. Durand return in August, but Mr. Storts responded, "Well, I would rather do it sooner than later, Judge." (*Id.* at 68.)   Another motion hearing was scheduled for June 7, so the court suggested that Ms. Durand could return then. (*Id.*) She said she was having surgery the next week and would be convalescing for three weeks. (*Id.*) The court indicated that she might report by letter or telephone. (*Id.* at 69.)

126.   Once Ms. Durand had finished her testimony and left the courtroom, Mr. Storts disparaged the mitigation function: "I realize that the case that we cited from

---

evidence of guilt and that in such circumstances it would be essential to take all of the time necessary to adequately prepare for the ultimate sentencing phase. Nevertheless, trial counsel did enlist Mr. Cruz's uninformed consent to this speedy trial strategy.

*Wiggins* and all that, and I understand what it says. But at the same time, suddenly it's become mitigation is wagging the rest of the dog." (*Id.* at 71.)  He explained that Mr. Cruz does not want to waive mitigation, but also does not want to put off the case indefinitely:

> I can't concede that we're going to be waiting to try this case next summer. I mean that's basically where Ms. Durand's running with. And it may well be that we're going to have to make some hard decisions on dealing with the work that she has, and then bringing in another mitigation person to take over and move it along.

(*Id.*) He added, ". . . this isn't exactly rocket scientry [sic]." (*Id.*)

127.  Mr. Storts then compared how mitigation specialists work to the way that lawyers respond to deadlines, implying everyone procrastinates. "And I'm inclined to think Ms. Durand is probably going to be able to get a lot more done than she realizes by possibly the end of July or end of August." (*Id.* at 72.) Ultimately at Mr. Storts' insistence, Ms. Durand's protestations, that she could not be ready to disclose mitigation prior to the end of the year, were ignored and the court continued the trial to November 16, 2004, with mitigation disclosure due July 16, 2004. (ROA 240.)

128.  What followed in the next two months was a series of increasingly acrimonious exchanges between Ms. Durand and the trial lawyers. On May 6, 2004, Mr. Storts wrote Ms. Durand to advise her of the new trial date and mitigation disclosure deadline. He wrote that he hoped her operation went well, but he needed an update, including "who I will be disclosing as mitigation witnesses, sometime prior to the latter part of June, 2004." On May 19, 2004, Mr. Basham advised Ms. Durand that he had brought in a psychologist, Dr. Hector Barillas. She responded that "we do not normally pick experts until we know what issues need to be explored by same" and pointing out that Dr. Barillas had written an unhelpful report in another of her cases. Mr. Basham replied on May 22, 2004, "We're not morons." He stressed the urgency the team faced:

> Cruz has a mitigation expert with referenced time dimensions that challenge the client's demands and first chair's expectations, and the Court's demands for disclosure and speedy trial (within 18 months). You may still be gathering information in November and making references to your other cases and your personal problems. Notwithstanding all of this, the case will be going to trial in November . . . [ellipsis in original] I have been asked to prepare for this. I cannot do this with the current pace of things.

129.   Ms. Durand e-mailed back on the same date and said she had not called anyone a moron and would not have taken the case if she did think Mr. Basham was a moron. She added, defensively:

> Everyone also knows that I have a part time job in Maricopa County and cannot devote all of my time to this case. Secondarily, my health has been a concern of late. Sorry, but I can't control that. . . . If you don't like the way this is going, you are free to get another person to do it.

A review of these e-mails prompted Mr. Storts to write Ms. Durand on May 28, 2004. He was "not at all pleased with the situation," noting, "[w]e are all professionals." He emphasized, "The one factor you need to understand, however, is the strategy and critical significance attached to the issue of Mr. Cruz's trial date." He urged a united effort to prepare for the November 16 trial date, adding that delay would "give the State a much better chance of obtaining a jury in Pima County. This would be a disaster for John Cruz. We believe our client can never, at any time, receive a fair trial in Pima County." He acknowledged that she was doing everything she could to meet the time constraints, but said that "we all need to make additional efforts to accomplish what needs to be done to meet the deadlines." He asked Ms. Durand to communicate by phone or in person "because I do not use a computer."

130.   On June 7, 2004, Mr. Storts told the court at another status conference that Ms. Durand was on track and that he would be prepared to make mitigation disclosure at the end of June and try the case in November. (Tr. June 7, 2004 at 15.) When this representation was made, trial counsel had information that the mitigation

44

investigation had just barely started and no mitigation witnesses had been interviewed.

131.   Mr. Basham e-mailed Ms. Durand on June 14 to indicate that the Court had approved another 300 hours for her and the "numerous people" who were working under her direction: "This did not cause any problems with IDS. You are funded."   Mr. Basham e-mailed Ms. Durand twice on June 25, first asking "what experts you anticipate calling" and later, following a discussion with private investigator Margaret DiFrank, indicating, "It is my understanding that John Cruz has 3 children – with 3 different mothers. And I don't believe we have interviewed any of the mothers. Or have we???" He indicated that Ms. DiFrank was available to assist, but she had been trying to reach Ms. Durand since June 11 without success. On June 26, Ms. Durand responded to Mr. Basham's e-mail of June 14: "Thanks for letting me know [about the approval of additional funding]. I have been off for a while." She alluded to her ongoing health problems and said she would be undergoing tests most of the following week. She concluded, "Cross fingers. I will let you know the plan the moment it's in place. I'm so sorry for any delay, but I can't control this health thing."

132.   Mr. Basham e-mailed back on the morning of June 26 to demand whatever Ms. Durand had in hand: "If you have any mitigation witnesses in mind I would suggest that you offer them up at this point, otherwise we are going to be developing and making our own selections in the immediate future" in order to comply with the disclosure deadline. He complained that Ms. Durand's vague plan "doesn't really give us too much to rely on for purposes of time demands vs. expectations. Can you organize all information that has been received to date and deliver it to our office?   And please indicate what records have not come in." Meanwhile, Ms. Durand continued responding to Mr. Basham's e-mails from the previous day, saying it was too early to "name expert witnesses" and again lamenting her health problems. Her next e-mail alluded to having had hand surgery ("Just had

45

the stitches out yesterday"), but asked Ms. DiFrank to communicate by e-mail rather than phone. She said she would be happy to have Ms. DiFrank's assistance. She denied having had any phone message from Ms. DiFrank, but later said she had forgotten that Ms. DiFrank called. She told Mr. Basham that she "still can't get [Mr. Cruz's] mom to answer letters about seeing her and her husband," but Ms. DiFrank was locating friends who might be interviewed.

133.   That evening, Mr. Basham e-mailed Ms. DiFrank to say that Ms. Durand's refusal to commit to any time schedule was unsatisfactory, and they would "need to proceed on [their] own." Mr. Storts then wrote Ms. Durand demanding a list of mitigation witnesses on or before July 9, 2004, because the deadline of July 16 was "a non-negotiable date." Mr. Basham e-mailed Ms. Durand at 7:55 a.m. on June 28, 2004, reiterating the July 16 deadline and stating, "If you want to participate in the choice of experts, now is the time for you to do it. Otherwise, please consider it as a matter in progress." She responded at 10:07 a.m. that she was withdrawing from the case and "probably should have done so when I realized how compressed the time line was and the problems that have come up with the family." She promised to bring her files to Tucson in the next week or two.

134.   Late that night on June 28, Mr. Basham e-mailed Ms. DiFrank to advise that Ms. Durand was withdrawing from the case. He immediately identified multiple experts that they would use: James Aiken (prison adjustment), Drs. Edward French and Michael Cochran (methamphetamine addiction), Dr. Hector Barillas (multiple issues), and Dr. Shannah Biggan (neuropsychologist). He then boasted of all the death penalty cases that he and Mr. Storts had handled successfully, adding, "Brick [Storts] and I were both defendant [sic] DP cases when Mary Durand was warden of the Maricopa County Jail. She wants her 1500 hours at 75 dollars an hour in this case. That was her initial request. You do the math." He concluded, "I hope you understand that we have tried very hard to keep her working for us. But she is just impossible."

135.   In this late-night email to Ms. DiFrank, Mr. Basham told her that Mr. Storts had 15 death penalty cases and he had about 10.[12]

136.   Undeterred by the fact that no mitigation investigation had begun in earnest, on July 16, 2004, trial counsel filed their mitigation disclosure. (ROA 240.) They identified six expert witnesses and provided summaries of those witnesses' testimony. However there was no basis for such disclosure. Five of the experts had not done any work on the case; just one of the experts, a psychologist, Dr. Hector Barillas, had briefly interviewed Mr. Cruz, but he had formed no opinions. The disclosure statement also listed as witnesses numerous family members and others who knew Mr. Cruz, but none had been interviewed.

137.   At the time of the mitigation disclosure on July 16, 2004, Mr. Cruz had not been considered a source of mitigation information, and he was never used as a source for mitigation evidence. After Ms. DiFrank assumed responsibility for the mitigation investigation (and while she remained busy as fact investigator), she had two brief meetings with Mr. Cruz. Neither DiFrank nor any other defense team member ever documented making any inquiry of Mr. Cruz with respect to information that might be relevant to or assist in an investigation of mitigation.

---

[12] As we explain below, this was a distortion of their actual experience.  Mr. Storts had been appointed to six capital cases, but none of those had proceeded to sentencing. Mr. Storts had no prior experience trying a capital sentencing. Mr. Basham had a total of four capital cases that he had actually tried through sentencing in his career, all of which resulted in sentences of death. But importantly, two of the cases he worked on took place in the mid-1970s prior to the Supreme Court's decision in *Lockett v. Ohio*, 438 U.S. 586 (1978), when non-statutory mitigation was neither relevant nor admissible in Arizona capital proceedings; therefore, those cases offered no experiential value. Mr. Basham became a commercial airline pilot after his work on those early cases and did not return to criminal law until the mid-1990s. He had a limited second chair role in two capital cases in 1998-2000; in one of those cases, *State v. Armstrong*, No. CR061846 (Pima Sup. Ct.), after failing to appear at the mitigation hearings, the court ordered him to be present. It appears that Mr. Basham did little if any mitigation work on either of those cases.

138.   On July 14, 2004, Mr. Storts received a letter from a Herman Flores. In his five page letter, Mr. Flores explained that the Compensation Fund created by the Pima County Attorney's Office was responsible for setting Mr. Cruz up for the murder of Officer Hardesty. As explained by Flores, "after your client's profile was completed, the qualified soldiers were set into place . . . the mission is to drive your client insane. . . . I have been in several situations where I actually believed I was going insane." Mr. Storts sent the Flores letter to the defense team noting that "Mr. Flores apparently has a lot of collateral information that may relate to John Cruz. . . . I think it might be worthwhile to contact him and see if there is any value in the information he is supplying."

139.   Another status conference with the court took place on July 26, 2004. (Tr. July 26, 2004.) Mr. Storts boasted that after Ms. Durand was fired or terminated, the defense team put together the entire mitigation case in three weeks.[13] (*Id.* at 21.)

140.   Mr. Storts insisted that the defense wanted to go to trial on November 16 and said he would take a special action to the Arizona Supreme Court if necessary to prevent a continuance. (*Id.*) Mr. Storts disputed whether mitigation specialists were really needed given all of the experience he and Mr. Basham had. Mr. Storts told the Court:

> **For the record, so there is no confusion as far as the *Wiggins* case** that apparently seems to be the issue that all mitigation experts are now using to talk about the reason we have to have one, **I have tried**, since May of 1996, 34 first degree murder cases. **Twelve** of them were **death cases**. I have nobody on death row. **Mr. Basham**, I know, **has tried** probably at least a third of that many or half and has certainly [sic] has at least, I don't know, **ten or twelve death penalty cases** that you were involved in the mitigation aspects of it **from start to finish**.

---

[13] Although Ms. Durand actually resigned from the defense team, Mr. Storts would continue to maintain she was terminated.

(*Id.* at 22.) (emphasis added.)

141.   Mr. Storts' hubristic stance, that he did not need a mitigation expert because he had tried twelve death cases, had no factual basis. In fact Mr. Storts had been appointed to six capital cases prior to the Cruz case, but each had ended, pled or settled without a capital sentencing proceeding ever having taken place. Mr. Storts had not "tried" a capital sentencing case; he had no prior experience in the conduct of a capital sentencing proceeding, and his skills at such were unknown and untested. In addition, Mr. Storts had been appointed to 12 first degree murder cases that he tried, <u>not</u> 34.  Mr. Basham did not speak up to correct the clearly erroneous portrayal of his prior experience. As explained above, his prior experience was exceptionally limited.

142.   Mr. Cruz, of course, had no idea that his trial counsel lacked any meaningful experience, or that they had embellished the same. Further Mr. Cruz had no understanding of the risks associated with his counsel's recommendation that he insist on a speedy trial, or a hasty three week mitigation investigation. His counsel never suggested there was any risk associated with this strategy, which is remarkable since evidence of guilt was overwhelming and it was a virtual certainty that the outcome of the case would hinge on the sentencing proceeding.

143.   To the contrary, instead of being informed of enormous risks he faced at the guilt phase, he had been led to believe that his case was defensible at the guilt phase. Just a few weeks before the July 26 hearing, on July 3, 2004, Mr. Storts wrote Mr. Cruz a letter concerning the anticipated trial testimony of Officer Ben Waters, who had seen Mr. Cruz drop the murder weapon as Mr. Cruz ran away from the direction of Officer Hardesty's fatally wounded body.  <u>Storts told Mr. Cruz that Waters was a liar and he could prove it, emphasizing this in the strongest possible terms: "We know one thing; we can establish he [Waters] is a liar."</u> In truth, there was no objectively reasonable basis whatsoever for Mr. Storts' portrayal of Officer

Waters' testimony, or the certainty of its impeachability.[14] Self-evidently, if Mr. Cruz agreed with Mr. Storts' speedy trial strategy, he was being influenced by disingenuous forecasts about the impeachability of the testimony of the key trial witness.

144.   Meanwhile, at the July 26 hearing, after bragging that they had put their mitigation case together in three weeks, and juxtaposing that a mitigation specialist was not needed due to trial counsel's extensive experience, Mr. Storts *arranged* for Mr. Cruz to tell the court that he was he was happy with the mitigation work being done and he wanted no delay in his trial. (*Id.* at 25.) Mr. Storts told the court that Mr. Cruz would say he was happy "so we don't have this come up twenty years from now." (*Id.* at 23.)

145.   On July 28, 2004, the prosecutor filed a motion to continue the trial because of insufficiencies in the mitigation disclosure; e.g., no expert reports or testing results were disclosed. (ROA 251.)  Mr. Cruz's trial counsel opposed the motion, insisting that it had provided the state with summaries of the expert witness testimony; however, trial counsel concealed the fact that in truth, none of the experts had expressed any opinions or reached any conclusions, and the testimonial summaries were made up.

146.   On August 12, 2004, the parties appeared before the court regarding the inadequacy of the defense mitigation disclosure. (Tr. Aug. 12, 2004.)  The court came to the obvious conclusion that the expert reports should have been disclosed at the time of the July 16 disclosure. After a good deal of dissembling by Mr. Basham and insistent probing by the court, Mr. Basham had to finally admit that experts had not completed their work and it became clear that the disclosure obligation had not

---

[14] As we explain below, Mr. Cruz was extremely vulnerable to misinformed advice about his probable innocence, because, as the defense team well understood, due to his diminished mental state at the time of the offense, Mr. Cruz had nearly complete amnesia for the day of the offense, including the shooting of Officer Hardesty.

been satisfied. (*Id*. at 13-27.) The court set a new disclosure deadline for September 17, 2004, and granted the prosecution's motion to continue the trial to January 19, 2005, placing the trial date outside of Mr. Storts' December 22, speedy trial deadline. (ROA 261.)

147.   The new disclosure date of September 17, 2004, came and went without any disclosure from the defense team, since the mitigation investigation was only just beginning.

148.   On October 4, 2004, another status conference was held regarding the persisting inadequacy and untimeliness of the mitigation disclosure, that was due on September 17, and that should have been produced back on July 16. (Tr. Oct. 4, 2004.)  Mr. Basham's e-mail communications with the experts during this time reveal that the experts had not completed their work or formed opinions by September 17 and so once again at this October 4 hearing, he admitted he had not fulfilled his disclosure obligations. (*Id*. at 17.)   The court had had enough and indicated that if disclosure was not made by November 1, he would preclude testimony or continue the trial date once again. (*Id*. at 15.)

149.   The defense finally *facially* belatedly complied with their July 16, 2004 mitigation disclosure obligations with disclosures made on November 1, November 23 and December 15. However, as explained below, the entire mitigation compilation was put together in a rush, and it ended up being ill-conceived, incomplete, undeveloped, and in many instances, in material respects, highly inaccurate, misleading, conflicting and factually erroneous.  Mr. Cruz's life history was miscast, and notwithstanding compelling evidence that Mr. Cruz was responsible for the offense and that he was laboring under a severely diminished capacity, trial counsel directed that no mitigation investigation be done to assess Mr. Cruz's mental state at the time of the offense.

150.   Instead, the focus of trial counsel was on an unsustainable denial of responsibility for the offense. On October 7, 2004, the defense filed a notice of

intent to rely on a third party culpability defense. (ROA 284.) There was no credible evidence to support such a defense. On November 9, 2004, the state moved to compel disclosure of evidence that might support such a third party defense. (ROA 323.) In their response to the state's motion, the defense offered hearsay on hearsay evidence that someone named "Shorty" shot Officer Hardesty. (ROA 357.)   The defense response also mentioned that treating EMT Rand Tavel asserted that when Mr. Cruz was arrested he immediately said that Arturo Sandoval shot the officer. (*Id*.) No evidence supported the conclusion that Mr. Sandoval (whoever he was) committed the shooting.[15]

151.   The jury never heard any evidence supporting the claimed third-party defense, but as we explain below, Mr. Cruz's lawyers were not dissuaded by a lack of evidence. Without ever explaining to Mr. Cruz the risks of doing so, trial counsel continued to maintain throughout the proceedings that Mr. Cruz was not the person responsible for the shooting. This tactic left the guilt-phase defense in a state of pretention, and as explained below this would threaten the sentencing outcome: before Mr. Cruz's trial, numerous studies of capital jury sentencing decision-making had shown that denial of responsibility in the face of overwhelming evidence of guilt would have a decidedly negative influence on sentencing proceedings. As mentioned above, reference the commentary to ABA Guideline 10.10.1, "counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime."

---

[15] An internal defense memo confirmed that Mr. Cruz had no memory of making such a statement and independently, as explained below, the defense team knew that Mr. Cruz had amnesia for the events of the day of the offense and the shooting of Officer Hardesty.

1

### 4)    Guilt-phase proceedings.

2    152.   After lengthy jury selection proceedings that took place between

3    January 19 and January 28, 2005, on February 1, 2005, counsel presented opening

4    statements, and the prosecution began to present its case-in-chief via witnesses and

5    other evidence. The state's case against Mr. Cruz was supported by a critical piece

6    of evidence, the testimony of Officer Ben Waters. As noted above, when Mr. Cruz

7    fled, Officer Hardesty went after Mr. Cruz on foot, and Officer Waters attempted to

8    head Cruz off in his patrol car. Once Waters pulled his car around onto Fort Lowell

9    Road, where he intended to head Cruz off, he saw Cruz with a handgun running

10   toward Ft. Lowell, and he radioed to Officer Hardesty that Cruz had a gun. At this

11   time, Officer Waters could not see Officer Hardesty, and he did not know that he had

12   been fatally wounded.  Officer Waters next saw Mr. Cruz drop the handgun. Waters

13   was able to apprehend Cruz and place him under arrest. The gun that Officer Waters

14   saw Mr. Cruz throw to the ground was proven to be the murder weapon; indeed that

15   fact was undisputed at the trial: the gun that had been seen in Mr. Cruz's possession

16   was admitted by the defense to be the murder weapon. Without regard to any other

17   evidence substantiating Mr. Cruz's guilt, the eyewitness testimony of Officer Waters

18   would be all that was needed to seal Mr. Cruz's fate at the guilt phase.

19   153.   Yet as noted above, rather than attempt to help Mr. Cruz understand

20   that it was a virtual certainty that the jury would credit Officer Waters' account and

21   find him guilty, on July 3, 2004, Mr. Storts told Mr. Cruz that Ben Waters was a liar

22   and he emphasized in the strongest possible terms: "We know one thing, we can

23   establish he [Waters] is a liar." While Mr. Storts' July 3 letter would encourage Mr.

24   Cruz to continue to deny responsibility, evidence that Officer Waters was a liar

25   never existed and was clearly lacking.[16] Thus, it is no surprise that once he entered

26

27   _____

28   [16] As we explain below, given that the trial lawyers knew that Mr. Cruz suffered
     amnesia for the events of the day of the offense, they should have taken reasonable

the courtroom and had to address the jury, Mr. Storts had to change his tune. During opening statements, he cautioned the jury that he would not suggest that Officer Waters had been untruthful; just mistaken. (Tr. Feb. 1, 2005 at 27-29.)  Nor did the obvious dominance of Officer Waters' testimony escape Mr. Storts, as he acknowledged during the opening statement to the jury that "if Officer Waters' testimony is unrefuted . . . and if the errors in it do not convince you that there's mistakes, then Officer Waters' testimony is basically a totally damning piece of testimony as far as Mr. Cruz is concerned." (*Id.* at 29.) In other words, Mr. Storts conceded that if the jury believed Officer Waters, then the murder weapon would be found in Mr. Cruz's hands, and just as surely, the jury would find Mr. Cruz guilty of the offense.

154.   Nevertheless, the guilt phase portion of the trial would continue over the course of the next three weeks with the trial lawyers insisting the jury should entertain doubt concerning Mr. Cruz's guilt and that someone else must have been responsible for the shooting. Best summarizing the spurious nature of the defense is the trial court's ruling denying the post-trial motion for new trial. There, dispensing with the defense argument that the jury should have been given a residual doubt instruction, the trial court held:

> In the instant case, as in <u>Harrod</u> and <u>Pandeli</u>, there is no factual basis for a residual doubt instruction. The evidence reflects that the Defendant fled from Officer Hardesty and Officer Waters by running through a hole in the fence into a vacant lot. Officer Hardesty pursued on foot while Officer Waters drove his patrol car around the block to cut off the Defendant's escape route. Defendant, with Hardesty in close foot pursuit, then scaled a fence into a neighboring residential yard. Although no witness saw the actual shooting, the evidence considered in its entirety, establishes beyond any doubt that it was the Defendant who, once in the yard, fired five shots from his five shot revolver into the pursuing Officer Hardesty.

---

measures to help him understand his responsibility for the shooting, and not, as was done, foster Mr. Cruz's nearly delusional belief system.

54

Immediately after the shooting, Officer Waters arrived in front of the yard and exited his patrol car and aimed his service weapon at the Defendant. Waters saw Defendant holding the revolver and saw the Defendant throw the revolver down. Defendant asked Waters to shoot him and get it over with it. Waters attempted to physically restrain the Defendant but the Defendant managed to escape. Waters was ultimately able to apprehend Defendant a short distance away following another foot pursuit that led over two more fences.

Later found in the Defendant's pocket were five bullets of the same type used to kill Officer Hardesty. Later testing found gunshot residue on the Defendant's clothing. Ballistic testing confirmed the revolver the Defendant threw down was the murder weapon. Stippling evidence showed the fatal shots were fired at close range. Recordings of police radio transmissions as well as the accounts of civilian witnesses in the area further supported the State's case. The jurors were taken to the crime scene and allowed to view all the relevant areas.

A defense expert on eyewitness testimony was called in an attempt to undermine Officer Waters' testimony, and in particular, raise doubt about Waters' description of the Defendant discarding the revolver. Waters' testimony was supported by police radio tapes wherein Waters is heard contemporaneously radioing that the suspect had a gun. At the time of that transmission, Waters did not know that Hardesty had been killed. This transmission was intended to alert Hardesty and other officers that the Defendant had been armed. **Officer Waters' testimony was credible and corroborated and not seriously called into question in any manner**.

Similarly unavailing were defense efforts to blame the gun residue results on contamination. The chain of custody and other evidence clearly showed that the gunshot residue was properly attributable to the Defendant having recently fired a gun. Also unavailing was the defense's attempt to inject doubt by pointing out that the Defendant's DNA was not found on the murder weapon. (On this point, the Court is not considering the additional incriminating evidence the jury did not hear. The jury was not aware of Wraxall's opinion that the Defendant could not be excluded as a DNA source on the gun. This Court granted the defense motion to preclude the State from calling Wraxall, the defense expert, to establish that point).

55

Although the jury heard that Defendant's DNA was not on the weapon, the jury also learned that Myra Moore was a possible contributor of DNA on the murder weapon. The Defendant spent the night before the murder with Ms. Moore. Ms. Moore's apartment was where Officers Hardesty and Waters discovered the Defendant and where the foot chase began. Ms. Moore testified the Defendant had a gun with him and that she touched the gun when knocking it off the bed. The DNA evidence did not exculpate the Defendant but potentially corroborated Defendant's link to the murder weapon via Ms. Moore's DNA.

The Motion for New Trial refers to third-party culpability evidence. In the context of this case, "third-party culpability evidence" necessarily means evidence that some other human being murdered Officer Hardesty. Officer Hardesty was last seen alive chasing the Defendant on foot. The Defendant was next seen, soon thereafter, throwing down the murder weapon a short distance away from Hardesty's body. There was no other human being in the immediate vicinity that could have possibly inflicted these close range wounds with the murder weapon the Defendant threw down.

The defense refers to Arturo Sandoval as being a third-party culpability possibility. Motion at 19-21. After being arrested and while being treated by a paramedic, the Defendant gave the paramedic a false name and also said Arturo Sandoval was involved in the crime. The Defendant's statements were properly excluded as hearsay without exception. The Defendant's statements were not excited utterances that stilled the powers of deception because the Defendant was deliberately deceiving by giving a false name.

The defense also alludes to Myra Moore as being "named as a third-party culpability possibility." Motion for New Trial at page 24. Ms. Moore was present at the apartment when the Defendant fled. After Defendant was arrested, police returned to the apartment to obtain statements from Ms. Moore and her mother. The Defendant, by running from Ms. Moore's location, was necessarily leading the murder victim away from Moore. Ms. Moore could not have possibly murdered Officer Hardesty.

There was no evidence of any human being, by any name, being in a position to murder Officer Hardesty except the Defendant. In light of all the evidence, a third person's involvement in the shooting is not even a

remote possibility. The crime scene visit was particularly instructive to this Court, and presumably, to the jurors as well. The short distances traveled and the need to hurdle fenced areas precluded another human from being involved in this brief foot pursuit and this murder. **The evidence created no doubt- residual, lingering or of any other type- about guilt**. This Court concludes that a residual doubt instruction was not factually warranted and would not have affected this jury's resolution of this case.

(ROA 669 at 2-4) (emphasis added).

### 5)   Sentencing-phase proceedings.

155.   During the sentencing phase of the proceedings, Mr. Cruz's trial counsel presented a virtual kitchen sink variety of mitigating factors totaling 17 different factors: (1) impaired capacity to appreciate the wrongfulness of his conduct, (2) impaired capacity to conform his conduct to the law, (3) unusual and substantial duress, (4) unforeseeability that the acts would cause death, (5) dysfunctional family, (6) deprivation of "necessary nurturing and love" from family, (7) family history of mental disorders, (8) post-traumatic stress disorder ("PTSD"), (9) drug addiction, (10) mental state affected by family history of mental disorders, PTSD, and drug addiction, (11) unfavorable impact on Cruz's family, (12) existence of family support, (13) compliance with prison rules, (14) lack of propensity for future violence, (15) capability to adapt to prison life, (16) lack of plan to commit the murder and the defendant's upbringing, lifestyle, and subculture all made it far more likely that he would find himself in this position.  *See Cruz*, 181 P.3d at 217-18.

156.   Although the trial lawyers orchestrated the entire guilt phase around the argument that Mr. Cruz was not responsible for the offense (and they continued to favor this notion during the sentencing phase) many of the mitigating factors did not integrate with the underlying guilt-phase defense, and in fact they were directly contradictory and conflicted with the guilt-phase defense. For example, seven of the mitigating factors assumed that Mr. Cruz was a direct participant in the offense:  (1)

impaired capacity to appreciate wrongfulness of conduct; (2) impaired capacity to conform conduct; (3) duress; (4) could not have foreseen grave risk of death; (10) mental state at the time affected by numerous factors including dysfunctional family, familial mental disorders, PTSD, and addiction; (16) killing of officer not planned; and (17) the defendant's upbringing, lifestyle, and subculture all made it far more likely that he would find himself in this position.[17]

157.   During the sentencing-phase opening statements, Mr. Basham said that the lawyers believed that Mr. Cruz had a credible defense during the guilt phase, but he encouraged the jury not to hold that against Mr. Cruz. (Tr. Mar. 1, 2005 at 21-22.) The defense called 16 witnesses during the mitigation phase including 5 experts.

158.   Mitigation witness Ricardo Ford.  Ricardo Ford was a Catholic priest who testified that he became acquainted with Mr. Cruz's maternal lineage (the Montenegro side of the family) around 1970. (*Id*. at 53.) The Montenegros lived in a neighborhood near downtown Tucson called Barrio Hollywood where there were a lot of drug problems. (Tr. Mar. 1, 2005 at 54-55.) Ford knew all the members of the immediate Montenegro family including Mr. Cruz's mother and his aunts and uncles and the maternal grandparents. (*Id.* at 55-58.) A few of Mr. Cruz's maternal uncles

---

[17] These inconsistencies are repeatedly emphasized as being contraindicated in the ABA Guidelines. Guideline 10.10.1 provides that "trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." Hofstra L. Rev., *supra*, at 1047. The commentary to Guideline 10.11 similarly provides that: "During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, 'the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation.' Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime."

(Danny, Edward and Luis) were known to have serious drug problems. Ford described Cruz's maternal grandmother Maria as very hard working, patient and spiritual, but he suggested she was too patient with her adult drug-abusing sons whom she allowed to live at her residence. (*Id.* at 59-61.) Ford said that he came into contact with Mr. Cruz when he was a young boy during his parents' divorce proceedings and that Mr. Cruz was stressed out. (*Id*. at 62.) Ford testified in the divorce/custody case of Mr. Cruz's parents. (*Id.* at 63.)

159.  Ford described Mr. Cruz's mother, Julie, as very motivated, likeable and a respected nurse, who had good values which she would have passed on to her son.[18] (*Id.* at 69.)  Ford testified that he learned that Cruz's mother, Julie, had been sexually abused by her father Albert, (*Id.* at 65), and eventually Julie suffered from psychiatric disorders as a result. (*Id.* at 72.) Ford testified Julie may have been overdoing medicines and had big problems, but Ford had no information with respect to how this might have affected Cruz, and he had little firsthand knowledge of Mr. Cruz, as he had not seen the 35 year old since he was a little boy. (*Id.* at 70-71.)

160.  <u>Mitigation witness Julie Lingenfelter (Mr. Cruz's Mother)</u>.   Julie testified she lived at Playa Del Rey, in Los Angeles, California since her move there in 1982. (Tr. Mar. 1, 2005 at 74.) Julie identified the members of her immediate family, including her parents, Maria and Albert, and her siblings Albert, George (who died from cancer at 21), Edward, Luis, Susie, Danny and Harvey. (*Id.* at 60, 75.)  Julie testified that her grandparents emigrated from Mexico. She related that her maternal grandmother was extremely abusive, hateful and cruel to her children

---

[18]  As we explain below, this aspect of Ford's testimony was inaccurate and misleading, as Mr. Cruz's mother had serious addiction issues around the use of illegal and prescription drugs and alcohol throughout Mr. Cruz's childhood, and she was not centered on passing on good values to her son.  However, this evidence was not presented to the jury.

and her grandchildren, including Julie and her siblings. (*Id.* at 78.)  She testified that her father was abused and neglected and forced out onto the streets as a little boy. (*Id.* at 79.)

161.   Julie described her own father, Albert, in the worst possible terms, explaining that he molested her sexually from when she was a small child until age 15. (*Id.* at 80.)   Her father rarely worked, he was an alcoholic, and he was a womanizer who beat her mother and her siblings. (*Id.*) Julie also indicated her father, Albert, beat Edward with a stick, a belt buckle and a belt because he had dyslexia. (*Id.* at 82.)

162.   Julie testified that her mother, Maria, was not aware of the sexual abuse, because her father threatened to kill her if she told anyone. (*Id.* at 82.)  She said she became bulimic and anorexic at age 10 and attempted suicide 3 times between ages 13-15. (*Id.*) Julie said she would disassociate to cope with her abuse issues and had problems getting close to people. (*Id.* at 92.) She claimed to be very close to her son until he was 7 or 8 years old, but after that, she could not hug him. (*Id.*)

163.   Julie also testified that all of her siblings were dysfunctional. Of her brothers, she related that Luis was an alcoholic, Danny and Edward were drug abusers, and Edward "is out of it mentally." (*Id.* at 84-87.)

164.   Julie testified that she met Mr. Cruz's father when she was 19 and married him at 21, in 1969.  (*Id.* at 96.)  The day after they married he hit her for the first time for not making potatoes like his mother. (*Id.* at 97.) She testified that the marriage was rife with domestic violence and emotional abuse. Mr. Cruz's father controlled her and hit her for any reason.  (*Id.* at 98.)  Julie said she went to nursing school and found out the abuse was not normal. When she refused to quit school, Mr. Cruz's father became enraged. (*Id.* at 100.) She also stated that Mr. Cruz's father constantly verbally abused her and that he told her every day for 10 years she was ugly as a dog.  (*Id.* at 101.)

165.   Julie also testified that just before she filed for divorce when Cruz was 8 years old, Mr. Cruz's father beat her and Cruz severely striking Cruz over 60 times with a belt. (*Id.* at 102.) She moved out the next day, whilst Mr. Cruz's father pointed a loaded rifle at them. Julie said that Mr. Cruz witnessed a lot of domestic violence. (*Id.* at 103-04.)

166.   Julie testified that she obtained a divorce from Mr. Cruz's father in 1981. She won custody after a long custody battle, but despite her ex-husband's history of physical violence, she decided she did not want custody of her son after all, and she allowed him to take custody of Mr. Cruz. (*Id.* at 121.) When Mr. Cruz was 13, his father married a girl just 16-17 years old. Julie related that the step-mother was mean and cruel to Mr. Cruz. She testified that Mr. Cruz's dad suffered a brain aneurysm and died at age 34 when Mr. Cruz was 15 years old. (*Id.* at 111.) She testified that Mr. Cruz was afraid he would eventually die young from an aneurysm because his paternal great-grandfather had also died at age 34 from this condition. (*Id.* at 112, 115.)

167.   Julie testified that she married Steve Lingenfelter in 1986 and settled in Playa del Rey. Mr. Cruz lived with them. (*Id.* at 117, 122.) She related that Mr. Cruz was very depressed after his father died. He wore black clothing for 1 1/2 years, and his grades suffered. (*Id.* at 114-15.) Julie testified that when Mr. Cruz was 17, in 1987 he could not live with her anymore, and he was sent to live with her mother, Maria, in Tucson. She claimed he left because she wanted him to move out of the basement in her home into a bedroom in the upstairs living area, where she could keep "a closer eye on him." (*Id.* at 117.)  She acknowledged that Mr. Cruz's adult uncles, Eddie and Luis (who had serious problems with drugs), also lived with Maria. (*Id.* at 118.)

168.   Julie described Mr. Cruz as being very sensitive as a young child, a very loving, and very sweet child. (*Id.* at 114.)

169.   On cross-examination, Julie admitted that domestic violence was never

61

reported to police and the alleged beating of Mr. Cruz by his father was also never reported to police.  (*Id*. at 120.)

170.   Julie testified that when she married Steve Lingenfelter in 1986, she and Steve opened their arms to Mr. Cruz, and they gave him everything he wanted; but because she was not able to supervise him, she let him move back to Tucson to live with her mother. (*Id*. at 123, 125.) Implicit in this cross-examination testimony is the idea that Mr. Cruz was a spoiled child who was given everything he wanted but who resisted proper parental supervision. However, as we explain below, the jury would never learn that these inferences were patently misleading: A thorough investigation would have demonstrated that Mr. Lingenfelter strongly disliked Mr. Cruz and neither he nor Cruz's mother had any interest in him; they preferred to engage in a drinking and drugging lifestyle and neither of these parental figures wanted Mr. Cruz anywhere around them. They literally wanted to be rid of him, and they did get rid of him, repeating a pattern that really started from the time Mr. Cruz was born.

171.   Mitigation witness Susan Alcaraz. Ms. Alcaraz is Mr. Cruz's maternal aunt (his mother Julie's younger sister). She helped care for him when he was a little boy when Julie was in nursing school and when Julie started working. She described her care for Mr. Cruz as extending over "days, weeks, months." (Tr. Mar. 1, 2005 at 136.) Why she was left to care for Mr. Cruz for months on end was never explored. She did testify that Mr. Cruz's mother was not able to show love and affection for her son because of her own mental problems, (*Id*. at 145-50); however, the details of this were never explored or presented to the jury.

172.   Ms. Alcaraz contradicted Mr. Cruz's mother's claim that she and Mr. Cruz suffered from repeated physical violence inflicted by Cruz's father.  She never saw any evidence of physical abuse of Mr. Cruz or his mother. (*Id*. at 137.) She testified that Mr. Cruz adored his father and he was devastated by the divorce which began when Mr. Cruz was 8 years old.  (*Id*. at 138.) She related that once Mr. Cruz's

father remarried, she thought the step-mother was jealous of Mr. Cruz and vice versa. (*Id*. at 140.)  She said Mr. Cruz was devastated by the death of his father, a circumstance made worse by his step-mother who would not allow Mr. Cruz a single keepsake; instead she sold all the father's possessions at a yard sale. (*Id.* at 143)

173.   Ms. Alcaraz testified that when Mr. Cruz was sent to live with his grandma Maria, her brothers Luis and Edward were living there and they were doing drugs.  She described Mr. Cruz as very sensitive, loving, caring person but as a lonely guy who got lost. (*Id.* at 147.)

174.   On cross-examination the prosecutor picked up on the theme and tried to have Ms. Alcaraz admit that Mr. Cruz did not like to live by the rules and would go between his mother and grandma's house so he could live by different sets of rules whenever he felt like it. (*Id.* at 151.) As we explain below, the truncated mitigation investigation left Mr. Cruz's counsel unprepared to have Ms. Alcaraz counter this prosecution refrain. As it was, the prosecutor used Ms. Alcaraz as a foil to suggest to the jury that Mr. Cruz was simply a spoiled child who did not want to follow the rules.

175.   <u>Mitigation witness Joe Cruz.</u> Joe Cruz is Mr. Cruz's paternal uncle and the younger brother of Mr. Cruz's father. (Tr. Mar. 2, 2005 at 12.) He testified that he was a banker and that all of his six other siblings had respectable employment. (*Id.* at 13, 15-16.) The principal evidence elicited from Joe Cruz was employed to contradict testimony elicited just a day earlier from Mr. Cruz's mother respecting her claim of constant abuse and maltreatment at the hands of Mr. Cruz's father. Joe Cruz would have none of that. He testified that he had spent a lot of time with Mr. Cruz's parents during their marriage and they got along well. (*Id.* at 19.) On cross-examination he went further, explaining that there was absolutely no marital discord between Mr. Cruz's parents, and that Mr. Cruz was not maltreated by his father.  (*Id.* at 30.)

176.   <u>Mitigation witness Delia Cruz Pedrazza</u>. Ms. Pedrazza is Mr. Cruz's

paternal aunt and the sister of Mr. Cruz's father. (Tr. Mar. 2, 2005 at 39.) Ms. Pedrazza also contradicted Mr. Cruz's mother's portraiture of his father; she described Cruz's father as a prankster, but not an abuser. (*Id*. at 19.) She related that Cruz's father was a wonderful man who tried to instill good values in Mr. Cruz. Ms. Pedrazza was less complimentary toward Mr. Cruz's mother, and she testified that Cruz's mother was not mentally or physically there for him due to her own problems. (*Id*. at 41-43, 57.)  Ms. Pedrazza was also critical of Mr. Cruz's step-mother, who she characterized as an insecure seventeen year old bride with bipolar disorder. (*Id*. at 44-45.) Ms. Pedrazza testified the death of Mr. Cruz's father was devastating because he was very close to his father. She also shared that the memories of her nephew are that he was a loving person, never angry, always a hugger. (*Id*. at 46, 53.)

177. <u>Mitigation witness Sean Stewart</u>. Mr. Stewart was a Pima County Sheriff's Department Jail Correctional Service Officer. (Tr. Mar. 2, 2005 at 62.) Defense counsel elicited testimony that Mr. Cruz had recently been moved so that he could be more closely observed, so he would not be able to injure himself or any other person.  He did confirm that Mr. Cruz had no major write-ups, he had not been a threat to guards or other prisoners and he was not known to have any gang affiliations. (*Id*. at 66, 69, 77.)

178. <u>Mitigation witness Romelia Cruz Holguin</u>. Ms. Holguin is another paternal aunt and sister of Mr. Cruz's father. (Tr. Mar. 2, 2005 at 78.) Ms. Holguin testified that she was just fourteen years old when Mr. Cruz was born and that she frequently babysat him and helped care for him. (*Id*. at 80.) Like the other Cruz family members, she had no evidence corroborating the allegations of Mr. Cruz's mother that his father was abusive. Ms. Holguin did testify that Mr. Cruz's mother was not a comforting mother, and she also testified that Mr. Cruz's very young step-mother was abusive; she teased Cruz, locked him out of the house and treated him like an outcast. (*Id*. at 86.) She also described the entire maternal side of the family

(i.e., the Montenegros) as into drugs and promiscuous. (*Id*. at 88-89.)

179.   Ms. Holguin related that she last saw Mr. Cruz in early May 2003, just a few weeks prior to the subject offense.  She described Mr. Cruz as paranoid, angry, depressed, withdrawn and limping.[19] Mr. Cruz related to her that he was on the run from the police, and he was limping from a fall from a two- or three-story window. (*Id*. at 94-96, 100.) On cross-examination, Ms. Holguin said she did not know who had taken responsibility for Mr. Cruz's three children from three different women. (*Id*. at 102.)

180.   Mitigation witness Tara White.  Ms. White was Mr. Cruz's wife. (Tr. Mar. 2, 2005 at 105.) Ms. White testified that she lived on the Zuni Indian reservation in New Mexico, where she was involved in helping run five family businesses with her parents, including the family ranch, a hardware store, a laundry business, a candy store and trailer park. (*Id*. at 106.) Apart from work she was also raising her and Mr. Cruz's son, Daniel. (*Id.*)

181.   Ms. White testified that she married Mr. Cruz in 1996, and their son Daniel was born in 2000.  When they met, she was working and going to school. She related that she and Mr. Cruz smoked marijuana and Mr. Cruz did cocaine.  (*Id*. at 109, 111-12.) She testified that Mr. Cruz had mood swings and was always sad and depressed. (*Id*. at 112.)  She was not asked to explain this or provide details.  She also said that Mr. Cruz always thought he would die young like his father; that he loved his mother but that he thought she was more concerned about herself. (*Id*. at 120-21.)

182.   Ms. White related that a few months after they married, Mr. Cruz was arrested in Illinois for a marijuana offense. (*Id*. at 113.) Mr. Cruz was released from

---

[19] There was no investigation with respect to whether and how the symptomatology evident in early May 2003 had relevance to Mr. Cruz's mental state at the time of the offense.

prison in 1998, and they moved to Zuni. (*Id*. at 115.) She said that he helped run the family businesses, but eventually they were not getting along, and in 2001 Mr. Cruz started using drugs (cocaine and marijuana) and he moved back to Tucson. (*Id*. at 116-17.)

183.   On cross-examination, Ms. White stated that when she and Mr. Cruz moved to Zuni, her parents were good to Mr. Cruz and gave him a job. (*Id*. at 129.) She also admitted that when she first met Mr. Cruz in the early 1990s, he was on probation for a drug-related offense and then after he was released from prison he picked up a conviction for fleeing a police officer. (*Id*. at 126.) She also testified that when Mr. Cruz left Zuni, their son Daniel was about 8 months old and he simply walked out on the jobs her parents had provided him. (*Id*. at 129.) She also admitted that Mr. Cruz did not pay support for Daniel, and he ended up with another woman, Jennifer Morse, after he returned to Tucson. (*Id*. at 131.) She added, however, that Cruz "went nuts," and they mutually agreed he should leave. (*Id*. at 130.) Ms. White's description of Mr. Cruz's diminished mental state was not further explained or explored.

184.   <u>Mitigation witness Albert "Junior" Montenegro</u>. Albert is Mr. Cruz's first cousin and the son of Mr. Cruz's maternal uncle, also named Albert. (Tr. Mar. 2, 2005 at 145.) (Mr. Cruz's uncle Albert is his mother's brother). At the time he testified, cousin Albert was serving time in prison for possession of narcotics. (*Id*. at 146.) He also had three prior drug offenses. (*Id*.) Albert testified that he went to high school with Mr. Cruz.  He said they did a lot of drugs: marijuana, cocaine, acid, mushrooms. Albert confirmed that when Mr. Cruz lived with his grandma Maria, there was lots of drugs and partying going on. (*Id*. at 148-49.)

185.   He also testified that Mr. Cruz changed after his father died; he became isolated, he stayed inside all the time, he did not want to talk to anybody "for years." (*Id*. at 148.)

186.   Turning to the time near the instant offense, Albert said that when Mr.

Cruz was arrested for the subject offense in May 2003, Cruz had been using meth. (*Id*. at 150.) He said Mr. Cruz would get paranoid when using meth, but he was not asked to provide any other detail regarding Mr. Cruz's drug usage or its effects. Albert was not cross-examined.

187.   <u>Mitigation witness Dr. Mike Austein</u>. Dr. Austein testified that he was board certified in internal medicine and addiction medicine. (Tr. Mar. 2, 2005 at 6.) Prior to his testimony, he had not spoken to Mr. Cruz. (*Id*. at 7.) Dr. Austein testified that 80% of the inmates in the Pima County Jail have addiction problems. (*Id*. at 9.) He testified that drug addicts are typically self-medicating other psychiatric problems, and he related that cocaine and meth users use those drugs to feel normal. (*Id*. at 13-14.) Dr. Austein testified that drug addiction leads to crime and that drug addiction is an illness. (*Id*. at 16-17.) He said that addicts need extensive ongoing treatment. He testified that crystal meth is horribly addictive and the use of the drug is associated with paranoia, long periods without sleep and resulting psychosis and violence. (*Id*. at 20-22.) He said that Mr. Cruz used a lot of different drugs including meth, and he characterized Mr. Cruz as a drug addict. (*Id*. at 22-23.)

188.   On cross-exam, Dr. Austein contradicted his own testimony about addiction and said that people who use drugs make the choice to do so. (*Id*. at 25.) He also testified that using illegal drugs instead of legal methods to address personal problems is also a choice and the decision to quit drugs is also a personal choice. (*Id*. at 26-27.) Dr. Austein said that plenty of treatment is available, through Medicaid, AA 12 steps; nevertheless some people choose a lifestyle of illegal drug use. (*Id*. at 28-29.) Dr. Austein said a drug screen at the time of Cruz's arrest was positive for meth and cocaine. He saw no psychiatric diagnosis for Mr. Cruz in the records he reviewed. Dr. Austein admitted he had no idea what role drugs played in Mr. Cruz's conduct on the day of the offense, or whether Mr. Cruz was under the influence. (*Id*. at 30-31, 33-34.)

189.   The takeaway from Dr. Austein's testimony is that he knew nothing

1   about Mr. Cruz and that illegal drug use is simply a matter of choice, as is the
2   decision not to seek treatment.

3       190.   Mitigation witness Dr. Hector Barillas. Dr. Barillas is a clinical
4   psychologist. (Tr. Mar. 3, 2005 at 37.) He examined Mr. Cruz, reviewed some case
5   records and interviewed some family members. (*Id*. at 38.) He prepared a report and
6   relied on a report of neuropsychologist Shannah Biggan. (*Id*. at 39-40.) He also
7   reviewed school records, Illinois Department of Corrections records, and a timeline
8   of Mr. Cruz's life.  (*Id*. at 39, 44.) He described Mr. Cruz's criminal record to
9   include a 1993 drug possession, marijuana trafficking in Illinois in 1997, a 1994
10  charge of fleeing from a police officer which resulted in a conviction in 1999 and a
11  2004 conviction for felon in possession of a weapon for conduct in 2002. (*Id*. at 45-
12  46.)

13      191.   He  suggested  that  Mr.  Cruz  be  referred  to  Dr.  Biggan  for
14  neuropsychological testing because when he administered the WAIS III to Mr. Cruz,
15  he showed some weaknesses in memory, and he was not sure if Mr. Cruz had a
16  problem or not. (*Id*. at 47.)  Mr. Cruz's counsel elicited testimony from Dr. Barillas
17  that Dr. Biggan found Cruz had no serious memory problems or deficits. (*Id*. at 47.)
18  He also related that he looked for evidence in Mr. Cruz's school records with respect
19  to whether he had a diagnosis of learning disability and said that such a diagnosis
20  had been ruled out.[20]

21      192.   Dr. Barillas testified that Mr. Cruz had an extensive history of drug use
22  starting in his teens and increasing after age 21. He related that Mr. Cruz used LSD
23  over 100 times, and used cocaine, marijuana and meth. (*Id*. at 49-50.) He understood
24  that Mr. Cruz had used drugs to within 24 hours of the offense. (*Id*. at 49-50.) He

25  _____

26  [20] As explained below, Mr. Cruz's trial counsel failed to supply Dr. Barillas with the
27  complete set of school records they had in their own files, which contained evidence
    that Mr. Cruz did have an obvious cognitive disorder and he was diagnosed learning
28  disabled and placed into the adaptive education program.

diagnosed Mr. Cruz with cocaine and meth dependence. (*Id*. at 51.)

193.   Dr. Barillas testified that Mr. Cruz was influenced to take drugs by the loss of his father, lack of emotional support from his mother, and negative family and peer influences. (*Id*. at 53.) But he provided no explanation as to the psycho-social dynamics that might have contributed to Mr. Cruz's drug use. (*Id*. at 49-102.) He also said (in direct conflict with the testimony of three other Cruz family members) that the father was a poor role model because of domestic violence and possible alcohol abuse. (*Id*. at 61.)

194.   Dr. Barillas considered and then made a diagnosis of Post-Traumatic Stress Disorder (PTSD) for Mr. Cruz.  He cited reports from Mr. Cruz and others that Mr. Cruz was shot at on three separate occasions during the days leading up to the offense. Without identifying any of the diagnostic criteria for PTSD, Dr. Barillas testified that psychostimulants like cocaine, methamphetamine and amphetamine will "rev you up" and make you "more reactive than normal."  (*Id*. at 67, 69-71, 73.) He then volunteered that it was difficult to make diagnosis of PTSD. (*Id*. at 83.)

195.   Dr. Barillas testified that Mr. Cruz suffered from impairments in his ability to conform his conduct to the requirements of the law, but he did not tie those impairments to his mental state or a diminished capacity at the time of the offense; instead he related Mr. Cruz's conduct to the overall adoption of an anti-social lifestyle spanning many years. (*Id*. at 81-83.) Dr. Barillas said that he did not discuss the offense with Mr. Cruz and he had no opinion about Cruz's state of mind at the time of the offense. (*Id*.)

196.   On cross-examination the prosecution challenged the conclusion that an abusive family environment molded Mr. Cruz into who he is. Dr. Barillas admitted that Mr. Cruz never told him that he had been physically abused by his father; he admitted there was some evidence of a close, loving relationship between Mr. Cruz and his father; and then conceded that it was possible Mr. Cruz's mother was lying about the father's abuse. (*Id*. at 87-88) Dr. Barillas was unprepared to say whether or

not Mr. Cruz acknowledged witnessing domestic violence. (*Id*. at 89.)

197.   Dr. Barillas was also unprepared to pinpoint when Mr. Cruz had last used drugs before the offense. (*Id*. at 90-91.) He was apparently not informed by Mr. Cruz's counsel that an eyewitness, Myra Moore, testified that she and Cruz stayed awake the night before using methamphetamines.[21]

198.   Dr. Barillas admitted that Mr. Cruz had received drug abuse treatment and that his in-laws (Tara White's parents) had tried to help him, but he accepted the prosecution's suggestion that Mr. Cruz went back to his old lifestyle and made the choice to go back to drugs. (*Id*. at 92-96, 98.) He also admitted that not everyone who has serious drug dependence commits serious crimes. (*Id*. at 99.)

199.   When asked if the murder of Officer Hardesty itself could have left Mr. Cruz with some symptoms of PTSD, Dr. Barillas said no, explaining, incredibly, that killing another human being at your own hands cannot cause PTSD. (*Id*. at 101-02.) As explained below, Mr. Cruz's lawyers would later present testimony from another expert witness who directly contradicted Dr. Barillas on this point.

200.   Finally, Dr. Barillas offered an unhelpful opinion based on research he had reviewed: while death-sentenced prisoners had only minor violent offenses, prisoners with parole-eligible life sentences were more violent than those sentenced to life without parole. (*Id*. at 77.)

201.   <u>Mitigation witness Lora Galioto</u>. Ms. Galioto was Mr. Cruz's high school girlfriend and mother of his first child, Jonathan. (Tr. Mar. 3, 2005 at 119.) She met Mr. Cruz in 1985, when he was 15 and she was 13. (*Id*. at 120.) Their son was born in 1989. (*Id*.) Ms. Galioto testified that she and Mr. Cruz used drugs (marijuana and LSD) in high school. (*Id*. at 124.) During these years, 1985-89, Mr.

---

[21] As explained below, Dr. Barillas was also deprived of significant additional evidence regarding Mr. Cruz's use of drugs in the days and hours leading up to the offense.

Cruz was living with Grandma Maria. Several of his uncles also lived at grandma's house. Ms. Galioto related that a lot of cocaine was being used at grandma's house. (*Id*. at 125-26.)

202. Ms. Galioto testified that at age 16 she got pregnant, but because Mr. Cruz's drug use escalated, she moved back to her mother's home. (*Id*. at 126-27.) Eventually, after the baby was born, she quit drugs and then broke up with Mr. Cruz due to his drug abuse and "quit being involved with him." (*Id*. at 130-31.)

203. On cross-examination, Ms. Galioto testified that when Mr. Cruz's mother sent money for the baby, Cruz took it and used it for drugs. (*Id*. at 131.) She also said that a few years prior Mr. Cruz came to Jonathan's birthday party high on drugs and displayed rage at Jonathan and she cut off the relationship. (*Id*. at 131-32.) Ms. Galioto related that Mr. Cruz mostly never held a job and failed to pay child support. (*Id*. at 132.)

204. Mitigation witness James Maccarelli. Maccarelli testified that during April/May 2003, he was living in an apartment on Geronimo Street in Tucson. He related that Mr. Cruz was staying in the apartment next door. During late April or early May (he was not sure of the exact date), gun shots were fired at him and Mr. Cruz as they stood and talked outside of their apartments. (Tr. Mar. 4, 2005 at 3, 5-9.) Another shooting at him and Mr. Cruz occurred a few days later. (*Id*. at 10-12.) On cross-examination, Maccarelli claimed that the police were called both times but they never came out. (*Id*. at 14.) He also said that after the shootings there was a police raid on the Cruz apartment but Mr. Cruz was not there. (*Id*.)

205. Mitigation witness Dr. Laura McCloskey. Dr. McCloskey testified that she was a developmental psychologist and associate professor at University of Pennsylvania; that she had previously taught at Harvard, as well as the University of Arizona in Tucson for eleven years. (Tr. Mar. 4, 2005 at 18-19.) Dr. McCloskey's principal expertise was on the effects of domestic violence on children, and she published over 30 articles on that subject. (*Id*. at 20.) She reviewed file material,

consisting of life history records, interviews of *some* of the family members, and child custody records from Mr. Cruz's parents' divorce proceedings and she interviewed some family members and spoke to Mr. Cruz. (*Id*. at 23.)

206.  Dr. McCloskey testified that children exposed to domestic violence before age 5 have more problems as adolescents. (*Id*. at 24-25.) She expressed the opinion that Mr. Cruz was abused psychologically and physically and neglected from middle childhood. (*Id*. at 25.) Dr. McCloskey based her opinion on the assumption that Cruz was exposed to chronic severe domestic violence and that Mr. Cruz's father had beat him with a belt and had terrible anger issues.

207.  Dr. McCloskey testified that Mr. Cruz's mother's mental health problems would have caused excessive anxiety for him and caused him to feel abandoned. (*Id*. at 34.) Feelings of abandonment were compounded by step-parents who disliked him and the loss of his father. (*Id*. at 34-35.) Dr. McCloskey testified that ultimately Mr. Cruz's inability to cope with the stressors led him to self-medicate with drugs. (*Id*.) She related that Mr. Cruz's use of LSD over 100 times after his father's death reveals an effort to escape to a mental state that mirrors schizophrenia. (*Id*.)

208.  Dr. McCloskey opined that Mr. Cruz started using drugs to drown out his own trauma. (*Id*. at 44.) She said that kids exposed to domestic violence do better if they have a healthy mother but Mr. Cruz did not have one. (*Id*.) Emphasis was placed on her assumption that Mr. Cruz was exposed to brutal domestic violence; that his mother was hit all the time and that it was chronic and severe. (*Id*.)

209.  Problematically, on cross-examination, Dr. McCloskey had to admit that she had met with Mr. Cruz just one time on the previous day. (*Id*. at 53.) Although her primary focus had been on Mr. Cruz's exposure to domestic violence, Dr. McCloskey said that she did not speak to or consider the testimony of members of Mr. Cruz's father's family who threw cold water on the idea that Mr. Cruz had been exposed to domestic violence.  (*Id*. at 59-60.)

210.   When asked if she agreed with the diagnoses of Dr. Barillas and Dr. Biggan, who found that Mr. Cruz did not suffer from serious psychopathology — she disagreed with Dr. Barillas and then contradicted Dr. Barillas's testimony that the symptoms of PTSD could not arise from Mr. Cruz's shooting of Officer Hardesty; she agreed he could have developed PTSD from the shooting. (*Id*. at 85-86.)

211.   <u>Mitigation witness Dr. Edward French</u>. Dr. French testified that he had a Ph.D. in Pharmacology and that he was a professor at University of Arizona Department of Medicine since 1988. (Tr. Mar. 4, 2005 at 106-07.)  Dr. French related that Pharmacology includes the study of what drugs do to the body and the study of drug reactions. (*Id*.)  Certain drugs do things to the brain which create craving and addiction. He has studied the effects of cocaine and meth. (*Id*. at 109.)

212.   Dr. French testified that the body's physical reactions to cocaine and meth are similar. Meth is a more potent stimulant but both cocaine and meth produce similar behaviors. And they are both very addictive. (*Id*. at 113, 116.) He explained that meth changes brain chemistry; it boosts neurotransmitters in the brain (i.e., the chemicals that allow one nerve cell to talk to another nerve cell). The neurotransmitters affected include those related to pleasure, mood, sex, sleeping and eating. Long-term effects include neurotoxicity (damage to brain).  Most typically meth will damage cortical and limbic areas of the brain. (*Id*. at 117-18.)

213.   Dr. French testified that post-arrest medical records show that Mr. Cruz had high levels of cocaine and meth in his urine but he could have ingested those drugs between 12 hours and 2-3 days earlier. (*Id*. at 119, 121.) (Apparently, Mr. Cruz's trial counsel failed to alert Dr. French to the testimony of an eyewitness, Myra Moore, who testified that she and Mr. Cruz were awake the night prior to the offense using methamphetamine).

214.   Dr. French further testified that meth makes the user hyper, jittery, restless, anxious, irritable, impulsive, and it can create delusional feelings of

invincibility. (*Id*. at 123.) Meth also increases release of Dopamine, which results in a feeling of pleasure and contributes to addiction. Use of meth and cocaine will cause sleep deprivation most often for more than a day or two. Meth can cause people to overreact, and it increases aggressiveness and belligerence. (*Id*. at 129.) Dr. French related that tweaking; i.e., when you are starting to come down and crash, is a very dangerous time, symptoms become increased with extreme paranoia and sometimes unpredictable violence. (*Id*. at 130.)  However, Dr. French did not evaluate whether Mr. Cruz was under the influence. (*Id*. at 131.) On cross-examination, Dr. French said he did not know how much meth Mr. Cruz used or what its effects were on him. (*Id*. at 131-32.)

215.  Mitigation witness James Aiken. Mr. Aiken testified that he was a former corrections warden and correctional consultant. (Tr. Mar. 4, 2005 at 137.) His prior experience included being a warden in South Carolina and Indiana. (*Id*. at 138, 141, 143.) He testified that he had been involved in executions and that he had helped perform two of them.

216.  Mr. Aiken testified that he had reviewed all of Mr. Cruz's prison and jail records. He concluded from his review that Mr. Cruz would not be considered predatory, that he would be categorized as among the least dangerous prisoners and that he would remain in strict confinement where he could be effectively managed for the rest of his life. (*Id*. at 152, 155.)

217.  On cross-examination, Mr. Aiken admitted that he had testified in Pima County Superior Court on three to four other occasions in the past year or so and his testimony for each defendant was essentially the same, that the prisoner can be "managed," and in fact he gave the substance of such testimony in favor of a defendant who had assaulted other inmates and guards. (*Id*. at 163.)

218.  Mr. Cruz's Allocution. On the advice of his counsel, Mr. Cruz presented a statement to the jury. He said he was very sorry that Officer Hardesty died, but he denied killing him, and he stressed that he would never admit to

something he did not do. (Tr. Mar. 8, 2005 at 27, 30.) He said that he felt indirectly responsible because if he had not run away from the officer, the officer would not have been shot by the unknown perpetrator. (*Id.* at 27.) He told the jurors that if it would make them feel better, they should sentence him to death. (*Id.* at 28.)

219.   <u>Closing Arguments</u>. During the defense closing argument, Mr. Storts' lead argument was that in order to get the death penalty, the state was triple counting the fact the victim was a police officer. (Tr. Mar. 8, 2005 at 39-40.) He argued that the death penalty was not mandatory in the case of the death of a police officer and that each juror had the power to vote for life no matter how other jurors vote. (*Id.* at 40-42.)

220.   Mr. Storts summarized the "conflicting evidence" he and Mr. Basham had presented on Mr. Cruz's family background by conceding that no one really knows what went on in the home. (*Id.* at 42-44.)

221.   Then he discounted all of the expert witness testimony that had been presented, explaining:

> [T]he problem with expert witnesses, when you start talking about psychological problems and post-traumatic stress disorder and dysfunctional families and how that impacts upon kids and whether or not somebody is loved as a child or not, it all gets to be a little too much. And frankly it gets to the point when many times when we use experts, you know, we, as lawyers, have a tendency to think you can get an expert up there.  Let's do it.  And the only problem with most experts are [sic] they don't really tell you things that you don't already know."

(*Id.* at 45-46.)

222.   Mr. Storts argued that the testimony of Dr. French and Dr. Austein had impact because it showed how horrible crystal meth is; "you have no control in a lot of ways."  It does not justify the death of Officer Hardesty, but it is "offered as a basis for a mitigator which is weighed against the aggravator to save John Cruz's life."  (*Id.* at 46-47.)

223.   In the state's closing, the prosecutor argued that the mitigation was not sufficient to call for leniency.  He cited Mr. Cruz's allocution as the best reason to deny leniency. Mr. Cruz's "words rang absolutely hollow"; Mr. Cruz wanted to "perpetrate the myth that somehow someone else must have come in from somewhere and committed this murder. They didn't, he did." (Tr. Mar. 8, 2005 at 50.) He argued that Mr. Cruz's failure to accept responsibility for the murder was the same as his failure to accept responsibility for his own actions throughout his entire life—for his children, for his wife, for anything "because he made choices to do what he wanted to do." (*Id*. at 50-51.)

224.   The prosecutor summed up the defense mitigation case as asking for leniency because Mr. Cruz was a drug abuser and came from a dysfunctional family. But the prosecutor argued that what the case was really about was that Mr. Cruz made choices, albeit the wrong choices over the past two decades. (*Id*. at 51-52.)

225.   In rebuttal, perhaps not hearing the prosecutor attack Mr. Cruz for his failure to accept responsibility, Mr. Storts argued Mr. Cruz should be spared because all doubt about his guilt has not been removed. (*Id*. at 70.) But whether Mr. Storts realized it or not, it had been. It was too late for Mr. Storts to be arguing his client was not sufficiently proven guilty; instead Mr. Cruz needed to accept responsibility for what was proven he had done and to demonstrate circumstances that were truly mitigating. This was never done, but as we explain below, it could have been without any difficulty. Under the circumstances, on March 10, 2005, the jury unanimously determined to impose a death sentence. (ROA 630.)

### 6)   Direct appeal proceedings.

226. On May 18, 2005, David Darby was appointed to represent Mr. Cruz during his direct appeal proceedings. (ROA 666.) Mr. Darby requested ninety-day extension to file Mr. Cruz's opening brief, which was granted by the court on March 7, 2006 (Ariz. Sup. Ct. Doc. Nos. 35-36.) The court granted seven requests for

extension of time to file Mr. Cruz's opening brief. (*See* Ariz. Sup. Ct. Doc. Nos. 35-49.) A show cause hearing was held on January 19, 2007 as result of counsel's repeated requests for delay; counsel was given a final extension and ordered to file Mr. Cruz's opening brief on March 5, 2007. (Ariz. Sup. Ct. Doc. No. 50.) Counsel did not file Mr. Cruz's brief until March 12, 2007. (Ariz. Sup. Ct. Doc. No.  53.) However, the court granted Mr. Darby's request to treat the brief as timely filed. (Ariz. Sup. Ct. Doc. No. 52-53.)

227.   In the Opening Brief, counsel raised five categories of issues, each of which included multiple subparts. (Ariz. Sup. Ct. Doc. No. 51.) First, counsel raised four jury issues, including: asserting trial court error for failing to change venue; failing to sequester the jury; and failing to strike multiple jurors.[22] (*Id.* at 39-63.) Second, counsel raised six pretrial issues, which included: a challenge to the constitutionality of Rule 20; assertions of trial court error for failing to determine pretrial whether it would sentence Mr. Cruz to life or natural life and for failing to increase peremptory strikes; a challenge to the use of statements made by Mr. Cruz; and claims related to third party culpability.[23] (*Id.* at 64-72.) Third, counsel raised ten trial issues, including: six mistrial motions made by trial counsel; a challenge to Myra Moore's testimony alleging intoxication; allegations of a coercive jury instruction; improper use of a shock belt on Mr. Cruz; and gruesome photographs.[24] (*Id.* at 72-105.) Fourth, counsel raised two penalty phase issues: a constitutional challenge to the (F)(10) aggravator and an assertion of trial court error for failing to

---

[22] Mr. Cruz has not raised the change of venue or failure to sequester the jury claims in this habeas petition.

[23] Mr. Cruz has not raised any of the pretrial issues in this habeas petition.

[24] Mr. Cruz has not raised several of the identified issues including: the challenge to a solitary photograph as gruesome; the challenge to the testimony of witness Myra Moore; and trial counsel's mistrial motion related to DNA evidence

instruct Mr. Cruz's jury on residual doubt.[25] (*Id.* at 105-11.) Finally, direct appeal counsel presented twenty-one issues to avoid preclusion in federal court, including at least two that were factually inapplicable to Mr. Cruz's case and several others that were not properly federalized for review.[26] (*See id.* at 111-15.)

228. Appellee's Answering Brief was filed on September 6, 2007. (Ariz. Sup. Ct. Doc. No. 60.) Direct appeal counsel received three extensions of time to file his Reply Brief, with the last court order directing filing no later than December 21, 2007. (Ariz. Sup. Ct. Doc. Nos. 62, 64-66, 68-69.) However, Mr. Cruz's reply brief was filed five days late, on December 26, 2007. (Ariz. Sup. Ct. Doc. No. 71.)

229. Oral argument on the merits of Mr. Cruz's appeal was held on February 14, 2008. (Ariz. Sup. Ct. Doc. No. 74.) The Arizona Supreme Court rejected each of Mr. Cruz's claims in an opinion issued on April 21, 2008. (Ariz. Sup. Ct. Doc. No. 75.); *State v. Cruz*, 181 P.3d 196 (2008).

230.   With respect to the jury's decision to impose a sentence of death, the Arizona Supreme Court found (1) that Mr. Cruz had failed to prove that he was suffering from any significant mental illness or that he was under the influence of drugs at the time of the offense; (2) that much of his mitigation evidence had been rebutted; (3) that he had established little or no causal relationship between the mitigating circumstances and the crime; and (4) his less than ideal early life in combination with the other described weaknesses in his mitigation case would require the conclusion that the jury did not abuse its discretion by imposing a sentence of death.  Accordingly, the Arizona Supreme Court affirmed the sentence. *Cruz*, 181 P.3d at 217-18.

---

[25] Mr. Cruz has not raised the challenge to the trial court's failure to instruct on residual doubt in this habeas petition.

[26] Mr. Cruz has not raised the second, third, fourth, fourteenth, and twenty-first issues raised to avoid Federal court preclusion in this habeas petition.

### 7)     State postconviction proceedings.

231.   On February 5, 2009, the Arizona Supreme Court issued a Notice for Post-Conviction Relief. (Ariz. Sup. Ct. Doc. No. 84.) On June 10, 2010, Gilbert Levy, a Seattle, Washington attorney, was appointed to represent Mr. Cruz in his state postconviction proceedings. (Ariz. Sup. Ct. Doc. No. 86.) On October 27 2010, Mr. Levy filed the first petition for postconviction relief. (PCR First Pet. for Postconviction Relief, Oct. 27, 2010.) On November 15, 2010, the court struck the petition due to its failure to cite the record and the failure to include citations to supporting legal authority. (PCR Order, Nov. 15, 2010.) Mr. Levy refiled the petition on December 10, 2010. In that petition, Mr. Levy generally alleged that Mr. Cruz was denied effective assistance of counsel when trial counsel failed to present evidence that Mr. Cruz was suffering from an amphetamine psychosis at the time of the offense. (PCR First Pet. for Postconviction Relief, Dec. 10, 2010.)  On March 11, 2011, Mr. Levy sought an extension of time to file an amended petition for postconviction relief. In support of his requested extension, Mr. Levy reported that Margaret DiFrank, the mitigation specialist during the trial-sentencing phase, had just been retained to investigate mitigation for the postconviction phase, and that DiFrank was reporting that because she did not have adequate time to investigate mitigation for Mr. Cruz's sentencing, she needed additional time to complete such investigation for the postconviction proceedings. (PCR Mot. for Ext. of Time, Mar. 11, 2011.)

232.   On May 5, 2011, Ms. DiFrank submitted a sworn Declaration in support of an additional request to extend the deadline for filing the amended postconviction petition. (PCR Margaret DiFrank Decl., May 5, 2011.) In this Declaration, Ms. DiFrank recounted the difficulties the trial team had with the original mitigation specialist, Mary Durand, and she explained that despite the fact that Ms. Durand had done little work and interviewed no mitigation witnesses, Mr.

Storts would not agree to continue the trial date, which "guaranteed that a proper mitigation investigation could not be accomplished prior to trial." (*Id*. at 2.) Ms. DiFrank then related that although she had no prior experience and lacked any knowledge about how to investigate mitigation for a capital sentencing, trial counsel delegated to her the responsibility for locating and interviewing mitigation witnesses. (*Id*. at 2-3.) Mr. Storts delegated to his spouse and paralegal the separate task of collecting potentially mitigating records. (*Id*. at 2-3.) Ms. DiFrank further stated that since her work on the Cruz sentencing, she had received training on the proper function of a mitigation specialist, and she had garnered several years of working experience as a mitigation specialist. (*Id*. at 3.) DiFrank then concluded based on her current experience that significant mitigation investigative tasks not conducted prior to Mr. Cruz's sentencing still needed to be completed. (*Id*. at 3-4.)

233.   On September 30, 2011, Mr. Levy filed his own Declaration disclosing that Mr. Cruz's trial counsel (Storts and Basham) had discovered that Ms. DiFrank had been appointed to work as the mitigation investigator in the postconviction proceedings. According to Levy, Storts and Basham were displeased; they objected to DiFrank's appointment alleging that there was a conflict of interest created by Ms. DiFrank's dual role as the original sentencing mitigation investigator and her renewed role in that capacity for the postconviction proceedings. (PCR Gilbert Levy Decl., Sept. 30, 2011.)   Mr. Levy requested a hearing to resolve the conflict of interest allegations. (PCR Mot. for Hr'g., Sept. 30, 2011.)

234.   Mr. Levy attached several letters to his September 30 Declaration. One of the letters was authored September 6, 2011, by David Basham and addressed to Caryn Caramella at the Pima County Office of Court Appointed Counsel. Citing a conflict, Mr. Basham objected to Ms. DiFrank's appointment to the Cruz postconviction case, and he disputed Ms. DiFrank's claim that she was not qualified to conduct the pre-sentencing mitigation investigation. (PCR Gilbert Levy Decl. at Ex. A.) Further, Mr. Basham insisted that between them, Mr. Storts and Mr. Basham

had "been involved in over fifty first degree murder cases and *close to thirty death penalty cases* . . . and that [b]ecause of our experience and background, we chose to personally supervise and proceed with the preparation and presentation of John Cruz's mitigation defense." (PCR Gilbert Levy Decl. at Ex. A.) (italics supplied) As we noted earlier above, and explain in more detail below, Mr. Basham's claims regarding his capital case experiences and those of Mr. Storts had no basis in reality. Nevertheless, on the next day, Mr. Storts submitted his own rejoinder in Mr. Basham's capital case experience claims, noting in his own letter to Ms. Caramella, that he "concur[red]with the entire contents of the [Basham] letter." (PCR Gilbert Levy Decl. at Ex. B.)

235.   On October 11, 2011, Mr. Levy filed a motion to conduct the deposition of Mr. Storts. (PCR Mot. for Dep., Oct. 11, 2011.) In his declaration supporting the motion for deposition, Mr. Levy cited the need to examine Mr. Storts with respect to: (1) the failure to secure the assistance of a qualified mitigation specialist; (2) the failure to provide expert witnesses with information needed to render full and complete opinions. Mr. Levy cited Mr. Storts' recent letter, threatening that either he or the attorney general would take legal action responsive to the DiFrank conflict of interest and confirming he would not appear in court without a subpoena. (PCR Gilbert Levy Decl., Oct. 17, 2011.)  Ultimately, however, Mr. Levy withdrew both his request for a hearing regarding the conflict of interest allegations and his request for deposition. (PCR Req. to Strike Hr'g., Oct. 31, 2011.)

236.  On January 27, 2012, Mr. Levy filed the amended petition for postconviction relief. (PR Appx. at 787-821, PCR Am. Pet. for Postconviction Relief, Jan. 27, 2012 ("PCR Pet."))   In the amended petition, Mr. Levy alleged several different claims: (1) that Mr. Cruz was denied his Sixth Amendment right to conflict-free counsel when Mr. Storts retained Kenneth Peasley, a former prosecutor who had been disbarred for suborning perjury, to assist in the preparation of Mr.

Cruz's case;[27] (2) Mr. Cruz was denied effective assistance of counsel at trial when trial counsel failed to challenge the credibility of police officer witnesses Waters, Rocha and Merrill;[28] (3) Mr. Cruz was denied effective assistance of counsel at sentencing when his counsel failed to adequately investigate and present mitigation evidence at sentencing. (PR Appx. at 794-809, PCR Pet. at 8-23.) In support of this latter claim of ineffective assistance, Mr. Levy presented the following evidence.

### (a)   Summary of Mr. Cruz's postconviction evidence

237.   Declaration of Margaret DiFrank. In her declaration in support of the amended petition, Ms. DiFrank recounted that when she was assigned mitigation tasks in connection with preparation for Mr. Cruz's sentencing, she lacked any training, knowledge or experience. (PR Appx. at 845, PCR Pet. Ex. 4 at 2). In other words, she was not qualified to conduct a mitigation investigation. Ms. DiFrank recounted that her role was circumscribed to interviewing witnesses. She explained that mitigation records collected by another team member were never shared with her, and she did not even begin interviewing potential mitigation witnesses for the sentencing until August 2004. DiFrank also avowed that when she told Mr. Basham that she would not have time to conclude her mitigation assignments, Mr. Basham offered no solution and rebuffed the idea that she could get additional time, by explaining that Storts "was very strict about time limits." Independently, DiFrank

---

[27] In connection with this claim, Mr. Levy alleged that Mr. Peasley had loyalties to his former colleagues at the Pima County Attorney's office and the police department, and that he in essence sabotaged Mr. Cruz by drafting Mr. Cruz's allocution, knowing that Mr. Cruz's denial of responsibility during the allocution would help the state obtain a death sentence. Mr. Levy alleged that Mr. Storts was tainted by Mr. Peasley's conflict of interest. Mr. Cruz has not presented this Peasley/Storts conflict of interest claim in his federal habeas petition.

[28] This claim was not presented by Mr. Levy in his petition for review to the Arizona Supreme Court and therefore it is an unexhausted claim. Mr. Cruz does not seek to resurrect the claim in these proceedings.

clearly understood that Mr. Storts wanted to take the case to trial as quickly as possible. (*Id*. at 846, PCR Pet. Ex. 4 at 3.) DiFrank related that due to "lack of experience, limited responsibilities, no coordination with incoming records, unrealistic time constraints [her] ability to identify and develop mitigating factors was severely compromised." (*Id.*) DiFrank claimed, however, that since the Cruz sentencing, she had obtained training and experience as a mitigation specialist and she employed that training and experience to obtain additional evidence from witnesses "that was neither presented to the [Cruz sentencing] experts nor to the jury. . . ." Some of the additional evidence discovered by DiFrank in the postconviction proceedings is presented below.

238.   Ana Rodriguez Montenegro. Ana is Mr. Cruz's maternal aunt through marriage. She is married to Albert Montenegro, Jr. Albert is the brother of Mr. Cruz's mother, Julie. Ana provided a statement to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 939-41, PCR Pet. Ex. 20.) Although she was identified as a potential witness in the pre-sentencing mitigation disclosure, (ROA 240 at 7), she was never contacted or interviewed until the postconviction proceedings. (PR Appx. at 939-41, PCR Pet. Ex. 20 at 3.) Ana's statement related: (1) She had frequent contact with Mr. Cruz and his parents and she babysat Mr. Cruz when he was an infant. (2) Mr. Cruz's parents were "always arguing" so little Johnny (i.e., Mr. Cruz) was always in distress. (3) Ana and her husband would come to Mr. Cruz's parents' home on a moment's notice when Mr. Cruz's mother would frantically call them to come get her when "arguing got out of hand," and on such occasions they would find little Johnny clinging to his mother and crying hysterically; and there were concerns expressed on some of these occasions about whether Mr. Cruz's father might kill his mother. (4) Ana recalled one incident where Mr. Cruz's father had his mother Julie down on the ground beating her in little Johnny's presence. (5) Ana's memories include Mr. Cruz's father verbally abusing Julie, calling her a whore and threatening to kill her. (6) Ana also related that her

mother-in-law, Maria (Julie's mother) was upset because Mr. Cruz's step-father, Steve Lingenfelter, was supplying cocaine to Julie. (7) Ana also confirmed that beginning when he was a teen, Mr. Cruz was exposed to his uncles Lalo and Luis getting high and selling drugs, including crack cocaine, day and night. (*Id.* at 939-41, PCR Pet. Ex. 20 at 1-3.)

239.   Albert Rodriguez Montenegro, Jr. Albert is Mr. Cruz's maternal uncle and eldest brother of his mother Julie. Albert has been married to Ana (whose declaration is discussed just above) for 44 years. Albert provided a statement to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 943-46, PCR Pet. Ex. 21.) Although he was identified as a potential witness in the pre-sentencing mitigation disclosure, (ROA 240 at 7), he was never contacted or interviewed until the postconviction proceedings. (PR Appx. at 945, PCR Pet. Ex. 21 at 3.) Albert's statement related: (1) When he was a child, his mother (Mr. Cruz's grandmother Maria) supported her eight children, who lived in a three room unfinished house without plumbing, while his father Albert, Sr., a violent alcoholic and womanizer, contributed nothing. (2) Albert was very well acquainted with Mr. Cruz's father in and out of family settings, as he had worked for many years with Mr. Cruz's father. Albert described Mr. Cruz's father as mean, raging and arrogant and provided several examples of same. (3) Albert said that Mr. Cruz's father was routinely verbally abusive to Cruz's mother, Julie, and to Mr. Cruz as well. (4) He remembers his sister Julie calling him to come get her out of the house because Mr. Cruz had been physically abusive to her. (*Id.* at 943-46, PCR Pet. Ex. 21 at 1-4.)

240.   Daniel Montenegro. Daniel is also one of Mr. Cruz's maternal uncles and a brother of his mother, Julie. Daniel provided a statement to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 948-50, PCR Pet. Ex. 22.) Although he was available, he was never contacted or interviewed until the postconviction proceedings. (*Id.* at 950, PCR Pet. Ex. 22 at 3.) Daniel's statement related that: (1) His father Albert, Sr., had sexually molested his own granddaughter, Daniel's

daughter Alicia. (2) He confirmed that Mr. Cruz was exposed to his uncles' drug use and drug dealing while just a young teen living at his grandmother's home, and he was separately exposed to his own mother Julie's use of illegal drugs, including crack cocaine. (3) Daniel recounted his own drug addiction, which began at age 11 with paint and glue sniffing, and progressed to use of heroin and cocaine, as well as drug dealing and abuse of prescription drugs. He attributes the damage to his large and small intestines (they both burst on separate occasions) to his abuse of drugs. (4) Daniel confirmed that when he was just a child, Mr. Cruz's step-mother Lydia would lock him out of the house all night long and that after Mr. Cruz's father died, he became depressed and did not care about anything. (*Id*. at 948-50, PCR Pet. Ex. 22 at 1-3.)

241. Edward "Lalo" Montenegro. Edward is also one of Mr. Cruz's maternal uncles and a brother of his mother, Julie. Edward provided a statement to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 955-56, PCR Pet. Ex. 24.) Although he was available, he was never contacted or interviewed until the postconviction proceedings. (*Id*. at 956, PCR Pet. Ex. 24 at 2.) Edward's statement related: (1) His father, Albert, Sr., hated him and subjected him to frequent beatings and physical abuse. (2) He claimed not to recall "what went on" at his mother Maria's house in the 1980s when he and the young teen Mr. Cruz lived there together; although several others have consistently reported that Edward was constantly using and dealing drugs while Mr. Cruz was present. (3) He admitted to a chronic use of crack cocaine. (4) He corroborated that Julie had a major drug-addiction problem, stating that whenever she came to Tucson from California, at her request he would always supply her with cocaine. (*Id*. at 955-56, PCR Pet. Ex. 24 at 2.)

242. Luis Montenegro. Luis is another one of Mr. Cruz's maternal uncles and a brother of his mother, Julie. Luis provided a statement to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 964-66, PCR Pet. Ex. 27.) Although

he was available, he was never contacted or interviewed until the postconviction proceedings. (*Id.* at 966, PCR Pet. Ex. 27 at 3.) In his statement, Luis recounted: (1) Mr. Cruz was in and out of his grandmother, Maria's, house from age eleven onward, and throughout this time, adults in the home were using illegal drugs in Mr. Cruz's presence. (2) Because Mr. Cruz's grandmother was always working, Mr. Cruz was literally "on his own" without any supervision while living at her home. (3) As a child, Mr. Cruz was depressed, a condition which worsened after the death of his father. (*Id.* at 964-66, PCR Pet. Ex. 27 at 1-3.)

243. <u>Susan Alcaraz</u>. Susan is Mr. Cruz's maternal aunt and his mother's younger sister. Susan did testify at Mr. Cruz's sentencing. In response to more thorough questioning than had been interposed prior to Mr. Cruz's sentencing, Susan provided a statement furnishing new information to Ms. DiFrank in the state postconviction proceedings. (PR Appx. at 973-78, PCR Pet. Ex. 29.) Ms. DiFrank related the following: (1) Susan recounted the level of severe dysfunction in her childhood home, primarily centered around her father's severe alcoholism and the associated acts of violence and terror that he brought into the family home. (2) Susan explained that her sister Julie never met Mr. Cruz's emotional needs, and by the time he was four or five, Julie had an active evening social life that included recreational drugging and promiscuity. (3) Susan explained that by the time Julie moved to California in 1982, when Mr. Cruz would have been around twelve, her drug usage was rampant, and Mr. Cruz was bounced around between his mother in California, his father's house, his grandmother Maria's house and Susan's home. There was no supervision at his grandmother's home, and his step-mother subjected Mr. Cruz to maltreatment. (4) Once Mr. Cruz's mother met her future husband, Steve, things did not improve as Steve did not like Mr. Cruz and would not allow him to share the family's living quarters; thus Mr. Cruz was forced to live in a separate area downstairs from the main family residence. (5) Steve was a pharmacist, and he supplied Julie with prescription drugs. (6) Julie was also heavily dependent on

alcohol, and Susan had seen her drink as many as 30 beers and heavily consume tequila. (7) When Mr. Cruz's father died, when Mr. Cruz was 15, he was devastated, but his mother Julie did not comfort him. (*Id.* at 973-78, PCR Pet. Ex. 29 at 1-6.)

244.   Henry Cruz. Henry is one of Mr. Cruz's paternal uncles. He was not interviewed prior to Mr. Cruz's sentencing. During a recorded interview in the postconviction proceedings, Henry tearfully made it clear that alcoholism and violence were not unique to the maternal (Montenegro) side of Mr. Cruz's family, when he described that his own father, Mr. Cruz's paternal grandfather was an extremely violent alcoholic, who spent most of his earnings on liquor and other women. (PR Appx. at 1133-39, PCR Pet. Ex. 31 at 14-20.) Thus, it was learned that Mr. Cruz's father was exposed to significant dysfunction and domestic violence during his own childhood.

245.   Tara White. Ms. White was Mr. Cruz's wife. She did testify at Mr. Cruz's sentencing. In response to more through questioning during a recorded interview during the postconviction proceedings stated: (1) Mr. Cruz suffered from severe bouts of depression and frequent thoughts of suicide during the time she knew him. (PR Appx. at 1069, 1087, PCR Pet. Ex. 33 at 22, 41.) (2) Mr. Cruz had nightmares about beatings by his father and Mr. Cruz recounted being beaten by his step-father Steven Lingenfelter. (*Id.* at 1073, PCR Pet. Ex. 33 at 26, 31.)[29]  (3) Mr. Cruz was always very sweet to her and never violent.  (*Id.* at 1096, PCR Pet. Ex. 33 at 50.)

246.   Julie Lingenfelter. Ms. Lingenfelter was Mr. Cruz's mother. She did testify at the sentencing hearings. Her 2011 recorded interview was submitted in support of the postconviction petition. (PR Appx. at 1027-47, PCR Pet. Ex. 32.)

---

[29] Page 31 from Exhibit 33 of the Amended Petition for Postconviction was not submitted to the Arizona Supreme Court with the filing of the Petition for Review Appendix.

247.   <u>Romelia Holguin</u>. Ms. Holguin is Mr. Cruz's paternal aunt; the sister of his father. She testified at the sentencing hearings. In response to more thorough questioning she corroborated her father's alcohol abuse and exhibitions of domestic violence. (PR Appx. at 1133-39, PCR Pet. Ex. 36 at 14-20.)

248.   <u>Lora Galioto</u>. Ms. Galioto met Mr. Cruz in high school; they became close friends and she gave birth to Mr. Cruz's first child, Jonathan.  Ms. DiFrank submitted a summary of her interview of Ms. Galioto in the state postconviction proceedings. (PR Appx. at 968-71, PCR Pet. Ex. 28.) Ms. Galioto elaborated on the sheer excess of illicit drug use and large quantity dealing that Mr. Cruz was exposed to by his maternal uncles during his early teen years and onward. She also corroborated what others have said regarding Mr. Cruz's underlying peaceful temperament; that she had never seen him direct violence at another person and that he was a loving and affectionate person. (*Id*. at 968-70, PCR Pet. Ex. 28 at 1-3.)

249.   <u>Dr. Laura McCloskey</u>. Dr. McCloskey testified during the sentencing proceedings. Dr. McCloskey reviewed the witness statements/summaries identified above and found considerable additional new evidentiary support for her sentencing testimony that "John endured substantial hardship as a child." (PR Appx. at 1163, PCR Pet. Ex. 38 at 12.) Dr. McCloskey explained that Mr. Cruz had endured a level of abuse that created a substantial risk that he might engage in violent offending, including, "neglect, physical child abuse, witnessing domestic violence, parental drug addiction, divorce, frequent moves, stepfather physical and psychological abuse and the sudden traumatic death of a parent." (*Id*. at 1164, PCR Pet. Ex. 38 at 13.)

250.   <u>Dr. Hector Barillas</u>. Dr. Barillas testified during the sentencing proceedings.   During the postconviction proceedings, Dr. Barillas reviewed additional information not provided to him during the sentencing proceedings.  From this new information, Dr. Barillas noted the *possibility* that Mr. Cruz might have Attention Deficit Hyperactivity Disorder, which still needed to be ruled out.  (PR Appx. at 1169, PCR Pet. Ex. 39 at 2.) Citing post-arrest reports describing Mr.

Cruz's agitated behavior, Dr. Barillas opined that Mr. Cruz was under the influence of cocaine and amphetamines at the time of the offense and that therefore "his judgment was probably impaired to conform his conduct to the requirement of the law." (*Id.*)[30]

251.  <u>Mark D. Cunningham, Ph.D.</u> Dr. Cunningham is Board Certified in both Clinical and Forensic Psychology by the American Board of Professional Psychology.[31] These are not vanity boards; the specialization standards are rigorous and include credentials review, peer-reviewed practice standards, oral examination, as well as a written examination for the forensic psychology certification. Dr. Cunningham is one of just 275 psychologists in North America who is board certified in forensic psychology; he is the recipient of prestigious awards and a frequent author and contributor to scholarly publications and scholarly symposia, all as summarized in his Curriculum Vitae. (PR Appx. 1185-1243, PCR Pet. at Ex. 40.) In January 2012, Dr. Cunningham submitted a 59 page sworn declaration that Mr. Levy filed in support of the amended postconviction petition.  At the time of submitting his report Dr. Cunningham had long been recognized as a testifying expert with respect to capital sentencing determinations relating to adverse developmental factors (i.e., "mitigation") and violence risk assessment (i.e., "future dangerousness") in both state and federal courts. Since 1995, he had testified as a clinical and forensic psychology expert regarding sentencing issues in approximately 130 state capital cases and approximately 55 federal capital cases. He had been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in Arizona, Alabama, Arkansas, California, Colorado, Connecticut,

---

[30] We explain later below, that postconviction counsel failed to provide Dr. Barillas with adequate, available evidence and records, such that Dr. Barillas' postconviction opinions, like his sentencing testimony, remained woefully inaccurate and incomplete.

[31] *See* http://www.abpp.org/i4a/pages/index.cfm?pageid=3299.

Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Nevada, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia. (*Id*. at 1185-86, PCR Pet. Ex. 40 at 1-2)

252. As revealed in Dr. Cunningham's curriculum vitae, he has been extensively involved in research and as the author of scholarly publications relevant to mitigation related evaluations at capital sentencing. He has been an invited author of Evaluation at Capital Sentencing, a recently published volume in the Oxford University Press series of "Best Practices" in forensic mental health evaluations. He is the first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12-volume Handbook of Psychology, as well as author of chapters on capital sentencing evaluations in other edited texts. He was the guest editor for a special issue regarding capital sentencing considerations for the Journal of Psychiatry and Law. Other scholarly publications include peer reviewed articles addressing standards of practice and complex considerations specific to evaluations of mitigating factors in capital cases, as well as evidentiary standards and associated scientific support for various violence risk assessment methodologies at capital sentencing.

253. At the time that Dr. Cunningham submitted his declaration, his scholarly activities have been noted by his peers. He was the recipient of the highly prestigious 2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy. The American Psychological Association, a professional organization of 160,000 members, confers this award on one psychologist annually who has made distinguished empirical and/or theoretical contributions to research in public policy, either through a single extraordinary achievement or a lifetime of work. He was awarded the 2005 Texas Psychological Association Award for Outstanding Contribution to Science. This is an annual award

in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. He is a Fellow of the American Psychological Association, a peer-reviewed distinction reflecting outstanding contribution to the profession of psychology at a national level. He was the recipient of the 2004 National Alliance of Sentencing Advocates and Mitigation Specialists John Augustus Award.

254.   In his report, Dr. Cunningham analyzed 27 different developmental and environmental risk factors Mr. Cruz was exposed to as a child, including among them;  (i) the evidence of multi-generational dysfunction, including the evidence of inter-generational mental disorders, drug addiction and alcoholism; (ii) the evidence that Mr. Cruz was exposed to this dysfunction; particularly the potent instability wrought by his mother's own mental illness, her promiscuity and her own serious substance abuse disorders; (iii) the abuse inflicted by his step-parents; and (iv) finally after his father's death, the incalculable damage of being introduced to a culture of drug use and drug dealing by multiple adult family members.   Hard science and well documented supportive scientific research helped Dr. Cunningham demonstrate that the multiple developmental and environmental risk factors to which Mr. Cruz was exposed to during his childhood did have a causal link to his social maladjustment, substance dependence and criminal offending including the drug-related capital offense. Dr. Cunningham's report persuasively discredited the State's argument at sentencing that Mr. Cruz's adult outcome was disconnected to his childhood experiences and was the result of Mr. Cruz's personal choices. (PR Appx. at 1185-1243, PCR Pet. Ex. 41.)

255.   Teresa A. McMahill.  Ms. McMahill provided a sworn affidavit in the support of ineffective assistance of counsel claim. (PR Appx. at 910-27, PCR Pet. Ex. 16.) Ms. McMahill holds a Master's Degree in Social Work and had worked as a mitigation specialist in capital cases since 1983. At the time of submitting her evidence in Mr. Cruz's postconviction proceedings, Ms. McMahill, had been

working as a mitigation specialist in capital cases over a span of 28 years and she had conducted mitigation investigations in over one hundred capital cases. Ms. McMahill cited a number of deficiencies in the work of Mr. Cruz's trial team, including (1) the lack of assistance from a qualified mitigation specialist; (2) the failure to obtain readily available records and interview available witnesses; (3) the nexus between the mitigation and the offense was not established; (4) there was not a cohesive or an effective theory of mitigation; (5) the defense team did not thoroughly investigate Mr. Cruz's mental illness or its link to the offense; (6) the defense team did not investigate the effect of culture on Mr. Cruz's development; (7) a thorough mitigation investigation was not conducted; and (8) Mr. Cruz did not accept responsibility for Officer Hardesty's death or express remorse.

### (b)    State's response to petition for postconviction relief

256.   In its efforts to defeat the amended postconviction petition, the state had no trouble finding collaborators: both Mr. Storts and Mr. Basham revealed themselves to be ready and willing advocates for the advancement of the State's interests in the proceedings, and not coincidentally, their own.  Mr. Basham and Mr. Storts each provided Affidavits to the State.  In his sworn statement, Mr. Basham established the framework against which the claims of ineffective assistance should be judged: that no one should dare to question their abilities or decision-making given their overwhelming capital case and homicide case experience that they had before taking on the task of defending against Mr. Cruz's capital sentence. Mr. Basham represented as a fact that they "had handled over 250 homicide cases, which include **at least** 50 capital homicide cases." (PR Appx. at 90, PCR Pet. Ex. K at 2.) (emphasis supplied) In truth, Mr. Storts had never participated in a capital sentencing proceeding and Mr. Basham had negligible experiences. (*See* paragraphs 307-11.) Nevertheless, building on the pure fiction that they had extensive capital case experience, Mr. Basham went on to swear that after he and Mr. Storts had

1  fired[32] the mitigation specialist Mary Durand, "counsel shared the **past experience,**
2  **skill understanding and ability** [apparently based on their handling of at least 50
3  capital cases] to develop, organize and present any and all mitigation evidence in the
4  sentencing phase. . ." (*Id*.) Then based on their vast capital case experiences, Mr.
5  Basham held himself out to be expert qualified to assess Ms. DiFrank's performance
6  and he held her work to be "competent thorough and conducted in a professional
7  manner." (*Id*. at 1291, PCR Pet. Ex. K at 3.) He went on to avow that counsel were
8  prepared for the sentencing. Mr. Basham separately stated that Mr. Cruz consistently
9  "demand[ed] a speedy trial, but this was a half-truth because the record shows that it
10 was Mr. Storts who had strongly recommended this speedy trial strategy to Mr.
11 Cruz, as leverage for the change of venue motion.  Mr. Basham closed his sworn
12 statement with an exposé on his level of "self-interest" in the outcome of the
13 proceedings by making an all-out attack on what he called the "unfounded
14 allegations" in the postconviction petition and for good measure he accused Mr.
15 Levy of unprofessional conduct.  Meanwhile, it was Mr. Basham who had built his
16 entire sworn affidavit on two material falsehoods: (1) that he and Mr. Storts had
17 overwhelming capital case experience, and (2) that Mr. Cruz was the mastermind of
18 the speedy trial strategy.  Neither of these representations were true.  Unfortunately,
19 as explained below, the state court relied on both sworn falsehoods to deny Mr. Cruz
20 relief.

21      257.   Mr. Storts also submitted a sworn affidavit to the State in support of its
22 opposition to the postconviction petition. Mr. Storts was also comfortable in
23 expressing something more than an unvarnished statement of the just facts, by taking
24 a strong advocate's position against the amended petition. Stepping outside the role
25 of witness, and into the role of advocate, he unleashed a fury of criticism on Mr.

---

[32] Mr. Basham apparently forgot that Ms. Durand quit when she determined that she would be unable to conduct a constitutionally required investigation.

Levy and the allegations in the postconviction petition, averring that the number of false statements in the postconviction petition were "too numerous to list." Therefore he did not list them. He quoted former Secretary of State Cordell Hull's statement following the attack on Pearl Harbor:  "I have never seen a document that was more crowded with infamous falsehoods and distortions-infamous falsehoods and distortions on a scale so huge. . ."  (PR Appx. at 1286-87, PCR Pet. Ex. J at 3-4.) On its merits, Mr. Storts affidavit principally defended the decision for Mr. Cruz to give his allocution to the jury, insisting it was necessary because Mr. Cruz had "adamantly refused to acknowledge his guilt." (*Id*. at 1284, PCR Pet. Ex. J at 1.)  He conceded however, that Mr. Cruz's allocution would have been different if he had accepted responsibility. [33] (*Id*. at 1285, PCR Pet. Ex. J at 2.)

### (c)   State court's postconviction decision

258.   As Mr. Basham and Storts clearly intended, the state postconviction court based the principal factual assumptions underpinning its ruling on the Affidavits of trial counsel; particularly Mr. Basham's. As explained below, the state court's summary disposition ruling relied on two factually erroneous and clearly false and misleading representations of trial counsel: (1) that trial counsel had overwhelming capital case experience and (2) counsel's preparations for the sentencing phase of the proceedings were necessarily and properly limited or truncated by Mr. Cruz's speedy trial strategy.

259.   The following examples show that the state court's decision was inextricably intertwined with Mr. Basham's misrepresentations. [34]   (1) In the preface

---

[33] As explained below, Mr. Cruz has accepted responsibility and he does so in these proceedings. The amnesic Mr. Cruz was egged on to deny his responsibility by Mr. Storts; that illusory denial of responsibility has been lifted as it could have and would have been had Mr. Cruz received effective counsel.

[34] The specific representations concerning capital case experience and Mr. Cruz's

to its decision, where the court "identif[ied] some of its salient considerations . . .;" the court made a factual finding that when Mr. Storts and Basham were appointed "[t]hese attorneys had handled over 250 homicide cases and at least 50 capital homicide."[35] (PR Doc. No. 1, Ex. 1 at 3, PCR Order, Oct. 31, 2012 at 3.)  (2) The court found that Mr. Storts' decision to replace Ms. Durand with the fact investigator Ms. DiFrank, who was not a mitigation specialist, was influenced by Mr. Cruz's desire to "get on with his trial." (*Id.*) (3) The court expressly stated that counsel's performance would be "evaluated" for its compliance with the reasonableness standards of *Strickland*, in light of the fact that Mr. Cruz had "maintained his right to a speedy trial." (*Id.* at 14, PCR Order, Oct. 31, 2012 at 14.) (4) The court went on in nearly the same breath to make the finding, that "faced with a client who maintained his right to a speedy resolution, counsel was faced with the choice of whether to proceed with an underperforming mitigation "expert," or to proceed with the services of an experienced investigator, who since has become a mitigation expert." (*Id.*).[36] (5) The Court found that Ms. DiFrank's lack of prior experience would be viewed in the context of "supervision [by] experienced counsel." (*Id.* at 15, PCR Order, Oct. 31, 2012 at 15) (6) The court found that Ms.

---

alleged insistence on his speedy trial rights are contained in the Affidavit of Mr. Basham; although it would be surprising if Mr. Storts were to claim that he had not read and approved of Mr. Basham's sworn statement in advance of its submission, given his extraordinary interest in defeating Mr. Cruz's claims.

[35] Above, we have stressed the mischaracterization of the capital case experiences of trial counsel and we have alluded to the fact that Mr. Storts had never tried a capital sentencing and that Mr. Basham's experience was negligible. However, as we explain below, the number of homicide case experience was also wildly inaccurate. Together they had 40 cases, not 250.

[36] In other words, because the insistence on a speedy trial was *allegedly* exclusively Mr. Cruz's strategy, counsel was excused from going to the trouble of finding another qualified mitigation specialist.

DiFrank's prior experience as a fact investigator appeared to prepare her for the task of locating and securing information from "potential mitigation witnesses," [and] [a]lthough additional expertise may be required to relate the pieces of information to each other, trial counsel – with experience handling over 250 homicide cases and at least fifty (50) capital cases – certainly had the expertise to make the appropriate connections." (*Id.*) (7) The court rejected outright Ms. DiFrank's statement that she had not had enough time to complete her mitigation investigation, with the finding that "in fact it was the consistent demand of Defendant Cruz to exercise his right to speedy trial. . . [and] [i]n maintaining his right to a speedy trial, defendant placed himself in the position of cutting short the mitigation investigation, a time constraint of which he now complains. (*Id.)* (8) The court summed up its assessment of counsel's performance under *Strickland* with the finding that "the defendant's assertion of his Constitutional right to speedy trial and desire 'to get on' with the trial resulted in very reasonable actions of defense counsel un using his past experience in capital cases and an experienced investigator to gather evidence of mitigation. This is not an ineffective counsel." (*Id*. at 16, PCR Order, Oct. 31, 2012 at 16.)

260.   After finding trial counsel's performance reasonable on the above noted factual premises, the court also found that prejudice was lacking under *Strickland* because Mr. Cruz's new mitigation evidence was cumulative and because he knew about the new evidence but failed to share it with his trial counsel. Below, we show that the state court decision will not benefit from the limitations on review contained in 28 U.S.C section 2254(d)(1)(2).

### (d)    Petition for Review to Arizona Supreme Court

261.   On December 28, 2012 Mr. Cruz sought timely review of the superior court's decision denying his postconviction petition by filing a petition for review with the Arizona Supreme Court. (PR Doc. No. 1.) The Arizona Supreme Court

denied the petition on May 29, 2013 and issued a warrant for Mr. Cruz's execution. (PR Doc. Nos. 15, 16.)

### 8)   Federal Habeas Proceedings

262.   On May 29, 2013, Mr. Cruz filed a motion for stay of execution, a motion for appointment of federal habeas counsel, a statement of intent to file a federal habeas petition and an application to proceed *in forma pauperis* with this Court. (ECF Doc. Nos. 2-4.)  The Court issued a stay of execution on May 30, 2013 and appointed the Federal Public Defender for the District of Arizona to represent Mr. Cruz in his federal habeas proceedings. (ECF Doc. Nos. 6-7.)

263.   Once appointed, undersigned counsel undertook an examination of the record and prior counsel's case files. Based on the substance of the record and case file, an investigation was conducted which readily led to several major evidentiary discoveries. These discoveries in turn ultimately shaped the ineffective assistance of counsel claim which is represented in Claim One below.  We briefly discuss the new evidence.[37]

264.   **Discovery #1.** In the face of overwhelming evidence of Mr. Cruz's guilt, Cruz's trial counsel encouraged him to assert a denial of responsibility (3rd party culpability) defense, and they employed this strategy: (i) despite knowing that Mr. Cruz had amnesia for the events surrounding the offense; and (ii) without explaining to Mr. Cruz that denying responsibility or claiming 3rd party culpability was both untenable and would greatly increase the risk of a death sentence.

265.   All of the early case records at counsel's disposal revealed that Mr. Cruz was suffering from the acute effects of drug intoxication (cocaine and

---

[37] The discussion below provides a broadly based non-exclusive list of the principal subject areas discovered during the federal habeas proceedings. There are additional facts that were discovered and that are identified throughout the habeas petition; typically these facts are identified as new by the lack of a supporting citation to the state court record.

methamphetamine) at the time of the offense. (*See* paragraphs 91-97 above.) Myra Moore, who spent the night prior to the offense with Mr. Cruz, would eventually testify that she and Mr. Cruz were using methamphetamine all night prior to the day of the offense. (Tr. Feb. 4, 2005 at 54-55.) Counsel had a copy of the recorded telephone transcript of Mr. Cruz's call with Cletus where Mr. Cruz clearly stated he had no memory of the events surrounding the offense. Counsel's internal memoranda reveal knowledge that Mr. Cruz could not recall significant details associated with the day of the offense or statements attributed to him after his arrest for the offense.

266.   Ms. Margaret DiFrank, the trial defense team investigator, will testify if given the opportunity to do so, that Mr. Storts and Mr. Basham were aware that Mr. Cruz was under the influence of drugs at the time of the offense, and that he had no memory of the events surrounding the crime.

267.   That trial counsel knew of Mr. Cruz's deficient memory is also revealed in the initial mitigation disclosure statement prepared by Mr. Basham and filed with the state court on July 16, 2004. In that disclosure, Mr. Basham represented that he would present expert mitigation evidence from neuropsychologist Dr. Shannah Biggan related to Mr. Cruz's history of blackouts and his memory loss related to his chronic history of substance abuse.[38] (ROA 240.)

268.   By itself, Mr. Cruz's amnesia does not provide a defense to the shooting of Officer Hardesty.  In fact, in and of itself, Mr. Cruz's amnesia is *not* inherently mitigating. It does strongly suggest, however, that Mr. Cruz was not well-placed to decide the propriety of asserting a denial of responsibility defense.  That Mr. Cruz was denying responsibility and at the same time was revealing memory

---

[38] As explained above, Mr. Basham prepared this mitigation disclosure to make it *appear* that he had complied with a mitigation disclosure deadline but he concealed in his disclosure that Dr. Biggan had not done any work on Mr. Cruz's case and his representations about "her opinions" had no factual basis whatsoever.

deficits would have signaled to an objectively reasonable trial counsel that special care had to be taken to show Mr. Cruz:  (i) that, in the face of overwhelming evidence, it was a virtual certainty that he would be found guilty, and (ii) that at the same time, failure to accept responsibility would significantly increase the probability that a jury would impose a death sentence.  These discussions never occurred.

269.   Instead, pathetically so, Mr. Storts actively encouraged Mr. Cruz to hold onto the delusional belief that he was not responsible for killing Officer Hardesty. As we know from Mr. Storts' July 3, 2004 letter to Mr. Cruz, Storts boldly represented that he could prove that Officer Ben Waters, the key witness tying Mr. Cruz the shooting and the murder weapon, was "a liar."

270.   As we explain in Claim One below, Mr. Cruz may have been entitled to exert some influence on his trial counsel to assert a denial of responsibility, 3rd party culpability defense.   But under prevailing professional norms, trial counsel had corresponding duties to explain the risks of doing so, so that a devastatingly poor client choice could be averted.   Here, that was not done during either the trial phase or the state postconviction stage.   Mr. Cruz does now understand that he has direct responsibility for killing Officer Hardesty.

271.   **Discovery  #2.**  Trial counsel's strategy to present a denial of responsibility defense automatically led trial counsel to the employment of a secondary decision, that trial counsel would not investigate Mr. Cruz's mental state at the time of the offense. The risks associated with this decision, which had the effect of extraordinarily narrowing the mitigation inquiry, were also never explained to Mr. Cruz.

272.   **Discovery #3.**  This next discovery combines several findings which must be viewed together, including: (i) Mr. Cruz's mother consumed alcohol throughout her pregnancy with Mr. Cruz; (ii) Mr. Cruz has cognitive deficits (brain damage) consistent with a neurodevelopmental disorder, including fetal alcohol

effects; and (iii) Mr. Cruz's cognitive deficits manifested in elementary school when he was diagnosed with a learning disability and placed in special education.

273.  Located in Mr. Storts' file was a letter addressed to him with a single Tucson Unified School District record attached.  The record identifies the fact that Mr. Cruz was diagnosed with a learning disability and placed in the adaptive education department in the 5th grade. This record was not included within the school records that trial counsel had Dr. Barillas identify at the sentencing hearing. (Tr. Mar. 3, 2005 at 43; Exhibit GR.) Nor, as we explain below, was this significant record provided to any of the presentencing mental health experts. The record also remained hidden in plain sight during the state postconviction proceedings.

274.  As we explain further below the diagnosis of learning disability is supportive of a finding that Mr. Cruz suffers from a neurodevelopmental disorder consistent with exposure to fetal alcohol.

275.  Because the sentencing took place prior to a thorough mitigation investigation, it was not discovered until the state postconviction proceedings, that Mr. Cruz's mother Julie long suffered from serious addiction issues, to and including: prescription drugs, alcohol, illegal drugs; e.g. cocaine.   During postconviction proceedings, Dr. Cunningham reported his suspicion that Julie may have abused alcohol and drugs during her pregnancy with Mr. Cruz. Nevertheless, even with Dr. Cunningham's admonition, the strong probability that Mr. Cruz was exposed to neurotoxins during Julie's pregnancy was ignored and not investigated. More recently, two of Julie's sister-in-laws (Romelia Holguin and Ana Montenegro) have recounted that Julie was an alcoholic who used of alcohol throughout her pregnancy with Mr. Cruz.

276.  **Discovery #4.** The discovery that Mr. Cruz's mother drank alcohol throughout her pregnancy and that Mr. Cruz was diagnosed with a cognitive related disability in elementary, led habeas counsel to consult with Dr. Shannah Biggan. At the request of Mr. Basham, Dr. Biggan had conducted neuropsychological testing on

Mr. Cruz in September 2004. She prepared a report, which Mr. Basham hurriedly disclosed nearly four months after the mitigation disclosure deadline had lapsed. (ROA 299.)

277.   At habeas counsel's request, Dr. Biggan reviewed her 2004 report, her billing records and associated work descriptions. She also reviewed the newly discovered school records revealing evidence of Mr. Cruz's learning disability, and witness declarations confirming Mr. Cruz's mother drank alcohol throughout her pregnancy. If given the opportunity to do so, Dr. Biggan will be willing to testify to several significant newly discovered matters, including:

- Dr. Biggan examined her billing records and noted an absence of any recordation of time expended consulting with Mr. Basham, or any other defense team member. In this respect, Dr. Biggan reported that her invoice is unusual, because in important forensic matters (like the instant Cruz matter, which involved a possible death sentence) she would nearly always be asked to expend time conferring with counsel in some detail about the expected objectives of the evaluation inquiry, and just as often, concerning the interpretation of the test results.  Dr. Biggan has indicated that if she had engaged in such a dialogue with Mr. Cruz's trial counsel, consistent with her billing practices in forensic matters, she would have included such expended time in her invoice.  As noted, here her invoice records no time in actual consultation with Mr. Cruz's trial counsel.

- Dr. Biggan's report and the test results revealed therein raise a number of issues, which Dr. Biggan could have addressed with trial or postconviction counsel had they discussed her test results with her. Habeas counsel did ask Dr. Biggan about Mr. Cruz's neuropsychological test results from her 2004 evaluation.  The report clearly reveals that Mr. Cruz had severe deficits on certain tests.  In her 2004 evaluation, Dr. Biggan summarized all of the testing with the conclusion that "overall" Mr. Cruz did not have "severe

deficits in cognitive function." Habeas counsel asked if this should be interpreted to mean that Mr. Cruz does not have neuropsychological deficits. Dr. Biggan answered that question with an unequivocal "no" : Mr. Cruz does have some neuropsychological deficits; he does exhibit impairments in his cognitive functioning; and testing did reveal that he has some brain dysfunction. Referring to her 2004 report, Dr. Biggan explained that Mr. Cruz's deficits involve the parts of his brain which are involved in working memory and processing speed. As made clear in her 2004 report, on a number of tests implicating these areas, Mr. Cruz scored either near zero or within the 1st and 2nd percentile. Several other scores were slightly higher but still evidence impairments.

- Dr. Biggan is of the opinion that her 2004 testing results do reveal elements of abnormal brain functioning; particularly in terms of working memory and processing speed, and Mr. Cruz does present with neurological impairments and brain damage; although in her opinion not severe. Mr. Cruz's trial counsel did not present this evidence to the jury.

- Next Dr. Biggan confirmed that she was not provided with evidence that Mr. Cruz's mother had used alcohol during her pregnancy. If she had known this fact she would have mentioned it in her report, since identifying the potential etiology of Mr. Cruz's working memory and processing impairments was a fundamental aspect of her evaluation and his mother's drinking could be related to these deficits. Therefore, Dr. Biggan recommended that the connection between Mr. Cruz's brain dysfunction and its relation to Fetal Alcohol Effects would be a proper area for further exploration by a qualified neuropsychologist.

- Dr. Biggan also found support for her recommendation that there be further neuropsychological study based on the education records that also were not provided to her during her 2004 evaluation. As noted previously, these

records show that Mr. Cruz was identified as suffering from learning disabilities while attending elementary school, and he was labeled "LD" and placed in adaptive education for learning disabled students in the 5th grade. She also made note of the fact that the educational records show that Mr. Cruz was recommended for testing for learning disability by his 3rd grade teacher because of Mr. Cruz's memory deficits, a prominent impairment that continued to affect Mr. Cruz during her 2004 evaluation.   Finally, Dr. Biggan noted that while her 2004 evaluation did not reveal a learning disability, neither can the 2004 testing rule out a diagnosis that Mr. Cruz is learning disabled; nor can the 2004 testing refute the finding that Mr. Cruz did suffer from a learning disability and related cognitive deficits during his childhood, as noted in his elementary school records. Accordingly, in light of the discovery that Mr. Cruz was diagnosed as learning disabled in childhood, Dr. Biggan agrees that the question with respect to whether he remains disabled would be a proper renewed inquiry for a qualified neuropsychologist.

- As explained above, Mr. Cruz's trial counsel never conducted any investigation into Mr. Cruz's mental state at the time of the offense and Dr. Biggan has now confirmed that during her 2004 evaluation, trial counsel never asked that she assist in the evaluation of Mr. Cruz's mental state at the time of the offense.

- Habeas counsel are investigating Mr. Cruz's mental state at the time of the offense, and they posed as a hypotheses that Mr. Cruz was under extreme stress at the time of the offense and they asked Dr. Biggan whether it would be appropriate to consider—in the context of Cruz's pre-existing brain dysfunction—how his neurological impairments would be affected by significant situational/environmental stressors, and whether under periods of significant stress Mr. Cruz's pre-existing deficits in working memory and

processing could substantially worsen and manifest in significant disruption in his executive functioning. Dr. Biggan unequivocally answered yes to this question and she indicated it would be appropriate for a qualified neuropsychologist to consider this issue, because Mr. Cruz's cognitive functioning would have the tendency to significantly degrade and ripen into significant neuropsychological deficits under highly stressful situational factors.

- To another point, Dr. Biggan has indicated that, during her 2004 evaluation, trial counsel never asked that she consider whether there were psychosocial risk factors posed by Mr. Cruz's impairments. Nor did counsel inquire how (without treatment) his neurological impairments might play out for him in his particular childhood psychosocial environment, in terms of learning and educational failures, aggravating symptoms of depression, influencing his abuse of drugs as well as his difficulty in overcoming a drug addiction, and instability in relationships with family and his children. Once again Dr. Biggan has indicated that, although she was not asked by trial counsel to make this assessment, she agreed that it would be appropriate for a qualified neuropsychologist to address these issues. Dr. Biggan believes it would be appropriate to consider Mr. Cruz's life within the context of his vulnerable brain.

- As explained above, Mr. Cruz has experienced amnesia for the events surrounding the offense. With respect to this area, Dr. Biggan once again agrees that amnesia would clearly be a significant area of inquiry by a qualified neuropsychologist, as evidence of amnesia would be symptomatic of a severe level of cognitive degradation and brain dysfunction at the time of the offense.

- As a final matter, habeas counsel posed the following question to Dr. Biggan: whether in her experience in working with brain damaged amnesic

104

patients it would be unusual for such a patient to deny engaging in actions they had in fact committed.  Dr. Biggan's answer was again unequivocal: she said that it is not unusual for an amnesic patient to deny responsibility for acts they do not remember, and she concluded that in the case of Mr. Cruz, it would be appropriate for a qualified neuropsychologist to address Mr. Cruz's inability to accept responsibility for his actions, during the trial phase of the proceedings, within the context of his neuropsychological deficits.

278.  In summary, Dr. Biggan has indicated that: (1) The connection between Mr. Cruz's brain dysfunction and its relation to Fetal Alcohol Effects would be a proper area for further exploration by a qualified neuropsychologist. (2) In light of the discovery that Mr. Cruz was diagnosed as learning disabled in childhood, the question with respect to whether he remains disabled would be a proper renewed inquiry for a qualified neuropsychologist. (3) It would be appropriate for a qualified neuropsychologist to consider how Mr. Cruz's pre-existing brain impairments would be expressed when Mr. Cruz was presented with significant environmental stressors, such as those present at the time of the instant offense, because Mr. Cruz's cognitive functioning would have the tendency to significantly degrade and ripen into significant neuropsychological deficits under highly stressful situational factors. (4) It would be appropriate for a qualified neuropsychologist to consider how Mr. Cruz's neurological impairments might play out for him in his particular childhood psychosocial environment, in terms of learning and educational failures, aggravating symptoms of depression, influencing his abuse of drugs as well as his difficulty in overcoming a drug addiction, and instability in relationships with family and his children—in other words, she recommended that Mr. Cruz's life be examined within the context of his vulnerable brain. (5) Amnesia would clearly be a significant area of inquiry by a qualified neuropsychologist, as evidence of amnesia would be symptomatic of a severe level of cognitive degradation and brain dysfunction at the

time of the offense. (6) In the case of Mr. Cruz, it would be appropriate for a qualified neuropsychologist to address Mr. Cruz's inability to accept responsibility for his actions during the trial phase of the proceedings, within the context of his neuropsychological deficits and amnesia.

279.   **Discovery #5**.  Mr. Cruz's introduction to early onset substance abuse was not simply a by-product of his unfortunate, dysfunctional social circumstances. Rather, as we explain below, Mr. Cruz's drug problems and his struggle to prevail over his addiction, also relates to the fact that he was born with an underlying, untreated neurodevelopmental disorder, with associated brain dysfunction and cognitive deficits. The implications of these deficits were highlighted as an area for further study by Dr. Biggan just above, and the study recommended by Dr. Biggan is directly addressed in Discovery #6, below.

280.   Yet another discovery is that since childhood Mr. Cruz has suffered from clinical depression, a significant mental illness. This illness, in combination with his pre-existing neurodevelopmental disorder and brain dysfunction also contributed to Mr. Cruz's development of a serious substance abuse disorder and unfolding struggle with addiction.  The holistic consideration of Mr. Cruz's twin disorders, consisting of the developmental impairments he was born with and depression; and the implications of these disorders for Mr. Cruz, in terms of their contribution to Mr. Cruz's drug addiction and his inability to overcome it, are separately addressed in Discovery # 9 below.

281.   Also related to the understanding of Mr. Cruz's drug addiction and his inability to overcome it, is the recognition that neither the jury nor the state postconviction court knew that Mr. Cruz tried mightily to overcome his drug addiction. Neither the jury nor the postconviction court knew that Mr. Cruz experienced several years of sobriety, until he became overwhelmed by an untreated, worsening depression and began self-treating with drugs, just as he had learned to do as a child. Mr. Cruz's efforts to repel his addiction began in 1997 after he was

imprisoned for a marijuana trafficking offense in Illinois, when he volunteered for participation in prison sponsored intensive drug treatment program. Reports from this program reveal Mr. Cruz's high level of participation and good faith efforts to prevail over his addiction. For nearly two years after his release from prison Mr. Cruz did just that.

282.   Mr. Cruz was released from prison in July 1999.  Following his release from prison, Mr. Cruz remained on parole for the Illinois case and he was serving probation for a Pima County offense (an offense which pre-dated the Illinois case). In the fall of 1999, Mr. Cruz and his wife Tara White returned to the Zuni Reservation in New Mexico where he successfully helped in the operation and management of the White family businesses.  From the time of his release in July 1999, Mr. Cruz was randomly drug-tested and his conduct was supervised. Probation reports demonstrate that Mr. Cruz did supremely well for a period of nearly 20 months after his release from prison, until mutual infidelity left his marriage to Tara in a state of peril.  By Tara's description, Mr. Cruz was severely depressed.  Mr. Cruz had received a lot of drug treatment in prison, but he had never received treatment for his depression, or his cognitive impairments.  His marriage in serious trouble and suffering from an untreated mental illness, Mr. Cruz left the Zuni reservation; he returned to same drug-addicted family members and the environment that introduced him to drugs in the first place. He began self-treating his depression in the usual way, with cocaine, hallucinogens and other drugs.

283.   Once separated from his wife Tara, the glue that helped keep him sober was gone. He failed his probation drug test in June, 2001 and again in July, 2001. It would have been important for the sentencing jury to know that Mr. Cruz wanted to stop using drugs; that he worked hard at it and he experienced a temporary triumph in doing so.  Mr. Cruz did not simply make a choice to fail, as argued by the prosecutor at his sentencing.

284.   As explained further below, Mr. Cruz's participation in the subject

offense had strong links to his addiction to methamphetamine, but the jury never understood that Mr. Cruz's addiction to meth came very late in his life story. Even at the time of his mid-2001 relapse, Mr. Cruz was not addicted to methamphetamine and he never had been.  (*See* paragraphs 64-68.) Unfortunately, it was that drug, and that drug alone, that overwhelmed and suppressed some of the best aspects of Mr. Cruz's character. He truly lost who he really was as a person. Prior to his addiction to meth, Mr. Cruz had absolutely no reputation for aggressiveness or violence; these were not aspects of his underlying personality traits or disposition.

285.   Meanwhile, after his separation from Tara, when Mr. Cruz returned to Arizona in mid-2001, he was introduced to a group of folks who were using and addicted to meth. Even then Mr. Cruz resisted using meth. Witnesses interviewed by habeas counsel, who were acquainted with Mr. Cruz during this time, have said that Mr. Cruz was not only rejecting methamphetamine, he was trying to persuade several of his friends to quit using meth. Tragically, Mr. Cruz met and fell for a young woman by the name of Jennifer Morse, who was heavily addicted to methamphetamines. From that point, Mr. Cruz's already difficult life took a serious turn for the worse and it was then in early 2002 that his battle with methamphetamine addiction began; a battle that defeated him in the worst possible way when it ended in the loss of the life of Officer Patrick Hardesty. Meth totally altered Mr. Cruz. Numerous witnesses have come forward to say this. Even the early police investigation reports make note of this fact—Mr. Cruz lost control of his life once he became addicted to methamphetamine. (*See* paragraphs 91 to 97.)

286.   In sum, the jury never understood that Mr. Cruz's clinical depression and the underlying neurodevelopmental disorder he was born with contributed greatly to his ultimately unsuccessful battle against substance abuse; or that these underlying mental disorders made him much more vulnerable to the influences of nearly all the adult relatives in his life, including his mother, who themselves were role models for how to become addicted to drugs.  The jury also never understood

the role that Mr. Cruz's meth addiction had in the offense and, that apart from that addiction, he had an underlying kind and peaceful character that would be worth preserving with a life sentence.

287.   Mr. Cruz's use of meth was unique in its intensity. Witnesses familiar with Mr. Cruz have said when using, he would routinely use large amounts and go for many days and even weeks without sleep. The heavy use of methamphetamine left him in a state of extreme paranoia and caused him to lose touch with reality. Mr. Cruz would also experience blackouts with loss of memory. Between March 2003 and Officer Hardesty's death, Mr. Cruz was "using meth and cocaine almost constantly," mixing the two mind-altering substances. Mr. Cruz's cousin, Albert, saw him every few days—his lack of sleep and extreme paranoia—the results of his heavy meth use apparent. Mr. Cruz became so paranoid and irrational a day or so before the shooting that he refused to tell his cousin where he was, even as he asked for his cousin to pick him up.

288.   Much of this information regarding Mr. Cruz's pattern of methamphetamine use— including the extent of his use, pattern of sleep deprivation when using, and the serious symptomatology that resulted, which included paranoia, hallucinations, memory blackouts, and losing touch with reality—was readily available to Mr. Storts through his representation of Mr. Cruz stemming from the Eppler charges. Witnesses to that shooting, and its aftermath, corroborate Mr. Cruz's heavy use of methamphetamine, his pattern of using for days without sleep, and the erratic changes in his behavior that appeared as Mr. Cruz succumbed to a deep and consuming methamphetamine addiction. What is more, the police reports in the Hardesty case were replete with notices to the trial team that Mr. Cruz's life had gone out of control once he became addicted to meth and that Mr. Cruz's actions at the time of the offense were meth-related. (*See* paragraphs 91 to 97 above.)

289.   **Discovery #6.** As explained above, this case went through the sentencing and postconviction phases without  Mr. Cruz's prior lawyers taking the

time to speak with the pre-sentencing neuropsychologist Dr. Biggan regarding any of the implications of the testing results described in her 2004 report.  What is more, Dr. Biggan was not informed of Mr. Cruz's exposure to alcohol during gestation, or his prior diagnosis of learning disability, and she was never asked to consider how Mr. Cruz's brain dysfunction and experience of amnesia might be understood in relation to mental state at the time of the offense. Accordingly, habeas counsel undertook to examine the neuropsychology issues in light of Dr. Biggan's recommendations that there be additional study of these unexplored areas. In furtherance of this effort, Dr. Kenneth Benedict a neuropsychologist administered testing to Mr. Cruz over two days on January 7-8, 2014.

290.  As noted above, Dr. Biggan concluded that Mr. Cruz does have neuropsychological deficits and impairments in cognitive functioning and brain dysfunction, and that Mr. Cruz has deficits related to working memory and processing speed which reveal areas of neurological abnormality and impairment. Furthermore, she acknowledged severely impaired scores in areas of memory testing.  Dr. Benedict found that these deficits, identified in his testing and the earlier testing of Mr. Cruz, were strongly indicative of brain damage that likely involves pre-frontal areas as well as deep temporal lobe and limbic structures.  They are also associated with and compounded by problems that are developmental in nature; i.e., Mr. Cruz was born with them. Dr. Benedict is also quite certain that Mr. Cruz evidences a specific learning disability in reading due to phonological processing deficits commonly referred to as "dyslexia." This type of problem and other developmental learning problems affecting Mr. Cruz are over-represented in individuals with Mr. Cruz's developmental history and they are also associated with the teratogenic effects of in-utero alcohol exposure known to have existed during his gestation.

291.  Dr. Benedict also determined that the neuropsychological deficits and brain dysfunction found in his evaluation were not sufficiently explained by the

developmental issues. He concluded that Mr. Cruz also had compounded his neurodevelopmental deficits with acquired brain injury from other trauma; e.g., polysubstance abuse and his history of psychosocial trauma. He found in summary:

1)   Mr. Cruz is neuropsychologically impaired with evidence of both neurodevelopmental problems and acquired brain injury.

2)   The pattern of cognitive strengths and weaknesses observed in Dr. Benedict's evaluation, and especially the pattern of impaired neuropsychological functions, are documented in reports and seen in available raw data from three prior evaluators: Dr. Fischer, Dr. Barillas, and Dr. Biggan.

3)   Dr. Benedict found multiple etiologies related to the pattern of brain dysfunction displayed by Mr. Cruz, including genetic factors and the presence of fetal alcohol exposure. He also found numerous psychosocial or environmental factors present in Mr. Cruz's case that are also known to be detrimental to brain functioning.  More specifically, children exposed to highly stressful, neglectful, and/or abusive environments are known to struggle with self-regulatory functions such as sustained attention, sleep architecture, modulation of stress responses and sensitivity to stress over time, organizational skills, and executive functions such as planning and impulse control, to name the most central ones identified in the literature related to the neuropsychological impact of neglect and abuse.

4)   Dr. Benedict found from a chronological and developmental perspective, that neuropsychological deficits were evident in Mr. Cruz from the start of elementary school, if not sooner.  Absent consistent identification and remediation, these problems put him at high risk for school problems, failure, and eventual exit from high school. As Mr. Cruz reached adolescence, he turned at a relatively early age to substance abuse that was modeled by several family members and fueled by efforts to alleviate depression, anxiety, and a sense of failure in more traditional avenues of life achievement such as school.  Mr.

Cruz's substance abuse escalated over the years to the point of major polysubstance abuse and dependence by the time of young adulthood. He utilized types and combinations of substances known to cause neurological damage, particularly to an already susceptible and vulnerable brain. The effects in particular of cocaine, methamphetamine, and LSD, which he was using extensively around the time of the crime, on the brain's limbic system are well-documented and highly consistent with the variety of memory problems Mr. Cruz has manifested over three evaluations. The history is also suggestive of extreme sleep deprivation well-known to affect mood, learning and the consolidation of memories, reality testing, and judgment. Drug binges also left him susceptible to risk-taking and resulted in physical trauma to his head.

5) Dr. Benedict specifically considered a number of factors that Dr. Biggan was not asked to consider, but which she agreed needed to be considered.

a.     Dr. Biggan has acknowledged that, at the time of her evaluation, she lacked evidence that Mr. Cruz's mother drank alcohol throughout her pregnancy and that Mr. Cruz was identified as learning disabled and placed in adaptive education in the fifth grade. Dr. Biggan has recommended further evaluation with respect to Mr. Cruz's brain dysfunction and fetal alcohol effects (FAE). Dr. Benedict did conduct this evaluation and he found that the record indicates that Mr. Cruz was exposed to alcohol during his gestation. Furthermore, Mr. Cruz had, and continues to display, difficulties with verbal learning (e.g., encoding verbal information), attention, reaction time, and executive functions, the very cognitive effects that have association with gestational exposure to alcohol. Hence, Dr. Benedict concluded that fetal alcohol effects are among the etiologies involved in Mr. Cruz's historical and currently demonstrated pattern of neurodevelopmental and cognitive problems.

b.     Dr. Biggan also suggested that it would be appropriate to

112

further evaluate whether Mr. Cruz's pre-existing brain dysfunction would be expected to worsen and result in significant disruption to Mr. Cruz's executive functioning, or other significant neuropsychological dysfunction, when he is confronted with significant situational/environmental stressors. Dr. Benedict also addressed this issue and found that the data from his evaluation indicate without question that Mr. Cruz's functioning deteriorates, even when he is not emotionally-aroused in a clinical context, once information becomes more complex, unexpected, and is presented at relatively rapid speeds. As explained above, these deficits were evident developmentally (at birth) and have been compounded by additional trauma. Once adding any degree of emotional arousal to a situation, such as at the time of the instant offense, there is a high degree of certainty in Mr. Cruz's case that his pre-existing neuropsychological deficits and brain dysfunction would significantly worsen and he would display rapid deterioration in planning, judgment, the ability to change behavior based on incoming and changing information from his environment, and his capacity to regulate impulses. Add the presence of psychoactive substances (and especially the over-use of psychostimulants, such as methamphetamine to this equation) and significant neuropsychological impairments would present with absolute certainty.

c.    Dr. Biggan also said that it would be appropriate to consider how Mr. Cruz's brain dysfunction would play out in his particular psycho-social environment and how (without treatment) those brain impairments might contribute to educational failure, aggravating symptoms of depression, his abuse of drugs, as well as his difficulty in overcoming a drug addiction. Dr. Benedict addressed this question as well, finding that in the context of Mr. Cruz's disturbed psycho-social environment Mr. Cruz's pre-existing brain impairments did contribute to his educational failure, aggravation of symptoms of depression, his abuse of drugs, as well as his difficulty in overcoming a drug

addiction. Dr. Benedict explains that individuals with the type of neurodevelopmental deficits and brain dysfunction as seen in Mr. Cruz require high levels of environmental structure, predictability, routine, and interpersonal support. This support is particularly critical during early development when the brain is changing and adapting to ongoing experience, and the need often lasts well through adolescence and into young adulthood.  Dr. Benedict found that Mr. Cruz's childhood experiences were notably aberrant from the recommendations of neuropsychologists and other mental health professionals ardently recommend for children with developmental disabilities. Mr. Cruz's environment was often lacking in structure and predictability such that it was hard for him to establish routines.  His sources of interpersonal support were not consistently available physically or mentally due to polysubstance abuse. Frequent failure experiences in school, which are revealed early in Mr. Cruz's school history, lead to depression and identification with deviant peer groups. Concurrent and subsequent exposure to alcohol and drug abuse among his family and peer groups inevitably lead to his own abuse and dependence on these substances.  Once Mr. Cruz's abuse evolved into dependence, it took on a life of its own and essentially foreclosed his ability to learn more adaptive coping mechanisms for his preexisting disabilities.  Mr. Cruz did not have the high levels of environmental structure, predictability, routine, and interpersonal support needed to overcome his neurodevelopmental dysfunction; he came out of an environment where his deficits were significantly aggravated and worsened.  Dr. Benedict further noted that while the interplay between Mr. Cruz's brain dysfunction and high-risk environment is easily traced and understood in hindsight. It is important to state that the developmental trajectory associated with his developmental and acquired brain dysfunctions was not immutable.  Dr. Benedict works on a daily basis with individuals who share varying degrees of brain-based and environmental risk factors who, with

early identification and treatment, experience significantly different and better outcomes.  Admittedly, the extent and multiplicity of psychosocial risk factors in Mr. Cruz's case is not routinely encountered, but Mr. Cruz possessed and possesses a number of "protective factors" (e.g., normal intelligence; normal capacity and desire for interpersonal attachment) that would have made him amenable to treatment efforts at points in childhood, adolescence, and even young adulthood.

         d.     Finally, Dr. Biggan suggested that it would be appropriate to consider the possibility that Mr. Cruz suffers from amnesia in relation to the offense and whether the presence of amnesia would be reflective of a severe level of cognitive degradation and dysfunction at the time of the instant offense. Dr. Benedict's evaluation did permit him to address this issue as well as the corresponding outcome for Mr. Cruz in terms of why he would have denied responsibility for an amnesic event. Dr. Benedict found that based on what is now known about the nature of Mr. Cruz's brain dysfunction, and the evidence of his amphetamine and cocaine use as well as sleep deprivation at the time of the crime in question, it is highly probable that Mr. Cruz would have difficulty recalling specifics related to the crime in question, if not complete amnesia for the time period surrounding the crime.  This conclusion is based on four distinct factors that, when combined together, have a synergistic or exponential effect: a pre-existing memory impairment that makes it highly challenging for Mr. Cruz to remember new experiences even under ideal circumstances; executive dysfunction that leads to deterioration in his baseline functioning under novel, stressful, and pressing situations; emotional distress and unexpected developments involved at the time of the crime; and the detected presence of mind-altering substances that induce "state-dependent" learning effects even in individuals with normal brain functioning.  With amnesia for the underlying events in place, Mr. Cruz's memory impairment left him susceptible to differing

accounts of the facts presented to him surrounding the time of his initial trial. Patients with memory impairments are well-known to "confabulate" responses to fit with whatever data they do have available to them, and they may also be highly suggestible.  Hence, Mr. Cruz's amnesia of the events pertinent to the crime resulted in a default mode of denying that such events where possible, and this initial reaction of maintaining his innocence was apparently fully encouraged and supported by his attorneys at the time. Mr. Cruz's denial of responsibility, while having no memory of the events would need to be understood in this context. Dr. Benedict believes that it is noteworthy, that once given a full accounting of the meaning of the evidence by his current attorneys, Mr. Cruz accepted responsibility for the crime.  With the clarity gleaned from a full accounting of the facts and disclosure from current legal counsel, it stands to reason that Mr. Cruz can now accept responsibility for his role in this crime without having any true memory of it.[39]

292.  **<u>Discovery #7.</u>** During the sentencing phase of the proceedings, Dr. Hector Barillas, a clinical psychologist, was asked to evaluate Mr. Cruz and he testified at the sentencing proceeding. As explained below, although he did not reevaluate Mr. Cruz during the state postconviction proceedings, Dr. Barillas did supplement his opinions in those proceedings at the invitation of Mr. Cruz's postconviction counsel. Now during these proceedings, habeas counsel have provided Dr. Barillas: (i) with additional evidence that Mr. Cruz's mother consumed alcohol throughout her pregnancy, and (ii) with school records that demonstrate that

---

[39] Mr. Cruz will offer a complete and comprehensive report/declaration from Dr. Benedict with his motion for evidentiary development. In addition, Dr. Benedict's findings are corroborated by the findings of Dr. Thomas Hyde, M.D., a neurologist, who identified Mr. Cruz's brain dysfunction on physical examination on February 7, 2014. Mr. Cruz will offer a complete and comprehensive report/declaration from Dr. Hyde with his motion for evidentiary development.

Mr. Cruz was identified learning disabled.

293.   With these considerations and others explained below in mind, if permitted to testify in these proceedings, Dr. Barillas would relate the following information. Dr. Barillas confirms that in 2004, he was engaged to conduct an evaluation of Mr. Cruz by Mr. Cruz's attorney David Basham. The evaluation arose in connection with Mr. Cruz's indictment on charges of the first degree murder of Tucson Police Officer Patrick Hardesty.  He understood Mr. Cruz was facing the death penalty and Mr. Basham sought his assistance in connection with preparation and presentation of mitigation evidence at Mr. Cruz's capital sentencing proceedings.  Dr. Barillas reports that at the time of his engagement in the Cruz matter, he had little experience in capital sentencing or in the development and presentation of mitigation in a "pre-sentencing" capital proceeding, and he had limited understanding of how to conduct a mitigation evaluation (from a forensic psychology perspective) in a capital case.

294.   Dr. Barillas has indicated that in connection with his 2004 evaluation, he spent only around 5 hours with Mr. Cruz, but since half of his time was expended administering testing to Mr. Cruz he only expended 2 ½ hours in a structured clinical interview of Mr. Cruz.  Dr. Barillas characterizes his engagement as not expansive; rather it was limited and circumscribed because he was informed by Mr. Basham that the defense team was denying Mr. Cruz's responsibility for the murder and therefore Dr. Barillas was advised he would not be asked to opine on Mr. Cruz's mental state at the time of the offense.  His 2 1/2 hour evaluation of Mr. Cruz conformed to the limitations placed on his engagement and he did not investigate, evaluate or consider Mr. Cruz's mental state at the time of the offense.

295.   Dr. Barillas has acknowledged examination of additional sources of information that he had not seen before: (1) statements from witnesses who confirmed that Mr. Cruz's mother drank alcohol throughout her pregnancy; (2) education records that demonstrate that Mr. Cruz was actually diagnosed as

117

suffering from a learning disability and placed in special education when he was ten years of age; and (3) statements from witnesses and related social history information as well as documentation from Mr. Cruz's mother's psychiatrist. Referencing these additional materials, Dr. Barillas found them collectively to describe a form of severe neglect and emotional abuse of Mr. Cruz during his childhood of which he was not previously aware.  Based on the new sources of information, Dr. Barillas concluded that all of the prior opinions he offered in this case, including those presented to the jury, were incomplete, inaccurate and ultimately unreliable.

296.   Dr. Barillas found that the new evidence suggested to him that Mr. Cruz suffered from a neurodevelopmental disorder from fetal alcohol exposure which he recommended be further evaluated.[40]

297.   Relatedly, Dr. Barillas has now learned that Dr. Biggan also was not aware that Mr. Cruz had suffered fetal alcohol exposure, or that he had been diagnosed with a related neurodevelopmental disorder (i.e., learning disability) in elementary school when she conducted her 2004 neuropsychological evaluation of Mr. Cruz. Dr. Barillas has also learned that Dr. Biggan now indicates that had she known that Mr. Cruz's mother consumed alcohol during her pregnancy and that he was diagnosed with a learning disability, she would have identified this evidence in her report, as according to Dr. Biggan, the identification of the potential etiology of Mr. Cruz's working memory and processing impairments was a fundamental aspect of her evaluation.

298.   During the sentencing proceedings, Dr. Barillas relied on Dr. Biggan's 2004 evaluation. Therefore, he has recently explained that if Dr. Biggan would have attached significance, in her 2004 written report, to the fact that Mr. Cruz had

---

[40] As explained above, Dr. Biggan also recommended such further evaluation and Dr. Benedict has completed the new evaluation.

neurological deficits that had its etiology in relation to fetal alcohol exposure, he also would have attached significance to the same evidence during his 2004 evaluation. Thus, Dr. Barillas agrees with Dr. Biggan that the subject of Fetal Alcohol Effects would be a proper area for further exploration by a qualified neuropsychologist.

299.   Dr. Barillas also found that implications from other new sources of information recently provided to him were also significant. He cited new social history evidence that was in stark contrast to the information provided to him prior to Mr. Cruz's sentencing, which now suggests a strong possibility that Mr. Cruz may have suffered from a much more severe form of childhood neglect and that this neglect (in combination with a neurodevelopmental disorder) may have contributed to Mr. Cruz's suffering from a clinical depression, a serious mental illness, beginning during his childhood.  Therefore, Dr. Barillas concluded that the question of whether Mr. Cruz suffered from such depression, and whether such depression in combination with a neurodevelopmental disorder, contributed to Mr. Cruz's longstanding struggle with drug addiction, should now be fully explored by a qualified psychologist and neuropsychologist.

300.   As noted above, during his 2004 evaluation, Dr. Barillas was not asked to conduct an examination of Mr. Cruz to determine his mental state at the time of the offense; in fact, he was instructed not to discuss the offense with Mr. Cruz and he had little understanding of the offense, or even whether Mr. Cruz was directly responsible for shooting Officer Hardesty. He was told by defense counsel that they were denying that Mr. Cruz was responsible for the offense.

301.   Subsequently, however, Dr. Barillas relates that he was retained by state postconviction attorney Gilbert Levy to review some additional evidence and to opine on Mr. Cruz's mental state at the time of the offense; however, he was not asked to examine or interview Mr. Cruz for this purpose and he did not do so. Nevertheless, based on the new information provided to him by Mr. Levy, in

January 2012, he did express an opinion that Mr. Cruz was probably under the influence of amphetamines and cocaine at the time of the offense and that his judgment was probably impaired, inhibiting his ability to conform his conduct to the requirements of the law. Dr. Barillas now explains that while this 2012 opinion found some support based on the information Mr. Levy provided to him, for the reasons explained below, he has now concluded that his 2012 opinion is also incomplete and lacks reliability, based on the new evidence habeas counsel provided to him.

302.   According to Dr. Barillas, when he expressed his 2012 opinion: (1) he lacked the evidence concerning the fact that Mr. Cruz's mother drank during her pregnancy, (2) he lacked the evidence showing Mr. Cruz received a diagnosis of a learning disability, (3) he lacked the evidence suggesting the complex interplay between a possible clinical childhood depression suffered by Mr. Cruz and a neurodevelopmental disorder from fetal alcohol exposure, and (4) he did not understand the implications of this new evidence as more recently described by Dr. Biggan. To this latter point, Dr. Barillas noted that Dr. Biggan had suggested an array of issues that should be still be addressed as part of a reliable appraisal of Mr. Cruz's mental state at the time of the offense, including but not limited to the significant neurocognitive implications related to evidence that Mr. Cruz may suffer from amnesia for the acts giving rise to the offense.  Based on all of the foregoing, Dr. Barillas has concluded that he was not able to conduct a reliable assessment of Mr. Cruz's mental state at the time of the offense during the state postconviction proceedings.

303.   Finally, Dr. Barillas has made the observation that, to the extent that Mr. Cruz did suffer from amnesia for his conduct contributing to the offense, and to the extent he has come to accept his responsibility for the offense, it would now be appropriate for a forensic evaluator to explore the subject of remorse with Mr. Cruz

in relation to his conduct which resulted in the stated offense.[41]

304.  **Discovery #8.**  In addition to the matters investigated and discovered above, important discoveries were made that aid in the understanding of Mr. Cruz's background and the level of instability, abandonment and neglect that permeated all of his childhood.

305.  **Discovery #9**. During the state postconviction proceedings, Mr. Levy asked Dr. Mark Cunningham to engage in a comprehensive review of records related to Mr. Cruz's history. However, Dr. Cunningham has confirmed that he was not asked to review the 2004 neuropsychological report of Dr. Biggan. Habeas counsel have provided the Biggan report to Dr. Cunningham and he has reviewed that report. He has also reviewed Dr. Biggan's more recent recommendations for additional neuropsychological study and testing. In addition, Dr. Cunningham has reviewed witness statements that report that Mr. Cruz's mother used alcohol during her pregnancy, which he had not seen previously. If permitted to testify, Dr. Cunningham would say that Dr. Biggan's report does confirm that Mr. Cruz suffers from neuropsychological deficits and brain dysfunction.  Had he been provided with Dr. Biggan's report during the postconviction proceedings, along with the newly discovered evidence that Mr. Cruz was exposed to alcohol during gestation, he would have alerted Mr. Levy that Mr. Cruz suffered from brain dysfunction and abnormality that could be associated with Fetal Alcohol Effects.  In the detailed report that Dr. Cunningham prepared in the postconviction proceedings, he hypothesized that Mr. Cruz's mother drank during her pregnancy, but he had no direct evidence of the same.  He also identified the types of neurodevelopmental deficits that might arise from fetal alcohol exposure.  Dr. Cunningham would testify that the deficits identified by Dr. Biggan in her 2004 testing are materially consistent

---

[41] Mr. Cruz will offer a declaration from Dr. Barillas with his motion for evidentiary development.

with the types of deficits he predicted for fetal alcohol exposure in his own report.[42]

306. **Discovery #10**. As made plain by the above, there has been no comprehensive, reliable, complete or accurate evaluation of Mr. Cruz's mental health or his mental state at the time of the offense. The two mental health professionals who evaluated Mr. Cruz in 2004 have both recommended additional testing and evaluation.  The neuropsychological portions of that additional study have been completed by Dr. Benedict and have been summarized above.  For the comprehensive analysis of all of the relevant data, habeas counsel engaged Dr. Robert Smith, a psychologist.  Dr. Smith interviewed Mr. Cruz over two days for twelve hours on February 27-28, 2014 and he reviewed an extensive case record.  A partial summary of the key ultimate conclusions of Dr. Smith are provided below.[43]

> "It is my professional opinion with a reasonable degree of psychological certainty that Mr. Cruz suffered from a number of factors at the time of the instant offense, including: a history of severe childhood trauma (i.e., physical, emotional and verbal abuse); Persistent Depressive Disorder, Early Onset, Severe; Hallucinogen Use Disorder – Severe (i.e., LSD, mushrooms, Ketamine), Stimulant Use Disorder – Severe (i.e., cocaine, methamphetamine) and Alcohol Use Disorder – Mild; and neurocognitive impairment.  In order to fully understand Mr. Cruz's emotions, cognition and actions at the time of the instant offense, it is important that each of his psychological issues be explained and their interaction discussed. The first area to be considered involves Mr. Cruz's repeated

---

[42] Mr. Cruz will offer a declaration from Dr. Cunningham with his motion for evidentiary development.

[43] Mr. Cruz will offer a complete and comprehensive report/declaration from Dr. Smith with his motion for evidentiary development.

experience of childhood trauma.  This trauma involved the verbal, emotional and physical abuse he endured growing up.  He recounted the following stressors: parents frequently arguing and fighting; parents separating and divorcing; parents treating Mr. Cruz in a cold, distant and unaffectionate manner; stepparents rejecting and critical of Mr. Cruz; Mr. Cruz sent from one parent to the other resulting in frequent relocations and different schools; no parental supervision or guidance, Mr. Cruz suffered repeated physical injuries from engaging in dangerous activities; extreme violence within the neighborhood; death of peers; physically beaten by father with a belt; punched and hit by maternal uncles; mother struggling with depression; Mr. Cruz struggling with depression; mother abusing drugs; stepfather abusing drugs; father's death; Mr. Cruz exposed to alcohol and drugs at a young age; and significant alcohol and drug abuse as an adolescent.  These ongoing events that occurred throughout Mr. Cruz's childhood resulted in his having difficulty with trust; developing low self-esteem, believing that he was inadequate and a failure, and being unable to form healthy relationships.  Mr. Cruz was plagued by overwhelming feelings of sadness, guilt, shame, embarrassment, frustration, fear, anxiety, anger and rage.  He struggled with a distorted self-perception, feelings of hopelessness and helplessness to improve his circumstances.  At points, he felt a sense of despair and futility about his life. This led to his development of a severe form of depression, Persistent Depressive Disorder, Early Onset, Severe.

Research has demonstrated that children who grow up in a dysfunctional family environment are at increased risk for the development of depression and substance abuse. (Sources: National

Institute of Drug Abuse- NIDA, National Institute of Alcoholism and Alcohol Abuse - NIAAA, and Substance Abuse and Mental Health Services Administration - SAMHSA) These children often develop psychiatric symptoms, such as Mr. Cruz's Persistent Depressive Disorder, and they learn to self-medicate their symptoms with alcohol and other drugs. This was the case for Mr. Cruz. He described ongoing use of alcohol and drugs to "self-medicate" his sense of depression and despair. Mr. Cruz recounted that he had no real friends as he was growing up, only acquaintances during middle school and high school. He noted that this pattern continued into adulthood with the exception of his relationship with his wife, Tara White. Given that Mr. Cruz endured repeated abuse and neglect throughout his childhood, he developed a distorted self-identity and very unhealthy interpersonal relationships. His impaired personality development resulted in his struggles with his girlfriends and his marital discord with Tara. He did not have adequate coping skills or strategies and was overwhelmed by the frustration and sadness at having failed relationships. As a result, Mr. Cruz developed a severe form of depression entitled Persistent Depressive Disorder. This depression began in childhood and continued throughout his adult years up until his arrest for the instant offense. He experienced symptoms of decreased energy, low self-esteem, feelings of hopelessness and despair. At points, his symptoms included poor appetite and hypersomnia. He was never adequately diagnosed or treated. Thus, he began attempting to treat himself through his use of alcohol and other drugs. Unfortunately, his substance use only served to exacerbate his depression and sense of isolation and suspicion of others.

The next psychological disorder affecting Mr. Cruz was his Substance Use Disorder.   He abused hallucinogens (i.e., LSD, mushrooms, Ecstasy, Ketamine); stimulants (i.e., cocaine and methamphetamine) and alcohol.   All of these substances impaired the functioning of Mr. Cruz's central nervous system, resulting in mood swings, poor impulse control, difficulty with attention and concentration, disrupted processing of information and sensory input, poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory.   Mr. Cruz had an extensive history of abusing these substances in combination.   As an adolescent, his use progressed and involved alcohol and numerous other drugs.   Eventually, he came to prefer LSD, mushrooms and ketamine as his "escape" and stimulants to help him remain vigilant and to remain awake.   Mr. Cruz's addiction to all of these substances was the direct result of both genetic and environmental factors.   The literature indicates that children of parents who abuse alcohol and other drugs are five to seven times more likely to develop an addiction.   (Sources: NIDA, NIAAA, and SAMHSA)   With regard to his parents, Mr. Cruz reported that his mother was a chronic abuser of substances.   In addition to his mother, Mr. Cruz's maternal relatives have significant histories of substance abuse. Consequently, Mr. Cruz was genetically predisposed to develop his own addiction.   Furthermore, the research regarding alcohol and drug dependence indicates that children who grow up in a dysfunctional family environment are at increased risk for substance abuse.   These individuals often develop psychiatric symptoms and/or disorders that they learn to "self-medicate" with alcohol and other drugs.   Mr. Cruz suffered a chaotic childhood, involving abuse

and neglect.  The result for Mr. Cruz was sadness, frustration, anger, and dysfunctional relationships.  In turn, Mr. Cruz relied upon LSD, mushrooms, Ecstasy, Ketamine, cocaine, methamphetamine and alcohol in an attempt to cope with his emotional pain.  It is important to note that Mr. Cruz had no control over his genetic make-up; the behavior of his parents and family members; or they type of environment where he grew up.  These were factors were "given" to him.  He had no choice or options regarding these circumstances.  Furthermore, he did not use drugs with the intent of becoming addicted nor did he know how to manage his addiction, depression and neurocognitive disorders.

The last area to be considered was Mr. Cruz's neurocognitive impairments.  Based upon the assessment of Dr. Benedict, he concluded that Mr. Cruz has suffered significant neurocognitive impairment from early childhood up to the present.  Dr. Benedict reported that Mr. Cruz was "neurologically impaired with evidence of both neurodevelopmental problems and acquired brain injury." Dr. Benedict noted that "there appear to be multiple etiologies related to the pattern of brain dysfunction displayed by Mr. Cruz. Presumably there are genetic factors related to his early learning problems, although the presence of fetal alcohol exposure is a compounding risk factor as well, and there are known genetic influences that increase susceptibility to the depression and addiction he manifested during childhood and adolescence."  Dr. Benedict added that psychosocial and environmental factors were also significant in Mr. Cruz's background that would be detrimental to his brain functioning. In particular, Dr. Benedict pointed out that Mr. Cruz's highly stressful, neglectful and abusive childhood

environment contributed to his struggle with "self-regulatory functions such as sustained attention, sleep architecture, modulation of stress responses and sensitivity to stress over time, organizational skills and executive functions." Dr. Benedict reported that "the extent of polysubstance abuse and attendant disruptions to nutrition and sleep coupled with numerous and cumulative closed head injuries that Mr. Cruz sustained (as a result of the impaired impulse control associated with polysubstance abuse and developmental disabilities) are judged to account for the substantial deficits he displays in learning and memory."  Furthermore, these deficits were significant at the time of the instant offense.  Dr. Benedict explained that "these deficits were evident developmentally and have been compounded by alcohol and drug abuse, and cumulative episodes of closed head injury.  Once adding any degree of emotional arousal to a situation there is high degree of certainty in Mr. Cruz's case that he would display rapid deterioration in planning, judgment, the ability to change behavior base on incoming and changing information from his environment and his capacity to regulate impulses.  Add the presence of psychoactive substances and these impairments will present with absolute certainty."  Given the facts of the instant offense, Mr. Cruz was under the influence of at least cocaine and methamphetamine, significantly deprived of sleep, and under severe emotional distress.

In considering all of Mr. Cruz's disorders at the time of the instant offense (i.e., Persistent Depressive Disorder- Early Onset, Severe, Substance Use Disorders and neurocognitive impairments), it is my professional opinion with a reasonable degree of psychological certainty that these disorders were sufficient to

significantly impair his emotions, cognition, perceptions and behavior at the time of the instant offense.  In combination, these disorders had a synergistic effect.  Each disorder exacerbated the effects of the other and directly contributed to his behavior at the time of the instant offense.

In considering the presentation of mitigating factors during Mr. Cruz's trial, there is clear evidence that his counsel was ineffective, failing to conduct an adequate psychosocial history, failing to present and explain his mental illnesses, and failing to present that he was under the influence of multiple substances at the time of the offense.  As a result, the Arizona Supreme Court Opinion is biased and based upon inaccurate data.  The court opined that**:** "Cruz was neither suffering from any significant mental illness nor under the influence of drugs at the time of the crime. . . Cruz established little or no causal relationship between the mitigating circumstances and the crime." *State v. Cruz* 218 Ariz. 149, 170-171, 181 P.3d 196, 217 - 218 (Ariz.2008).  Clearly, the recent data compiled by Mr. Cruz's counsel and experts demonstrates that Mr. Cruz suffered from significant mental illness at the time of the offense, including Persistent Depressive Disorder – Early Onset, Severe and neurocognitive impairment.  Furthermore, the data regarding Mr. Cruz's substance abuse is compelling.  His self-report of abuse of hallucinogens and stimulants leading up to the time of the instant offense is corroborated by numerous witnesses and a toxicology screen conducted shortly after his arrest confirmed recent use of stimulants (i.e., positive for cocaine and methamphetamine).  These disorders, depression, neurocognitive impairment and substance abuse, co-occurred at the time of the offense and were

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

exacerbated by the fact that Mr. Cruz had gone for an extended period of time without sleep.  Thus, Mr. Cruz was suffering from a significant mental illness (i.e., Persistent Depressive Disorder and neurocognitive impairment) and was under the influence of drugs (i.e., cocaine and methamphetamine) at the time of the crime.  Mr. Cruz's disorders constituted significant mitigating circumstances that directly contributed to his commission of the instant offense. Thus, there was a causal relationship between Mr. Cruz's mitigating circumstances and the crime.  In combination, these disorders (i.e., depression, neurocognitive impairment, substance abuse, sleep deprivation, and history of being a victim of trauma) overwhelmed Mr. Cruz's ability to control his behavior at the time of the offense. Furthermore, as a result of the combined effect of his disorders (i.e., Persistent Depressive Disorder, neurocognitive impairment, and substance abuse), Mr. Cruz's capacity to conform his conduct to the requirements of the law was significantly impaired.

It is important to note that the experts and trial counsel failed to explain the interaction between Mr. Cruz's neurocognitive impairment, childhood trauma, depression and ongoing substance abuse.  As indicated in Dr. Benedict's report, "from a chronological and developmental perspective, neuropsychological deficits were evident in Mr. Cruz from the start of elementary school if not sooner.  He had difficulty staying focused when trying to learn basic academic skills due to a combination of psychological distress and a specific learning disability with respect to learning sound-symbol relationships.   Absent consistent identification and remediation, these problems put him at high risk for school problems, failure, and eventual exit from high school. As Mr. Cruz reached adolescence he

turned at a relatively early age to substance abuse that was modeled by several family members and fueled by efforts to alleviate depression, anxiety, and a sense of failure in more traditional avenues of life achievement such as school.  Mr. Cruz's substance abuse escalated over the years to the point of major polysubstance abuse and dependence by the time of young adulthood.  He utilized types and combinations of substances known to cause neurological damage, particularly to an already susceptible and vulnerable brain."  Thus, Mr. Cruz's neurocognitive impairments made him highly susceptible to becoming overwhelmed, discouraged and depressed.  Then, he learned to abuse substances in an attempt to cope with his struggles.   Unfortunately, he was unaware that his extensive substance abuse was exacerbating his brain damage.  This was also true with regard to Mr. Cruz's depressive disorder.  His depression began at an early age as a result of numerous childhood traumas.  He turned to alcohol, LSD, Ecstasy, cocaine, and methamphetamine to cope with his depression.  These substances, however, contributed to his depression.  Alcohol is a central nervous system depressant; and cocaine and methamphetamine withdrawal involve significant symptoms of depression. Thus, Mr. Cruz's abuse of substances only served to contribute to his downward spiral, causing greater brain impairment and depression.  These symptoms then led him to abuse more substances in his efforts to cope.

Finally, the prosecution claimed, during the sentencing proceedings, that Mr. Cruz's anti-social behaviors and drug use, beginning in childhood, were simply choices.  This contention is not supported by Mr. Cruz's history or research regarding these behaviors. The clinical research regarding alcohol and other drug

addiction indicates that children of alcoholics/addicts are at extreme risk for developing their own addiction.  Specifically, children of alcoholics/addicts are five to seven times more likely to develop an addiction to alcohol and other drugs than their peers.  This susceptibility is directly related to a genetically inherited trait.  In considering Mr. Cruz's family, the data indicated that his family had a significant history of abusing alcohol and other drugs.  This positive family history for substance abuse placed Mr. Cruz at risk for developing his own addiction to alcohol and other drugs.  It is important to note that he was unaware of this risk and he did not have any control over his genetic susceptibility.

The research regarding alcohol and drug dependence also indicates that children who grow-up in a dysfunctional family environment are at increased risk for substance abuse.  These individuals often develop psychiatric symptoms and disorders that they learn to "self-medicate" with alcohol and other drugs.  Mr. Cruz experienced a number of significant stressors as a child and had inadequate strategies to cope with these circumstances.  As a result of these traumatic events which he could not control, he developed low self-esteem; viewed himself as inadequate and ineffectual; and evidenced ongoing feelings of depression.  He learned early in life that he could escape his emotional pain by abusing alcohol, hallucinogens and stimulants.  Unfortunately, he did not realize his susceptibility to addiction or the fact that his substance abuse exacerbated his mood swings, adding to his problems.  Furthermore, the research regarding alcohol and drug dependence indicates that children who grow up in a dysfunctional family where alcohol and drug abuse is accepted come to believe

that substance abuse is "normal."  As a result, they do not recognize the negative risks associated with substance use or the negative consequences associated with abuse.  Mr. Cruz was surrounded by family and peers abusing alcohol and other drugs throughout his life.

To further understand Mr. Cruz's craving for substances and relapse following treatment, it is imperative that the biological processes underlying compulsive use, cravings and the struggle with abstinence be adequately explained.  In considering Mr. Cruz's abuse of alcohol, hallucinogens and stimulants, the research has demonstrated that the chronic use of these substances results in the release of very high levels of a neurotransmitter, dopamine.  This release of dopamine occurs in areas of the brain that regulate feelings of pleasure called the "reward center." The result of this excess of dopamine is and experience of intense euphoria.  As Mr. Cruz's abuse of these substances continued, the ability of his brain to produce dopamine was significantly reduced and he experienced a drop in the level of dopamine, resulting in an intense craving for more hallucinogens and stimulants.  As his level of dopamine repeatedly dropped, he required higher and more frequent doses of each of the substances in order to achieve the same level of intoxication or "high."  When he attempted to discontinue his use of these substances, he felt intense cravings, depression, agitation, irritability and physical withdrawal.  Based upon Mr. Cruz's self-report, and the accounts of his family members and friends, Mr. Cruz abused alcohol, hallucinogens, and stimulants for many years and displayed symptoms of acute intoxication and withdrawal at various times.  This intense addiction and the related physiological changes in brain chemistry resulted in Mr. Cruz's struggle to

achieve abstinence and his history of relapse.

In light of Mr. Cruz's struggle with neurocognitive impairments, depression and addiction, it is important to review his attempts at treatment.  Mr. Cruz related and the records confirmed that he attended a drug treatment program, Gateway Foundation, while incarcerated at the Taylorville and Graham Correctional Facilities from March 12, 1998 to July 1999.  He described the treatment as being conducted seven days per week and that he was assigned a primary counselor who met with him one on one and then he also attended group therapy.  The documents from Gateway Foundation reflected that the program was based upon a therapeutic community model of care.  The primary diagnosis for Mr. Cruz was cannabis dependence.  It is important that the treatment staff were unaware of Mr. Cruz's neurocognitive impairments and depressive disorder.  Thus, the staff did not know that they needed to modify their educational approach to assist Mr. Cruz in fully comprehending his addiction and the steps required to sustain his abstinence.  In addition, the staff did not realize that Mr. Cruz had a longstanding history of depression that he treated with various substances.  Thus, his treatment focused solely upon his abuse of substances, but did not consider the impact of his depression and neurocognitive deficits upon his recovery.  As a result, Mr. Cruz's treatment was inadequate to assist him in achieving sustained abstinence.  Based upon the research regarding the treatment of individuals with co-occurring mental illness, neurocognitive impairment and substance dependence, Mr. Cruz required an intensive treatment program, with coordinated services, including: individual counseling, group counseling, case management, modified education that was adapted

to overcome his learning deficits, instruction regarding co-occurring disorders, psychotropic medication, life skills training, vocational skills development and stable, sober housing following treatment. Unfortunately, Mr. Cruz did not receive this type of care and, despite his success over two years; he was unable to sustain his abstinence during his probation and returned to substances to cope with the stresses during the period leading up to the instant offense."

307.   **Discovery # 11.** Lastly there is the discovery of the inexperience of trial counsel, which is in issue in the proceedings only because they repeatedly insisted that it be an issue. During state postconviction proceedings, Mr. Basham provided an affidavit swearing that between them, he and Mr. Storts had handled at least 50 capital cases and 250 homicide cases prior to representing Mr. Cruz.  As we explain below, this was a shocking distortion of the plain truth. Obvious questions of fact regarding their actual experience resulting from their varying accounts of same during the state court proceedings, led habeas counsel to investigate.

308.   After confronting Mr. Basham with the results of our independent investigation, he agreed that his representations in the state court were untrue. To our knowledge, he has not taken any steps to correct the statements made in those proceedings. We have confirmed with Mr. Basham that prior to the Cruz case, his total capital case experience was derived from just several cases:

- **John Henry Knapp.**  In 1974, nearly thirty years prior to Mr. Cruz's case, Mr. Basham was appointed to represent Mr. Knapp as a second chair public defender. Knapp was sentenced to death under Arizona's pre-*Lockett* death penalty statute, which prohibited consideration of almost all mitigation, apart from a few limited statutory mitigators. Given that nearly all mitigation evidence was barred under the pre-*Lockett* law, this capital case experience of Mr. Basham, pre-dating Mr. Cruz's case by nearly three decades would have been of extremely limited or no value.

- **Joe Clarence Smith.** Our examination shows that Mr. Basham's involvement in the Smith case in 1975 was also nearly three decades before the Cruz case. Mr. Smith was also sentenced to death under Arizona's pre-*Lockett* death penalty statute and for the reasons stated, Mr. Basham's involvement in the Smith case would have offered him virtually nothing from an experiential standpoint that he could apply to the Cruz case.

- **Commercial Airline Pilot.**  Mr. Basham became a commercial airline pilot after the Smith case and he was virtually absent from the practice of law for many years.

- **Danny Montano.** After 20-plus years' absence from capital representation, in 1998 Mr. Basham was appointed as second chair to represent Mr. Montano, who was sentenced to death following a mitigation hearing which took up less than one day with 3 witnesses.  Little mitigation work was done in this case by either counsel.

- **Martin Corrales.** Mr. Basham was appointed as second chair in 1999. Mr. Corrales was convicted of second degree murder, a non-capital offense; thus his case proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication.

- **Shad Armstrong.** In 1999 Mr. Basham was appointed as second chair to assist lead counsel Harley Kurlander. The record shows that Mr. Basham's contribution to the mitigation phase of the proceedings was so minimal that he failed to even appear at many of the capital sentencing mitigation hearings.  Ultimately the state court judge expressed displeasure at Mr. Basham's lack of interest in the proceedings and the court had to actually order Mr. Basham to be present during the proceedings. Mr. Armstrong was sentenced to death.  The record shows that Mr. Kurlander conducted nearly all, if not all of the witness examination and argument. We expect

our further investigation to show that Mr. Basham's actual contribution to the mitigation phase was *de minimis*.

- **Bryan Padd.** The state withdrew its notice of intent to seek the death penalty prior to commencement of the trial. Mr. Padd's case proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication.

309. *In toto*, prior to Mr. Cruz's case, Mr. Basham arguably had some participation in a total of four litigated capital sentencing proceedings; however two of these sentencings preceded Mr. Cruz's case by nearly 30 years, and they were pre-*Lockett* cases and not productive of or correlated with experiences needed in the post-*Lockett, Wiggins* world. Also prior to his appointment in the Cruz case, and after a 21 year separation from capital case work, he had some albeit minimal second chair participation in 2 post-*Lockett* sentencings but in one of the cases he needed to be ordered to actually appear at the sentencing proceedings. Mr. Basham's representation that he and Mr. Storts had been involved in 250 homicide cases was also a gross mischaracterization. Prior to Mr. Cruz's case, Mr. Basham had been involved in 10 homicide cases, and Mr. Storts approximately 30.

310. After confronting Mr. Storts with the results of our independent investigation, he agreed that the representations which had been made during the state court were not true. <u>We have also confirmed with Mr. Storts that prior to the Cruz case, he had never participated in a capital sentencing proceeding.</u>

- **Sylvia Estrella.** Although he was initially appointed to this capital case in 1998, Mr. Storts withdrew from the representation prior to trial. Robert Hooker was the lawyer who tried the case. Mr. Storts did not adjudicate her trial or any capital sentencing proceeding.

- **Alvin Williams.** When Mr. Storts was appointed to represent Mr. Williams in 1999 he was initially charged with capital murder. The first trial ended in mistrial. After a conviction was obtained in the second trial,

the state withdrew its notice of intent to seek the death penalty.   Mr. Williams' case proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication.

- **Desean Bruce.** Mr. Storts was appointed to represent Mr. Desean in 1999. The state withdrew its notice of intent to seek the death penalty prior to commencement of the trial. Mr. Bruce's case proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication.

- **Tiffany Imel.** Mr. Storts was appointed to represent Ms. Imel in 1999. Ms. Imel was convicted of conspiracy to commit first degree murder, a non-capital offense; thus her case also proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication.

- **Bryan Padd.** Mr. Storts was appointed to represent Mr. Padd in 2001. The state withdrew its notice of intent to seek the death penalty prior to commencement of the trial. Mr. Padd's case proceeded as a non-capital case and it did not ultimately require an actual capital sentencing adjudication**.**

- **David Doogan.** Mr. Storts was appointed to represent Mr. Doogan in 1999.  Mr. Doogan accepted a plea to second degree murder approximately six months after Mr. Storts was appointed to represent him and thus the case did not require an actual capital sentencing adjudication.

311.   Our review shows that *in toto*, Mr. Storts had been appointed to six capital cases prior to his appointment to the Cruz case, but he had <u>not</u> had <u>any</u> prior experience in a capital sentencing proceeding. His skill at investigating and presenting mitigation in a capital, case had been untested; indeed the test of his knowledge and skill would come in Mr. Cruz's case for the first time.

137

## II.     State Court Presumption of Correctness.

312.   Mr. Cruz hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state courts in his case. Certain findings of fact by the state court in Mr. Cruz's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court and the opinion by the Arizona Supreme Court on direct appeal. Pursuant to 28 U.S.C. § 2254(e)(1), Mr. Cruz intends to assert that certain findings of fact by the state court at trial or on direct appeal, if any are found to exist, are not fairly supported by the record. Mr. Cruz also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at the state court hearings; that Mr. Cruz did not receive full, fair and adequate hearings in the state court proceedings; and that Mr. Cruz was otherwise denied due process of law in the state court proceedings.

313.   In addition, Mr. Cruz asserts that certain findings of fact by the state court in regard to his state postconviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to: any and all factual findings made by the trial court in regard to Mr. Cruz's state postconviction proceedings, as well as the decision of the Arizona Supreme Court on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Mr. Cruz intends to assert that certain findings of fact by the state court, concerning his state postconviction proceeding, if any are found to exist, are not fairly supported by the record.

## III.     Exhaustion

314.   Mr. Cruz states that several of the federal constitutional claims alleged

herein have been exhausted in proceedings before the Arizona courts. Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum.[44]

315.   Mr. Cruz expressly reserves his right to amend this petition. In *McCleskey v. Zant*, the United States Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." 499 U.S. 467, 498 (1991). Referring to Rule 6 (discovery), Rule 7 (expansion of the record) and Rule 8 (evidentiary hearing), of the Rules Governing Section 2254 Cases in the District Courts, the Supreme Court held that a habeas petitioner must have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *See id.* Mr. Cruz believes additional claims may be identified through a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Mr. Cruz will present any additional claims through amendments or supplements to the petition.

## IV.    The AEDPA is unconstitutional

316.   Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court.  *See Bounds v. Smith*, 430 U.S. 817, 822-23 (1977).  One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus. However, the passage of the Anti-Terrorism and Effective Death

---

[44]The burden is on the state to demonstrate that the petitioner failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

Penalty Act ("AEDPA") substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996).  AEDPA's restrictions suspend the writ of habeas corpus and violate the doctrine of separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

### A.    The AEDPA suspends the writ of habeas corpus

317.  Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ.  The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.  The Suspension Clause is a structural limitation on the power of Congress.  Like bills of attainder and *ex post facto* laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred."  *United States v. Lovett*, 328 U.S. 303, 315 (1946).  The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void."  *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

318.  Because the AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus.  *See* 28 U.S.C. § 2254.  For example, there is no dispute that Mr. Cruz's right to a jury trial was violated and that his death sentence is unconstitutional.  However, under the tenets of AEDPA, the federal court must determine whether the complete deprivation of a jury, in a capital case, was a "reasonable" or "unreasonable" constitutional violation.

**B.     The AEDPA violates the separation-of-powers doctrine**

319.   Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

320.   Congress has the power to constrain courts' authority.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993).  "[T]he judicial Power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."   U.S. Const. art., § 1. However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008).

321.   The separation of powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government."  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal citations and quotation marks omitted).   When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution"; the Court answered that "[i]t is emphatically the province and duty of the judicial department to say what the law is."  5 U.S. at 177.

322.   "[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain law, how to judge."  *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring).   Because the AEDPA requires courts

to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally suspends the writ of habeas corpus.  The question before the federal court should simply be whether Mr. Cruz's constitutional rights were violated in such a way that he is entitled to habeas relief.  Adding the gloss of "unreasonable" versus "reasonable" constitutional violations robs the writ of its ability to remedy constitutional wrongs.

### C.   Conclusion

323.   The AEDPA suspends the writ of habeas corpus and violates the separation of powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist."  *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring).  Also, the AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action."  *Id.*   Therefore, the AEDPA is unconstitutional.

## V.   Federal Constitutional Claims

324.   Mr. Cruz petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgment and sentence of the state courts of Arizona, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the Constitution of the United States.  In support of this request, Mr. Cruz offers the following:

**Claim One**

**Mr. Cruz was denied effective assistance of counsel at his sentencing in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

## I.    Preface

325.   Mr. Cruz alleges and incorporates by reference the fact allegations stated herein above.   This claim challenges the constitutionality of Mr. Cruz's sentence. This claim was raised, but only in part, in Mr. Cruz's state postconviction proceeding; hereafter the "PCR Sentencing Ineffectiveness Claim." (PR Appx. at 800-09, PCR Pet. at 14-23.)  A separate discussion of the constitutional deficiencies in the state court's disposition of the PCR Sentencing Ineffectiveness Claim is presented in Claim Two below.

326.   The underlying framework of Claim One; its theoretical contours and constructs, as well as a substantial set of facts presented in support of this Claim, were not presented in the state court proceedings. That is to say, although some of the facts supporting this claim were presented in state court, a substantial portion of the facts were not.  In addition, as we explain below, several components of the constitutional deficiencies in trial counsel's performance are presented here for the first time.

327.   The legal effects that arise from the presentation of new legal theories and facts in this petition, which were not presented in the state court, are affected by two principal variables.

328.   First, in Claim Two, we demonstrate that based on evidence before the state court, when that court decided Mr. Cruz's PCR Sentencing Ineffectiveness Claim, it made serious errors, which render its decision not subject to the limitations on habeas relief set forth in 28 U.S.C. § 2254(d)(1)(2). Once these limitations on relief are lifted, this Court will be required to consider Mr. Cruz's PCR Sentencing

Ineffectiveness Claim *de novo. Panetti v. Quarterman,* 551 U.S. 930, 953 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (§ 2254(d) limits the authority granted in § 2241 for granting relief but, once a petitioner is able to show that his claims are not precluded by § 2254(d), then federal court is permitted to consider the presented constitutional claim de novo).  It follows, also as explained below in Claim Two below, because the state court disallowed an evidentiary hearing and development of the factual record in a manner that contravenes subsection § 2254(d)(2), Mr. Cruz will be entitled to supplement the state court record with some new facts within the limits that exhaustion permits.  See *Williams v. Woodford*, 859 F.Supp.2d 1154, 1161 (E.D. Cal. 2012) (Judge Alex Kozinski, sitting by designation, granting expansion of record where state court denied evidentiary hearing and its decision was based on an unreasonable determination of the facts under § 2254(d)(2)); *Lor v. Felker*, 2012 WL1604519 (E.D. Cal. 2012) (where state court improperly decided issues of fact without granting evidentiary hearing its decision ran afoul of § 2254(d)(2) and habeas petitioner would be granted a hearing and permitted to expand the record).  Therefore, based generally on the principles above, some of the new evidence supporting Claim One will be admissible to support Claim Two (the PCR Sentencing Ineffectiveness Claim) to the extent permitted under exhaustion principles.

329.  The second variable affecting the consideration of the new evidence supporting Claim One is regulated by the Supreme Court's decision in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) Under *Martinez*, to the extent that Claim One is rendered unexhausted by the new evidence supporting the Claim, lack of exhaustion is due to the ineffectiveness of Mr. Cruz's state postconviction counsel, and therefore any default in presentation of the evidence supporting Claim One in state court is excused. *See Dickens v. Ryan*, 740 F.3d 1302, 1317-22 (2014) (en banc) Under the foregoing analysis all of the new evidence supporting Claim One must be considered.

## II.     Introduction

330.   This claim turns on application of the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984). *Strickland* guarantees fulfillment of Mr. Cruz's Sixth Amendment right to counsel. *See Martinez v. Ryan,* 132 S.Ct. at 1317. "The right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Id.* Under the well-known two prong test, Mr. Cruz must establish deficient performance by his trial counsel and prejudice. *Strickland* at 466 U.S. 688, 694

331.   General Standard for Assessment of Deficient Performance. To establish deficient performance, Mr. Cruz must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland* 466 U.S. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* Several general propositions are attached to the assessment of deficient performance.   First, the reasonableness of counsel's challenged conduct on the facts of the particular case must be viewed as of the time of counsel's conduct. 466 U.S. 690. Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

332.   Third, although Mr. Cruz "must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance," *Id.* at 689; strategic choices resulting from lack of diligence in preparation and investigation are not protected by the presumption in favor of counsel. *See Wiggins v. Smith,* 539 U.S. 510, 521-22 (2003). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (citing

*Strickland* at 466 U.S. 690-91).  Therefore, "the strength of the general presumption that counsel engaged in sound trial strategy turns on the adequacy of counsel's investigation. *Francis v. Miller*, 557 F.3d 894, 901 (8th Cir.2009) (quoting *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005), in turn relying on *Strickland*, 466 U.S. at 690–91)).

333.  Finally, fourth, courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . '" Justice Stevens cited <u>Strickland</u>, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ."

334.  <u>General Standard for Assessment of Prejudice</u> In order to establish prejudice Mr. Cruz must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694  When a Petitioner like Mr. Cruz challenges a death sentence the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Id.* at 695. When making this determination, the court must consider the totality of the mitigating evidence; i.e., the evidence introduced at the original sentencing and the new mitigation evidence. *Williams v. Taylor*, at 529 U.S. 397-98.

335.   Further when considering prejudice, *Strickland* recognizes that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." 466 U.S. at 695-66.

336.   With the foregoing parameters defining deficient performance and prejudice in mind, next Mr. Cruz will address the deficiencies in the performance of his trial counsel. As explained below, trial counsel engaged in a nearly epic series of objectively unreasonable decisions that ran in clear opposition to clearly established "prevailing professional norms" in capital cases.   The confluence of these deficiencies worked together to deprive Mr. Cruz of a fair sentencing proceeding and the end result was that the sentencing failed to achieve the ultimate Sixth Amendment objective: to render the proceeding a "reliable adversarial testing process." *Strickland*, 466 U.S. at 688.

### III.   Deficient Performance

**A.   Trial counsel presented a specious non-responsibility defense during the guilt phase which carries strong risks for imposition of a death sentence in the penalty phase.**

337.   Capital cases stand alone in their uniqueness in a singular aspect that is known or should be known to any counsel holding herself out as qualified to assume representation in a capital case: presenting a denial "I did not do it" defense during the guilt phase of a capital case can have enormous negative consequences on the sentencing phase. Under well-established professional norms, capital counsel know that mounting a denial defense in the face of overwhelming evidence of guilt "may

be tantamount to a death sentence." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 333 (1983). What was stressed in the 1983 Goodpaster article remains true today; where the evidence of guilt is overwhelming, a guilt-phase strategy based upon a denial of responsibility will be difficult, if not impossible, to reconcile with an effective penalty-phase strategy. *Trial for Life*, at 330.

338.   Indeed, the Supreme Court acknowledged the unique professional norms applicable to capital defense in *Florida v. Nixon,* 543 U.S. 175, 190-93 (2004), where the Court recognized that in the face of overwhelming evidence of guilt, counsel could reasonably decide is was necessary to concede the defendant's responsibility during the guilt-phase "to focus on the trial's penalty phase." *Id.* at 191-92. "In such cases, "avoiding execution [may be] the best and only realistic result possible." *Id.* at 191 (citing ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed.2003)).

339.   Further reinforcing these clearly established professional norms, the Court quoted from Andrea Lyon's 1991 article, Defending the Death Penalty Case: What Makes Death Different? 42 Mercer L.Rev. 695, 708 (1991): "It is not good to put on a 'he didn't do it' defense and 'he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney." 543 U.S. 191-92.

340.   The Supreme Court supported its findings concerning the unique professional norms regulating counsel's informed decision-making in a capital case with citation to well publicized jury research, published in 1998, that revealed that in interviews of jurors in capital trials juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense, and in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have

148

dire implications for the sentencing phase. *Id.* at 192 (citing and quoting from Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-1591, 1597 (1998)). The Court "summarize[d] [the obvious], in a capital case, counsel must consider in conjunction both the guilt and penalty phases." 543 U.S. 193. The ABA Guidelines which Mr. Cruz's trial counsel said they had mastered and would follow, reiterate what has been said above: "Ideally, the theory of the trial must complement, support and lay the groundwork for the theory of mitigation." [C]ounsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary. In sum, unless there are compelling reasons for not doing so, capital counsel must present an integrated defense. *See* ABA Guidelines 10.10.1 and 10.11 and Comments.

**B.   When trial counsel presented a specious non-responsibility defense during the guilt phase, without providing advice to Mr. Cruz regarding the ineffectiveness of the strategy for the sentencing phase, counsel's conduct was constitutionally deficient.**

341.   Framing a defense case for acquittal that "will preclude or handicap effective advocacy for life" may result in ineffective assistance. *Trial for Life*, 58 N.Y.U. L. Rev at 329. That is precisely what happened here.

342.   The stage is set with these facts: (1) Mr. Cruz had amnesia for events giving rise to the offense. (*See* paragraphs 96, 264-67 above.) (2) Despite clear impairments to his memory, Mr. Cruz maintained that it was not he who committed the offense. (*See* paragraphs 268-70 above.) (3) Trial counsel knew that Mr. Cruz was vulnerable and that his memory was impaired; nevertheless, they simply accepted Mr. Cruz's denial of responsibility, and then fed Mr. Cruz's delusion that he was not responsible by overstating the strengths of the defense. (*See* paragraphs

264-70.) (4) Trial counsel never explained the negative downside risks of presenting a denial of responsibility defense in a capital case, where evidence of guilt was overwhelming.

343.   The above four elements describe counsel whose performance is perforce objectively unreasonable and constitutionally deficient under *Strickland*. Mr. Cruz was entitled to know, what his counsel knew or should have known, that "challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase. *Florida v. Nixon* 543 U.S. at 192 (citing and quoting from Sundby, 83 Cornell L. Rev. 1557, 1589-1591, 1597.) Mr. Cruz should have been told that "mounting a denial defense in the face of overwhelming evidence of guilt "may be tantamount to a death sentence." *Trial for Life*, 58 N.Y.U L. Rev. 333.

344.   When Mr. Cruz's counsel failed to confront him with the overwhelming evidence of his guilt, and instead simply acquiesced in Mr. Cruz's vision of reality without regard for the sentencing outcome, counsel performed deficiently. *See Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001) (counsel's performance constitutionally deficient in allowing the defendant to direct the defense, without ever advising him about its hopelessness); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (counsel had duty to confront client with difficulties in his alibi story); *State v. Yoh,* 910 A.2d 853, 869-70 (Vt. 2006) (client's insistence on all or nothing defense would not excuse defense counsel from offering advice on inadvisability of such strategy); *State v. Lee*, 142 Ariz. 210 (1984) ("[a]bsent a clear showing that a criminal defendant was informed of the dangers and disadvantages attendant to a proposed course of action and absent a clear showing that he or she knowingly or voluntarily agreed to forego a claim of ineffectiveness if counsel followed that course of action, we will not consider the admissibility of a waiver of the right to ineffective assistance premised on an unreasoned trial tactic.").

345.   The criminal defense lawyer's obligation to provide the client with a

candid estimate of the outcome of a particular strategy is a sacred duty, and that long-standing prevailing professional norms require fulfillment of this obligation is unchallengeable. The principles are engrained in the ABA Standards for Criminal Justice. *See* Defense Function Standards 4-5.1 Advising the Accused (2d ed. 1986 Supp.) "[D]efense counsel should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome. . . . and should not intentionally understate or overstate the risks, hazards, or prospects of the case. . ." And *see Boria v. Keane,* 99 F.3d 492, 496 (2d Cir. 1996) (scarcity of cases deciding criminal defense counsel's duty to advise client "undoubtedly arises from the circumstance that such duty is so well understood by lawyers . . . that the question has never been litigated"). What is more, Mr. Cruz's trial lawyers' decision to forgo the giving of essential advice to him is not excused under the guise of trial strategy; "in no event could [counsel be] relieved of his constitutional duty to give professional advice. *Id* at 99 F.3d 498.

346. Here however, trial counsels' constitutionally deficient decision to present a denial of responsibility defense, without the informed consent of their client, represents only one side of a two sided coin. Selection of an implausible trial defense would surely harm the sentencing process just by itself, but that is not all that happened: trial counsel allowed the denial of responsibility defense to automatically foreclose any investigation into Mr. Cruz's mental state at the time of the offense. This too was a constitutionally deficient tactic employed without Mr. Cruz's informed consent.

**C.   Counsels' decision to parlay the specious trial defense into decision to foreclose investigation of Mr. Cruz's mental state at the time of the offense was constitutionally deficient and objectively unreasonable.**

347. It was bad enough for trial counsel to offend Mr. Cruz's capital jury by presenting a denial defense in the face of overwhelming evidence of guilt. But the

decision to deny responsibility led to another unreasonable decision.  Trial counsel decided that Mr. Cruz's denial of responsibility meant that there could be no investigation into whether Mr. Cruz's mental state was a contributing cause for the offense. An entire block of potentially powerful mitigating evidence was taken off the table. Then in a half measure, trial counsel ineffectively presented some minimal evidence regarding Mr. Cruz's mental state; albeit not directly tied to the cause of his behavior at the time of the offense.  For example, during the sentencing phase, counsel drew attention to Mr. Cruz's use of drugs and related problems with addiction and they presented evidence that he had methamphetamine and cocaine in his drug screen at the time of his arrest. (*See* paragraphs 187-89, 192, 194-95, 197, 211-14.) They presented a variety of experts to address the behavioral effects of drugs, but <u>no</u> expert had been asked to evaluate Mr. Cruz's mental state and none could explain the effects of drugs on him at the time of the offense. (*See* paragraphs 195, 214.)  The principal sentencing mental health expert, Dr. Barillas was instructed <u>not</u> to evaluate Mr. Cruz's mental state. (*See* paragraph 294.)

348.   The above record demonstrates unequivocally, that trial counsel knew that Mr. Cruz's mental state was a relevant mitigator; they presented indirect evidence from at least four experts[45] that he might have been laboring under a diminished mental capacity,[46] but they did so in the most ineffective manner possible, <u>without actually investigating his diminished capacity at the time of the offense.</u> The decision to make Mr. Cruz's diminished mental capacity the centerpiece at sentencing via four expert witnesses, without actually investigating Mr. Cruz's diminished mental capacity, cannot be justified by any rational strategy and is *per se* the essence of objectively unreasonable performance: a diminished

---

[45] Dr. French, Dr. Austein, Dr. Barillas and Dr. McCloskey.

[46] Mr. Storts presented a meager closing argument as to this point.  (*See* paragraph 222.)

capacity defense requires investigation to be effectively presented.

349.   "[C]ounsel had a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary." *Strickland,* 466 U.S at 690; *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003). No doubt trial counsel will probably claim they had to avoid addressing Mr. Cruz's mental state head on because he had denied responsibility for the offense.   But as explained above, this does not transform counsel's failure to investigate Mr. Cruz's mental state into an acceptable strategy. Counsel were required to confront Mr. Cruz with the obvious plain truth: that maintaining a denial defense and at the same time discarding any investigation into his mental state at the time of the offense would substantially increase the probability that the jury would return a death verdict; whereas, accepting responsibility, showing remorse and investigating mitigation to the fullest extent possible was a more plausible option. *See Johnson v. Baldwin*, 114 F.3d at 840 (when an attorney abdicates his duties to investigate the case and to render professional advice and, instead, acquiesces in the uninformed decisions of the client regarding trial strategy, that client receives no benefit from counsel's skill and knowledge and is deprived of his constitutional right to counsel); *Boria v. Keane*, at 99 F.3d 498 (when counsel utterly fails to give the client advice, however, he or she makes no strategic decision, and counsel's actions are not due any deference); *Phillips v. Woodford*, 267 F.3d at 978 (counsel ineffective when he presented alibi defense without advising client it was hopeless and counsel failed to investigate any other more plausible defense).

350.   The Fourth Circuit's decision in *Gray v. Bunker,* 529 F.3d 220 (4th Cir. 2008), is also illustrative of capital counsel's duty to provide professional advice before abandoning needed investigation of mental state issues for the mitigation phase of a capital proceeding, even when the defendant initially refuses to have his mental state at the time of the offense investigated. In *Gray,* the court held that the defendant's refusal to cooperate did not excuse counsel's obligation to "give the full

picture of [the capital offender] and his crime, including the fact that he was acting under severe mental or emotional disturbance and with impaired capacity [at the time of the offense.]" *Id*. at 238 The court rejected the idea that Gray's refusal to put his mental state in issue "ended counsel's responsibility to investigate for mental health evidence" or the duty to provide professional advice to the defendant regarding the risks of the client's strategy. *Id.* at 231. For example, the court noted that because the defendant's refusal to cooperate with the mental health investigation came earlier in the proceedings, counsel was required to revisit the issue with the defendant, but this his lawyers failed to do. The lawyers offered no professional advice to their client and instead acquiesced in the client's ill-fated strategy; and like Mr. Cruz's counsel they presented "scattered . . . testimony about [the defendant's] mental state. . . [and] did not present a cohesive case for mental or emotional disturbance factor." *Id.* at 233 n.2, 235. This was not an effective counsel. *Id.* at 231.

351.   Mr. Cruz's trial lawyers' decision to forgo the giving of essential advice to him is not excused under the guise of trial strategy; "in no event could [counsel be] relieved of his constitutional duty to give professional advice. *Boria* 99 F.3d at 498. This means that the *twin* decisions of Mr. Cruz's trial counsel to present a denial of responsibility defense, and then parlay that decision to foreclose any investigation of Mr. Cruz's mental state at the time of the offense, may not be excused under the pretext of trial strategy. Mr. Cruz's uninformed acquiescence in such strategy is therefore irrelevant. On the facts of this case, the decision to present a denial of responsibility defense in the face of overwhelming evidence of guilt, and then present a half-baked diminished capacity defense unsupported by any investigation of Mr. Cruz's diminished capacity at the time of the offense, is a strategy that was objectively unreasonable under prevailing professional norms and therefore, constitutionally deficient under *Strickland.*

352.   As illustrated above, in paragraphs 289-91, 306, the recent investigation to Mr. Cruz's mental state has demonstrated that due to a combination of disorders,

including neurodevelopmental disorder he was born with, as well as other mental and cognitive disorders directly tied to his painful childhood and not of his own making, Mr. Cruz was significantly impaired at the time of the offense and unable to confirm his conduct to the requirements of the law. What is more, the new evidence shows that with proper advice and assistance from counsel Mr. Cruz has now been able to recognize that his disabled memory for the events resulting in the offense, does not mean he lacks responsibility; rather, he does see now that the evidence shows he is responsible, whether he remembers or not. These developments have naturally allowed Mr. Cruz to feel and express true remorse for the tragedy that unfolded for officer Hardesty, his fellow officers, and most notably officer Hardesty's family.

353. Mr. Cruz was especially vulnerable to misadvice, or to receiving no advice, which is what happened. Instead, of being served realistic advice, trial counsel fed Mr. Cruz's delusion that somehow someone else must have committed the offense. This reached its pinnacle when Mr. Storts told Mr. Cruz he could prove that officer Waters was a liar. (*See* paragraph 143 above.) Of course Officer Waters did not lie, and he tied Mr. Cruz to the murder weapon, making it a virtual certainty that he would be convicted. Mr. Storts failed in his duty to provide a "candid estimate of the probable outcome," (ABA Defense Function Standard 4-5.1) and in the failure to provide such advice, neither Mr. Storts nor Mr. Basham functioned as an effective counsel.[47] Counsels' presentment of a denial of responsibility defense,

---

[47] This would not be the first time that Mr. Storts was determined to have provided ineffective representation in the context of failing to communicate with a client and depriving the client from making an informed decision. In S*tate v. Pesqueira*, Pima County Case No. CR20072811, the Superior Court found Mr. Storts ineffective for failing to communicate a proffered plea agreement. As a result the case went to trial and the client was convicted. The court set aside the conviction and allowed Mr. Pesqueira the benefit of the offered plea, resulting in a substantially reduced sentence.

while foreclosing the investigation of a compelling avenue of mitigation, was objectively unreasonable, where they did so without providing the professional advice demanded of capital defense counsel.

**D.** **Trial counsel failed to investigate and present all reasonably available mitigation evidence; or to explain the significance of such evidence.**

### 1) The Duties of Capital Counsel.

354. In a capital case, the fundamental nature of counsel's professional duties required under the Sixth Amendment may best be understood in relation to the elements of a constitutionally just procedure under the Eighth Amendment. The sentencing process in a capital case is structured to focus the sentencer on the extent of the defendant's personal culpability. A capital sentencer must be afforded the opportunity to assess "the character and record of the individual offender." *Eddings* v. *Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks and citation omitted). As the Supreme Court has explained, "[i]f the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted), abrogated on other grounds, *Atkins v. Virginia*, 536 U.S. 304 (2002); *see also California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring); *Eddings*, 455 U.S. at 111 (explaining that consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").

355. A prisoner's right to put all relevant mitigation in front of the sentencer is meaningless in the absence of effective counsel. In recognition of this, the Supreme Court has repeatedly held that absent an objectively reasonable basis for

not doing so, capital counsel must "conduct sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all the available [mitigating] evidence," including evidence of the offender's background and family history. *See Williams v. Taylor*, 529 U.S. at 399 (holding that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not fulfilled their obligation to conduct a thorough investigation of the defendant's background); *Wiggins v. Smith*, 539 U.S. at 523-25 (holding that abandonment of investigation into petitioner's background after acquiring only rudimentary knowledge of his history from a narrow set of sources fell short of well-defined norms; citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p. 133 (1989), noting that among the topics counsel should consider investigating are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Sears v. Upton*, 130 S. Ct. 3259 (2010) (holding that trial counsel's inadequate background investigation, which resulted in a false portrayal of petitioner's family and upbringing, was deficient and prejudicial, warranting remand); *Porter v. McCollum*, 130 S. Ct. 447 (2009) (holding that petitioner demonstrated that counsel provided deficient representation in penalty phase of capital murder prosecution, as required to establish ineffective assistance, by showing that counsel failed to uncover and present any mitigating evidence regarding petitioner's mental health, family background, or military service).

356.   The professional duty to conduct a thorough investigation of a capital defendant's background for a capital sentencing proceeding was well-entrenched under prevailing professional norms at the time of Mr. Cruz's 2003-2005 capital proceedings. *See Rompilla*, 545 U.S. at 379, 387 n.7 (citing the 1982 ABA Criminal Justice Investigation Standards on Investigation in support of finding trial counsel

ineffective in a case where they had engaged the services of three mental health experts, but failed to conduct the thorough investigation that is essential to reliable assessments and effective mitigation); *Wiggins*, 539 U.S. 524-25 (citing the 1982 Criminal Justice Investigation Standards and the 1989 ABA Capital Guidelines for mitigation investigations for a representation that occurred in 1989); *Williams v. Taylor*, 529 U.S. 396 (citing the 1980 ABA Criminal Justice Investigation Standards for a representation that occurred in 1986); *Porter*, 558 U.S. at 36, 39 (noting with respect to the norms applicable during Porter's 1988 trial, that counsel were deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation).   In *Porter*, for example, the Court noted that "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background." *Id*. at 39. Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id*. at 36.  Similarly, *Sears v. Upton*, 561 U.S. ___, 130 S.Ct. 3259 (2010), the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 130 S. Ct. at 3266. In *Sears*, postconviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id*. at 3261.

357.  "With the Supreme Court stressing the importance of the jury being able to consider the background and character of a defendant in order to assure the individualized sentencing required by the Eighth Amendment in a trial conducted in 1980, a fortiori it was the obligation of a defense attorney to present that evidence so the jury could consider it." *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) (explaining that counsel's obligation to investigate and unearth relevant

mitigation on prisoner's background was clearly established by 1980); *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998) (noting that counsel's obligation to conduct meaningful mitigation investigation was not a novel concept in 1981); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (stating that "to fail to present important mitigating evidence on defendant's background and family history in the penalty phase of a capital case when there is no risk of doing so can be . . . devastating"); *Hamilton v. Ayers*, 583 F.3d 1100, 1132–33 (9th Cir. 2009) (internal quotations marks and citation omitted) ("[s]ustained feelings of terror, panic, confusion, and abandonment as a child have long term consequences for adult behavior. Psychosis, dissociative states, depression, disturbed thinking and alcohol and drug dependency are directly linked to child victimization**.**")

358.   Undoubtedly, it was well-settled that under the prevailing norms at the time of Mr. Cruz's capital sentencing, that absent a sound strategic reason for not doing so, his counsel were required to conduct sufficient investigation and preparation to be able to present and explain the significance of all the available mitigating evidence.

359.   Closely correlated with the duty to thoroughly investigate and present mitigation is the duty to provide complete and accurate information about the capital defendant's background to evaluating mental health professionals. *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (counsel has an affirmative duty to provide mental health experts with social history information needed to develop an accurate profile of the defendant's mental health profile); *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir.1997) (counsel ineffective for failing to provide sufficient background information to their psychologist); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (counsel ineffective for failing to provide four mental health experts with relevant background information which resulted in incomplete and inaccurate diagnoses and failure to identify brain impairments); *Jacobs v. Horn*, 395 F.3d 92, 97, 106 (3d Cir. 2005) (counsel ineffective where he retained a mental

health expert but failed to provide him "with the necessary information to conduct a proper evaluation"). Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Russell Stetler, Mental Health Evidence and the Capital Defense Function: Prevailing Norms, 82 UMKC L. Rev. 407 (2014); Richard G. Dudley, Jr., & Pamela Blume Leonard, Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment, 36 Hofstra L. Rev. 963 (2008); Douglas Liebert & David Foster, The Mental Health Evaluation in Capital Cases: Standards of Practice, 15:4 Am. J. Forensic Psychiatry 43 (1994); George W. Woods, David Freedman, & Stephen Greenspan, Neurobehavioral Assessment in Forensic Practice, 35 Int'l J. of L. & Psychiatry 432 (2012).

360.  Many capital defendants have psychiatric disorders or are cognitively impaired and by definition they are likely to be poor historians. Therefore a reliable evaluation requires historical data from sources independent of the client.  This is why a social history investigation is so critically important.

361.  Capital counsel's duties also include the obligation to assemble a qualified defense team. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003), state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).

362.  A social history investigation conducted by a qualified mitigation expert requires a substantial expenditure of time and cannot be completed in a matter of hours or days. It takes time to establish rapport with the client, his family, and

others who may have important information to share about the client's history. Typically, during initial interviews with clients and their family members, the information obtained in incomplete and superficial.  Repeated interviews are needed to obtain disclosure of sensitive, sometimes shameful or traumatizing information.

363.   An experienced mitigation expert requires time to break down barriers to disclosure, and obtain accurate and meaningful responses to the posed questions. An experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. *See* Lee Norton, Capital Cases: Mitigation Investigation, The Champion, 43-45 (May 1992); *see also* Pamela Blume Leonard, A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team, 31 Hofstra L.Rev. 1143, 1154 (2003) ("it takes hundreds of hours to conduct a thorough social history investigation") and David DeMatteo, Daniel C. Murrie, Natalie M. Anumba, & Michael E. Keesler, Forensic Mental Health Assessments in Death Penalty Cases 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").   One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required.

364.  As explained below, Mr. Cruz's trial counsel defaulted in their fulfillment of each end every duty described above. Counsel failed to conduct a thorough investigation of Mr. Cruz's background; indeed the mitigation that was presented was incomplete, inaccurate and misleading. Counsel did not have the assistance of a qualified mitigation expert and they lacked such a qualification themselves. Counsel failed to provide accurate or complete social history data to their mental health experts thus the evaluations that were done were also incomplete

and inaccurate.[48]

> **2)   Trial counsels' near obsession with asserting Mr. Cruz's speedy trial rights spiraled into forfeiture of their duty to thoroughly investigate Mr. Cruz's background and to provide relevant information concerning his background to the mental health experts.**

365.   The record clearly demonstrates that from near the inception of trial counsels' appointment to the case, they established the objective of getting the case scheduled for trial prior to the expiration of the speedy trial deadlines in Rule 8 of the Arizona Rules of Criminal Procedure.   As we demonstrate below, this speedy trial agenda was launched by trial counsel; <u>not</u> Mr. Cruz.

366.   It is relevant to the context, and the ultimate *Strickland* assessment of whether trial counsels' speedy trial strategy was objectively reasonable, that the strict timetable was established in a case where there was overwhelming evidence of Mr. Cruz's guilt and the only proceeding that would ultimately matter was the sentencing phase. Objectively reasonable counsel would also understand this context and know that saving Mr. Cruz's life would be dependent on presenting a powerfully convincing case for leniency. Similarly reasonable counsel would know that it would be reckless to proceed with the sentencing phase under these circumstances, without taking the time needed to adequately and painstakingly prepare Mr. Cruz's case for life.

367.   Under these circumstances, in the absence of the most compelling reasons, reasonable counsel would <u>never</u> agree to cut-short the time needed for investigation and development of mitigation.

368.   Nevertheless, from the very beginning, Mr. Storts unwaveringly

---

[48] The separate failure to adequately develop and present evidence of Mr. Cruz's diminished mental capacity at the time of the offense was separately presented above.

inextricably linked the insistence on a speedy trial to his change of venue motion. As early as October 2003, Mr. Storts represented to the court that if the change of venue motion was granted he would be ready to go to trial during the summer 2004. (Paragraphs 106-113 above.) Mr. Storts made this representation before any mitigation investigation had commenced and before he could conceive of what such an investigation would entail or how much time it would take.

369.   To be sure, this legal strategy did not originate with Mr. Cruz, who had no legal training and would not have made the venue/speedy trial link. To the extent Mr. Cruz hitched his wagon to the speedy trial train, he was following the advice of his counsel.

370.   On April 19, 2004, trial counsel filed a Motion Re: Notification of Speedy Trial Rights. (ROA 206.) This motion joined Mr. Cruz's speedy trial rights (i.e., Mr. Cruz's right to a trial prior to December 14, 2004 under Rule 8.2, Arizona Rules of Criminal Procedure) with his change of venue motion, while simultaneously seeking a continuance of the trial date from September 7 to mid-October in order to have "all of the required mitigation testimony" available. As trial counsel explained, "The principle [sic] reason is the Defendant is putting the court on notice, as to his speedy trial rights, is that, if the trial commences on October 18, 2004, and a fair and impartial Pima County jury cannot be seated, the Defendant will expect the State to be able to commence the trial in another jurisdiction, on or before December 14, 2004."

371.   When trial counsel filed the notice of speedy trial rights, they did so before any mitigation investigation had commenced and before they could conceive of what the investigation would entail or how much time it would take. Further, Mr. Cruz had not been advised of the grave risks associated with establishing a strict timetable in a capital case, when it was unknown what needed to be done to investigate mitigation or how long it would take.

372.   Viewed in context, trial counsels' decision to hold the mitigation

investigation subordinate to the defendant's *theoretical* speedy trial rights was a meaningless, reckless and objectively unreasonable strategy; no reasonable capital counsel would allow such a strategy to upend their duty to thoroughly investigate mitigation on a timetable independently suitable to the requirements of such investigation. This is evident for the following reasons.

373. First, the underpinning for trial counsels' strategy that the jury pool in Pima County, with its population near 1,000,000, would be insufficient to allow selection of a fair and impartial jury and therefore force a change of venue, had no basis in reality. NONE. This attenuation of counsel's strategy from what was real or possible is independently sufficient to demonstrate the objective unreasonableness of the strategy.[49] Trial counsel cited no known case in the modern history of the death penalty in Arizona, where venue was moved out of Pima County because a fair and impartial jury could not be impanelled. All of this can mean only one thing: if trial counsel insisted on a speedy trial, they would get what they asked for. Mr. Cruz would have his speedy trial, but would the mitigation investigation be completed? Trial counsel never gave primacy to this latter question; they moved headlong into a guaranteed speedy trial, without knowing anything about what a mitigation investigation would entail or how long it would take. These are not the actions of objectively reasonable capital counsel.

374. However, there is another troubling, irreconcilable pall of

---

[49] The proof is in the pudding. With respect to the ultimate venire, review of the juror questionnaires reveals 71 prospective jurors had no exposure to any pre-trial publicity and 3 of these served on Mr. Cruz's jury. Of the remaining venire, 103 prospective jurors classified their exposure to pre-trial publicity as "very little," and of these 10 served on Cruz's jury or as alternates. Of these 13 jurors who served, and knew nothing or very little, none of them expressed any opinion favoring the prosecution or Mr. Cruz's guilt. The one juror selected who disclosed a fair amount of exposure to publicity had formed no preconceived notions with respect to guilt. No member of the venire who had a great deal of exposure to pre-trial publicity served on the jury.

unreasonableness shrouding counsels' speedy trial strategy: it would have no conceivable benefit to Mr. Cruz, NONE. Even if the utterly implausible happened and a Pima County jury could not be impanelled within the speedy trial deadline, Mr. Cruz would not enjoy a dismissal of his case with prejudice. The indictment could be refiled and he would face trial for capital murder, and in all events he would be faced with a case where there was overwhelming evidence of guilt and counsel would need to be fully prepared to make the case for life at sentencing, albeit in a different venue.

375.   Nevertheless, once the April 2004 Notice of Speedy Trial was filed there was a frenzy to maintain Mr. Cruz's speedy trial rights. (*See* paragraphs 121-28 above.)   Trial counsel attempted to compel their mitigation specialist Mary Durand to produce the results of her mitigation investigation even before it had been done. Citing the need for a constitutionally thorough mitigation investigation, Durand quit the team.  (*See* paragraphs 128-37.)  Ignoring the actual reasons Durand gave for withdrawing, trial counsel would later re-write history claiming Durand had been terminated (*See* paragraphs 133, 139.)

376.   With Durand out of the way, in keeping with their unreasonable insistence on enforcement of Mr. Cruz's speedy trial rights, counsel engaged in the charade of preparing what they represented as their complete mitigation disclosure. However, they prepared this disclosure, including the articulation of the subject matter of the expert witness testimony BEFORE any mitigation investigation or expert work had been done. (*See* paragraphs 136-37, 145-49.) This describes a process that was objectively unreasonable and does not describe the work of effective capital counsel, who are intent on fulfilling their obligation to thoroughly investigate a capital defendant's background.

377.   The justification for the maddening rush to complete disclosure of the mitigation, even before the mitigation investigation had begun, was trial counsels' insistence on enforcing Mr. Cruz's speedy trial rights; a strategy which, as explained

above, had no rational basis. Under no circumstances could such a plainly unreasonable strategy excuse counsel from fulfilling their duty to conduct a thorough investigation of Mr. Cruz's background; particularly in the absence of Mr. Cruz's informed consent. Counsel never explained to Mr. Cruz that if he insisted on speedy trial that it was a certainty he would get a speedy trial in Pima County, where he had better be fully prepared to present his mitigation. Moreover, counsel knew full well Mr. Cruz was not in a position to waive investigation and presentation of mitigation. In fact, Mr. Storts represented to the court during the April 26, 2004 hearing that Mr. Cruz did not want to waive mitigation. (*See* paragraph 126.)

378. "[C]ounsel ha[d] a duty to make[a] reasonable investigation" before they actually disclosed their mitigation case, *Strickland,* 466 U. S. at 690-91, but they failed to do so. Instead they conducted no investigation before presenting their mitigation case. Constitutionally, they could justify their failure to investigate only in light of "a reasonable decision that makes particular investigations unnecessary." *Id.* Counsel's *irrational* insistence on a speedy trial as the rationale for the decision not to investigate was not "a reasonable decision that makes particular investigations unnecessary." *Id.* To state the obvious, disclosure comes after an investigation. Objectively reasonable counsel in a capital case would have moved to extend the mitigation disclosure deadline until after the mitigation investigation had been completed. If that required waiver of a speedy trial then so be it. But reasonable actions were not taken.

379. Instead, following the disclosure of mitigation, Mr. Storts bragged in court that they had put their entire mitigation case together in three weeks. He claimed they did not need a mitigation expert given the fact that he and Mr. Basham had tried over 22 capital cases start to finish. (*See* paragraphs 139-41.) As explained above, Mr. Storts had never tried a capital case start to finish and Mr. Basham's experience was negligible, at best.

380. Following this, trial counsel still hung mightily to their speedy trial

strategy, even after it became apparent that their mitigation disclosure (and thus their supporting investigation) had been woefully deficient and inadequate. (*See* paragraphs 145-49.)  Reasonable counsel would not have maintained this charade, they would have sought whatever additional time was needed in order to fulfill their duty to thoroughly investigate.  But what was reasonable was not done. Instead, counsel pressed on to obtain the soonest possible trial date. (*See* paragraphs 145-49.)

381.   Meanwhile, as the clock for preparing the mitigation case was about to run out, Margaret DiFrank, the guilt-phase investigator who had the mitigation phase investigation heaped on her, told Mr. Basham that she had not had enough time to complete the mitigation investigation and she asked for additional time. (PR Appx. at 846, PCR Pet. Ex. 4 at 3.) But DiFrank was rebuffed. (*Id.*)  She would get no additional time. She was told in so many words that lead counsel, Mr. Storts was stickler for keeping to established deadlines. Mitigation investigation needs would be supplanted to lead counsel's arbitrary timetable for getting the case done.[50] (*Id.*)

382.   This was not a case where trial counsel set out to evade investigation of Cruz's background and social history, in favor of some other strategy. *See Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1407-08 (2011) (recognizing that alternate strategy could obviate an investigation into defendant's background that would help humanize the defendant). But unlike the example given in *Pinholster*, this was a case where the trial counsel did adopt a strategy to investigate Mr. Cruz's background in an attempt to humanize him.  Hence, they had every incentive to make the best case and to investigate thoroughly.  In the end, this was not done.  Not by design, but rather for lack of time, and the application of skills necessary to the task at hand. See

---

[50] That the case was going to be autocratically managed on a strict time table was evident from the moment the "speedy trial" date was set, when Mr. Storts told Ms. Durand the trial would take place on the date set, even though the mitigation investigation had not started and Mr. Storts had no idea what the scope of the investigation would be, or how long it would take.  (*See* paragraph 113.)

*Williams v. Allen* 542 F.3d 1326, 1340 (11th Cir. 2008)  ("Given that counsel's sentencing case focused on establishing that Williams had a troubled background, they had every incentive to develop the strongest mitigation case possible"). Consequent to counsel's inadequate investigation; the jury was provided an inaccurate and misleading profile of Mr. Cruz. (*See* paragraphs 390-430 below) This is deficient performance. *Williams*, 542 F.3d 1339 (quoting *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995)).

383.  Counsel's ineffective mitigation investigation also resulted in evaluations by mental health experts that were incomplete and inaccurate.  Counsel failed to investigate and discover relevant social history information that could have and should have been provided to these experts.  They supplanted this lapse by failing to provide the experts with other relevant information contained in their own files. For example:  (1) Counsel failed to share with the psychologist Dr. Barillas or the neuropsychologist Dr. Biggan that counsel had learned Mr. Cruz had suffered from blackouts and that he lacked memory for the events surrounding the offense. (2) Counsel failed to share with Dr. Barillas or Dr. Biggan evidence in their own files that showed that Mr. Cruz was diagnosed with a learning disability in elementary school, evidencing that he suffered from a cognitive impairment or some other neurodevelopmental disorder. (3) Counsel failed to discover readily available evidence that Mr. Cruz's mother drank throughout her pregnancy. (*See* paragraph 272.)

384.  Dr. Biggan's records reveal that in the rush to finish the mitigation investigation she never had any substantive communication with trial counsel either before or after her testing. Once presented with relevant information she lacked previously, and after being asked to elucidate her test findings, Dr. Biggan made a number of observations and recommendations for additional evaluation.  (1) Dr. Biggan described with particularity Mr. Cruz's brain dysfunction.  (*See* paragraph 277.) Dr. Biggan recommended further evaluation and testing with respect to the

connection between Mr. Cruz's brain damage and fetal alcohol effects. (*See* paragraph 277.)  (3) Dr. Biggan suggested that Mr. Cruz's brain impairments could ripen into much more severe neuropsychological impairment and disruption in his executive function, if Mr. Cruz was exposed to environmental or situational stress (as he was for example at the time of the instant offense) and therefore she suggested further evaluation of this issue. (*See* paragraph 277.) (4) Dr. Biggan also recommended further evaluation with respect to how Mr. Cruz particular brain dysfunction would have played out in his particular dysfunctional psychosocial setting and how it might contribute to educational failure, depression, drug abuse and difficulty in overcoming addiction, all of which were obvious and relevant questions in Mr. Cruz's case. (*See* paragraph 277.) (5) Dr. Biggan also recommended that Mr. Cruz's amnesia should be explored from a neuropsychological perspective, noting that the presence of amnesia would strongly suggest that at Mr. Cruz was suffering from a severe level of cognitive dysfunction at the time of the offense. (*See* paragraph 277.)

385.   Trial counsel should have had Dr. Biggan address the five issues above prior to the sentencing, but due to inattention, neglect and failure to provide relevant information to Dr. Biggan, the necessary evaluation was not done. The resultant evaluation that was completed by Dr. Biggan was incomplete and inaccurate. The overall failure to prepare Dr. Biggan to address obvious case-related questions or to explain the significance of the available mitigation evidence from a neuropsychological perspective did not result from reasoned trial strategy; it resulted from inattention and constitutionally deficient counsel. Trial counsel's failure to provide necessary information to Dr. Biggan and prepare her to address the obvious issues related to Mr. Cruz's impairments in relation to his social history and the offense was objectively unreasonable and constitutes deficient performance. *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir.1998) (failure to provide necessary information to experts or to prepare them constitutes deficient performance under

*Strickland*); *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) ("counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health"); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir.1999) (counsel renders ineffective assistance at penalty phase for failing to investigate and adequately prepare expert witness); *Claybourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (counsel failed to provide any mental health expert with records sufficient to develop an accurate psychological profile of defendant)

386. What is true with respect to counsel's deficient preparation of Dr. Biggan is also true to Dr. Barillas. Upon examination of information regarding Mr. Cruz and his background, Dr. Barillas concluded without hesitation that the prior opinions he offered in this case, including those presented to the jury, were incomplete, inaccurate and ultimately unreliable. (*See* paragraph 295.) He also recommended further evaluation and study of the evaluation questions posed by Dr. Biggan, as well as the question of whether Mr. Cruz may have suffered from clinical depression, a serious mental illness beginning in childhood. Trial counsel's failure to provide necessary information to Dr. Barillas and prepare him to address the obvious issues related to Mr. Cruz's impairments in relation to his social history and the offense was objectively unreasonable and constitutes deficient performance. *Bean v. Calderon*, *supra ;Caro v. Woodford*, *supra; Wallace v. Stewart*, *supra.*

387. As explained below, trial counsels' deficient performance resulted in prejudice. The new mitigation case bears little resemblance to the case actually presented to the jury.

## IV.   Prejudice

388. The Supreme Court has never limited *Strickland*'s prejudice inquiry "to cases in which there was only 'little or no mitigation evidence.'" *Sears v. Upton*, __ U.S. __, 130 S. Ct. 3259, 3266 (2010) (per curiam). Instead, the Supreme Court has

found prejudice despite defense counsel's presentation of some evidence at mitigation, particularly where that evidence serves to mischaracterize the defendant's life. *See id.* Here, trial counsel's mitigation investigation was superficial at best. Their failure to gather records, interview witnesses, provide information to experts, and to consult with said experts meant that the powerful and compelling story that could have served to mitigate the single aggravator in a non-premeditated murder was not understood by the jury considering Mr. Cruz's case.

### A. Mr. Cruz was prejudiced by counsel's deficient performance where fallacies went uncorrected by the defense.

389.   In *Sears*, the defense presented evidence that the defendant's childhood was "stable, loving, and essentially without incident" in furtherance of their strategy to use the impact of a death sentence on Sears' family as mitigation. *Id.* at 3261. Counsel's portrayal at mitigation could not have been further from the truth. Counsel's presentation mischaracterized Sears' childhood, which was replete with abuse, school struggles, and brain impairment, inaccurately as a stable and loving childhood, a point on which the prosecution repeatedly capitalized as he argued to the jury that death was the proper sentence to impose upon Sears. *Id.* at 3261-62. Much like *Sears*, Mr. Cruz's trial record is littered with mischaracterizations from which the State profiteered as it urged Mr. Cruz's jury to sentence him to death— mischaracterizations and falsities that defense counsel could have countered with readily available evidence had they conducted an adequate investigation into the available mitigation. An adequate mitigation investigation would have supplied counsel with the evidentiary power to dismantle repeated falsehoods and inaccuracies, including:

390.   During cross-examination of defense witness Ricardo Ford, the prosecutor elicited testimony that Mr. Cruz's mother Julie possessed good values, which would have passed on to Mr. Cruz. (Tr. Mar. 1, 2005 at 69-70.) An adequate mitigation investigation would have allowed the defense to easily demonstrate this

mischaracterization of Julie's values as "good" and to illustrate the lessons that she passed on to her son. As discussed at paragraphs 2, 5 and 22, Mr. Cruz's mother was an alcoholic who abused substances even during her pregnancy with Mr. Cruz. By the time she remarried, when Mr. Cruz was about fifteen years old, Julie partied all night, using alcohol and both prescription and illicit drugs, and then slept all day.

391.   Moreover, the suggestion that Julie had the desire, or even made an effort, to impart a single positive life lesson to Mr. Cruz would have been clearly refuted by a proper mitigation investigation. Mr. Cruz spent a significant amount of time with his cousin Irma when he went to live with his mother in California, at around age fifteen.  Irma recalls that Julie would try to get rid of Mr. Cruz regularly by leaving him at Irma's home or by giving him money; sometimes Julie would disappear from Mr. Cruz's life for weeks. Mr. Cruz was little more than a bothersome obligation to his mother. (*See* paragraphs 13 to 31.)

392.   Hopped up on drugs and alcohol, ducking her responsibilities whenever she was able, Julie certainly could not be characterized, as either having, or trying to impart, good values to her son. If anything, Julie was one of several adult role models who taught Mr. Cruz a singular lesson at a very young age, one that would ultimately serve as his downfall—to use and abuse substances to ease life's pain.

393.   Similar to Ricardo Ford's cross-examination, when the prosecution examined Mr. Cruz's mother, Julie testified to her sincere efforts to mother Mr. Cruz, to raise him right. Julie testified that she and her new husband, Steve, opened their arms to Mr. Cruz; that both she and her husband were committed to raising Mr. Cruz. (Tr. Mar. 1, 2005 at 123-24.) The very clear implication, one the prosecution used as a refrain in closing argument, was that Mr. Cruz gave up a wonderful opportunity, abdicating a wholesome life of responsibility and instead chose a party lifestyle. Again, the damage of trial counsel's inadequate mitigation investigation is evidenced by their inability to correct this flawed and inaccurate view of Julie's parenting skills, of what life was like with Julie and her husband Steve, and the

complete and utter abandonment Mr. Cruz faced while residing with the couple.

394.   Rather than commitment and open arms, as explained in paragraphs 20 to 28, violence and substance abuse ran rampant in Julie and Steve's home, a home that Mr. Cruz was never welcome in. Julie and Steve abused alcohol and substances extensively while Mr. Cruz lived with him. Julie feared Steve, who would display violent rages. Given the extensive substance abuse and a violent husband, it is unsurprising that Julie's mental health only deteriorated. This couple was not committed to Mr. Cruz, but were instead totally unavailable to him. When they were not partying, they worked nights and slept during the day, effectively leaving Mr. Cruz alone and unsupervised. And, Steve never wanted Mr. Cruz, not from the very outset of his relationship with Julie.

395.   The prosecutor argued in closing that Mr. Cruz left California when "things got a little tough for him, when things got a little too restrictive[.]"(Tr. Mar. 8, 2005 at 52.)  Things were tough in California, but not in the inaccurate manner depicted at trial and referenced by the prosecution. Things were tough because Mr. Cruz's mother and step-father were abusing drugs and alcohol, physically abusing him, and doing their very best to get rid of him. There were no open arms in California, there was no commitment to Mr. Cruz; there was only drug abuse, alcoholism, violence, and abandonment there for Mr. Cruz. He did not choose to return to Tucson because he wanted to party; partying was all that was going on in Julie's home. Rather, he left because as a young teen he found himself unwanted and alone in an intolerable environment.

396.   An adequate mitigation investigation would have enabled trial counsel to correct the mischaracterizations and outright inaccuracies created by the State's cross-examination with the *actual* facts—that Julie lacked good values, only teaching her son about the use and abuse of substances; that Julie and her husband were not committed to Mr. Cruz and did not open their arms to him; they were unavailable to him, either physically absent or so intoxicated that they might as well

not have been there.

397.   In addition to allowing trial counsel to correct these false implications, this evidence would have bolstered the case at mitigation that the defense claimed it was presenting. Testimony regarding the true conditions under which Mr. Cruz lived in California, which ultimately led to his  return to Tucson, would have provided powerful support to demonstrate two defense-proffered mitigating factors—the dysfunctional family he came from as well as the lack of nurturing and love. *See Cruz*, 181 P.3d at 217.

398.   The defense's failed investigation also missed another important rebuttal point—counsel's failures meant they were unable to counter the prosecutor's argument that Mr. Cruz's squandered the opportunity to get off drugs while in prison. (Tr. Mar. 8, 2005 at 52; "This, despite the fact that, as Dr. Barillas said, he had extensive treatment in one of his prison stays to try to help him get off of drugs, to try to help him improve his life.") It is true that Mr. Cruz participated in a prison drug treatment program. (*See* paragraphs 59-60.) And after his release, for the first time, Mr. Cruz saw some real success. (*See* paragraphs 57-60.) What Mr. Cruz's jury did not know, as a direct result of defense counsel's deficient mitigation investigation, was that the likelihood of success for Mr. Cruz, the chance of Mr. Cruz beating his addiction, was slim. Dr. Smith has identified a significant failure with regard to the substance abuse treatment that Mr. Cruz's received—the program in which Mr. Cruz was involved did not assess, diagnose, or treat his lifelong depression.

399.   There was a vital and missing piece necessary for any hope that Mr. Cruz would be able to successfully battle an addiction that commenced when he was an adolescent. Had counsel adequately investigated Mr. Cruz's social history, his mental status, and the drug treatment he received, they would have been able to effectively rebut any suggestion that Mr. Cruz squandered his drug treatment opportunity. Rather, counsel could have elucidated for the jury the inadequacies of

the treatment and the all but certain failure Mr. Cruz would suffer because he was not also being treated for his life-long depression, a condition he had self-medicated with drugs and alcohol since childhood.

400.   Ultimately, defense counsel's inadequate investigation meant that they were unable to correct these inaccuracies. Had counsel adequately investigated and prepared for mitigation, Mr. Cruz's jury would have "have been faced with a strikingly different and more accurate picture" of Mr. Cruz's life circumstances. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir. 2006). That different and more accurate picture creates a reasonable probability that Mr. Cruz's jury would have imposed a sentence less than death.

> **B.   Mr. Cruz was prejudiced where trial counsel's deficient failure to investigate and discover facts as well as their failure to divulge information to defense experts, rendered mental health evaluations incomplete and ultimately inaccurate.**

401.   If one only looks superficially at Mr. Cruz's penalty hearing, the defense case might appear adequate. However, it is not the number of experts or other witnesses that determines the quality of counsel's representation. For example, the Ninth Circuit Court of Appeals has found counsel rendered prejudicially deficient performance where trial counsel presented as many as four testifying experts. *See Frierson v. Woodford*, 463 F.3d 982, 991-92 (9th Cir. 2006) (*citing Caro*, 165 F.3d at 1226). Instead, it is the quality of the evidence that this Court should consider. And, the quality is directly linked to defense counsel's investigation, which in this case was constitutionally deficient.

402.   Here, the experts consulted and presented by the defense, could never have hoped to provide relevant, compelling mitigation evidence because of defense counsel's failure to adequately conduct their mitigation investigation, which meant that important facts went undiscovered at trial. Counsel owed a "professional responsibility to investigate and bring to the attention of mental health experts who

are examining his client[ ] facts that the experts do not request." *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (*citing Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999); *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002)). Despite this duty, the experts evaluated Mr. Cruz, and testified on his behalf, did so without awareness of key facts. As detailed in paragraphs 276 and 289-303, defense counsels' woeful investigation failed to discover significant facts that would have led the trial experts, specifically Dr. Biggan and Dr. Barrillas, to ask important questions and conduct further inquiry.

403.   Counsel failed to investigate and discover that Mr. Cruz's mother consumed alcohol regularly during her pregnancy. This information was not difficult to find, it simply meant asking a witness beyond Mr. Cruz's own mother about her behavior during her pregnancy. (*See* paragraph 5.) Both Drs. Biggan and Barillas agree this fact would have been important as they evaluated Mr. Cruz. And, based on this fact alone, both experts would recommend additional inquiry be made by a neuropsychologist.

404.   But counsel did not merely fail to investigate available mitigation evidence, missing key facts, counsel also failed to recognize the importance of records sitting in *their own files*. For example, in trial counsel's file sat the records indicating that Mr. Cruz was tested and found to be learning disabled while still in elementary school. Despite *having* this record in their possession, defense counsel failed to share it with their trial experts. This record is significant because it is supportive of neurodevelopmental problems and corrobative of the finding that Mr. Cruz suffers from Fetal Alcohol Effects as a result of his mother's use of alcohol during her pregnancy. This school record as well, Dr. Biggans and Dr. Barrillas indicate, should prompt additional inquiries into Mr. Cruz's neuropsychological functioning.

405.   Both Dr. Biggan and Dr. Barrillas armed with these new facts, would recommend further neuropsychological testing. Mr. Cruz can establish that the

additional testing, which could have been conducted at the time of trial, would have yielded significant results. The testing has been performed by neuropsychologist Dr. Ken Benedict who has found that Mr. Cruz has historical and current neurodevelopmental cognitive problems. Mr. Cruz's brain dysfunction, given the horrific childhood he endured, would have contributed to Mr. Cruz's school failure. These impairments would have served to aggravate his symptoms of depression as well as his substance abuse. Indeed, Mr. Cruz's neurodevelopmental disorder and brain dysfunction contributed to his developing a serious substance abuse disorder. These conditions also made it more difficult for Mr. Cruz to overcome his addiction later in life. Significantly, Mr. Cruz's brain impairments, according to Dr. Benedict, would have become worse and would have caused significant disruption to Mr. Cruz's executive functioning when he faced significant stressors. Finally, Dr. Benedict was able to opine that Mr. Cruz's brain dysfunction coupled with sleep deprivation and his use of methamphetamine and cocaine near the time of the offense, made it highly probable that Mr. Cruz would have difficulty recalling the events surrounding Officer Hardesty's death. Had Drs. Barillas and Biggan received all of the relevant and pertinent facts, an expert like Dr. Benedict could have testified at sentencing to significant and compelling mitigation—brain development caused by Mr. Cruz's mother that contributed to his failures as a child, which then exacerbated what would have already been a debilitating childhood depression, and which would have made it more likely that Mr. Cruz would abuse substances and experience great difficulty in seeking to beat that addiction. Most significant, however, would be the interplay of all of those factors when Mr. Cruz found himself in the stressful situation of police officers pursuing him. Both Dr. Biggan and Dr. Benedict agree that under stress, Mr. Cruz's neuropsychological deficits would deteriorate and become more severe. (*See* paragraph 291.)

406.   Neuropsychological deficits like those Mr. Cruz presents are commonly considered to result in *Strickland* prejudice when they have been kept from the

sentencer. *Sears*, 130 S. Ct. at 3262-63 (holding that counsel was ineffective for failing to investigate and present evidence of significant frontal lobe brain damage); *Porter*, 130 S. Ct. at 451, 454 (concluding that counsel was ineffective for failing to investigate and present neuropsychological evidence that "Porter suffered from brain damage"); *Jefferson v. Upton*, 130 S. Ct. 2217 (2010) (remanding for determination of whether state court fact-finding denying ineffectiveness claim was entitled to deference, when counsel failed to present uncontroverted expert testimony indicating that Jefferson had permanent brain damage that causes abnormal behavior over which he had no or substantially limited control); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 237, 240, 241 (2007) (finding court's instructions "prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence," including, *inter alia*, "possible neurological damage" and the "strength [of the defendant's mitigation case] was its tendency to prove that his violent propensities were caused by factors beyond his control – namely, neurological damage and childhood neglect and abandonment"); *Rompilla v. Beard*, 545 U.S. at 392 (holding "While [trial counsel] found 'nothing helpful to [Rompilla's] case,' their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of 'red flags'", pointing up a need to test further. When they tested, they found that Rompilla 'suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions').

407.   The prosecution capitalized on defense counsel's failure to discover and present evidence of Mr. Cruz's brain impairment in its closing argument, arguing that "the best they come up with is that he's got a substance abuse disorder and maybe he's got posttraumatic stress disorder; *no neuropsychological disorders*, no personality disorders." (Tr. Mar. 8, 2005 at 56, emphasis added.) As it stood, Mr. Cruz's experts were ill-informed. Dr. Biggan's evaluation was based on incomplete information. And, Dr. Barrillas relied on her evaluation when he testified on Mr.

Cruz's behalf. Dr. Barrillas now agrees that the absence of these facts render his trial opinions fatally flawed.

408.   An adequate investigation would have discovered Mr. Cruz's mother's alcohol consumption during pregnancy, which would have prompted the experts to ask more questions. Provision of the school records, in *counsels' own file*, would have signaled the need for similar inquiries by the trial experts. Effective counsel would have discovered and provided this information. Their failure to do so deprived Mr. Cruz's jury of the type of evidence the courts have repeatedly recognized as powerful mitigating evidence.

409.   In addition to providing compelling evidence for a sentence less than death, developing this neuropsychological evidence would have led to the conclusion that Mr. Cruz has suffered from significant memory issues, issues that were noticed as early as elementary school. As Dr. Benedict's testing has demonstrated those deficits, that he was born with, have only worsened over time. A true understanding of Mr. Cruz's neurocognitive functioning would have precluded the trial court from assuming that much of the mitigation evidence Mr. Cruz offered in state postconviction review "was within [Mr. Cruz's] knowledge[.]" (PCR Order, Oct. 31, 2012 at 4.) Persons that suffer from his type of neurocognitive impairments are notoriously poor historians. With an adequate mitigation investigation under their belt, counsel would have discovered this fact. Mr. Cruz's knowledge is limited at best.

### C.   Mr. Cruz was prejudiced by counsel's deficient performance where trial counsels' failure to investigate left them powerless to explain Mr. Cruz's "choices."

410.   The entire theme of the prosecution's case at sentencing was to urge the jury to sentence Mr. Cruz to death by focusing on the assertion that Mr. Cruz's mitigation case boiled "down to the fact that the [Mr. Cruz] made choices in his life, he made the wrong choices in his life, and he kept making those choices over the

past two decades." (Tr. Mar. 8, 2005 at 51-52.) The overall theme of the prosecutor's closing argument, that Mr. Cruz had chosen a life of drugs and partying rather than a world of opportunities and responsibility, could have been rebutted by the defense had counsel effectively represented Mr. Cruz at sentencing. What emerges from a complete understanding of Mr. Cruz's life circumstances is that he did not "choose" the things in his life that made him the man who confronted Officer Hardesty in May 2003.

411.   Mr. Cruz did not choose to have a mother who abused alcohol during her pregnancy. Julie made those choices for him and Mr. Cruz suffered the consequences—in fetal alcohol effects and damage to his brain in ways that were never repaired.

412.   Mr. Cruz did not choose to have a violent and abusive father in Cruz Sr.[51] He did not choose to have a mother who was unable to show him the most basic affection. Julie and Cruz Sr. made these choices for him and Mr. Cruz lives

---

[51] Defense counsel's inept and ineffectual investigation and mitigation presentation is also demonstrated by their presentation relative to Cruz Sr. Counsel offered testimony from Mr. Cruz's mother that Cruz Sr. was violent and brutal to both Mr. her and to Mr. Cruz. (*See* paragraphs 164-166.) Both Drs. Barillas and McCloskey relied on Mr. Cruz's brutal childhood during their testimony. (*See* paragraphs 193, 196, 206, and 208-09.) Counsel followed up what was compelling mitigation evidence of Mr. Cruz's brutal and violent childhood with the testimony of several of Mr. Cruz's aunts and uncles all of whom either testified that they could offer no support for the abuse allegations or testified that Cruz Sr. was *not* abusive to Mr. Cruz or his mother. (*See* paragraphs 172, 175-76, and 178.) Counsel was not even sufficiently familiar with their mitigation evidence to ensure that their presentation was internally consistent. The result was that counsel themselves undermined a compelling mitigating factor, as well as the testimony of Mr. Cruz's mother and two of their testifying expert witnesses, causing significant prejudice to Mr. Cruz's mitigation case. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (noting that defense expert testimony rendered worthless contradictory and substantial testimony also offered by the defense). The contradictory evidence offered by Mr. Cruz's defense was "[q]uite simply . . . completely devastating to the defense." *Combs*, 205 F.3d at 288.

with the results—a depression that started as a young child. A depression that only exacerbated.

413.   Mr. Cruz did not choose to be abandoned and unwanted by his mother. He did not choose to have a step-mother who tormented him, or a step-father who did not want him. He did not choose to have drug-addicted uncles who would remind them that, even though he lived under their roof, he was not one of them—he was not a Montenegro.

414.   Mr. Cruz did not choose to have virtually every adult role model he encountered from the age of twelve on be a user and abuser of substances.

415.   Mr. Cruz did not choose to develop depression in childhood and to then proceed through life with that condition untreated. In fact, he probably did not understand that was what he suffered from. This depression started in childhood, with his mother and father, in a home filled with violence, abuse, and abandonment. Mr. Cruz's circumstances never improved; violence, abuse, and abandonment were constants in his life.

416.   Mr. Cruz did not choose a partying lifestyle, using drugs for the fun of it. Mr. Cruz's use of substances began in childhood, and the experts now indicate his use is best understood as commencing to manage the symptoms of his long-term depression. The combination of his neurodevelopmental brain disorder and his depression contributed to his development of his substance abuse disorder. And, those two conditions combined, increased his inability to successfully battle his addictions.  When he started using drugs as a child, Mr. Cruz was too young to understand the implications of his substance use. And, he had no clue of the contributing and exacerbating effects it had on his neurocognitive deficits and his depression.

417.   Under the circumstances, Mr. Cruz had precious few choices that were not limited by the home he can from, the caretakers to whom he was exposed, his own neurodevelopmental frailties, his underlying depression, or an addiction he was

181

primed to develop by genetics, severe family dysfunction and in utero exposure to substances. None of this, however, is an excuse for Officer Hardesty's death. Nor do these factors absolve Mr. Cruz of his responsibility for this tragedy. But a properly conducted mitigation investigation would have given the defense the ammunition to explain how numerous events outside of Mr. Cruz's control shaped and limited his choices over a lifetime, contributing to the tragic events of May 26, 2003.  Mr. Cruz's social history, coupled with the evidence of neurocognitive impairments, addiction, and depression would have helped the jury understand Mr. Cruz's life "choices" in a very different light. This is the type of evidence that the Ninth Circuit has repeatedly found prejudicial ineffectiveness in cases where counsel neglected investigation of a capital defendant's background and mental health. *Stankewitz v. Wong,* 698 F.3d 1163 (9th Cir. 2012); *Detrich v. Ryan*, 677 F.3d 958 (9th Cir. 2012); *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010); *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009); *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009); *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008); *Lambright v. Schriro,* 490 F.3d 1103 (9th Cir. 2007); *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005); *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002); *Karis v. Calderon,* 283 F.3d 1117 (9th Cir. 2002); *Caro v. Woodford,* 280 F.3d 1247 (9th Cir. 2002); *Ainsworth v. Woodford,* 268 F.3d 868 (9th Cir. 2001); *Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998). Properly and completely informed of Mr. Cruz's life circumstances, there is a reasonable probability that at least one juror would have voted in favor of life.

1
2
3
4
5

    **D.  Mr. Cruz was prejudiced by counsels' deficient failure to explain the combination of issues that both contributed to his drug addiction, and prevented him from successfully battling it. Moreover, counsel failed to alert the jury to the fact that the John Cruz who killed Officer Hardesty on May 23, 2005 was very different from the man who existed prior to his methamphetamine addiction.**

6
7
8
9
10
11
12
13
14
15
16

    418.   A complete mitigation investigation would have given the defense a full understanding of Mr. Cruz's psycho-social history. This understanding would have led counsel to ascertain that Mr. Cruz's drug addiction was a product of the horrific circumstances of his childhood, which resulted in a significant depression that has been with Mr. Cruz since he was a young boy, as well as his untreated brain dysfunction. These frailties, which were not of his own devise, made Mr. Cruz far more susceptible to the many negative influences in his young life—violent adult family members using and abusing substances. It was the combination of these factors that led Mr. Cruz to drug use and which ultimately ensured that he would be unable to overcome that addiction as an adult. (*See* paragraphs 279-83.)

17
18
19
20
21
22

    419.   The jury was never informed that Mr. Cruz tried to overcome his addiction after he was released from prison. Records reveal that Mr. Cruz was successful in staying off drugs for nearly two years. But, as Mr. Cruz's depression remained untreated, and when his marriage began to crumble, he returned to drugs to self-medicate his depression as he had done since childhood. (*See* paragraphs 61-65 and 282-83.)

23
24
25
26
27
28

    420.   Moreover, Mr. Cruz's ultimate addiction to methamphetamine was strongly linked to the present offense as discussed in more detail in Mr. Cruz's discussion of prejudice emanating from counsel's deficient performance. Mr. Cruz's jury never understood that Mr. Cruz resisted using methamphetamine. It was only after he fell in love with a woman heavily addicted to methamphetamine that Mr. Cruz began using. And, from this point on, the jury should have learned, Mr. Cruz

changed. He was no longer the same person his friends and family knew. His fall into methamphetamine addiction was both extreme and acute with devastating ramifications, but most significantly, the loss of Officer Patrick Hardesty's life. (*See* paragraphs 67-87.)

421.   Mr. Cruz's jury should have known the kind of man Mr. Cruz was before he used methamphetamine; not his criminal history, but the kind and peaceful person his friends knew him to be. The jury also should have been advised that Mr. Cruz's lifelong depression made him susceptible to the numerous adult family members modeling substance abuse as a way to manage life. That same untreated depression substantially increased the likelihood that he would turn to substances to self-treat his condition, as well as his brain dysfunction. The jury should have known that Mr. Cruz was born with a neurodevelopmental disorder that both contributed to his use of substances and his inability to stop using those same substances.

422.   What the jury heard was that Mr. Cruz was an irresponsible partier. (Tr. Mar. 8, 2005 at 53-54; "But John Cruz didn't do that because it was easier to go back to his drug lifestyle and live with the people he wanted to live with and simply make his living selling drugs, using drugs, and doing what he wanted to do."; *Id.* at 56; "In essence, what it comes down to is he has used drugs for a long time, so they put a label on him and he's got substance abuse disorder. What that means is he chose to use drugs over a period of time, and so now we call it a disorder.") The jury heard that Mr. Cruz was asking for leniency because he chose to use drugs; the prosecutor argued Mr. Cruz "shouldn't be shown leniency because he wasn't a good enough person to stay away from the drugs even though he had every incentive in the world." (Tr. Mar. 8, 2005 at 56-67.) A proper mitigation investigation would have presented a very different picture of Mr. Cruz, one the jury deciding whether he should live or die should have seen.

**E.  Mr. Cruz was prejudiced by counsel's deficient failure to investigate his mental state at the time of the offense and to thus establish a causal nexus between Mr. Cruz's mitigation case and Officer Hardesty's death.**

423.   While counsel suggested there was a diminished capacity defense at sentencing, they did so in an indirect, inaccurate and completely ineffective manner. To argue diminished capacity, defense counsel need to *know* Mr. Cruz's capacity at the time of the offense. This defense necessitated expert inquiry into Mr. Cruz's state of mind at the time of the offense. It also necessitated that counsel reveal the wealth of knowledge they already possessed that suggested that Mr. Cruz suffered from diminished capacity at the time of the offense. Counsel not only withheld key information from their experts—like the fact that Mr. Cruz suffered amnesia for the time of the offense and lacked any real clarity for the events of several days preceding—they explicitly directed experts like Dr. Barrillas not to inquire into Mr. Cruz's mental state at the time of the offense. Counsel was well-aware of facts to support inquiry into defense of diminished capacity—Mr. Cruz's amnesia, his extensive methamphetamine use and the resultant changes to his personality—as evidenced by internal memoranda as well as discovery disclosures provided by the state. Yet counsel's truncated investigation and ineffectual use of experts, including failing to provide them with all the relevant facts, meant that the diminished capacity offered defense by the defense was a nullity.

424.   An inquiry has been performed into Mr. Cruz's mental state at the time of the offense, an inquiry recommended by Drs. Biggan and Barillas now that they have been fully informed of the relevant facts, and the picture painted provides real support for the position that Mr. Cruz was operating with a diminished capacity at the time of the offense. As discussed at paragraph 306, the interactions of a variety of factors—his history of childhood trauma, lifelong depression, and substance abuse—all collided during probably the most stressful situation he had confronted to

date, armed police officers chasing him. Had counsel done their duty at mitigation, expert testimony could have been offered to establish that Mr. Cruz's deficits, presented at the time of the offense, were sufficient to significantly impair Mr. Cruz's emotions, cognition, perceptions and behavior at the time of the offense. (*See* paragraph 306.) According to Dr. Smith, each of Mr. Cruz's conditions played off of each other, directly contributing to Officer Hardesty's death.

425.  Again, evidence like that discussed above relevant to Mr. Cruz's mental state at the time of the offense (as discussed in paragraph 306) was entirely consistent with what the defense's purported mitigation strategy. Counsel offered, as mitigators, that Mr. Cruz suffered from an impaired capacity to appreciate the wrongfulness of his conduct and an impaired capacity to conform his conduct to the law. *Cruz*, 181 P.3d at 217. Counsel recognized the importance of Mr. Cruz's mental state as mitigation evidence. The evidence counsel presented, however, did not prove anything, as counsel had directed their experts not to evaluate Mr. Cruz's mental state at the time of the offense. Indeed, the jury likely believed, as the Arizona Supreme Court did, that "Cruz was neither suffering from any significant mental illness nor under the influence of drugs at the time of the crime." *Cruz*, 181 P.3d at 217. Moreover, the jury, like the Arizona Supreme Court, would not have made the connection between Mr. Cruz's mitigation evidence and the offense: "Cruz established little or no causal relationship between the mitigating circumstances and the crime." *Cruz*, 181 P.3d at 217. Mr. Cruz could have established each of this points had they performed the tasks necessary to prepare and present a capital case—Mr. Cruz suffered from a lifelong, untreated, severe mental illness; he was under the influence of drugs at the time of the crime (and also sleep-deprived); and the cumulation of his psycho-social history, his mental illness, his substance abuse, and his underlying brain dysfunction in the face of an extremely stressful situation combined to impair his ability to appropriately respond to this stressful situation. Put simply, had all of the available mitigation evidence been investigated and presented,

Mr. Cruz could have established that there is a causal relationship between Mr. Cruz's mitigating circumstances and the crime; in combination, the disorders from which Mr. Cruz suffered overwhelmed his ability to control his behavior at the time of the offense, as well as significantly impairing his capacity to conform his conduct to the requirements of the law.

426.   Counsel had at their fingertips some of the most compelling mitigation evidence available, evidence that directly linked Mr. Cruz's mitigation to the commission of the offense. This link is never required, but when it presents itself, it provides powerful support for a sentence less than death. *See Tennard*, 542 U.S. at 287; *Murray v. Schriro*, No. 08–99013, 2014 WL 998019, 31 (9th Cir. Mar. 17, 2014) (*citing Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011; *Eddings*, 455 U.S. at 114-15) ("sentencer may consider 'causal nexus ... as a factor in determining the weight or significance of mitigating evidence....'"). Providing the jury a causal nexus between the wealth of mitigating evidence available and Officer Hardesty's death would have "impact[ed] the quality and strength of the mitigation evidence and offered a persuasive explanation of [Mr. Cruz's] crimes." *Cunningham v. Wong*, 704 F.3d 1143, 1169 (9th   Cir. 2013) (internal quotations omitted) (*citing State v. Tucker*, 160 P.3d 177, 201 (2007); *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (holding that counsel's failure to present expert testimony explaining a possible causal link between defendant's childhood and his crime was prejudicial)). A compelling piece of the puzzle that helps to understand how the events of May 26, 2003 was missing as the sentencer considered Mr. Cruz's case for life, a piece which the courts have deemed particularly significant to the sentencing equation. *See id.*

427.   That missing puzzle piece, offered by way of compelling mental health evidence, was not merely cumulative, "or a case in which counsel reasonably declined to provide further documentation to support and explain trial experts' opinions." *Johnson v. United States*, 860 F. Supp.2d 663, 877-91 (N.D. Iowa 2012 (internal quotes and citations omitted). Rather counsel failed "to present a viable

mental health mitigation case that was different in scope, content, and connection to the offense[ ]." *Id.* Thus, "there is a reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* Mr. Cruz has proved prejudice.

### F.   Mr. Cruz was prejudiced by counsels' encouragement and ultimate presentation of a denial defense at penalty.

428.   Trial counsel were presented with overwhelming evidence of Mr. Cruz's guilt. Counsel were also aware that Mr. Cruz had no recall of the events of May 26.  Despite his amnesia, Mr. Cruz maintained his innocence. Not once did counsel confront Mr. Cruz with the overwhelming nature of the state's case.  Nor did counsel suggest that just because Mr. Cruz did not remember shooting Officer Hardesty, that did not mean that he did not shoot him.

429.   Had counsel properly investigated and represented Mr. Cruz, these are conversations counsel would have had with him. And as evidenced by the foregoing, Mr. Cruz's case for life would have looked very different.  A properly investigated and presented mitigation case would have concluded with a powerful statement by Mr. Cruz accepting responsibility for Officer Hardesty's death and expressing remorse, rather than clinging desperately to a denial defense that only aided the state in its efforts to get a death sentence.  (See Tr. Mar. 8, 2005 at 50-52, 55.)

### G.   Conclusion

430.   The prejudice emanating from counsel's deficient performance is evident. Mr. Cruz's jury was ill-informed as it was called upon to decide whether Mr. Cruz should live or die. The jury was unaware of factual inaccuracies that were used by the state in support of its case for death. The jury was unaware of significant mental health and cognitive issues that were either caused by his mother's in utero abuse of alcohol or inflicted upon him by the very nature of his chaotic and abusive

childhood. The jury was not informed of the significant negative impact this conditions would have on his efforts to battle his addiction to substances. The jury never heard Mr. Cruz accept responsibility for his actions, which resulted in Officer Hardesty's life. The missing evidence, the undeveloped facts place Mr. Cruz's case for life in a starkly different light and demonstrate the reasonable probability that had counsel done their job effectively at least one juror would have voted in favor a life sentence.

## Claim Two

**Mr. Cruz presented a colorable claim in the state postconviction court that he was denied effective assistance of counsel at his sentencing in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

### I.   Review Standards

431.   In the state court proceedings, Mr. Cruz presented the claim that he was denied effective assistance of counsel at sentencing.  (PR Doc. No. 1; PR Appx. at 800-809;  PCR Pet. at 14-23.) Petitioner has also presented this sentencing ineffective assistance of counsel claim in Claim One above; however, the claim that was presented in state court was much narrower than that presented in Claim One. For example, the state court claim did not fairly present any of the eleven different categories of evidence identified in paragraphs 264-311 above, which dramatically expand the claim of deficient performance, as well as the showing of prejudice.  As explained in Claim One, *Martinez v. Ryan, supra,* provides the mechanism for the consideration of the merits of Claim One.

432.   Nevertheless, Mr. Cruz did present a colorable claim for relief on his state court ineffective assistance of counsel claim and for the reasons explained below, that claim survives and must receive federal review.

433.   The state postconviction court dismissed the claim, finding that Mr.

Cruz had failed to *allege* a colorable claim. (PCR Order, Oct. 31, 2012 at 18.) In his petition for review to the Arizona Supreme Court, Mr. Cruz argued that he had presented a colorable claim and that the superior court had erred in dismissing the claim without granting a hearing. (PR Doc. No. 1 at 20.)  Because Mr. Cruz's claim was presented and decided by the state court, it must be determined whether this Court's review is limited by the provisions in the Antiterrorism and Effective Death Penalty Act (the AEDPA) under 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

434.   Several additional rules apply when reviewing a state court decision under § 2254(d). First, the court reviews the last reasoned decision from the state court. *Hurles v. Ryan,* 706 F.3d 1021, 1038 (9th Cir. 2013).  In Mr. Cruz's case the last reasoned decision was the postconviction trial court's decision. (PCR Order, Oct. 31, 2012.) A state court's decision will be determined to be "contrary to clearly established Federal law" if its decision contradicts the governing law articulated by the Supreme Court or reaches a result different than that reached by the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 405-06.

435.   A state court's decision will be determined to be an unreasonable application of clearly established federal law when the state court identifies the correct legal rule, but applies it to a new set of facts in a way that is objectively unreasonable. *Id.* at 407.  And an "unreasonable application of" those holdings must be "objectively unreasonable," not merely wrong; even "clear error" will not suffice.

*Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003).

436.   "Clearly established federal law means the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Xiong v. Felker*, 681 F.3d 1067, 1073 (9th Cir. 2012) (citation omitted). "Circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir.2011) (citation omitted). With respect to Mr. Cruz's claim, the clearly established law is *Strickland v. Washington, supra.*

437.   With respect to subsection 2254(d)(2) which asks whether a state court decision  is based on an unreasonable determination of the facts, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. *Lockyer v. Andrade,* 538 U.S. at 75. Review under § 2254(d)(2) is "demanding but not insatiable," and "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  All federal circuits have found the standard met. *Taylor v. Maddox*, 366 F.3d 992 at 999-1000 (9th Cir. 2004).

438.   A state court determination of factual issues that is not supported by the state court record without an evidentiary hearing on those issues, is per se unreasonable. *Hurles v. Ryan,* 650 F.3d 1301, 1312 (9th Cir. 2011) ("We have repeatedly held that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference [under AEDPA]."); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."); *Williams v. Woodford*, 859

F. Supp. 2d 1156 ("Under this circuit's precedent, '[i]f a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts.'").

439.   Review under subsection 2254(d)(1) is limited to the record before the state court. *Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 388, 1398 (2011).

440.   Once Mr. Cruz can demonstrate that his claims are not precluded by the limitations on relief in § 2254(d), as he does below, then this Court considers the claim *de novo.   See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (§ 2254(d) limits the authority granted in § 2241 for granting relief; however, once a petitioner is able to show that his claims are not precluded by § 2254(d), then this Court is permitted to consider the presented constitutional claim *de novo*).

## II.   The summary of evidence presented in state court.

441.   During the state postconviction proceedings, in support of his claim that trial counsel had performed deficiently, Mr. Cruz presented an affidavit from Margaret DiFrank, the pre-sentencing mitigation fact investigator, who averred that due to lack of experience and insufficient time, she was not able to complete the mitigation investigation. (PCR Pet. Ex. 4.) She went on to explain that she told Mr. Basham that additional time was needed to complete the investigation, but she was rebuffed with advice that it was Mr. Storts' preference that the timetable was not to be disturbed.   (PR Appx. at 846, PCR Pet. Ex. 4 at 3.)   Ms. DiFrank's sworn statement identified a number of investigatory leads and activities that she did not have time to complete prior to the sentencing. (PR Doc No. 1 at 10.) Among the more important discoveries that Ms. DiFrank made was that Mr. Cruz's mother had a severe drug abuse problem; that she was an alcoholic and that these conditions in combination with her mental illness showed that Mr. Cruz had suffered from a far

more severe level of abandonment, neglect and instability than had been imagined previously.  Mr. Cruz's mother could be added to the list of many of Mr. Cruz's adult relatives with responsibility for his care who had severe substance abuse problems. (PR Appx. at 948-51, 955-56, 976-78; PCR Pet. Exs. 22, 24, 29.) In addition, Ms. DiFrank uncovered evidence corroborating that Mr. Cruz had been exposed to significant domestic violence as a young child, witnessing his father beat his mother and that he had suffered beatings not only from his father, but also his step-father. (PR Appx. at 939-41, 943-46, 1048-1113; PCR Pet. Exs. 20, 21, 33.) The violence did not stop there however.  Ms. DiFrank also discovered that Mr. Cruz was beaten by his drug addicted uncles, while living at the home of his grandmother. (PR Appx. at 968-71, PCR Pet. Ex. 28.) Evidence was also introduced that added substantial weight to the showing that Mr. Cruz's adult uncles, who lived with him at his grandmother's home, were dealing large quantities of drugs and that these adults were substantially impaired by their own continuous drug use. (PR Appx. at 973-78, 968-71; PCR Pet. Exs. 28, 29.) Finally Ms. DiFrank produced additional evidence demonstrating the level of inter-generational dysfunction, alcoholism, and domestic violence that permeated both sides of Mr. Cruz's family, including new evidence that Mr. Cruz's paternal grandfather was a violent alcoholic who beat his children, thus revealing for the first time that Mr. Cruz's father was exposed to substantial domestic violence and dysfunction.

442.   PCR counsel retained the services of Dr. Mark Cunningham. (PR Appx. 1174-1183, 1183-1243; PCR Pet. Exs. 40, 41.) Dr. Cunningham reviewed the numerous adverse factors in Mr. Cruz's developmental history including neglect, physical abuse, drug addiction and mental illness on the part of immediate family members. (*Id.*) In his report, Dr. Cunningham analyzed 27 different developmental and environmental risk factors Mr. Cruz was exposed to as a child, including among them; (i) the evidence of multi-generational dysfunction, including the evidence of inter-generational mental disorders, drug addiction and alcoholism; (ii) the evidence

that Mr. Cruz was exposed to this dysfunction, particularly the potent instability wrought by his mother's own mental illness, her promiscuity and her own serious substance abuse disorders; (iii) the abuse inflicted by his step-parents; and (iv) finally after his father's death, the incalculable damage of being introduced to a culture of drug use and drug dealing by multiple adult family members.   Hard science and well documented supportive scientific research helped Dr. Cunningham demonstrate that the multiple developmental and environmental risk factors to which Mr. Cruz was exposed to during his childhood did have a causal link to his social maladjustment, substance dependence and criminal offending including the drug-related capital offense. Dr. Cunningham's report persuasively discredited the State's argument at sentencing that Mr. Cruz's adult outcome was disconnected to his childhood experiences and was the result of Mr. Cruz's personal choices. (PR Appx. at 1185-1243, PCR Pet. Ex. 41.)

443.   Juxtaposed against the evidence presented by Mr. Cruz, the state presented evidence from Mr. Basham and Mr. Storts, raising a number of questions of fact. While Ms. DiFrank said the mitigation investigation was not completed, Mr. Basham suggested the investigation was complete, and he and Mr. Storts were prepared for the sentencing. (PR Appx. at 1290, Resp. to PCR Pet. Ex. K at 2.) While Ms. DiFrank challenged her own competency, Mr. Basham said Ms. DiFrank was competent. (PR Appx. at 1291, Resp. to PCR Pet. Ex. K at 3.)  Relying on false evidence to support his position, Mr. Basham put himself and Mr. Storts in an allegedly superior position to judge their own performance, as well as Ms. DiFrank's performance, based on their epic prior experiences in handling capital cases. (PR Appx. at 1290, Resp. to PCR Pet. Ex. K at 2.) Mr. Basham also threw in for good measure that their level of preparation was consistent with Mr. Cruz's demand for a speedy trial, omitting mention that trial counsel had devised the speedy trial strategy. Ultimately the state court believed Mr. Basham over Ms. DiFrank. As we explain below, the state court decision was based on unreasonable determination of the facts

and separately it was contrary to *Strickland.*

**III.    The state court decision regarding the alleged deficiencies in trial counsel's performance was based on an unreasonable determination of the facts, and separately its decision was contrary to *Strickland.***

444.   Above, in the summary of the postconviction case history, Mr. Cruz demonstrated that, after being actively misled by Mr. Basham, the state court premised its decision on two principal erroneous findings: (1) the court viewed the entire claim within the context of a "fact" assumption that Mr. Cruz imposed a demand for a speedy trial on his counsel and therefore he "placed himself in a position of cutting short the mitigation investigation. . ." and (2) trial counsel had vast experience in handling 250 homicides and at least 50 capital cases. (*See* paragraphs 256-59.) We address first the finding that Mr. Cruz elected to cut short the mitigation investigation due to his demand for a speedy trial.

445.   Contrary to the state court finding, the state court record dispositively shows that the idea for a speedy trial originated with trial counsel; it was a tactic that they recommended to Mr. Cruz to further the possibility that a speedy trial demand would ultimately be successful in causing a change of venue.  This was not Mr. Cruz's idea. (*See* paragraphs 123, 269-70, 368-70.) The record also shows that this strategy was objectively unreasonable. (*See* paragraphs 365-82.) While it is conceivable (although barely) that after a full and fair evidentiary hearing, new evidence would come forth so the state court could make an ultimate factual finding that it was indeed Mr. Cruz who masterminded the idea to demand a speedy trial, and therefore he should be blamed for deficiencies in the mitigation investigation, this conclusion could not be made on the version of the record before the court without a hearing. *Hurles v. Ryan,* 706 F.3d 1021, 1038 -1039 (9th Cir. 2013) "We have held repeatedly that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, "the fact-finding process itself is deficient" and not entitled to deference." *Taylor,* 366

F.3d at 1001 ("If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an unreasonable determination of the facts.") (internal quotation marks omitted); *Lor v. Felker,* 2012 WL 1604519 at *11-12 (state court could not rely on portion of record to support its factual conclusion and disregard record that did not support its conclusion); *Williams v. Woodford*, 859 F. Supp. 2d at 1154 (under Ninth Circuit precedent, "if a state court makes evidentiary findings without a hearing and giving the petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination of the facts.'") Clearly the evidence in the state court record with respect to who hatched the speedy trial idea does not support an outright finding that it was Mr. Cruz.

446.   The above demonstrates that the state court decision rests on an unreasonable determination of the facts. Once this showing is made, there is no impediment to Mr. Cruz's development of his claim in federal court and this Court must review Mr. Cruz's claim on the deficiency of counsels' performance *de novo.* In *Williams*, Judge Kozinski, sitting by designation, explained the foregoing as follows:

> Because the state court's decision "was based on an unreasonable determination of the facts," section 2254(d) does not preclude Williams's claim. Section 2254(d) operates like a two-lane highway, with each lane guarded by a tollbooth. To pass through, a petitioner must demonstrate that the state court adjudication either clashed with federal law (section 2254(d)(1)) or "was based on an unreasonable determination of the facts" (section 2254(d)(2)). Williams qualifies for the latter. The gate of one lane is thus opened, and 2254(d) poses no further obstacle to Williams developing his claim in federal court.

859 F.Supp.2d at 1161.

447.   Even apart from the above, although Mr. Cruz need not show any other inadequacy in the state court's decision regarding the deficiency in counsel's performance, it was defective in other respects.  For example, there was a conflict in

196

the testimony between Ms. DiFrank and Mr. Basham on the question of preparedness for the sentencing.  Ms. DiFrank stated that she had not completed her investigation and asked for more time, and Mr. Basham claimed they were prepared.  The court elected to believe Mr. Basham, engaging in a credibility assessment that could not be made without a hearing.  This also reveals an unreasonable determination of the facts.

448.   In addition the state court elected to rely exclusively on trial counsel's alleged experience as capital counsel to resolve fact disputes between Ms. DiFrank and Mr. Basham concerning the level of preparedness for the sentencing.  (*See* paragraphs 258-59, 443.) When the state court did this, its decision was "contrary to" *Strickland* as understood under subsection 2254(d)(1). Reliance on counsel's competency in totality as opposed to a particular deficient respect, fails to apply the *Strickland* standard at all. *Henry v. Poole,* 409 F.3d 48, 72, (2d Cir. 2005); *Green v. Lee*, 2013 WL 4052830, 18 (E.D.N.Y. 2013) (citation omitted).

449.   Finally, the state court's reliance on trial counsel's alleged experience was itself problematic due to significant factual issues in the state court record. At a hearing on August 22, 2003, Mr. Storts represented the capital case experience of the trial team as belonging exclusively to Mr. Basham, who allegedly had 14 capital cases in the 5 years preceding Mr. Cruz's case.[52] (Tr. Aug. 22, 2003 at 3.) Conflicting with this initial account of the team's experience, on July 26, 2004, Mr. Storts had represented that between them Mr. Storts had "tried" 12 capital cases and Mr. Basham had tried 10-12. (Tr. July 26, 2004 at 22.) Still later, during the earlier phase of the postconviction proceedings, Mr. Basham authored a September 6, 2011 letter, which was provided to the court and made part of the state court record, that represented that between them, he and Mr. Storts had handled close to 30 death

---

[52] Mr. Basham said nothing during the hearing to correct this misrepresentation of his experience during that 5 year period.

penalty cases. (PCR Mot. for Hr'g to Determine Conflict Ex. A.) Then in Mr. Basham's July 17, 2012 affidavit, he swore that between them, he and Mr. Storts had handled "at least" 50 capital cases and 250 homicide cases. (PR Appx. at 1290, Resp. to PCR Pet. Ex. K at 2.) From these varying accounts, which ranged from 14, to 22, to 30 capital cases, the court relied on the final representation, that counsel had handled "at least" 50 capital cases. Given the questions of fact in the record, the alleged experience that these lawyers actually had could not be determined without a hearing. The state court's reliance on Mr. Basham's affidavit to the exclusion of the contradicting evidence that came from trial counsels' own mouths represented an unreasonable determination of fact under subsection 2254(d)(2).

450.   Finally the state court appeared to blame Mr. Cruz once more for the failure to develop and present mitigation, finding that Mr. Cruz was aware of the new mitigation prior to his sentencing. This finding also constitutes an unreasonable finding of fact and demonstrates unreasonable application of *Strickland*. The state court record contains no facts which show that anyone on the trial defense team considered Mr. Cruz a source of mitigation evidence or that they ever had any communication with him on that subject. It therefore is evident that the state court "made assumptions about facts outside the record without giving [Mr. Cruz] an opportunity to present evidence as to those facts and, indeed, refusing to look at evidence he did present. This is a textbook case of a defective fact-finding process akin to the type condemned in *Taylor*, 366 F.3d 992, and *Hurles*, 650 F.3d 1301." *Williams v. Woodford*, 859 F. Supp. 2d at 1159.

**IV. The state court's prejudice determination was also based on an unreasonable determination of the facts and was also decided contrary to *Strickland*.**

451.   The state court found the postconviction evidence merely cumulative. This was an unreasonable determination of the facts. (*See* paragraph 260.)

452.   The state court held that even if the new evidence was substantive and

not cumulative that "[g]iven the weight to be afforded the missing mitigators, as against the aggravating factor . . . defendant demonstrates no prejudice." (PCR Order, Oct. 31, 2012 at 17.) The quoted portion of the court's decision reveals that it applied the wrong test for measuring prejudice because it failed to consider the totality of the mitigating evidence.  When measuring prejudice in a capital penalty phase proceeding, the court re-weighs the evidence in aggravation against the "totality of the evidence – 'both adduced at trial *and the evidence adduced in the habeas proceeding[s].*'"  *Wiggins v. Smith*, 539 U.S. at 536 (quoting *T. Williams v. Taylor*, 529 U.S. at 397-98 (emphasis in original)).  The record shows that the court failed to reweigh the totality of the mitigating evidence resulting in a decision that is contrary to *Strickland*.  *Williams v. Taylor,* 529 U.S. at 397-98 (finding the decision of the Virginia Supreme Court to be contrary to and an unreasonable application of *Strickland* because decision itself  simply held that the "new evidence" would not have changed the sentence; it did not re-weigh the totality of the new and old mitigation as required by *Strickland*).

453.   The court also conflated the test for measuring prejudice under *Stickland* with the test adopted by the Arizona Supreme Court to independently review capital sentences. The court observed that the Arizona Supreme Court gives minimal weight to mitigation insufficiently connected to the crime when reviewing the propriety of a death sentence and then held that by that standard Mr. Cruz had failed to show prejudice. (PCR Order, Oct. 31, 2012 at 17.) That is not the test for measuring prejudice under *Strickland*.

454.   For all the above reasons, the state court's prejudice decision does not withstand scrutiny under subsection 2254 (d)(1)(2) and  "2254(d) poses no further obstacle to [Cruz] developing his claim in federal court." *Williams v. Woodford*, 859 F. Supp. 2d at 1161.

**Claim Three**

**Mr. Cruz was denied his right to a fair trial, impartial jury, and reliable sentencing proceedings as a result of biased jurors serving on his jury.**

455.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

456.   Mr. Cruz presented part of this claim in Argument I.C and I.D of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 55-63.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 205-06 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

**I.   Jurors 136, 150, 169 and 178 should have been stricken for cause.**

**A.   Juror 136**

457.   Juror 136 should have been stricken for cause based on the juror's connection to law enforcement, particularly her friendship with a member of the Tucson Police Department. (Tr. Jan. 25, 2005 at 152-54, 160-61.) The juror noted the officer was a good friend. (*Id.* at 154.) The juror claimed she could set aside this relationship. (*Id.*)

458.   The defense moved to strike Juror 136 based on her law enforcement connection. (*Id.* at 160-61; *see also* Tr. Jan. 28 at 28-30, 50.) The state opposed the request. (Tr. Jan. 25, 2005 at 161.) The court rejected the challenge noting that the officer Juror 136 knew was not testifying during Mr. Cruz's proceedings. (*Id.* at 161-62.)

459.   Of course, bias is not merely established by knowing a testifying witness. And, this particular juror's close ties to a member of the Tucson Police Department, for whom Officer Hardesty worked and from which numerous of its

officers would be testifying, necessitated her removal from the venire.

### B.   Juror 150

460.   Juror 150 should have been stricken due to the connection between her and Dr. Stidham, the juror's pediatrician, who was a homicide victim. Defense counsel represented the accused in that matter. (Tr. Jan. 25, 2005 at 119-23, 156-60.)

461.   Both of Juror 150's sons were Dr. Stidham's patients; they had seen him as recently as two or three months prior to his murder. (*Id.* at 120.) Defense counsel indicated he was moving to strike the juror, particularly because the Stidham case was a high-publicity case and defense counsel would be involved in that. (*Id.* at 123.) The state objected. (*Id.*) Defense counsel clarified that the juror seemed to hold Dr. Stidham in high regard and that the doctor's reputation and character may be challenged in the other case by counsel. (*Id.* at 124.) Noting that the juror said she could be fair and impartial and that these were two separate cases, the court denied the challenge. (*Id.* at 124.)

462.   The defense renewed this challenge a short while later. (*Id.* at 156-57.) The state again objected. (*Id.* at 157.) The trial court, after noting that it hoped the defense was not saying they were going to try the Stidham case in the media, denied the challenge. (*Id.* at 158; *see also* Tr. Jan. 28, 2005 at 28-30, 48-50.)

463.   Defense counsel telegraphed the fact that he was involved in a case that would necessarily negatively reflect on someone that Juror 150 held in high regard. Counsel's concern was that this would negatively impact the juror's views of counsel and, resultantly, Mr. Cruz. This relationship, given the unique factual circumstances of counsel's involvement in the case, necessitated her removal from the venire.

### C.   Juror 169

464.   Juror 169 should have been excused due to the prejudgment of guilt, her anti-gun stance, and the fact that she had formed an opinion regarding Mr. Cruz's

guilt. (Tr. Jan. 25, 2005 at 124-25, 128, 160-61; *see also* Tr. Jan. 28, 2005 at 28-30, 48-50.)

465.   Juror 169 indicated in her questionnaire that she had an opinion about Mr. Cruz's guilt. (Tr. Jan. 25, 2005 at 124.) She noted, "I think that was that basic earlier opinion that I mean he is probably guilty, yes." (*Id.*) She agreed that was her frame of mind when she completed the jury questionnaire. (*Id.* at 125.) However, she later told the prosecution that she could set aside her opinion. (*Id.* at 126.) Even later, the juror told defense counsel she had not formed a guilt opinion. (*Id.* at 128.) When defense attempted to clarify by noting either she had or had not formed an opinion, the juror indicated "It's not that simple." (*Id.*) At this point, the trial court interceded, and the juror claimed she could decide guilt based on the evidence and disregard what she had heard. (*Id.* at 129.)

466.   Subsequently, the defense moved to excuse Juror 169 based on the questionnaire indicating she had formed a guilt opinion and also because she does not like guns and had formed opinions regarding that. (*Id.* at 160.) The state objected (*Id.* at 160-61.)

467.   The trial court described the juror as "not the smartest person you are going to have out there, and on the questionnaire she could have misunderstood them." (*Id.* at 161.) The court indicated that while he did not totally disagree with the defense, the court was denying the challenge. (*Id.*)

468.   The record is devoid of any statement suggesting that the juror misunderstood the jury questionnaire, particularly as it related to whether she had formed an opinion on Mr. Cruz's guilt. Her pre-formed opinion on guilt, an opinion that she would later pretend did not exist, necessitated her removal from Mr. Cruz's venire.

### D.   Juror 178

469.   Juror 178 should have been excused due to a predisposition against

mental health defenses and mental health evidence, as well as his indication that he would hold it against Mr. Cruz if he did not testify during the proceedings. (Tr. Jan. 26, 2005 at 173-75, 205-06, 214; *see also* Tr. Jan. 28, 2005 at 28-30, 48-50.)

470.   The juror indicated he was "a little bit leary [sic] in a case of mental deficiencies and things of that nature" as the court was inquiring into whether the jurors could be fair and impartial. (Tr. Jan. 26, 2005 at 173.) The trial court quickly followed up inquiring whether the juror could follow the law and whether the juror could be fair and impartial to both sides. (*Id.* at 174.)

471.   In his questionnaire Juror 178 had indicated his opinions about psychiatrists and psychologists are "somewhat fuzzy," clarifying during voir dire that they "are allowed to, and are bound to, disagree with each other and it depends on who is the best presenter." (*Id.* at 175.) Despite twice expressing negative opinions, the juror assured the court he could consider psychological evidence as mitigation. (*Id.* at 178.)

472.   When voir dire moved on to address Mr. Cruz's Fifth Amendment rights, Juror 178 indicated he would question why Mr. Cruz did not take the stand. (*Id.* at 205.) Again, however, he claimed to be able to follow instructions. (*Id.*)

473.   The defense moved to excuse this juror based on his responses regarding mental impairments and psychological evidence. (*Id.* at 214.) The state objected. (*Id.*) The trial court related the issue entirely to the juror's comments about guilty but insane and denied the challenge. (*Id.* at 215.)

474.   The totality of the juror's response suggested he would not be open or receptive to the psychological mitigation Mr. Cruz's defense planned to present.[53]

---

[53] Elsewhere in this Petition, Mr. Cruz asserts trial counsel were prejudicially deficient in their investigation and presentation of mitigation evidence. Mr. Cruz's reference to the defense's planned mitigation case is not meant to serve as a waiver of that claim or to suggest in any fashion that the mitigation presentation offered by the defense was somehow adequate. *See* Claim One.

**E.    Counsel was forced to use peremptory challenges on Jurors 136, 150, 169, and 178.**

475.    Because the trial court failed to remove Jurors 136, 150, 169, and 178, Mr. Cruz was required to exercise a peremptory challenge to remove each from his jury.  The trial court's failure to strike these jurors meant that Mr. Cruz's peremptory challenges were unavailable to remove other inappropriate jurors as discussed *infra*.

**F.    Jurors 62, 123, 127, and 193 should have been removed from Mr. Cruz's jury. They were not stricken for cause, and Mr. Cruz had no remaining peremptory challenges to ensure their removal.**

476.    Jurors 62, 123, 127 and 193 should have been removed for cause. Alternatively, Mr. Cruz would have removed each juror by peremptory challenge but for Mr. Cruz having to strike jurors 136, 150, 169 and 178, all of whom should have been removed for cause.

**G.    Juror 62[54]**

477.    Juror 62 stated he would have a problem and might base his verdict and sentence on anger, sympathy, or prejudice. (Tr. Jan. 20, 2005 at 112.) In response, Juror 62 was asked if he could follow the trial court's instruction. (*Id.* at 113.) The juror noted "I think that I can." (*Id.*) The juror noted he could be fair and impartial (*id.* at 111), but reverted to qualifying language that raised concerns about his true ability to be fair and impartial, (*see id.* at 114, "I think that I can be a fair individual, that's what I hope anyway, that's what I'm striving to do."; *id.* at 120 "Having heard

---

[54] In addressing this issue, direct appeal counsel referenced a colloquy he asserted occurred between Juror 62 and defense counsel. (Ariz. Sup. Ct. Doc. No. 51 at 61-62.) Review of the record reveals that the cited colloquy was between defense counsel and Juror 64, not Juror 62. (*See* Tr. Jan. 20, 2005 at 127-28.) Direct appeal counsel also incorrectly alleged that Juror 62 had stated that life in prison was not a substantial enough penalty for first degree murder; this, again, was an issue raised by Juror 64, not Juror 62. (*Compare* Ariz. Sup. Ct. Doc. No. 51 at 61, *with* Tr. Jan. 20, 2005 at 127-28.)

the question again, it sounds like that I have - - I have some doubt whether I - - whether I would be able to follow instructions."; *id.* at 120-21 "I think I could follow the instructions."; *id.* at 121, "I don't think I have feelings of anger or prejudice, but perhaps later on in trial that might become a factor."; *id.* at 122, In response to whether he can follow instructions, "I think I can, I think I could."). The defense noted that even when the juror was indicating he could be fair "there's some hesitation I note[.]" (*Id.* at 123.)

478.   This same juror indicated there are crimes where the death penalty should always be imposed. (*Id.* at 125.) However, the trial court precluded counsel from ascertaining if the killing of a police officer was such a circumstance. (*Id.* at 125-26.)

479.   Defense counsel challenged Juror 62 for cause based on his responses, which demonstrated uncertainty regarding his ability to be fair and impartial. (*Id.* at 135; *see also* Tr. Jan. 28, 2005 at 53.) The state agreed "there was hesitancy" (Tr. Jan. 20, 2005 at 135), but stated that on reflection the juror indicated he could fairly sit and consider the issues, (*id.*). The trial court rejected the challenge indicating it heard Juror 62 say "over and over" "he's fair I'm open to getting the information deciding - - I can follow the instructions, I can be fair." (*Id.* at 136.)

480.   Here, the trial court was required to excuse juror 62 for cause. In fact, the juror did not over and over proclaim his ability to be fair, but instead expressed hesitancy and concern repeatedly.

## H.   Juror 123

481.   Juror 123 indicated in her questionnaire that her brother was a police officer and that she may tend to favor the prosecution. (Tr. Jan. 25, 2005 at 19-20). Because this case dealt with the murder of a police officer, Mr. Cruz moved that this juror be excused for cause, which the trial court denied. (*Id*. at 73; Tr. Jan. 28, 2005 at 28-29, 48-56.)

482. The familial relationship between Juror 123 and a police officer necessitated her removal in this matter. Even the juror herself initially agreed that she would tend to favor the prosecution. This juror should have been removed.

### I.   Juror 127[55]

483. Referencing Juror 127's questionnaire, defense counsel identified several reasons they would have preempted this juror including connections to law enforcement, the fact that the juror indicated an eye for an eye was fair, and that she expressed concerns about the cost of maintaining prisoners. (Tr. Jan. 28, 2005 at 51-52.)

484. This juror's death penalty stance, as well as her law enforcement connections, meant she could not fairly and impartially serve on Mr. Cruz's jury. She should have been removed.

### J.   Juror 193

485. Juror 193 stated in her questionnaire and during voir dire that her husband was a police officer. (Tr. Jan. 27, 2005 at 8.) When defense counsel asked this juror whether she would want someone such as herself sitting on her own jury, she indicated that "he probably would not want me" sitting on the jury. (*Id.* at 37.) Despite this fairly horrifying revelation, defense counsel did not move to strike Juror

---

[55] Mr. Cruz failed to argue Juror 127 should have been removed for cause in his direct appeal to the Arizona Supreme Court. *Cruz*, 181 P.3d at 205 n.3 (treating the argument related to Juror 127 as waived). Elsewhere in this Petition, Mr. Cruz argues appellate counsel rendered deficient performance to Mr. Cruz's prejudice by identifying Juror 127 as a juror who should have been stricken but failing entirely to offer an argument supporting this position. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel's failure to assert appellate ineffectiveness was deficient to Mr. Cruz's prejudice, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012); *Ha Van Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

193.

486.   Despite these deeply concerning statements and her law enforcement connections, trial counsel failed to challenge Juror 193. Mr. Cruz's argument related to Juror 193 thus was reviewed for fundamental error only. *Cruz*, 181 P.3d at 205.[56]

## II.   Mr. Cruz was denied his right to an unbiased and impartial jury.

487.   Under the Sixth and Fourteenth Amendments, a defendant has a right to an unbiased and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *see also Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971) (internal citations omitted). The United States Supreme Court has consistently affirmed the right for a careful, searching voir dire in capital cases. *Id.* at 730-34 (citing *Ham v. South Carolina*, 409 U.S. 524 (1973)). The "presence of a biased juror cannot be harmless: the error requires a new trial without a showing of actual prejudice." *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (citations omitted); *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001).

488.   In order to determine if a defendant was prejudiced by the trial court's failure to excuse a biased juror for cause, this Court must determine whether the composition of the jury panel as a whole was affected by the trial court's error. *Gray v. Mississippi*, 481 U.S. 648, 665 (1987) (citations omitted).

489.   Jurors 62, 123, 127, and 193 served on the jury that convicted and

---

[56] Elsewhere in this Petition, Mr. Cruz argues that trial counsel's failure to challenge Juror 193 for cause was prejudicially deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984); *see* Claim One. Moreover, postconviction counsel's failure to assert trial ineffectiveness was deficient to Mr. Cruz's prejudice as a result of failing to raise this meritorious claim, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012. Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

sentenced Mr. Cruz to death. All four of these jurors, but especially Juror 193, demonstrated prejudice against Mr. Cruz. In this case the trial court's error in not excusing Jurors 62, 123, 127 and 193 for cause affected the reliability of the truth-finding process, and the impact of the error is not capable of rational assessment. Moreover, the trial court's erroneous failure to strike Jurors 136, 150, 169, and 178 left defense counsel with insufficient peremptory challenges to remove these jurors from the panel.

490.   The damage done is evident. For example, Juror 193 was selected as foreperson. Following the jury's imposition of the death penalty, Juror 193 stated to the press that the jury had sent a message with its death verdict. Juror 193's statement demonstrates the jury's decision was influenced improperly by emotion, passion, and prejudice against Mr. Cruz. Moreover, "sending a message" is not an aggravating circumstance upon which a death sentence could be based. Juror 193's statement demonstrates the impact of biased jurors seated on the jury.

491.   The Arizona Supreme Court rejected Mr. Cruz's challenge to Jurors 62, 123, 127, 136, 150, 169, and 178 noting that each of these jurors "[u]pon questioning . . . unequivocally stated that they could fairly evaluate the evidence, follow the court's instructions, and set aside any preconceived notions of guilt." *Cruz*, 181 P.3d at 205. The state court's decision resulted in both unreasonable fact findings and unreasonable application of clearly established Federal law.  Promises that a juror can be fair or follow the law are insufficient under the Constitution. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Morgan*, 504 U.S. at 735 (footnote omitted). The Arizona Supreme Court's opinion failed to search beyond the promise to be fair, to follow instructions, to inquire into the dogmatic beliefs of the jurors as required by *Morgan*.

492. Parsing through the voir dire of the disputed jurors and conducting the

inquiry contemplated by *Morgan*, reveals the unreasonable nature of the state court's findings of "unequivocal assurances" that jurors could follow the law, fairly evaluate the evidence, and set aside their opinions on Mr. Cruz's guilt. For example, Juror 169's voir dire started with an opinion that Mr. Cruz was guilty, moved to a statement that she would be able to set aside that opinion, and ended with a denial of having any opinion whatsoever. (*See* Tr. Jan. 25, 2005 at 124-25, 128.) While unequivocal, this transition is also internally inconsistent and unbelievable. Juror 62's voir dire, to the contrary, is entirely equivocal filled with both hesitancy and concern about his abilities. (*See* Tr. Jan. 20, 2005 at 111-14, 120-22.)

493. Regarding Juror 193, the court rejected this claim noting the juror stated she could be fair and impartial to both sides. *Cruz*, 181 P.3d at 206. The court also missed the crux of Mr. Cruz's argument when it noted that "Cruz's concerns that sympathies based on her husband's former job might influence her decisions exemplify why a defendant is given peremptory strikes: to remove a qualified juror whom the defendant does not wish to have on the jury." *Id.* Had the trial court properly granted even one of the challenges for cause identified herein, a peremptory challenge would have been available to remove Juror 193 from his jury.

494. The court also refused to consider Juror 193's post-verdict statements. *Id.* This holding is inconsistent with Federal law. *See Doan v. Brigano*, 237 F.3d 722, 728 (6th Cir. 2001) *abrogation on other grounds recognized by Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003). *Doan* relied on *Staub v. City of Baxley*, 355 U.S. 313 (1958), to support its conclusion that the Ohio aliunde rule could not serve to preclude Supreme Court review "when the very application of that evidence rule is alleged to prevent Doan from ever showing that his federal constitutional right to a fair and impartial jury that considers solely the evidence presented to it at trial was violated." *Doan*, 237 F.3d at 728. Here, review of Juror 193's statement is essential to Mr. Cruz's demonstration of a Federal constitutional violation.

495. Mr. Cruz was entitled to a fair and unbiased jury. It is evident that the

jury panel was affected by the trial court's failure to remove these jurors. As such, Mr. Cruz is entitled to habeas relief.

## Claim Four

**Improper restraints during his capital trial deprived Mr. Cruz of his rights to due process, a fair trial and fair sentencing proceedings.**

496. Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

497. Mr. Cruz presented part of this claim in Argument 3-I of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 101-04.) To the extent that the state court addressed this claim on its merits, its rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of facts in light of the evidence presented.

498. Mr. Cruz failed to argue on direct appeal that the shock belt worn by Mr. Cruz was visible. Counsel's failure was prejudicially deficient performance as counsel preserved on the record the argument that the shock belt was visible. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel rendered prejudicially deficient performance by failing to assert direct appeal counsel's ineffectiveness for failing to pursue this issue, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

## I.   Mr. Cruz was improperly restrained during the trial court proceedings.

499.   On the first day of trial, defense counsel objected to the heightened security precautions used on Mr. Cruz, which included a leg brace and shock belt.

(Tr. Jan. 19, 2005 at 4.) Counsel noted the shock belt made it "extremely uncomfortable if not impossible for [Mr. Cruz] to sit up in any kind of way that doesn't indicate to the jury that he is in an uncomfortable situation and, frankly, restrained." (*Id.*) Counsel indicated he had no idea why this level of restraint was being used against Mr. Cruz. (*Id.*)

500.   Counsel noted Mr. Cruz's improved security ranking at the county jail, indicating that Mr. Cruz was initially in isolation but had since been moved to general population. (*Id.*) This was a result of Mr. Cruz's lack of both violent behavior and disciplinary problems. (*Id.*) Counsel explicitly objected to the manner in which Mr. Cruz was being restrained. (*Id.* at 5.)

501.   The trial court later advised counsel that Officer Spencer was present and had advised the court that use of both the shackles and the shock belt were a result of Mr. Cruz's cuff status. (*Id.* at 75.) Officer Spencer advised that this was standard procedure when prisoners left the jail, particularly when wearing civilian clothing. (*Id.*) Moreover, the court indicated that Mr. Cruz was considered an escape risk because of the "high visibility of his case." (*Id.* at 75-76.) And, the court noted "I'm also told this is a procedure they're using now regularly." (*Id.* at 76.) The deputy confirmed, in response to defense counsel's question, that Mr. Cruz wore the shock belt because of his cuff status. (*Id.* at 77.)

502.   Trial counsel filed a motion to address the issue on January 21, 2005. (ROA at 451.) Counsel argued that the security used on Mr. Cruz—including uniformed officers, a leg brace, and a shock belt—was excessive. (ROA 451 at 3.) Counsel argued that these excessive security precautions would cause Mr. Cruz's jury to conclude that he was violent and dangerous, had a criminal history, and was an extreme escape risk. (*Id.*) Counsel argued further that the shock belt was uncomfortable and made it difficult for Mr. Cruz to communicate with counsel during the proceedings. (*Id.* at 4.)

503.   During January 25, 2005 proceedings, the trial court indicated it had

spoken to Sergeant Binnion regarding the security matter. (Tr. Jan. 25, 2005 at 78.) Binnion indicated to the court that the sheriff's department experience with the belt was that "[i]t's not all that uncomfortable. It's less uncomfortable than the protective gear that the officers have to wear regularly." (*Id.*) And, the court noted that from its observation of Mr. Cruz, he "doesn't demonstrate that he's been in any discomfort" and "I understand from him[57] that apparently there's been no complaints [sic] about way the belt is on." (*Id.*) The court also felt there was "just practically no chance that, you know, the shackles and what have you would be observed." (*Id.*)

504.   The court noted that jail personnel were advised regarding an alleged escape plan. (*Id.* at 79.) Trial counsel indicated this allegation was false. (*Id.*) At this point, the trial court recognized a hearing was necessary. (*Id.*) In response to the court's indication that the information regarding the alleged escape plan was "somewhat dated," defense counsel noted that the information was a year and a half old. (*Id.*)

505.   The trial court sealed two memos related to this topic, which reflect that in July of 2003 a female prisoner, Robin Fahr, claimed that "Jennifer Moore" told her about a possible escape attempt related to Mr. Cruz.  Fahr claimed that "Moore" had the details of this escape plan in her possession on the back of paperwork belonging to Mr. Cruz. Jail personnel then searched Jennifer Morse's possessions and found nothing of significance. In response to the trial court's offer of a hearing, defense counsel indicated he was not prepared to proceed that afternoon. (Tr. Jan. 25, 2005 at 83, ROA 457.)

506.   On January 27, 2005, the trial court indicated Mr. Cruz would not have the leg brace on during the following day's proceedings, when jury selection was to

_____

[57] From the transcript, it is not clear who gave the court information regarding a lack of complaints, but presumably the trial court is indicating that Binnion has received no complaints regarding the shock belt based on trial counsel's prior representations that Mr. Cruz was uncomfortable wearing the shock belt.

commence. (Tr. Jan. 27, 2005 at 214.) The court noted it wanted Mr. Cruz to be able to stand up before the jurors. (*Id.*) Defense counsel protested indicating Mr. Cruz could not stand up while wearing the shock belt because "it's very noticeable." (*Id.*) Mr. Cruz pointed out that it was sticking out and that there was a lump in the back. (*Id.* at 214-15.) While the court disagreed, defense counsel was clear that he did not want Mr. Cruz standing while wearing the shock belt. (*Id.* at 215.) Counsel noted, again, that a hearing was still needed on the matter. (*Id.*) When the court stated that counsel was supposed to identify a time, counsel responded that he had not thought about it. (*Id.*)

507.   During January 28, 2005 proceedings, trial counsel indicated that Mr. Cruz had the shock belt on and noted he thought Mr. Cruz would not be wearing it. (Jan. 28, 2005 at 3.) The trial court indicated security asked him to take a look at Mr. Cruz to see if appearance would be a problem. (*Id.*) The trial court noted, "I don't think that that's really obvious from that close" and it "certainly not [sic] obvious from the back." (*Id.*)   Ultimately, the court ruled the security precautions would continue as they were. (*Id.*)

508.   The record reveals that defense counsel failed to request the hearing offered by the trial court. Defense counsel also failed to offer evidence supporting their position that the allegation of an escape plan was false and, resultantly, that Mr. Cruz was being improperly restrained during the trial court proceedings.[58]

---

[58] Any deficiency in the state court record on this Claim is a direct result of trial counsel's prejudicially deficient representation in failing to request the needed hearing and to investigate and present relevant evidence to bolster counsel's position that the allegation of an escape plan was false and that, resultantly, the security precautions in place were excessive. *Strickland*, 466 U.S. 668; *see also* Claim One. Moreover, postconviction counsel provided prejudicially deficient representation in failing to allege trial counsel's ineffectiveness. *Martinez*, 132 S. Ct. 1309; *see also* Claim One.

## II.   The shock belt used on Mr. Cruz was an excessive restraint and deprived him of his Sixth and Fourteenth Amendment rights.

509.   The right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, demands that "'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). Unfairly prejudicial circumstances, including excessive security and the appearance of a defendant in visible restraints or in prison clothing, at any stage of a trial may impact the jury and undermine the defendant's right to a fair trial and the constitutionally required presumption of innocence. *See id.* at 569 (recognizing that "the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy") (internal quotation omitted).

510.   The use of stun belts "raises all of the traditional concerns about the imposition of physical restraints." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003). Particularly because, "[g]iven the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences," making it likely to interfere with a defendant's ability to confer with his counsel and participate in his defense. *Id.* As a result, the decision to compel a defendant to wear a stun belt "must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *Id.* at 901 (internal quotation omitted).

511.   The prohibition on unjustified shackling is based on three main constitutional concerns, each of which is implicated in Mr. Cruz's trial and sentencing proceedings. *See Deck v. Missouri*, 544 U.S. 622, 630-32 (2005); *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

512. First, the security measures undermined the impartiality of Mr. Cruz's jury. *See Deck*, 544 U.S. at 630, 632-33. Defense counsel argued that the shock belt was visible to the jurors. In addition, counsel argued that the manner in which the belt forced Mr. Cruz to sit would signal to the jury that he was restrained. Any jurors who observed these security measures likely understood the security measures as a reflection of the danger posed by Mr. Cruz. *See id.* at 633 (noting that shackles imply that a defendant is dangerous and that this is "nearly always a relevant factor in jury decision making" in a capital case). These security measures, which counsel asserted were visible to the jurors, deprived Mr. Cruz of the right to an impartial jury.

513. Second, the security measures impaired Mr. Cruz's ability to communicate with counsel and deprived Mr. Cruz of a meaningful opportunity to present a complete defense. *See id.* at 631-32. Third, the knowledge that Mr. Cruz was wearing a stun belt was an affront to the dignity and decorum of the judicial proceedings. *See id.*

514. "The lower federal courts have [also] observed two further weaknesses in imposing physical restraints: they may confuse and embarrass the defendant, thereby impairing his mental faculties; and they may cause him pain." *Spain v. Rushen*, 883 F.2d 712, 720-21 (9th Cir. 1989). Here, the security measures threatened to confuse or embarrass Mr. Cruz and cause him pain. (ROA 451 at 4) ("This belt is extremely uncomfortable and makes it difficult for the Defendant to focus and communicate with counsel during trial proceedings."); *see also Spain*, 883 F.2d at 720-21.

515. Based on these constitutional concerns, the Supreme Court has concluded that "due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Deck*, 544 U.S. at 632; *see also Allen*, 397 U.S. at 344. Enforcing this principle, the Ninth Circuit has concluded "it is a denial of due process if a trial court orders a defendant

shackled without first engaging in a two-step process," requiring trial courts to 1) "be persuaded by compelling circumstances that some measure [is] needed to maintain security of the courtroom," and 2) "pursue less restrictive alternatives before imposing physical restraints." *Duckett*, 67 F.3d at 748.

516.   The Arizona Supreme Court noted that "[g]iven the constitutional ramifications of the use of shock belts, courts should provide a hearing – evidentiary if necessary – at which the defendant may contest the use of shock belts or other restraints." *Cruz*, 181 P.3d at 214. However, in rejecting Mr. Cruz's claim, the Arizona Supreme Court noted that while counsel challenged the accuracy of the reports, he declined to proceed on a hearing, and then never requested the hearing offered by the trial court at a later time. *Id.* Resultantly, the court found no error in Mr. Cruz's case because the trial court offered Mr. Cruz a hearing, which was declined, and because the court's decision "was based on a documented threat of escape, not merely on security personnel's preference for the shock belt." *Id.*

517.   The Arizona Supreme Court's decision was an unreasonable fact-finding as well as an unreasonable application of clearly established Federal law. Here, the trial court failed to identify compelling circumstances requiring the excessive security and failed to consider or pursue less restrictive alternatives. *See Duckett*, 67 F.3d at 748. As an initial matter, no evidence was ever produced showing that Mr. Cruz posed a threat to anyone in the courtroom. In addition, no viable security threat was ever confirmed—compelling circumstances were not present. As noted in the sealed reports obtained by the trial court, no evidence to actually support the prisoner's suggestion of an escape plan by Mr. Cruz was obtained when Morse's possessions were searched. Moreover, this alleged escape plan was reported more than a year and a half prior to the trial proceedings, during which time Mr. Cruz was not a disciplinary problem at the jail. And, despite repeated court appearances, Mr. Cruz never attempted to execute this alleged escape

1   plan.[59]

2       518.   Even if the other prisoner's uncorroborated story of an "escape plan"

3   gave rise to a need for additional security measures, there is no indication in the

4   record that compelling circumstances necessitated the security actually imposed—

5   the use of a high-voltage shock belt. *See Spain*, 883 F.2d at 719-20, 721-29 (noting

6   that the defendant's prior escape attempts gave rise to a need for some security

7   measures before concluding that the measures actually imposed, shackling, were

8   unnecessary and unconstitutional).

9       519.   Rather than carefully balancing Mr. Cruz's constitutional rights with

10  any identifiable security risks and imposing security measures as a last resort, the

11  trial court simply deferred to Mr. Cruz's jailers. The trial court's abdication of its

12  responsibility to consider the constitutionality of the security measures was

13  improper; it is the "duty of the trial court, not correctional officers, to make the

14  affirmative determination, in conformance with constitutional standards, to order the

15  physical restraint of a defendant in the courtroom." *See Gonzalez*, 341 F.3d at 902.

16      520.   The trial court also failed to consider and pursue less restrictive

17  alternatives. Indeed, trial counsel noted on the record they were not opposed to Mr.

18  Cruz wearing the leg brace during the proceedings. The trial court's failure to

19  consider less restrictive or obtrusive security measures violated Mr. Cruz's right to

20  due process by failing to take "account of the circumstances of the particular case."

21  *Deck*, 544 U.S. at 632; *see also Duckett*, 67 F.3d at 748.

22      521.   As noted previously, as a result of prejudicially deficient representation,

23  Mr. Cruz did not allege on direct appeal that the shock belt was visible to jurors, but

24  argued that it impeded his ability to communicate with counsel. *Cruz*, 181 P.3d at

25

26  [59] Any deficiencies regarding the impropriety of these security measures is a direct
27  result of the ineffective assistance of trial counsel, who failed to request the hearing
    offered by the trial court and failed to proffer the evidence to support his record
28  position that the allegations of an escape plan were false. *See* Claim One.

214. As a result, the Arizona Supreme Court did not address the merits of Mr. Cruz's claim that his restraints were visible, and this Court's review of this portion of the claim is *de novo*. *See Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784-85 (2011) (citation and parenthetical omitted); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

522.   The record demonstrates that Mr. Cruz was actually prejudiced by the security measures at the resentencing. The shock belt impacted Mr. Cruz's conduct in the courtroom and his ability to participate in his defense. Further, counsel represented that the shock belt was visible on Mr. Cruz, and his awkward sitting position indicative of restraint, supports the contention that jurors observed the security measures and understood the measures as a reflection of Mr. Cruz's dangerousness. The use of the shock belt, visible on Mr. Cruz as evidenced by counsel's representation, was inherently prejudicial. *See Deck*, 544 U.S. at 635; *see also Duckett*, 67 F.3d at 749 (noting that shackling in extreme forms is not susceptible to harmless error review). As such, habeas relief is warranted.

### III.  Conclusion

523.   By erroneously requiring Mr. Cruz to wear a shock belt, the trial court violated Mr. Cruz's rights under the Sixth and Fourteenth Amendments. Mr. Cruz is entitled to habeas relief.

### Claim Five

**Mr. Cruz's right to due process was violated when the trial court admitted prejudicial testimony in violation of Arizona's disclosure rules that amounted to evidence of bad character. This testimony was also improper opinion testimony.**

524.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

525.   Mr. Cruz presented part of this claim in Argument 3-D of his direct

appeal. (Ariz. Sup. Ct. Doc. No. 51 at 94-95.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

526.   Mr. Cruz failed to argue on postconviction review that trial counsel rendered prejudicially deficient representation by failing to object to this testimony in a timely fashion and for failing to proffer a curative instruction. *Strickland v. Washington*, 466 U.S. 668 (1984); *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

527.   During Mr. Cruz's trial, criminalist Frank Powell of the Tucson Police Department offered opinion evidence regarding the reason the trigger of the gun used to kill Officer Hardesty was modified, indicating the gun was modified for the purposes of concealing the weapon. (Tr. Feb. 10, 2005 at 202.) Defense counsel failed to object at the time Powell's testimony was offered. (*See id.*; *see also Cruz*, 181 P.3d at 213.) However, the following day counsel moved for a mistrial. (Tr. Feb. 11, 2005 at 3-4.) Trial counsel argued that Powell's opinion that the gun hammer was modified for concealment purposes had not been previously disclosed to the defense. (*Id.*) Moreover, counsel noted the testimony suggested "bad character, bad conduct, a bad act, and that the person that possessed this weapon was engaging in illegal behavior." (*Id.* at 3-4.) Counsel indicated a curative instruction was insufficient to remedy the damage and requested a mistrial. (*Id.* at 4.) Counsel did, however, alternatively request a curative instruction if the court denied the mistrial motion. (*Id.*)

528.   The trial court denied counsel's motion based on waiver and a lack of merit. (*Id.* at 9; *see also Cruz*, 181 P.3d at 213.) The court indicated it would be happy to consider an instruction "at the time of instructions," (Tr. Feb. 11, 2005 at 9), thus failing to cure the prejudicial nature of the testimony by immediately addressing the issue with the jury. Moreover, the record does not reflect that counsel proffered the requested curative instruction at any time. Counsel's failure to object subjected Mr. Cruz's motion to the more onerous standard of review in the Arizona Supreme Court—fundamental error. *Cruz*, 181 P.3d at 213.

## I.   Frank Powell offered highly prejudicial opinion evidence that deprived Mr. Cruz of due process.

529.   The United States Supreme Court has held that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). However, habeas corpus relief is available if the error deprived the petitioner of a fundamentally fair trial and therefore rises to the level of a violation of due process. *Id.*; *see also United States v. LeMay*, 260 F.3d 1018, 1026-27 (9th Cir. 2001); *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993).

530.  Powell's testimony raises this concern. His prejudicial opinion testimony improperly conveyed to the jury that Mr. Cruz was a person of bad character and suggested bad acts as noted by trial counsel. It certainly suggested that the person who had the gun intended to use it, and to use it both stealthily and quickly, as argued by the prosecutor in closing:

> You shoot somebody five times after you pull the gun, this gun that has a sawed off hammer so it doesn't catch on your clothing as you pull it, five times at close range, did he intend or know his actions would cause death? Absolutely.

(Tr. Feb. 24, 2005 at 27.) And, he returned to this point again during his rebuttal closing:

> It was in his front pocket with the hammer sawed off so that he could

get it out of there quickly.

(*Id.* at 101.) This theme likely carried over into closing argument during the penalty phase of Mr. Cruz's trial where the prosecutor urged the jury to consider the manner in which Officer Hardesty was killed as aggravation.[60] (Tr. Mar. 8, 2005 at 58.)

531.   Equally troubling, the state did not disclose this opinion pre-trial (Tr. Feb. 11, 2005 at 3) in violation of Ariz. R. Crim. P. 15. Rule 15.1(b)(7), which requires production of acts the prosecutor intends to use to prove several facts, including intent. There can be no question based on the prosecutor's argument that this fact was presented to the jury to support the state's position that Mr. Cruz shot Officer Hardesty with the intent to kill. Foreknowledge of Mr. Powell's opinion would have benefited Mr. Cruz, and prejudice as identified above resulted from its admission.

532.   In rejecting this claim, the Arizona Supreme Court made an unreasonable finding of fact as well as unreasonably applying clearly established Federal law. *See* 28 U.S.C. §2254(d)(1)-(2). The Arizona Supreme Court found that '[i]t was unlikely that the jury concentrated on the filed-off hammer on the Taurus when no evidence was presented that Cruz modified the gun and the trial was focused on other, more serious issues." *Cruz*, 181 P.3d at 213. However, the record before the state court supports a contrary finding. Indeed, the prosecutor emphasized that the gun hammer was modified for easy access enabling Mr. Cruz to shoot Officer Hardesty, who never pulled his weapon. Had the prosecution not referenced the gun modification, perhaps the state court's determination would pass muster, but the jury's attention was drawn to this fact—both in closing and again in rebuttal closing. Moreover, the clear intimation was the Mr. Cruz altered the weapon, or another criminal he associated with him had done so—the state brought in the gun's

---

[60] Elsewhere in this Petition, Mr. Cruz argues that the prosecutor committed misconduct when making this argument to Mr. Cruz's jury. *See* Claim Seven.

prior owner to testify that the hammer was modified when he owned it. (Tr. Feb. 15, 2005 at 81.)

533.   Ultimately, the state court found there was no fundamental error and that the trial court properly denied the motion. *Cruz*, 181 P.3d at 213. As noted above, however, this testimony was prejudicial to Mr. Cruz with a probable carryover effect as the jury went on to consider the appropriate penalty to be imposed on Mr. Cruz.

534.   This testimony violated Mr. Cruz's rights to a fair trial as well as to timely pre-trial disclosure of evidence violating Ariz. R. Crim. P. 15 and the Fifth, Sixth, Eighth, and Fourteenth Amendments. Habeas relief is warranted.

## II.   Frank Powell offered an improper expert opinion.

535.   Mr. Cruz did not present this portion of his claim to the state court. Trial counsel failed to object to Powell's testimony as an improper expert opinion. (Tr. Feb. 10, 2005 at 2; *see also* Tr. Feb. 11, 2005 at 3 *et seq.*) As such, trial and postconviction counsel's performance was deficient to Mr. Cruz's prejudice as a result of failing to raise this meritorious claim, which excuses any procedural default. *Strickland*, 466 U.S. 668; *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309; *see* Claim One.

536.   The Rules of Evidence speak specifically to the admissibility of expert opinion testimony. Under Arizona Rule of Evidence 702, an expert is a person who has "knowledge, skill, experience, training, or education." An expert can offer his opinion where four criteria are met. First, the expert must have "scientific, technical, or other specialized knowledge" that will help the expert to understand the evidence or to determine a fact at issue. Ariz. R. Evid. 702(a). Second, the testimony must be based on "sufficient facts or data." Ariz. R. Evid. 702(b). Third, the expert must base his testimony on reliable scientific methods and/or principles. Ariz. R. Evid. 702(c). And, fourth, the expert must reliably apply those principles and methods to the

current case. All four criteria must be met for a witness to offer an expert under Evidence Rule 702.

537.   The United States Supreme Court has held that "federal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67 (*quoting Lewis*, 497 U.S. at 780). However, habeas corpus relief is available if the error deprived petitioner of a fundamentally fair trial and therefore rises to the level of a violation of due process. *Id.*; *see also LeMay*, 260 F.3d at 1026-27; *McKinney*, 993 F.2d at 1384.

538.   Offering the opinion that the gun hammer was removed for concealment purposes does not meet the requirements of Rule 702. Powell's testimony is precisely the type of opinion evidence the Arizona Rules intend to preclude at criminal trials. Rank speculation, unsupported by scientific methods or principally. However, because Powell was an "expert witness" his opinion that Mr. Cruz's gun was altered to both conceal it and to make access to it both quick and easy, his opinion likely carried great weight with the jury. Thus such testimony was detrimental to the Mr. Cruz as evidenced by the emphasis of this fact during both closing *and* rebuttal closing.

539.   This testimony violated Mr. Cruz's rights to a fair trial and the Fifth, Sixth, Eighth, and Fourteenth Amendments. Habeas relief is warranted.

### Claim Six

**The trial court's preclusion of relevant mitigating evidence deprived Mr. Cruz of a fair sentencing proceeding and reliable sentence in violation of the Eighth and Fourteenth Amendments.**

540.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

541.   Mr. Cruz presented this claim in Argument in Argument II.b of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 64-67.) The Arizona Supreme Court

denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

542.   Trial counsel sought to offer Duane Belcher's testimony, Chairman of the Arizona Board of Executive Clemency, for two points. First, he would testify that if Mr. Cruz was given a natural life sentence he would "never, ever eligible [sic] for consideration of any type of parole status." (Tr. Jan. 10, 2005 at 62; *see also* ROA 427 at 3.) Second, Belcher would testify that since 1994, "if an individual gets a 25-to-life-sentence, the most the Board can do is do nothing more than make a recommendation. They have no power or authority to commute a sentence to release anybody after 25 years." (Tr. Jan. 10, 2005 at 62; *see also* ROA 427 at 3.) Moreover, where a prisoner serving a natural life sentence applies for parole, the parole application will not be entertained because the statute specifically provides release is unavailable. (ROA 427 at 3.) The testimony was not allowed and defense counsel's motion to reconsider was denied. (ROA 611 at 3.)

543.   The defense again addressed this issue in their motion for new trial. (ROA 644 at 30-32.) In support of their argument, counsel referred the trial court to a press release issued by three jurors stating: "we were not given the option to vote for life in prison without the possibility of parole." (*Id*. at Ex. 9.) The trial court denied the mistrial motion. (ROA 669.)

**I.    Belcher's testimony was a factor that could have led the jury to impose a sentence less than death and thus was relevant mitigating evidence.**

544.   The Eighth Amendment requires individualized sentencing of capital defendants. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 4428 U.S. 280 (1976). There is no instance where individualized sentencing is more important than in the realm of capital punishment. Death is a "qualitatively

different" punishment. *Woodson*, 428 U.S. at 304. Thus, where the state seeks to take a life as punishment for a crime, an individualized sentencing decision is essential. *Lockett*, 438 U.S. at 605.

545.   Because of the essential nature of individualized sentencing, capital defendants are entitled to consideration of all factors that may cause the jury to impose a sentence less than death. *Id.* at 586; *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Accordingly, the trial court must permit capital juries to consider all relevant evidence in mitigation of the death penalty. *Woodson*, 428 U.S. 280; *Penry v. Lynaugh*, 492 U.S. 302 (1989) *overruled on other grounds Atkins v. Virginia*, 536 U.S. 304 (2002); *Eddings*, 455 U.S. 104. The trial court may not preclude sentencing juries from considering any mitigation factor, nor may the sentencer refuse to consider a relevant mitigating factor. *Eddings*, 455 U.S. at 114. "Any barrier" to mitigation "must fail." *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990).

546.   In rejecting Mr. Cruz's claim, the Arizona Supreme Court found there was no abuse of discretion in precluding Belcher's testimony because Belcher "would have been asked to speculate about what the Board might do in twenty-five years." *Cruz*, 181 P.3d at 207. This finding was unreasonable based on the trial court record, which gave detailed information regarding Belcher's testimony. Belcher would have testified to the state of the law; there is no indication on the record that he would have been asked to speculate.

547.   Moreover, the Arizona Supreme Court opinion is devoid of any mention of the body of Federal case law that required admission of Belcher's testimony. The court did not merely unreasonably apply clearly established Federal law; it wholesale ignored it.

548.   The trial court improperly precluded Mr. Cruz from presenting relevant mitigating evidence. Habeas relief is appropriate.

**Claim Seven**

**Misconduct by the state's attorney violated Mr. Cruz's rights to due process and protection against cruel and unusual punishment.**

549.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

550.   Mr. Cruz did not present this claim to the state court. As such, appellate counsel rendered deficient performance to Mr. Cruz's prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel's failure to assert appellate ineffectiveness was deficient to Mr. Cruz's prejudice as a result of failing to raise this meritorious claim, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

551.   To succeed on a claim of prosecutor misconduct, Mr. Cruz must meet one of two standards. Mr. Cruz must demonstrate either that the prosecutor's misconduct prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or that the prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger v. United States*, 295 U.S. 78 (1935).

**I.   Sentencing phase misconduct.**

**A. The prosecutor improperly argued that Mr. Cruz needed to demonstrate a causal nexus between his mitigation and the crime.**

552.   In his penalty-phase closing argument, the prosecutor held Mr. Cruz's mitigation to a higher burden than demanded by law, arguing that Mr. Cruz had failed to demonstrate a causal nexus between the mitigation he offered and the

offense. While discussing Mr. Cruz's parents' divorce and his father's death, the prosecutor argued:

> And what does that have to do with what he did on May 26th of 2003? It has absolutely nothing to do with what he did. It has absolutely nothing to do with him killing Patrick Hardesty. It's an excuse. It's an excuse that he wants you to look at and feel sorry for him because his father died 20 years ago and his mother wasn't a nurturing mother.

(Tr. Mar. 8, 2005 at 55.)

553.   In capital cases, the Eighth Amendment requires heightened reliability because death is a qualitatively different punishment. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion). Resultantly, the capital sentencer must undertake an individualized assessment of a defendant's culpability when assessing punishment. *See id*.; *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."). Absent such consideration there is a constitutionally unacceptable "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Eddings v. Oklahoma*, 455 U.S. 104, 119 (1982) (quoting *Lockett*, 438 U.S. at 605).

554.   Individualized sentencing requires that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. Merely admitting mitigating evidence at sentencing does not comply with the Eighth Amendment. *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302, 319 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the

sentencer."). Rather, the sentencer must be "given a 'vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision.'" *Penry v. Johnson* (*Penry II*), 532 U.S. 782, 797 (2001) (quoting *Penry I*, 492 U.S. at 328 (internal quotation marks omitted)); *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007) ("[T]he jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death.").

555.   In *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court held that the Eighth Amendment is violated when courts impose a requirement that evidence must satisfy a "causal nexus" test before it is considered mitigating. While mitigating evidence must be relevant to be admitted, the Court held that courts cannot apply a screening mechanism such as a heightened relevance standard to take mitigating evidence out of the sentencer's effective reach. *Id*. at 285 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990) ("[A] State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'"). "Once this low threshold for relevance is met, the Eighth Amendment requires that the [sentencer] be able to consider and give effect to a capital defendant's mitigating evidence." *Id*. at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377-78 (1990)).

556.   The *Tennard* Court expressly disapproved of the causal nexus portion of the Fifth Circuit's test, finding that the test would screen out much traditionally mitigating evidence. 542 U.S. at 285-86. In *Smith v. Texas*, 543 U.S. 37 (2004), the Supreme Court again condemned a state appellate court's application of a causal nexus to find mitigating evidence irrelevant. *Id*. at 45. The Court characterized the causal nexus test as "a test we never countenanced and now have unequivocally rejected." *Id*.

557.   The prosecutor's argument clearly urged the jury to apply a causal

nexus test to Mr. Cruz's mitigating evidence depriving him of his right to individualized sentencing and protections against cruel and unusual punishment. Habeas relief is warranted.

### B. The prosecutor improperly argued that the manner and circumstances of the offense were to be weighed as aggravation.

558.   In his penalty phase closing argument, contrary to Arizona law, the prosecutor told the jury to weigh the nature and circumstances of Patrick Hardesty's murder as part of the aggravating circumstance:

> Each of you swore an oath to uphold that law. It's not simply that there is one aggravator and a counting of how many mitigators there might be. It's the quality of each. It's the quality of whatever we might find to be mitigating in this man's life as the defendant, things that happened to him when he was 10 or 11 or 12. *It's the quality of the aggravating factor for taking the life of Patrick Hardesty. Not just taking the life, but the manner in which he took the life: five shots, two of them hitting the vest, two others hitting his torso, and an execution to the head.* It was the quality of what he did.

(Tr. Mar. 8, 2005 at 58.) (emphasis added).

559.   Arizona law is clear on this point—the nature and circumstances of the offense are mitigating factors, not aggravating circumstances. *See* A.R.S. § 13–751(G); *State v. Lynch*, 234 P.3d 595, 602 (Ariz. 2010) ("The court also correctly defined a "mitigating circumstance" as "any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense."). This is further demonstrated by A.R.S. § 13-751, which enumerates the aggravating circumstances with which a capital defendant may be charged; excluding A.R.S. § 13-751(F)(6) ("[t]he defendant committed the offense in an especially heinous, cruel or depraved manner"), the nature and circumstances of the offense are not facts to be weighed in aggravation.

560.   By telling the jury it could weigh the actual circumstances of Officer Hardesty's killing as part of the aggravating circumstance, the prosecutor told the jury it could consider matter beyond the aggravating circumstance when weighing the proper penalty. Thus, the prosecution misled the jury. *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985). These statements were designed to mislead the jury into believing it could weigh and consider factors precluded by law. *See id.*; *Berger*, 295 U.S. at 85 (finding reversible error where prosecutor made "improper insinuations and assertions calculated to mislead the jury."); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 436 (1988) ("Neither paid nor appointed counsel may deliberately mislead the court with respect to either the facts or the law."). The unacceptable consideration of nonstatutory aggravators violated the Eighth Amendment's requirement of reliable and nonarbitrary sentencing in a weighing state. *See Stringer v. Black*, 503 U.S. 222, 237 (1992); *Sochor v. Florida*, 504 U.S. 527, 532 (1992). The argument ran the very real risk of causing the death penalty to be imposed in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 238, 277 (1972); *Proffitt v. Florida*, 428 U.S. 242, 259 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). This is so because consideration of nonstatutory aggravating circumstances destroys the guided discretion required by *Furman* and its progeny.

561.   The prosecutor's argument was contrary to law and deprived Mr. Cruz of a fair trial, an individualized sentence, and due process.  He is entitled to habeas relief.

## II.   Conclusion

562.   The prosecutor's acts of misconduct, considered separately or cumulatively, deprived Mr. Cruz of his rights to a fair trial, individualized sentencing, and his protection against cruel and unusual punishment. Habeas relief is warranted.

**Claim Eight**

**Mr. Cruz was deprived of his rights to a fair and impartial jury, a fair sentencing proceeding, and a reliable sentence when the trial court provided coercive instructions during the penalty phase of his capital case.**

563.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

564.   Mr. Cruz did not argue to the state court that the trial court's coercive jury instruction violated federal law. Appellate counsel utterly failed to mention any violation of federal law when he raised a similar claim before the Arizona Supreme Court on direct appeal, and as such, appellate counsel rendered deficient performance to Mr. Cruz's prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel's failure to assert appellate counsel's ineffectiveness was deficient to Mr. Cruz's prejudice, which excuses any procedural default. *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012); *Ha Van Nguyen v. Curry*, ___ F.3d ___, 2013 WL 6246285 at *1 (9th Cir. 2013) (holding *Martinez* applied to failure to raise claim of ineffective assistance of appellate counsel). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

565.   Beginning early in Mr. Cruz's trial, jurors expressed fear and intimidation when interacting with the trial judge. (Tr. Feb. 3, 2005 at 39, 40, 44, 47; Tr. Feb. 4, 2005 at 6.) Against this backdrop, the court would later instruct the jury on how deliberations would proceed. The instructions emphasized the need for unanimity, (Tr. Mar. 8, 2005 at 83-85, 87), and included a modified *Allen* charge,[61]

---

[61] *Allen v. United States*, 164 U.S. 492 (1896) (approving charge that verdict must be

(Tr. Mar. 8, 2005 at 84-85). However, the instructions failed to illuminate jurors as to the consequences of failing to reach a unanimous verdict. (*See* Tr. Mar. 8, 2005 at 72-89.) One of the court's final instructions to the jurors admonished them not to reveal their numerical division to anyone until a verdict had been reached or they had been discharged. (Tr. Mar. 8, 2005 at 86.)

566.   After deliberating for three hours, and just before leaving for the day, the jurors sent the judge a note asking, "If one person's decision remains unchanged against the other 11 jurors [i]s this a hung jury? If so what happens next?" (ROA 619.) After learning the jury's question and the court's proposed answer, defense counsel immediately telephoned the judge to express his objection to the answer. (Tr. Mar. 9, 2005 at 2.) The next day, during a hearing on the matter, defense counsel requested a mistrial based on the jury's revelation of its numerical division. (Tr. Mar. 9, 2005 at 2-3.) Counsel also suggested that the court poll the jurors to ask whether they were, indeed, at an impasse and whether further deliberations would be fruitful. (Tr. Mar. 9, 2005 at 3-4, 14.) The State argued that the trial court's proposed answers—that the situation described was a hung jury and that the jury continue deliberations to "resolve any differences"—would reveal the answers defense counsel sought. (Tr. Mar. 9, 2005 at 14.) The trial court ultimately found the questions from the jurors were hypothetical, (Tr. Mar. 9, 2005 at 16), and proceeded to answer as follows:

> 1- Yes.
> 2- At this time I would ask you to continue your deliberations to attempt to resolve any differences.

*State v. Cruz*, 181 P.3d 196, 214 (Ariz. 2008). After receiving the court's supplemental instruction, the jury continued its deliberations and returned its verdict imposing the death penalty.

---

that of each juror, "not a mere acquiescence in the conclusion of his fellows"; jurors had duty to decide case "if they could conscientiously do so"; and that jurors in minority should consider whether their views were reasonable).

567.   On direct appeal, Mr. Cruz argued that in light of the jury's revelation of its numerical division, the trial court's instruction to "resolve any differences" was impermissibly coercive. *Id.* Direct appeal counsel did not mention any constitutional violation related to the instruction. (Arizona Sup. Ct. Doc No. 51 at 98-101.) The Arizona Supreme Court held that, assuming the jury question regarding a hung jury were merely hypothetical and the jurors were still deliberating, the instruction was not impermissibly coercive. *Cruz*, 181 P.3d at 214. The Arizona Supreme Court further explained that even if the jury were not deliberating but were instead deadlocked at the time the court gave the supplemental instruction, the instruction was not coercive because it "neither ask[ed] the jury to reach a verdict nor suggest[ed] that any juror should change his or her views"; there was no "overt pressure" on the holdout juror, and, therefore, no coercion. *Id.* The court did not decide whether the trial court's instruction violated any federal law. *See id.* at 213-14.[62]

## I.   The trial court's instruction coerced the jury's verdict in violation of Mr. Cruz's Sixth and Fourteenth Amendment rights.

568.   Decades ago, the United States Supreme Court established that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). The Court elaborated that reviewing courts must examine the trial court's instruction in the context it was given and under the totality of the

---

[62] Mr. Cruz asserts that because the Arizona Supreme Court did not decide whether the trial court's supplemental instruction to the jury violated federal law, this claim has not been adjudicated on the merits, and this Court's review is *de novo*. However, should this Court determine that the Arizona Supreme Court also decided and denied the federal claim pled in this Petition, Mr. Cruz asserts that the ruling resulted in a decision that was both contrary to clearly established federal law and based upon an unreasonable determination of the facts. As such, this Court may grant the writ under 28 U.S.C. § 2254(d).

circumstances to determine whether it was coercive. *Id.* at 237. Some of the relevant considerations in reviewing a supplemental jury instruction for coerciveness include: the instruction itself in the context it was given; suggestions the jury would not be released until a unanimous verdict is reached; suggestions the jury must agree; indications the trial court knew the jury's numerical division; indications the instruction was directed at the jurors in the minority; the length of deliberations following the instruction compared with the total length of deliberations; and other indications of coercion. *Tucker v. Catoe*, 221 F.2d 600, 611 (4th Cir. 2000).

569.   Where the jury's numerical division has been revealed, the trial court should exercise caution in giving supplemental instructions to avoid coercing a verdict. *Cf. United States v. Sae-Chua*, 725 F.2d 530, 532 (9th Cir. 1984) (reversing conviction after modified *Allen* charge given subsequent to inadvertent revelation of jury's numerical division in federal prosecution). The United States Supreme Court has found that inquiry into the jury's numerical division "can rarely be resorted to without bringing to bear in some degree, serious, although not measurable, an improper influence upon the jury." *Brasfield v. United States*, 272 U.S. 448, 450 (1926) (holding inquiry into jury's numerical division warrants automatic reversal).[63] A trial court's knowledge of the jurors' vote on the merits of their decision before giving the instruction is a circumstance that points toward coercion. *See Lowenfield*, 484 U.S. at 239-40; *Smith v. Curry*, 580 F.3d 1071, 1081 (9th Cir. 2009); *Tucker v. Catoe*, 221 F.3d at 611.

570.   A criminal defendant is deprived of his right to the uncoerced verdict of the jury where jurors are encouraged, without any principled reason, to surrender their own conscientiously held beliefs. *Smalls v. Batista*, 191 F.3d 272, 279 (2d Cir.

---

[63] Although the Supreme Court exercised its supervisory powers in *Brasfield*, the decision "is nonetheless instructive as to the potential dangers of jury polling." *Lowenfield v. Phelps*, 484 U.S. at 240.

1999); *United States v. Mason*, 658 F.2d 1263, 1268 (9th Cir. 1981) ("If cases grappling with *Allen* have a common thread, it is this: the integrity of individual conscience in the jury deliberation process must not be compromised."). Encouraging a deadlocked jury to resolve their differences without admonishing jurors not to abandon their conscientiously held beliefs sends the message that "the jurors in the majority [are] to hold their position and persuade the single hold-out juror to join in a unanimous verdict." *See Jiminez v. Myers*, 40 F.3d 976, 981 (9th Cir. 1993). At the same time, the message to the lone hold-out is that "he or she [has] no other choice but to convince or surrender." *Smalls*, 191 F.3d at 280.

571.   Although the Constitution does not require giving an instruction on the consequences of failing to agree on a sentence, "the failure to so inform the jury is certainly one of the contextual circumstances bearing on the question of jury coercion . . . ." *Hooks v. Workman*, 606 F.3d 715, 742 (10th Cir. 2010) (citing *Lowenfield*, 484 U.S. at 234); *cf. Jones v. United States*, 527 U.S. 373, 381-82 (1999) (acknowledging Eighth Amendment requires trial court to instruct jury on consequences of failure to agree on sentence where failure to do so would affirmatively mislead jury regarding role in sentencing process). Where the jury has been admonished that unanimity is required in order to return a verdict but has not been given any guidance regarding what will occur in the event unanimity is impossible, an instruction to continue deliberations to resolve any differences can have a coercive effect. *Id.* at 749 (finding instruction to resolve differences so that "case can be completed" was coercive).

572.   The United States Supreme Court held the supplemental instruction given in *Lowenfield* did not coerce the jury's verdict. 484 U.S. at 241. There, the trial judge polled the jurors to determine whether further deliberations would be helpful in reaching a verdict. *Id.* at 240. The Court carefully contrasted the permissible inquiry as to how the jurors stood on the question of whether further deliberations might result in a verdict with an improper inquiry into how the jurors

stood on the merits of the verdict. *Id.* When giving the supplemental instruction, the trial court was careful to admonish jurors that the point of deliberations was to engage in "impartial consideration of the case," not to surrender their conscientiously held beliefs. *Id.* at 235. Finally, the Court emphasized the fact that defense counsel did not object to either the jury polling or the supplemental instruction, suggesting that the supposed coercive effect of the trial court's actions was, to all those involved, subtle. *Id.* at 240.

573.   In this case, the totality of the circumstances indicates that the trial court's supplemental instruction resulted in a coerced verdict. The instruction here bore little resemblance to that upheld in *Lowenfield*, and the context in which the instruction was given added to the coercive effect.

574.   First, unlike the trial court in *Lowenfield*, the trial court here was told the jury's numerical division on the merits of the verdict. The trial court's assumption that the jury mentioned only a hypothetical vote of 11-1 was unreasonable. The court did absolutely nothing to test its assumption; nor did the court alert the jurors to the fact that its answer was predicated upon this assumption. The tenor of the answer actually implied that the court assumed the vote was an accurate depiction of the state of deliberations. Any juror in the minority could rightly presume that the instruction to "resolve any differences" was aimed squarely at him or her. And, because the trial court's instruction effectively informed the jurors that the only procedure in place in the event they were unable to agree on a verdict was more deliberation, the minority juror would have been under even more pressure to acquiesce in the decision of the majority.

575.   Second, in contrast to the *Lowenfield* instruction, the supplemental instruction here failed to admonish jurors not to abandon their conscientiously held views. In fact, the trial court's instruction to "resolve any differences," without more, necessarily implied that some number of jurors must cede their position to come to a resolution. Third, defense counsel immediately objected to the court's

proposed instruction and, at the first opportunity, argued the instruction's impropriety and requested a mistrial in light of the fact that the jury had divulged its numerical division. The coercive effect of the court's instruction was immediately apparent under the circumstances.

576.  Fourth, the jurors deliberating whether Mr. Cruz should live or die were never given accurate information about the consequences of a hung jury despite having specifically requested it. The initial instructions emphasized the fact that the jury must come to a unanimous decision if it were to return any verdict at all, but the instructions left a critical gap in information about what would occur if unanimity were impossible. The trial court's supplemental instruction closed that gap when it indicated that if the jury hung, it was to continue deliberations until differences were resolved. This combination of instructions suggested to the jurors that they must agree and that they would not be released until agreement was reached.

577.  Finally, the instruction was given to jurors who were afraid of the court. Several jurors had already mentioned they were generally intimidated and fearful that mistakes would get them into some sort of trouble. After receiving the instruction that a deadlocked jury must deliberate to resolve any differences, Mr. Cruz's jury would not step outside the lines again; it would return a unanimous verdict.

**II. Conclusion.**

578.  Under the totality of the circumstances, and in the context it was given, the trial court's supplemental instruction to the jury in Mr. Cruz's case coerced the verdict imposing death, violating Mr. Cruz's Sixth and Fourteenth Amendment rights to a fair trial and due process. Mr. Cruz is entitled to habeas relief.

**Claim Nine**

**The A.R.S. § 13-751(F)(10) aggravating circumstance is unconstitutional because fails to narrow the class of death-eligible offenders by double counting a factual element to establish first degree murder and to make a capital defendant death eligible.**

579.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

580.   Mr. Cruz presented this claim in Argument VI.A of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 105-07.) The Arizona Supreme Court denied this claim on the merits. *Cruz*, 181 P.3d at 216. The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

**I.   Mr. Cruz was made death-eligible based on the same set of facts that served to support a finding of first degree murder.**

581.   In Arizona, a defendant can be charged with first-degree murder by killing a police officer in the line of duty, A.R.S. §13-1105(A)(3), and be eligible for the death penalty based solely on the aggravating circumstance of killing a police officer in the line of duty, A.R.S. § 13-751(F)(10). This is precisely the scenario presented in Mr. Cruz's case.  Mr. Cruz was indicted for First Degree Murder under A.R.S. §13-1105(A)(3), which reads: "Intending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty." (ROA 1 at 1.) The sole aggravating circumstance proved was A.R.S. § 13-751(F)(10), which provides that "[t]he murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have

known, that the murdered person was a peace officer." (ROA 573.) Patrick Hardesty was an on duty police officer who was killed in the course of performing his official duties. Resultantly, proof of A.R.S. §13-1105(A)(3) made Mr. Cruz automatically eligible for the death penalty.

## II.   A.R.S. § 13-751(F)(10) unconstitutionally fails narrow the class of death-eligible offenders.

582.   "[T]o avoid [the] constitutional flaw of vagueness and over breadth under the Eighth Amendment, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence of a defendant as compared to others found guilty of (aggravated) murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Arizona's statutory scheme fails to meet this constitutional requirement because the (F)(10) aggravator fails to genuinely narrow the class of individuals eligible for the death penalty.

583.   A.R.S. §13-1105(A)(3) defines the category of murderers. If it is proved beyond a reasonable doubt that the defendant killed an officer in the line of duty, the defendant charged only with the (F)(10) aggravator becomes eligible for the death penalty upon conviction for the underlying substantive offense. The same set of facts are double counted making a class of capital defendants automatically eligible for the death penalty.

584.   The Arizona Supreme Court recognized the uniqueness presented by Mr. Cruz's case—"the State did not allege premeditation or felony murder." *Cruz*, 181 P.3d at 216. The Court further noted that the (F)(10) aggravator requires "proof of nearly identical facts." *Id.* In point of fact, it requires proof of identical facts, as the court notes when it continues its discussion:

585.   To commit first degree murder, a defendant must intend to kill a person he knows to be a law enforcement officer who is acting in the line of duty. Nothing more is required to prove the (F)(10) aggravating circumstance, which renders a

defendant eligible for a death sentence. *Id.* The Court further noted that the only other police murder it had considered at the time of Mr. Cruz's direct appeal included proof of a second aggravator. *Id.* at n.6. Finding no compelling argument to overturn prior precedent, the court denied Mr. Cruz's challenge to the (F)(10) aggravator.

586.   The Arizona Supreme Court's decision is an unreasonable application of clearly established Federal law; there is no genuine narrowing performed by this aggravator—the Arizona Supreme Court's discussion of this issue demonstrates this point. *Cruz*, 181 P.3d at 216 ("Nothing more is required to prove the (F)(10) aggravating circumstance, which renders a defendant eligible for a death sentence.").

587.   The scheme is unconstitutional because the (F)(10) aggravating circumstance merely repeats, as an aggravating circumstance, factors that distinguish first degree murder from other categories of murder. The (F)(10) aggravator merely repeats the definition of A.R.S. §13-1105(A)(3) as alleged, which automatically qualifies the defendant for the death penalty. As such, the (F)(10) aggravator does not reasonably justify the imposition of a more severe sentence on this class of murderers. But, the prosecuting attorney and the sentencing body are given unbounded discretion that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification. The aggravating circumstance must therefore fail. *Zant*, 462 U.S. at 877.

588.   As compared to other aggravated murderers, the defendant who kills a police officer in the line of duty is treated more severely. Arizona's aggravators, excluding (F)(10), when used in connection with A.R.S. §13-1105(A)(3), add an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death. But the A.R.S. §13-1105(A)(3) aggravated murder defendant facing only the (F)(10) aggravator becomes automatically eligible for the death penalty—not a single additional proof of fact is necessary. (ROA 1, 573.)

589.   Equal protection of the law requires that legislative classifications be supported by, at least, a reasonable relationship to legitimate State interests. *Skinner v. Oklahoma*, 316 U.S. 535 (1942). The State has arbitrarily selected one class of murderers who may be subjected to the death penalty automatically. This statutory scheme is inconsistent with the purported State interests. The killer who kills with premeditation is treated less severely, which is also nonsensical because his blameworthiness or moral guilt is higher, and the argued ability to deter him less. The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are automatically eligible for the death penalty. There is no rational basis or any State interest for this distinction and its application is arbitrary and capricious.

590.   Arizona's death penalty statute is unconstitutional because it fails to genuinely narrow the class of death eligible offenders in violation of the Eighth and Fourteenth Amendments. Mr. Cruz is therefore entitled to relief.

### Claim Ten

**The death penalty is categorically cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.**

591.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

592.   Mr. Cruz raised this claim as V.1 and V.5 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 112-13.) The Arizona Supreme Court denied this claim on the merits. *Cruz*, 181 P.3d at 203, 218. The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

593.   Thirty-five years ago the United States Supreme Court held that "the

death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." *Id.* at 183. Nevertheless, empirical evidence has emerged over the last thirty-five years that has eroded these two justifications for the death penalty. *See, e.g.*, Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005). Because the death penalty serves neither the goal of retribution nor that of deterrence, it should be abolished pursuant to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Accordingly, his sentence is constitutionally infirm under the Eighth Amendment, and he is entitled to relief.

## Claim Eleven

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it affords the prosecutor with unbridled discretion to seek the death penalty.**

594.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

595.   Mr. Cruz raised this claim as V.7 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 113.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

596.   In Arizona, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his or her unreviewable determination that one or more aggravating circumstances exist. This discretion is limited solely by the whims of individual prosecutors as to which cases, in their sole judgment, are appropriate for the death penalty. *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983). Arizona's scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), leads to the wanton and freakish imposition of the death sentence, *see Furman v. Georgia*, 408 U.S. 238, 310 (1972) (opinion of Stewart, J.). Thus the fact that Arizona prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Mr. Cruz's death sentence must therefore be vacated.

### Claim Twelve

**Arizona's capital sentencing scheme discriminates against poor, young, and male defendants in violation of the Fourteenth Amendment.**

597.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

598.   Mr. Cruz raised this claim as Claim V.8 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 113.) The Arizona Supreme Court denied this claim on the merits. *Cruz*, 181 P.3d at 203, 218. The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

599.   The Fourteenth Amendment guarantees that no State shall "deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause protects criminal defendants from being sentenced based on purposeful discrimination. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Arizona's death row is predominantly populated by indigent males. Although women commit approximately ten percent of all murders, only two of the 122 persons on death row are women. FBI, Crime in the United States 2011, Table 42: Arrests by Sex 2011. Given the statistics, if a defendant is lucky enough to be a woman, given the same circumstances, there would be no sentence of death imposed. There is nothing regarding the nature of the crime, or the aggravating or mitigating circumstances, that can explain this disproportionate pattern other than systemic discrimination on the basis of class and sex. The discriminatory application of the death penalty in Arizona violates Mr. Cruz's constitutional rights as guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

### Claim Thirteen

**Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it denies capital defendants the benefit of proportionality review of their sentences.**

600. Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

601. Mr. Cruz raised this claim as Claim V.9 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 113.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an

unreasonable determination of the facts in light of the evidence presented.

602.   When the United States Supreme Court sanctioned the modern death penalty scheme, it did so based on the belief that state supreme courts would conduct proportionality reviews in individual cases in order to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 204-07. The Arizona Supreme Court, however, has abandoned this procedural safeguard. *See State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992). Abandoning the required proportionality review violates the Eighth Amendment. Mr. Cruz was sentenced to death under Arizona's scheme that lacked proportionality review. His sentence is therefore constitutionally infirm, and he is entitled to relief.

**Claim Fourteen**

**Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it does not require the State to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.**

603.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

604.   Mr. Cruz raised this claim as Claim V.10 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 114.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

605.   Before the jury may impose a death sentence, Arizona's capital sentencing scheme requires the jury to find that aggravating circumstances outweigh

mitigating circumstances, in the sense that the jury must conclude that the mitigating circumstances are not "sufficiently substantial to call for leniency." A.R.S. § 13-703(E); (*see also* ROA 625 at 12-13.) Arizona's capital sentencing scheme does not impose any particular burden of persuasion on either party to the sentencing hearing. Therefore, the sentencing scheme does not require the prosecution to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

606.   In light of the qualitative difference between a sentence of death and a sentence to a term of imprisonment, the Eighth Amendment demands a higher degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id*. In addition, to avoid the arbitrary and inconsistent imposition of death on a "jury-by-jury" basis, a specified burden of proof is required to ensure that juries faced with similar evidence will return similar verdicts. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[c]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all."). Without such safeguards, Arizona's capital sentencing scheme violated Mr. Cruz's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. As a result, Mr. Cruz is entitled to relief.

**Claim Fifteen**

**Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances.**

607.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

608.   Mr. Cruz raised this claim as Claim V.11 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 114.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

609.   Under the Eighth and Fourteenth Amendments, a capital defendant has a right to an individualized sentencing determination. *See Zant*, 462 U.S. at 879. There was no individualized sentencing determination in Mr. Cruz's case because the sentencing jury had no guidance in determining whether the mitigating evidence presented was sufficiently substantial to call for leniency. The trial court instructed the jury "The law does not define what is "sufficiently substantial to call for leniency." Each juror must determine for him or herself what is "sufficiently substantial to call for leniency." (ROA 625 at 12.) In the absence of any guidance, the risk that Mr. Cruz's death sentence was the result of unfettered discretion is intolerably high. Mr. Cruz's sentence is constitutionally infirm, and he is entitled to relief. *See Furman*, 408 U.S. at 239-40.

1

2

3

4

5

6

**Claim Sixteen**

**Eighth, and Fourteenth Amendments to the United States Constitution because it does not require the State to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.**

7    610.   Mr. Cruz raised this claim as Claim V.12 of the issues raised to avoid

8    preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 114.) The Arizona

9    Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213

10   (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to,

11   or involved an unreasonable application of, clearly established federal law, as

12   determined by the United States Supreme Court. In the alternative, it was an

13   unreasonable determination of the facts in light of the evidence presented.

14   611.   Before the jury may impose a death sentence, Arizona's capital

15   sentencing scheme requires the jury to find that aggravating circumstances outweigh

16   mitigating circumstances, in the sense that the jury must conclude that the mitigating

17   circumstances are not "sufficiently substantial to call for leniency." Ariz. Rev. Stat.

18   § 13-703(E); (*see also* ROA 625 at 12-13). Arizona's capital sentencing scheme

19   does not impose any particular burden of persuasion on either party to the sentencing

20   hearing. Therefore, the sentencing scheme does not require the prosecution to prove

21   beyond a reasonable doubt that aggravating circumstances outweigh mitigating

22   circumstances.

23   612.   In light of the qualitative difference between a sentence of death and a

24   sentence to a term of imprisonment, the Eighth Amendment demands a higher

25   degree of "reliability in the determination that death is the appropriate punishment in

26   a specific case." *Woodson*, 428 U.S. at 305. The reasonable-doubt standard "is

27   indispensable to command the respect and confidence of the community in

28   applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is

critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id*. In addition, to avoid the arbitrary and inconsistent imposition of death on a "jury-by-jury" basis, a specified burden of proof is required to ensure that juries faced with similar evidence will return similar verdicts. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[c]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all."). Without such safeguards, Arizona's capital sentencing scheme violated Mr. Cruz's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. As a result, Mr. Cruz is entitled to relief.

### Claim Seventeen

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently channel the discretion of the sentencing authority.**

613.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

614.   Mr. Cruz raised this claim as Claim V.13 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 114.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

615.   Under Arizona law, a broad range of conduct constitutes first-degree murder, because that crime includes intentional, premeditated killings, killings committed in the course of a number of other crimes, and the killings of law-enforcement officers in the line of duty. *See* Ariz. Rev. Stat. § 13-1105(A) (1989).

The aggravating factors that make a first-degree-murder defendant eligible for the death penalty sweep up such a broad range of conduct that they do not meaningfully separate out a group of offenders whose crimes are so egregious they should be eligible for the death penalty. *See id.* § 13-703(F); *compare, e.g., State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive is death-eligible), and *State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used insufficient force), *with State v. Smith*, 687 P.2d 1265, 1266-67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness), and *State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding that the defendant used excessive force). Because Arizona's definition of first-degree murder and the aggravating factors sweep so broadly, they fail to perform the constitutionally required function of channeling the sentencer's discretion toward imposing a death sentence on only the most egregious of murders. *See Gregg*, 428 U.S. at 192-98. Because Mr. Cruz was sentenced to death under Arizona's broad capital sentencing scheme, his sentence is constitutionally infirm and he is entitled to relief.

### Claim Eighteen

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant.**

616.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

617.   Mr. Cruz raised this claim as Claim V.15 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 115.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

618. Because death is the ultimate penalty, unlike any other, the sentencer must provide an "individualized determination based on the character of the individual and the circumstances of the crime." *McCleskey v. Zant*, 462 U.S. 862, 879 (1983); *see also Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (acknowledging that death is a punishment different from all other sanctions). Under Arizona law, the jury must impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E); (*see also* ROA 625 at 12-13). Frequently, mitigating evidence is not considered because of the use of a screening mechanism designed to prevent the sentencer from considering such evidence. *See, e.g., State v. Ramirez*, 871 P.2d 237, 252-53 (Ariz. 1994) (requiring the defendant to prove mitigating evidence by a preponderance of the evidence before the sentencer must "accept" the evidence as mitigating); (see also ROA 202 at 6). In addition, Arizona's sentencing scheme presumes that death is the appropriate punishment. The use of such a sentencing scheme deprives the sentencer of discretion to impose a sentence other than death, in violation of the Eighth and Fourteenth Amendments. *See Woodson*, 428 U.S. at 302-03. Mr. Cruz's sentence is therefore constitutionally infirm, and he is entitled to relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Claim Nineteen**

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it requires a defendant to affirmatively prove that the sentencing body should spare his life.**

619.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

620.   Mr. Cruz raised this claim as Claim V.16 of the issues raised to avoid preclusion on direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 115.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

621.   Arizona law required Mr. Cruz to prove mitigating circumstances by a preponderance of the evidence before the sentencing body could rely on those circumstances to spare his life. *See* Ariz. Rev. Stat. § 13-703(C). The law therefore presumed that death was the appropriate punishment, for if Mr. Cruz did not carry his burden of persuasion the sentencing body was required to impose a death sentence. *See id.* § 13-703(E). Mr. Cruz's death sentence is therefore constitutionally infirm, *see Woodson*, 428 U.S. at 305; *Patterson v. New York*, 432 U.S. 197, 210-11 (1977), and he is entitled to relief.

252

**Claim Twenty**

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances.**

622.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

623.   Mr. Cruz presented this claim in Argument in Argument V.18 of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 115.) The Arizona Supreme Court denied this claim on the merits. *State v. Cruz*, 181 P.3d 196, 213 (Ariz. 2008). The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

624.   Under the Eighth and Fourteenth Amendments, a capital defendant has a right to an individualized sentencing determination. *See Zant v. Stephens*, 462 U.S. 862, 879 (1983). There was no individualized sentencing determination in Mr. Cruz's case because the sentencing juries had no guidance in determining whether the mitigating evidence presented was sufficiently substantial to call for leniency. In the absence of such guidance, the risk that Mr. Cruz's death sentence was the result of unfettered discretion is intolerably high. Mr. Cruz's sentence is constitutionally infirm, and he is entitled to relief. *See Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (per curiam).

**Claim Twenty-One**

**The failure of Arizona's capital sentencing scheme to include independent review violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution  depriving capital defendants, including Mr. Cruz, of their rights to due process and equal protection amounting to cruel and unusual punishment.**

625.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

626.   Mr. Cruz did not present this claim to the state court. As such, appellate counsel rendered deficient performance to Mr. Cruz's prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel's failure to assert appellate ineffectiveness was deficient to Mr. Cruz's prejudice as a result of failing to raise this meritorious claim, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012); *Ha Van Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

627.   For murders committed after August 1, 2002, A.R.S. § 13-756(A) states that death sentences are reviewed only "to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." No death sentence has been reversed under the abuse of discretion standard; it denies meaningful review.

628.   The "abuse of discretion" standard of review is inconsistent with the Supreme Court's decisions mandating "meaningful" independent appellate review of all death sentences and violates the Eighth and Fourteenth Amendments. In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court upheld Georgia's capital

sentencing law, which was stricken by *Furman v. Georgia*, 408 U.S. 238 (1972). Among the post-*Furman* provisions in the new Georgia law was the "independent" appellate review of each death sentence. Such a provision was viewed by the Court as a necessary "check against the random or arbitrary imposition of the death penalty." *Gregg*, 428 U.S. at 206; *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) ("Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality."); *Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law."). Significantly, the Georgia law approved in *Gregg* required that the Georgia Supreme Court review every death sentence and: ". . . determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." 428 U.S. at 204 (citation omitted.)

629.   The statutory appellate review provisions upheld in *Gregg* are glaringly absent from the current version of A.R.S. § 13-756(A). The "abuse of discretion" review in its current formulation is nothing more than a rubber stamp of the jury's conclusions and fails to protect capital defendants from arbitrary and capricious death sentences; this statute fails to meet the dictates of *Furman* and the Eighth Amendment.

630.   "The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990). The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate

review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1990) (*citing Clemons*, 494 U.S. at 749). The elimination of independent review and the restriction of the Arizona Supreme Court's review to an abuse of discretion standard unconstitutionally limits the court's mandate to conduct meaningful review of each death sentence in violation of the Fifth, Eighth and Fourteenth Amendments. Mr. Cruz's sentence is constitutionally infirm, and he is entitled to relief.

### Claim Twenty-Two

**Arizona's requirement that mitigating factors be proved by a preponderance of the evidence unconstitutionally prevents the jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

631.  Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

632.  This claim was not raised in Mr. Cruz's state court proceedings. Mr. Cruz's failure to raise the claim previously can be excused by demonstrating cause and prejudice. The ineffective assistance of Mr. Cruz's state direct appeal and postconviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Mr. Cruz. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Mr. Cruz will demonstrate at an evidentiary hearing that direct appeal and postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when she failed to raise this meritorious claim.

633.  At trial, the state court instructed the jury that "[t]he defendant has the burden of proving the existence of a mitigating circumstance by a preponderance of the evidence. A fact is proven by a preponderance of the evidence if it is shown to be more likely than not so." (Tr. Mar. 8, 2005 at 79.) The jury instruction permitted the jury to consider only mitigation proved by a preponderance of the evidence and thus

potentially limited the jury's ability to consider all of the mitigating evidence presented.

634.   In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court concluded that "in all but the rarest kind of capital case," the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense . . . [offered] as a basis for a sentence less than death." *Id.* at 604-05. "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *see also Boyde v. California*, 494 U.S. 370, 377-78 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Upon meeting the low threshold for relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde*, 494 U.S. at 377-78). Imposing a standard that limits the mitigating evidence considered by the jury violates the Eighth Amendment's requirement that the sentencer be allowed to consider any aspect of the defendant's character or record that counsels in favor of a sentence other than death. *See Smith v. Texas*, 543 U.S. 37 (2004); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604.

635.   The jury instruction limited the mitigation that the jury could consider in violation of the Eighth Amendment and Supreme Court jurisprudence, and Mr. Cruz is entitled to relief.

## Claim Twenty-Three

**Mr. Cruz will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments.**

636.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

637.   Mr. Cruz has not yet presented this claim to the Arizona courts because his opportunity to seek executive clemency has not yet become ripe. Mr. Cruz presents this claim now in order to avoid difficulties with raising this claim in future federal habeas proceedings. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-46 (1998). Under Arizona law, Mr. Cruz has a right to seek executive clemency before execution. *See* Ariz. Const. art. V, § 5; Ariz. Rev. Stat. § 31-401 et seq. This should be part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390, 415 (1993). Accordingly, Mr. Cruz has a due process liberty interest in the impartiality of the system by which clemency may be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

638.   Mr. Cruz's clemency proceedings will not be impartial. On information and belief, Mr. Cruz asserts that both the selection process for members of Arizona's Board of Executive Clemency ("the Board") and the conflicting roles of the State will work to deprive him of a fair clemency proceeding. Without judicial review of the bias inherent in Arizona's clemency process, Petitioner will never have an opportunity to vindicate his right to a fair and impartial clemency process.

639.   The Board consists of five members appointed by the Governor with input from the Director of the Department of Corrections, the Director of Public Safety, and three other individuals of her choosing. *See* Ariz. Rev. Stat. § 31-401(A). The Governor may remove members of the Board for cause. *See id*. § 31-401(E). On information and belief, Mr. Cruz asserts that the Attorney General's Office, the office that advocated for his death in state appellate and postconviction proceedings, is responsible for training the members of the Board regarding their duties. On information and belief, Mr. Cruz  asserts that he will neither have notice of the time and place of the hearing, the evidence the Governor will use when she decides whether to grant or deny clemency, or an opportunity to present evidence to her in favor of granting clemency. For all these reasons, Arizona's clemency procedures do

not comport with the procedural due process protections guaranteed to him by the Fourteenth Amendment. Mr. Cruz is entitled to habeas corpus relief.

### Claim Twenty-Four

**Mr. Cruz was denied his right to the effective assistance of counsel in his state court trial proceedings.**

640.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

641.   This claim, and its component parts, have not been previously presented to the Arizona state courts. However, Mr. Cruz can establish cause and prejudice for his failure to raise the claim previously. Specifically, the ineffective assistance of his state post-conviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to him. *See Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

642.   The Sixth and Fourteenth Amendments guarantee the accused the right to counsel at trial. *Gideon v. Wainwright*, 372 U.S. 335, 342-45 (1963). The standard for judging counsel's effectiveness is found in *Strickland v. Washington*, 466 U.S. 668 (1984). When evaluating claims of ineffective assistance of counsel under *Strickland*, this Court must first determine if counsel's performance was deficient. *Strickland*, 466 U.S. at 686-87. The proper measure of counsel's performance is reasonableness under prevailing professional norms. *Id*. at 688. Second, this Court must determine if Mr. Cruz was prejudiced by counsel's deficient performance. *Id*. at 686-87. This Court must assess whether Mr. Cruz was deprived of a reliable trial and sentence. *Id*. at 693-94.

1
2

I.    **Trial counsel's failure to object and to preserve issues for appellate review.**

3   643.   Federal courts have consistently recognized that *Strickland*'s duties to
4   advocate and to employ "skill and knowledge" include the necessity for trial counsel
5   to object or otherwise preserve federal issues for review. *See, e.g., Alexander v.*
6   *Shannon*, 163 F. App'x 167, 173 (3d Cir. 2006); *Gravley v. Mills*, 87 F.3d 779, 785
7   (6th Cir. 1996); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994); *cf. Freeman*
8   *v. Lane*, 962 F.2d 1252, 1259 (7th Cir. 1992) (appellate counsel ineffective for
9   abandoning viable federal claim—cause and prejudice for default established). Here,
10   counsel repeatedly failed to exercise skill and knowledge to object and preserve
11   issues for further appellate review, including:

12
13   A.    **Trial counsel failed to request a hearing in order to investigate and present evidence demonstrating excessive security precautions were being employed during Mr. Cruz's trial.**
14

15   644.   Trial counsel rendered deficient performance to Mr. Cruz's prejudice
16   by failing to request the hearing offered by the trial court in order to present
17   evidence demonstrating that the security precautions in place for Mr. Cruz's trial
18   were excessive. To avoid repetition, Mr. Cruz incorporates herein by reference the
19   discussion in Claim Four of the clearly established federal law related to this Claim.

20   645.   Trial counsel repeatedly objected to the excessive security precautions
21   used during Mr. Cruz's trial and sentencing proceedings. (*See, e.g.,* Tr. Jan. 19, 2005
22   at 4-5; ROA at 451.) When the trial court suggested that such precautions were
23   appropriate as a result of an alleged escape plan to which jail personnel had been
24   alerted, trial counsel noted the dated nature of these allegations, which were made
25   approximately one and a half years prior to the current proceedings. (Tr. Jan. 25,
26   2005 at 79.) Moreover, counsel adamantly declared that these allegations were false
27   (*Id.*)

28   646.   The court recognized that this factual issue warranted a hearing and

offered one to counsel. (*Id.*) Counsel declined indicating he was not prepared to proceed on that date. (*Id.* at 83.) The trial court made clear it would entertain a hearing a later date, and subsequently reminded counsel of this. (*See id.*; *see also* Jan. 27, 2005 at 215.) Despite the court's willingness to receive evidence on the matter, and counsel's assertion that the grounds for the excessive security were false, counsel never requested a hearing and never proffered the evidence to support their position the allegations of an escape plan were false.

647.   Counsel was greatly concerned about the implications and impressions the excessive security would create on Mr. Cruz's jury. (*See, e.g.,* Tr. Jan. 19, 2005 at 4-5; ROA at 451.) Moreover, counsel recognized that it was having a limiting effect on Mr. Cruz's interaction with counsel. (*See, e.g.,* ROA 451 at 4.) Tr. Counsel claimed the basis for these measures was false, yet failed entirely in their role as Mr. Cruz's advocates by failing to offer up the evidence they claimed to possess. Barring these efforts by counsel, the trial court was very clear that the excessive security measures would remain in place.

648.   As Mr. Cruz argued in Claim Four, these measures were prejudicial to him. Had counsel marshalled available evidence a reasonable probability exists that the state courts would not have permitted the excessive, prejudicial security precautions.   Resultantly, Mr. Cruz was prejudiced by counsel's deficient performance. *See Strickland*, 466 U.S. 694. Accordingly, Mr. Cruz is entitled to relief.

## B.     Trial counsel failed to challenge Juror 193 for cause.

649.   Trial counsel rendered deficient performance to Mr. Cruz's prejudice by failing to challenge Juror 193 for cause. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Three of the clearly established federal law related to this Claim.

650.   Juror 193 offered concerning statements of bias during her voir dire,

including indicating that she would not want someone like herself serving if she were in Mr. Cruz's place. (Tr. Jan. 27, 2005 at 8, 37.) In addition, this juror had strong law enforcement connections. Defense counsel made a regular practice of challenging jurors with even limited law enforcement connections. (*See, e.g.,* Tr. Jan. 25, 2005 at 152-54, 160-61.) Here, Juror 193's connection was her husband, and she admitted she would not want someone like herself serving on her own jury.

651. Counsel's failure to challenge this juror was prejudicially deficient having two significant ramifications on Mr. Cruz. First, Juror 193 became the foreperson of Mr. Cruz's jury and led the charge to "send a message" by sentencing Mr. Cruz to death. (ROA 644 at Ex. 3.) Second, counsel's failure meant that the Arizona Supreme Court considered Mr. Cruz's later challenge to Juror 193 only as fundamental error, a much more onerous burden for Mr. Cruz's claim. *Cruz*, 181 P.3d at 205.

652. Had counsel challenged Juror 193, it is probable that the trial court would have removed this juror for cause. At a minimum, counsel's challenge would have ensured this error was not reviewed under the onerous fundamental error standard of review when raised on direct appeal. Resultantly, Mr. Cruz was prejudiced by counsel's deficient performance. *See Strickland*, 466 U.S. 694. Accordingly, Mr. Cruz is entitled to relief.

**C.   Trial counsel failed to lodge a timely objection to Frank Powell's prejudicial testimony.**

653. Frank Powell, a Tucson Police Department criminalist, testified during the State's case in chief that the gun hammer on the weapon used by Mr. Cruz to kill Officer Hardesty was modified for purposes of concealment. (Tr. Feb. 10, 2005 at 202.) Defense counsel failed to lodge a timely objection to this testimony, which was not disclosed pre-trial and which amounted to bad character evidence. Counsel failed entirely to assert that Powell's testimony amounted to an improper expert opinion. (Tr. Feb. 10, 2005 at 2; *see also* Tr. Feb. 11, 2005 at 3 *et seq.*) To avoid

repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Five of the clearly established federal law related to this Claim.

654.   Belatedly, counsel brought to the trial court's attention the prejudicial impact of Powell's testimony. More troubling, counsel allowed an expert to offer an opinion on a matter wholly outside his realm of expertise. Counsel's failure to object allowed the jury to receive unchecked evidence that amounted to bad character and state of mind evidence, which the prosecution capitalized on in closing, (Tr. Feb. 24, 2005 at 27, 101). This evidence was highly prejudicial, suggesting that Mr. Cruz actively concealed his weapon from Officer Hardesty with the intent to quickly and stealthily kill him. Counsel's failure to object resulted in the Arizona Supreme Court subjecting Mr. Cruz's direct appeal claim to the more onerous fundamental error review when asserted before the Arizona Supreme Court. *Cruz*, 181 P.3d at 213. Had counsel properly objected, the trial court would have excluded this improper evidence. Resultantly, Mr. Cruz was prejudiced by counsel's deficient performance. *See Strickland*, 466 U.S. 694. Accordingly, Mr. Cruz is entitled to relief.

### D.   Trial counsel failed to object to prosecutor misconduct.

655.   Trial counsel rendered deficient performance to Mr. Cruz's prejudice by failing to object to acts of prosecutorial misconduct committed during his sentencing proceedings. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Seven of the clearly established federal law related to this Claim.

656.   In closing argument, the prosecution made arguments that were incorrect as a matter of law. These improper arguments included: arguing that Mr. Cruz needed to establish a causal nexus between his mitigation and Officer Hardesty's death and directing the jury to weigh Officer Hardesty's killing itself, including the method and manner, as part of the aggravating circumstance. (*See* Tr. Mar. 8, 2005 at 55, 58.)

657.   These arguments were both contrary to Arizona and Federal law. As such, counsel were duty bound to object and to correct the misleading nature of these arguments. Reasonably effective counsel would have objected to the prosecutor's improper argument, objection that the trial court would have sustained. Resultantly, Mr. Cruz was prejudiced by counsel's deficient performance. *See Strickland*, 466 U.S. 694. According, Mr. Cruz is entitled to relief.

## II.   Trial counsel failed to make a compelling argument for a sentence less than death during their penalty phase closing arguments.

658.   Defense counsel made significant efforts to obtain a pre-verdict determination from the trial court of what life sentence it would impose on Mr. Cruz if the jury imposed a life sentence on Mr. Cruz. (*See, e.g.,* ROA 65, 100, 137.) The trial court rejected this request because it asked the court to pre-judge the evidence.

659.   Counsel's goal was not without merit—to assure the jury that it could impose a life sentence on Mr. Cruz safe in the knowledge that he would not be released. As evidenced by a post-verdict jury statement, it is evident that this issue weighed on the jurors' minds. (ROA 644 at Ex. 9.) Counsel could have accomplished the same goal in a number of ways during their closing argument. For example, counsel could have advised the jury that if it recommended a life sentence, Mr. Cruz would request that the trial court impose a sentence that ensured he would not be parole eligible. Indeed, counsel could have advised their client to tell the jury of this position during the glaringly misguided allocution that was presented to the jury.

660.   Counsel anticipated the precise problem that developed in the jury, concern that Mr. Cruz might be released if he received a sentence less than death. Reasonably effective counsel would have formulated strategies to alleviate that concern. Resultantly, Mr. Cruz was prejudiced by counsel's deficient performance. *See Strickland*, 466 U.S. 694. According, Mr. Cruz is entitled to relief.

### III.  Conclusion

661.   Counsel rendered prejudicially deficient performance during Mr. Cruz's trial and sentencing proceedings. Resultantly, the numerous issues were not preserved for federal review, the state court record was not adequately developed, a biased juror sat on Mr. Cruz's jury, impermissible evidence was received by Mr. Cruz's jury, acts of prosecutorial misconduct went unchecked, and powerful arguments in favor of sentence less than death were not marshalled in Mr. Cruz's defense. Counsel's failures violated Mr. Cruz's rights to effective assistance of counsel, a fair trial, and a reliable sentencing proceeding. It is reasonably probable that, if counsel had performed effectively, a different result would have been obtained.

### Claim Twenty-Five

**Mr. Cruz was denied his right to the effective assistance of appellate counsel on direct appeal of his capital conviction.**

662.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

663.  Mr. Cruz did not previously argue appellate counsel rendered prejudicially deficient performance related to the issues discussed in this Claim. This failure can be excused by demonstrating cause and prejudice. Specifically, the ineffective assistance of his state postconviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to him. *See Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012); *Ha Van Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

664.   The effective assistance of appellate counsel is guaranteed by the Due

Process Clause of the Fourteenth Amendment. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."). The standard of review for a claim of appellate ineffective assistance is the same standard as that which is used when a habeas court reviews a claim alleging the ineffective assistance of counsel at trial. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Accordingly, the now familiar test found in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the essential elements to Mr. Cruz's claim of ineffective assistance of counsel on direct appeal.

665.   The essential elements of this claim are: 1) whether appellate counsel was deficient in his performance in handling Mr. Cruz's appeal under objective standards under prevailing professional norms, and; 2) whether appellate counsel's deficient performance prejudiced Mr. Cruz. *See Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*, 466 U.S. at 687-88). "To establish prejudice [Mr. Cruz] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the appeal]." *Id.* at 391 (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

666.   Federal courts have consistently recognized that *Strickland*'s duties to advocate and to employ "skill and knowledge" include the necessity for counsel to object or otherwise preserve federal issues for review. *See, e.g., Alexander v. Shannon*, 163 F. App'x 167, 173 (3d Cir. 2006); *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994); *Freeman v. Lane*, 962 F.2d 1252, 1259 (7th Cir. 1992) (appellate counsel ineffective for

abandoning viable federal claim—cause and prejudice for default established). Appellate counsel performs ineffectively when he fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Here, appellate counsel repeatedly failed to raise or fully argue federal constitutional violations in Mr. Cruz's direct appeal of right to the Arizona Supreme Court.

## I.   Appellate counsel was ineffective for failing to raise meritorious claims.

### A.   Appellate counsel failed to argue any reason that Juror 127 should have been removed from Mr. Cruz's jury.

667.   In Mr. Cruz's direct appeal brief, appellate counsel identified numerous jurors that should have been removed for cause from Mr. Cruz's jury. (*See* Ariz. Sup. Ct. Doc. No. 51 at 55-63.) Included among the identified jurors was Juror 127. While appellate counsel identified this juror, he offered no arguments to support his claim. *See Cruz*, 181 P.3d at 205 n.3 (treating the argument related to Juror 127 as waived.). To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Three of the clearly established federal law related to this Claim.

668.   Compelling reasons were identified on the record by defense counsel for the removal of this juror, red-flagging the arguments to be made by appellate counsel. A reasonable probability exists that the state courts would have overturned Mr. Cruz's conviction and death sentence in light of the service of this biased juror had counsel raised the compelling, record-based reasons for striking this juror. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

### B.   Appellate counsel failed to argue that the shock belt Mr. Cruz wore during his capital proceedings was visible to his jury.

669.   Appellate counsel asserted as error the excessive security measures used during Mr. Cruz's state trial court proceedings. In making this argument,

appellate counsel failed to assert a key component of Mr. Cruz's claim—that the shock belt was visible to Mr. Cruz's jury. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Four of the clearly established federal law related to this Claim.

670.   The record plainly reveals defense counsel's position that the shock belt worn by Mr. Cruz was visible to the jury. (*See* Tr. Jan. 19 2005 at 4 (noting the shock belt made it "extremely uncomfortable if not impossible for [Mr. Cruz] to sit up in any kind of way that doesn't indicate to the jury that he is in an uncomfortable situation and, frankly, restrained"); Tr. Jan. 25, 2005 at 214, (Defense counsel noting Mr. Cruz could not stand up while wearing the shock belt because "it's very noticeable"); *id.* 214-15 (Mr. Cruz noting that it was sticking out and that there was a lump in the back; *id.* at 215 (defense counsel making clear he does not want Mr. Cruz standing while wearing the shock belt)).

671.   Despite trial counsel's efforts to make a clear record regarding the visibility of the shock belt that Mr. Cruz wore, nowhere in direct appeal counsel's claim does he make this assertion. *Cruz*, 181 P.3d at 214 ("Cruz does not claim that the belt was visible to jurors[.]") The clearly established Federal law on point for Mr. Cruz's claim specifically references "visible restraints." *Deck v. Missouri*, 632. The absence of this allegation made Mr. Cruz's claim far more difficult to succeed on.

672.   A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of the visibility restraints employed as evidenced by available, record-based evidence. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

### C.   Appellate counsel failed to fully and completely challenge Frank Powell's improper testimony.

673.   Appellate counsel raised as error Frank Powell's testimony regarding modifications to the hammer of the gun used to kill Officer Hardesty. (Ariz. Sup. Ct.

Doc. No. 51 at 94-95.) In making his arguments, appellate counsel failed to allege that this testimony was also an improper expert opinion offered in violation of Ariz. R. Evid. 702. This claim was easily discernible on the face of the appellate record and by review of Rule 702. This was not the type of opinion testimony admissible in a capital trial. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Five of the clearly established federal law related to this Claim.

674.   A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of Powell's improper testimony, which the prosecution capitalized on in both his closing and rebuttal closings (Tr. Feb. 24, 2005 at 27, 101), had appellate counsel advanced this argument. *See Strickland*, 466 U.S. 694. According, Mr. Cruz is entitled to relief.

### D.   Appellate counsel failed to raise claims of prosecutor misconduct.

675.   Appellate counsel rendered deficient performance to Mr. Cruz's prejudice by failing to allege the prosecutor's acts of misconduct on direct appeal to the Arizona Supreme Court. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Seven of the clearly established federal law related to this Claim.

676.   The prosecutor made two improper arguments at sentencing. First, he argued that the jury should reject Mr. Cruz's mitigation evidence because he failed to establish a causal nexus between his mitigation and Officer Hardesty's death. (Tr. Mar. 8, 2005 at 55); *see also Tennard v. Dretke*, 542 U.S. 274 (2004). Second, he argued that the jury should weigh the circumstances of the actual killing as part of the aggravating circumstances. (Tr. Mar. 8, 2005 at 58); *see also* A.R.S. . § 13–751(G); *State v. Lynch*, 234 P.3d 595, 602 (Ariz. 2010) ("The court also correctly defined a "mitigating circumstance" as "any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense."). Both arguments,

apparent on the record, were contrary to the law and thus highly improper. *Berger v. United States*, 295 U.S. 78, 85 (1935) (finding reversible error where prosecutor made "improper insinuations and assertions calculated to mislead the jury."); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 436 (1988) ("Neither paid nor appointed counsel may deliberately mislead the court with respect to either the facts or the law."). Here, appellate counsel could have easily established that the prosecution's argument was misleading to the jury and deprived Mr. Cruz of a fair sentencing proceeding and individualized sentencing, as well as his protections against cruel and unusual punishment. A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of the prosecutor's acts of misconduct, which struck at the heart of Mr. Cruz's mitigation case and mislead the jury regarding what could be weighed on the aggravation side of death's scale. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

### E.   Appellate counsel failed to Federalize Mr. Cruz's coerced verdict claim.

677.   Appellate counsel rendered deficient performance to Mr. Cruz's prejudice by failing to Federalize his argument that the trial court's instruction coerced the jury's death verdict in this case. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Eight of the clearly established federal law related to this Claim.

678.   Appellate counsel failed to reference clearly established Federal law that would have demonstrated the coercive nature of the trial court's instruction. This instruction was particularly problematic because the trial court was alerted to the numerical division of the jury. The resultant instruction was likely viewed as directed at the lone holdout juror identified by the numerical division provided to the trial court. A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of this coercive jury instruction had the appellate lawyer alerted the Arizona Supreme Court to the relevant and

applicable federal constitutional law. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

**F.    Appellate counsel failed to argued that Arizona's statutory requirement that mitigating factors must be proved by a preponderance of the evidence unconstitutionally precludes the jury from considering mitigation evidence.**

679.    Appellate counsel rendered deficient performance to Mr. Cruz's prejudice by failing to assert that Arizona's death penalty statutes, which required Mr. Cruz to prove mitigating factors by a preponderance of the evidence, precluded Mr. Cruz's jury from considering mitigation evidence in violation of the Eighth and Fourteenth Amendments. To avoid repetition, Mr. Cruz incorporates herein by reference the discussion in Claim Twenty-Six of the clearly established federal law related to this Claim.

680.    Mr. Cruz's jury was instructed that he bore a preponderance of the evidence burden in proving any mitigation before the jury could consider any evidence offered as mitigating. (Tr. Mar. 8, 2005 at 79.) However, clearly established Federal law mandates that the sentence "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstance so the offense . . . [offered] as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). The trial court's instruction ran the very real risk that Mr. Cruz's jury would not consider relevant mitigating evidence because of the evidentiary burden imposed on Mr. Cruz.

681.    A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of this unconstitutional flaw in Arizona's death penalty statutes. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**G.**    **Appellate counsel failed to challenge the lack of independent review and the restriction of the Arizona Supreme Court's review in his case to an abuse of discretion standard.**

682.    Appellate counsel failed to argue that the Arizona Supreme Court must independently review Mr. Cruz's death sentence in order to determine whether the sentence was proper. Resultantly, the statutory change that removed the court's power of independent review and substituted review under an abuse of discretion standard violates the Eighth and Fourteenth Amendments.

683.    This change in the law happened approximately three years prior to Mr. Cruz's trial and well-before his direct appeal was filed. Appellate counsel should have been aware of the change in the law and should have challenged this issue before the Arizona Supreme Court. A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence had the court conducted a proper independent review. *See Strickland*, 466 U.S. 694. According, Mr. Cruz is entitled to relief.

684.    "The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990). The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1990) (*citing Clemons*, 494 U.S. at 749). Appellate counsel's failure to assert as error this fundamental change in Arizona law amounted to prejudicially deficient performance. A reasonable probability exists that the state courts would have overturned Mr. Cruz's death sentence in light of this unconstitutional flaw in Arizona's death penalty statutes. *See Strickland*, 466 U.S. at 694. Accordingly, Mr. Cruz is entitled to relief.

**II.    Conclusion**

685.    In assessing Mr. Cruz's claim, it is noteworthy to compare the omitted

issues with the issues raised on appeal. It is evident that appellate counsel failed to raise stronger issues in favor of weaker ones. For example, in identifying issues he was preserving for federal review, appellate counsel included two issues that were not applicable to Mr. Cruz's case. (Ariz. Sup. Ct. Doc. No. 51 at 112 (V-4), 115 (5-21).) Counsel also argued that a single photograph of Officer Hardesty offered by the State was gruesome and warranted a new trial. (*Id.* at 104-05.) Clearly, direct appeal counsel did not reject the issues identified issues herein in favor of stronger claims.

686.   Appellate counsel had a duty to raise the meritorious issues identified in this claim on direct appeal. The failure to raise these claim constituted deficient performance. Because Mr. Cruz's due process rights were violated, and appellate counsel failed to present the identified issues to the Arizona Supreme Court, Mr. Cruz was prejudiced. Resultantly, Mr. Cruz is entitled to habeas relief.

### Claim Twenty-Six

**The numerous errors committed during Mr. Cruz's re-sentencing proceedings cumulatively produced a proceeding that was fundamentally unfair and violated his due process.**

687.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

688.   Mr. Cruz did not present this claim to the state courts on direct appeal or on postconviction review. As such, appellate counsel rendered deficient performance to Mr. Cruz's prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, postconviction counsel's failure to assert appellate ineffectiveness was deficient to Mr. Cruz's prejudice as a result of failing to raise this meritorious claim, which excuses any procedural default. *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012); Ha Van Nguyen v. Curry, 736 F.3d 1287 (9th Cir. 2013). Mr. Cruz will demonstrate at an evidentiary hearing on his postconviction attorney's

ineffectiveness as cause for procedural default that postconviction counsel fell below the standards of a minimally competent capital postconviction attorney when he failed to raise this meritorious claim.

689.   In cases where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the Ninth Circuit Court of Appeals recognizes that the cumulative effect of multiple errors may still prejudice a defendant. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894-95 (9th Cir. 2003) (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal); *Harris v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (finding that counsel's deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights).

690.   As the above listed claims illustrate, multiple errors were committed during Mr. Cruz's trial and sentencing proceedings. Even if this Court were to find that none of the claims raised above merit relief alone, the cumulative effect of all the errors is so prejudicial that Mr. Cruz is also entitled to relief on that basis. For all the reasons discussed in those claims presented in this petition, Mr. Cruz's constitutional rights were violated, and he is entitled to relief under the Eighth and Fourteenth Amendments to the United States Constitution.

**Claim Twenty-Seven**

**Mr. Cruz's rights to a fair trial, reliable sentence, and a fair and impartial were violated by improprieties the jury either committed or was exposed to during the trial and sentencing phases of his capital trial.**

691.   Mr. Cruz incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

692.   Mr. Cruz presented this claim in Arguments III.A, C, D, and F of his direct appeal. (Ariz. Sup. Ct. Doc. No. 51 at 72-78, 86-97.) The Arizona Supreme Court denied these claims on the merits. *State v. Cruz*, 181 P.3d 196, at 196, 211-13 (Ariz. 2008). The Arizona Supreme Court's rejection of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by United States Supreme Court. In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

693.   The Sixth and Fourteenth Amendments to the United States Constitution entitled Mr. Cruz to an impartial and "indifferent" jury panel. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Despite these constitutional guarantees, Mr. Cruz's trial was plagued with improprieties to which the trial court inadequately responded depriving him of his due process rights.

**I.   Repeated improprieties involving Mr. Cruz's jury occurred during Mr. Cruz's capital trial and sentencing proceedings.**

694.   Upon information and belief, Mr. Cruz's right to a fair and impartial jury, to a fair trial, and to a reliable sentence were violated by to numerous improper occurrences that directly impacted his capital jury, including:

**A.   Mr. Cruz's jurors violated their admonition**.

695.   The jury commissioner contacted the trial court after a juror had been in contact indicating concern about communication by another juror who had been talking about the case in the jury room and elevator. (Tr. Feb. 3, 2005 at 5.) The court conducted individual interviews of the jurors, after which Jurors 7 and 118 were removed from the panel. (Tr. Feb. 3, 2005 at 49 *et seq.*; ROA 492 at 2.)

696.   Shortly thereafter, KVOA Channel 4 interviewed Juror 118. (ROA 512, Court Exhibit 7.) In the interview, Juror 118 stated that that many of the jurors were involved in the same type of discussion that resulted, in part, in her being excused from the jury. She also stated that jurors said nothing, or very little, when questioned by the court regarding her concerns because they were concerned about whether they might get into trouble. She indicated that the discussions between the jurors had tainted the panel. She expressed her opinion that case should start over because neither side would receive a fair trial. (*Id.*) Defense counsel, based on the KVOA interview, requested additional inquiry of the jury panel and moved for mistrial. (ROA 497, 500-01; *see also* Tr. Feb. 8, 2005 at 16-17.) Counsel argued for a mistrial because an "irrevocable cloud" over the jury's fairness and impartiality existed based on the court's inquiry (ROA 500 at 5), and the interview of Juror 118 indicating that other jurors had violated the court's admonition, failed to alert the court, and responded untruthfully to the court's questions. (ROA 497, 500-01.) The trial court denied the mistrial motion as well as counsel's request to further inquire of the jury. (ROA 503; Tr. Feb. 8, 2005 at 54.)

697.   In rejecting Mr. Cruz's claim, the Arizona Supreme Court made several findings of fact, including holding that there was nothing inappropriate about the conversation the jurors engaged in on the elevator, *Cruz*, 181 P.3d at 211; that there was nothing of substance said when the jurors discussed the two witnesses, *id.*; that those same witnesses were only relevant to tangential matters, *id.*  Thus, the court

concluded that the comments by jurors did not affect the jury or the fairness of Mr. Cruz's trial. *Id.* Regarding the juror's identification of Mrs. Hardesty to other jurors as well as statements regarding the number of witnesses and the selection of alternates, no other juror recalled these occurring. *Id.* The court determined that if the statements were made, they did not impact the jury. *Cruz*, 181 P.3d at 211.

698.   These findings of fact were made, however, on a less than complete record. As more information came to light, via Juror 118's TV interview and followed up by an interview by defense counsel, it became apparent that the jurors were distressed over the trial court's inquiry and Juror 118 asserted that their responses resultantly were less than candid. Here, the trial court's inquiry was insufficient and thus the Arizona Supreme Court unreasonably applied clearly established Federal law. *Remmer v. United States*, 347 U.S. 227 (1954), speaks in terms of adequate fact-finding, and the Court specifically found error in the trial court's failure to conduct a hearing, develop all the relevant facts and rule based upon those facts. 347 U.S. 229-30. There is little difference between the error in *Remmer* and the one committed at Mr. Cruz's trial. Here, as the evidence mounted that jurors committed misconduct, and that they were less than candid in their responses to the trial court, that same court was duty bound to inquire further. *Smith*, 455 U.S. at 217. The trial court's failure to do so ran counter to clearly established Federal law.

**B.   Jurors observed a State's witness hugging members of the Hardesty family.**

699.   Following the testimony of state's witness Alejandro Ruiz, Ruiz was observed in plain view of the jury shaking hands and hugging members of Officer Hardesty's family, including the victim's wife. (Tr. Feb. 3, 2005 at 177; ROA 501 at 4.) This was immediately brought to the attention of the trial court. (Tr. Feb. 3, 2005 at 176-78.) Defense counsel moved for a mistrial as a result of these events. (ROA 501 at 4; (Feb. 08, 2005 at 54.)

1

2   700.   In rejecting Mr. Cruz's claim, the Arizona Supreme Court held that

3   even if the jury observed witness Ruiz hugging the Hardesty family, Mr. Cruz

4   suffered no prejudice. *Cruz*, 181 P.3d at 211. Of course, the Arizona Supreme

5   Court's decision reveals a fatal flaw in the record below—the trial court and the

6   Arizona Supreme Court could not know if Mr. Cruz suffered prejudice without an

7   adequately developed record. Mr. Cruz repeats the same refrain throughout this

8   claim—the trial court was duty bound to protect Mr. Cruz's due process rights and

9   to make inquiry. *Smith*, 455 U.S. at 217. Its failure to do so flies in the face of

10  clearly established Federal flaw, rending the Arizona Supreme Court's reliance on

11  its action san unreasonable application of clearly established Federal law.

### C.   Jurors were exposed to media coverage during the trial.

13  701.   In her post-discharge interview by defense counsel, Juror 118 indicated

14  that at least one juror violated the court's admonition to avoid media exposure, when

15  she noted that a juror indicated such exposure. Defense counsel requested the trial

16  court conduct further investigation into this jury misconduct (ROA 569, 579), which

17  the court summarily denied. (ROA 588 at 3; Tr. Feb. 24, 2005 at 52.)

18  702.   This request is intertwined with defense counsel's request for the notes

19  of the reporter that conducted the interview with Juror 118; Juror 118 indicated that

20  KVOA only taped five questions, but that the reporter's notes "encompass the entire

21  conversation she had with the reporter and contain materials she felt could be of

22  interest to the court." (ROA 525.) In particular, counsel asserted the reporter's notes

23  "will address exactly what it was that Juror number 118 told the reporter concerning

24  a male juror who may have been reading or in possession of a newspaper." (ROA

25  561 at 5.) In court, counsel was more specific, "she stated specifically, just - - the

26  second day we were there when we first got in there into the jury room, one of the

27  men said, I saw it in the paper." (Tr. Feb. 24, 2005 at 9.) In rejecting defense

28  counsel's request, the court criticized defense counsel for failing to raise the issue

278

earlier, having had the information in question since February 10, 2005. (Tr. Feb. 24, 2005 at 52.) The court found the matter waived, and denied the motion. (*Id*. at 52-53.)

703.   Earlier in the proceedings, prior the revelations of Juror 118, a newspaper was found in the jury room. It was identified as the "Green Valley News." (Tr. Feb. 15, 2005 at 25-26.) The court indicated it did not reference the case and the paper was discarded. (*Id.*)

704.   The Arizona Supreme Court's tortured review of the record, with the pretense that the issue arose but once at trial, does not withstand review of the record. Resultantly, the Arizona Supreme Court's decision rests on unreasonable findings of fact.

705.   In rejecting Mr. Cruz's claim, the Arizona Supreme Court held that nothing in this statement indicates that the paper contained any information about the case. Thus, not only was the motion untimely, but Cruz has not shown that he was prejudiced. *Cruz*, 181 P.3d at 212. The Arizona Supreme Court's decision merges two separate instances, linking two separate events. What is apparent from the record is that a Green Valley newspaper was discovered in the jury room. In an entirely separate instance, Juror 118 indicated that a male juror had discussed viewing media coverage of the case in the jury room. The court held that nothing in Juror 1818's statement indicated the paper "contained any information about the case." *Id.* at 212. However, Juror 118's statement could not have been clearer on this point, the man said "I saw it in the paper." *Id.* To pretend the "it" was not a reference to Mr. Cruz's trial denies logic and is an unreasonable fact-finding. Confounding Juror 118's allegations with the found Green Valley News offers no proof that the male juror at issue was not exposed to media related to Mr. Cruz's case.

706.   Moreover, other than the bailiff's discovery of an issue of the Green Valley News in the jury room, no other evidence was presented indicating that a juror might have been reading a newspaper; this finding wholly ignores Juror 118's

statement to the contrary. The cold record clearly demonstrates that Juror 118's allegation of a juror reading a newspaper was separate and distinct from the trial court's discovery of the Green Valley News. Juror 118's statement, referred to by counsel, was not that someone had brought in a Green Valley newspaper into the jury room that did not reference the case; rather Juror 118 indicated that a male juror had seen media coverage about the case.

707.   It was the trial court's adamant refusal of further inquiry that prevents Mr. Cruz from further developing this issue. The trial court's actions were contrary to Federal law. *Smith*, 455 U.S. at 217. In *Silverthorne v. United States*, 400 F.2d 627, 643 (9th Cir. 1969), the court noted the combination of the appearance of prejudicial newspaper articles in a local paper in conjunction with allegations that jurors had been reading newspapers was sufficient to trigger the trial court's duty to investigate the matter further. Further inquiry was warranted. *Remmer* speaks in terms of adequate fact-finding, and the Court specifically found error in the trial court's failure to conduct a hearing, develop all the relevant facts and rule based upon those facts. 347 U.S. 229-30.  The trial court here wholesale failed to develop the record as it related to Juror 118's allegation that at least one male juror was exposed to media coverage of the trial.

### D.   Conversation overheard by defense witness Tara White demonstrated that the jurors were biased prior to sentencing.

708.   On March 2, 3005, Tara White testified that she had heard comments coming from the jury room to the effect that the jurors could not understand why they were being kept so long because "they" [Mr. Cruz] did not have a chance." (ROA 604 at 3; Tr. Mar. 2, 2005 at 134.)

709.   The court questioned several persons seated in the vicinity regarding White's allegation. Four persons testified that that they did not hear any noise coming from the jury room; two witnesses were the victim's brother and a friend of his. (Tr. Mar. 2, 2005 at 155, 162, 171, 177.) Of course, the trial court itself had

1   heard the jurors in the jury room and told his bailiff to admonish the jurors to lower

2   their voices, and so acknowledged this to White when she raised the issue to the

3   court while on the witness stand. (Tr. Mar. 2, 2005 at 134; Tr. Mar. 3, 2005 at 146-

4   47.)

5        710.   The trial court also posed an interrogatory to the jurors, asking "did you

6   say or hear another juror say to the effect, 'I can't believe they are keeping us this

7   long, they don't have a chance.'" (ROA 600.) The jurors all responded negatively to

8   the trial court's interrogatory. (ROA 611 at 4.)

9        711.   Defense counsel moved for a mistrial prior to, and following, the

10   court's inquiry of the jurors via a written interrogatory. (ROA 603; Tr. Mar. 3, 2005

11   at 147.) The trial court denied the mistrial motions. (ROA 611 at 4.)

12        712.   In rejecting Mr. Cruz's claim, the Arizona Supreme Court found that

13   the trial court's inquiry encompassed every person who was seated near the witness

14   stand when White testified—not one heard what White claimed to hear. *Cruz*, 181

15   P.3d at 213. The court further noted that the trial court submitted a written

16   interrogatory to each juror asking if they had heard such a statement to which each

17   juror replied negatively. *Id.* As such, the court found the trial court's response was

18   appropriate. *Id.*

19        713.   Here, the trial court's inquiry was insufficient and thus the Arizona

20   Supreme Court unreasonably applied clearly established Federal law. *Remmer*

21   speaks in terms of adequate fact-finding, and the Court specifically found error in

22   the trial court's failure to conduct a hearing, develop all the relevant facts and rule

23   based upon those facts. 347 U.S. 229-30. There is little difference between the error

24   in *Remmer* and the one committed at Mr. Cruz's trial. Indeed, the credibility of the

25   jurors' responses simply could not be judged from a piece of paper. Moreover, the

26   text of this question would signal to any juror that such an admission would be

27   problematic to say the least. Given the early indications that jurors were offering less

28   than candid responses to the court out of a fear that they would get into trouble, this

question certainly would have caused that same fear to surface in the jurors. Accurate factual development, if it was possible, necessitated examining the jurors individually and under oath, not posing a question via notepaper.

714.   Moreover, the decision is an unreasonable fact-finding in light of the record. Four witnesses claimed to have heard *nothing*. The trial court itself heard *something*. Reliance on this contrary fact, disputed by the personal knowledge of the court, to reject White's claim cannot withstand review.

## II.   Conclusion

715.   As a result of these improprieties, upon information and belief, Mr. Cruz was deprived of a fair and impartial jury, to a fair trial, and to a reliable sentence were violated due to numerous improper occurrences that directly impacted his capital jury. This violated Mr. Cruz's rights to due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments. As such, Mr. Cruz is entitled to habeas relief.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Cruz respectfully prays this Court to:

1.   Order that Mr. Cruz be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Mr. Cruz to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.   Order that upon completion of discovery, Mr. Cruz be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Mr. Cruz be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related

to the petition;

3. Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4. Issue a writ of habeas corpus to have Mr. Cruz brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5. In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Mr. Cruz brought before it to the end that he may be relieved of his unconstitutional sentences;

6. Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted this 1st day of May, 2014.

Jon M. Sands
Federal Public Defender
Cary Sandman
Kelly Culshaw
Assistant Federal Public Defenders

s/ Cary Sandman
Counsel for Petitioner-Appellant

1

**Certificate of Service**

2

    I hereby certify that on May 1, 2014, I electronically filed the foregoing

3

Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF

4

system.  I certify that all participants in the case are registered CM/ECF users and

5

that service will be accomplished by the CM/ECF system.

6

7      s/ Tamelyn McNeill

8      Legal Assistant
       Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28