# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Montenegro Cruz,<br><br>               Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>               Respondents. | No. CV-13-0389-TUC-JGZ<br><br>DEATH PENALTY CASE<br><br>**MEMORANDUM OF DECISION AND ORDER** |

      Petitioner John Montenegro Cruz, a state prisoner under sentence of death, has filed a Petition for Writ of Habeas Corpus. (Doc. 28.)[1] Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United States Constitution. He seeks expansion of the record, discovery, and an evidentiary hearing in support of two claims in the Petition. (Doc. 38.) Respondents oppose the Petition and the request for evidentiary development. (Docs. 31, 42.) For the reasons set forth below, the Court finds that Petitioner is entitled to de novo review of Claim 2. The Court further finds that an evidentiary hearing will assist the Court in determining whether trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of Petitioner's trial, as alleged in Claim 2. Petitioner's motion, therefore, will be granted in part. The remaining claims in the Petition are denied.

//
//

---

[1] "Doc." refers to numbered documents in this Court's electronic case docket.

## BACKGROUND

Petitioner was convicted and sentenced to death for the 2003 murder of Tucson Police Officer Patrick Hardesty. The following facts concerning the crime are based on the Arizona Supreme Court's opinion in *State v. Cruz*, 218 Ariz. 149, 155–56, 181 P.3d 196, 202–03 (2008), and this Court's review of the record.

On May 26, 2003, Tucson Police Department Officers Patrick Hardesty and Benjamin Waters responded to a hit-and-run accident. The investigation led the officers to a nearby apartment occupied by two women and Petitioner, who fit the description of the hit-and-run driver.

The officers asked Petitioner to step outside and identify himself. Petitioner said he was "Frank White." Officer Hardesty contacted police dispatch but was unable to verify the identity. He asked Petitioner for identification and Petitioner replied that he had left it in the car.

As Officer Hardesty and Petitioner approached the car, Petitioner leaned in as if retrieving something, then "took off running." Officer Hardesty chased Petitioner on foot, while Officer Waters drove his patrol car around the block in an attempt to cut Petitioner off.

When Officer Waters turned the corner, he saw Petitioner throw a gun on the ground. Officer Hardesty was nowhere in sight. Officer Waters radioed Officer Hardesty that Petitioner had a gun, then got out of his car and drew his service weapon on Petitioner, who stated, "Just do it. . . . Just go ahead and kill me now. Kill me now. Just get it over with." Officer Waters apprehended Petitioner after a brief struggle.

Officer Hardesty's body was discovered immediately. He had been shot five times. Two bullets were stopped by his protective vest, two bullets entered his abdomen below the vest, and a fifth bullet entered his left eye, killing him almost instantly. Four of the five shots were fired from no more than twelve inches away.

The handgun thrown down by Petitioner, a .38 caliber Taurus revolver, held five cartridges. All five cartridges had been fired, and forensic examiners determined that the five slugs, recovered from Officer Hardesty's body and vest, were fired from that Taurus

revolver. Five unfired .38 cartridges that matched the cartridges fired from the Taurus were found in Petitioner's pocket when he was apprehended.

Petitioner was indicted on one count of first-degree murder.[2] The State filed its notice of intent to seek the death penalty alleging a single aggravating factor: "The murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer." A.R.S. § 13–703(F)(10) (2003) (currently found at § 13-751(F)(10)).[3] A jury convicted Petitioner of first-degree murder and found the (F)(10) aggravating factor.

In the penalty phase, Petitioner alleged the following mitigating factors: impaired capacity to appreciate the wrongfulness of his conduct; impaired capacity to conform his conduct to the law; unusual and substantial duress; unforseeability that the acts would cause death; dysfunctional family; deprivation of "necessary nurturing love" from family; family history of mental disorders; posttraumatic stress disorder ("PTSD"); drug addiction; mental state affected by family history of mental disorders, PTSD, and drug addiction; unfavorable impact on Petitioner's family; existence of family support; compliance with prison rules; lack of propensity for future violence; capability to adapt to prison life; and lack of plan to commit the murder. Petitioner asserted that his "upbringing, life-style and subculture all made it far more likely that he would find himself in this position." The jury did not find the proffered mitigation sufficiently substantial to call for leniency, and determined that Petitioner should be put to death.

On direct appeal, the Arizona Supreme Court affirmed Petitioner's conviction and death sentence. *Cruz*, 181 P.3d at 218. The court found that the jury did not abuse its discretion by determining that Petitioner should be sentenced to death:

---

[2] Judge Theodore B. Borek, of the Pima County Superior Court, presided over Petitioner's trial, sentencing, and petition for post-conviction relief proceedings.

[3] At the time of Petitioner's offense in 2003, Arizona's capital sentencing scheme was set forth in A.R.S. §§13-703 and 13-703.01 to -703.04. It is presently set forth in A.R.S. §§ 13-751 to -759. The Court refers throughout this order to the statutes in effect at the time Petitioner committed the crime.

Although Cruz's early life was certainly not ideal, absent is the type of horrible abuse often found in our capital jurisprudence. Cruz was neither suffering from any significant mental illness nor under the influence of drugs at the time of the crime. The evidence presented on most of these mitigating circumstances was weak, and Cruz established little or no causal relationship between the mitigating circumstances and the crime. Moreover, much of the mitigating evidence offered by Cruz was effectively rebutted by the State.

*Id.* at 217.

Petitioner filed a petition for post-conviction relief ("PCR") in the trial court raising three claims based on alleged deprivations of his Sixth Amendment right to conflict-free counsel and to the effective assistance of counsel during both the guilt and sentencing phases of his trial. (Doc. 31, Ex. W at 23–35.) The PCR court addressed these claims as six distinct claims of Sixth Amendment deprivations by counsel: trial counsel's actual conflict of interest as evidenced by defense counsel's vouching for the credibility of Officer Waters (Claim I (A)), and by not advising the Petitioner of the effect of his failure to take responsibility during allocution (Claim I (B)); trial counsel's ineffectiveness for failing to challenge the credibility of three law enforcement officers in connection with the murder weapon and unspent cartridges (Claim II (A)), and affirmatively vouching for the officers during final argument (Claim II (B)); and counsel's ineffectiveness at sentencing for failing to advise Petitioner to take responsibility for the crime during his allocution (Claim III (A)), and failing to fully investigate certain mitigating factors and present expert testimony regarding the causal connection between the mitigating circumstances and the crime (Claim III (B)). (Doc. 31, Ex. RR at 6, 8–13.)

The PCR court denied relief without conducting an evidentiary hearing. (Doc. 31, Ex. RR.) The court found Claims I (A) and (B) precluded because Petitioner failed to raise these claims on direct appeal; alternatively the court found the claims lacked merit because counsel's actions represented a sound trial strategy. (*Id.* at 6–9) (citing Ariz. R. Crim. P. 32.2(a)(3)). The court found that Petitioner failed to raise a colorable claim as to

Claims II (A) and (B), finding counsel's actions in connection with these claims constituted trial strategy, and that Petitioner failed to demonstrate a colorable claim of deficient performance or prejudice. (*Id.* at 11.) The court found that Petitioner failed to raise a colorable claim as to Claim III (A). (*Id.* at 12.) Finally, the court found Claim III (B) not colorable because trial counsel's choices in connection with mitigation were reasonable and represented sound trial strategy and "none of the factors addressed by defendant, either alone or in connection with other mitigation, would alter the sentence of death as found by a jury." (*Id.* at 13–18.) The Arizona Supreme Court denied discretionary review of the petition on May 29, 2013. (Doc. 31, Ex. XX.)

Petitioner filed his petition for writ of habeas corpus in this Court on May 1, 2014. (Doc. 28.)

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 ("§ 2254").[4] *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

## I.     PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

Under AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277–78 (1971). A petitioner must clearly alert

---

[4] Petitioner's challenge to the constitutionality of AEDPA is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor separation of powers).

the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). He must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or his failure to present the claim in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)–(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (explaining district court must consider whether the claim could be pursued by any presently available state remedy). Therefore, in the present case, if there are claims that were not raised previously in state court, the Court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. *See Ortiz*, 149 F.3d at 931. If no remedies are currently available, Petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

If there are claims that were fairly presented in state court but found defaulted on state procedural grounds, such claims will be found procedurally defaulted in federal

court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir.), *cert. denied*, 135 S. Ct. 710 (2014) (Arizona's waiver rules are independent and adequate bases for denying relief); *Ortiz*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (finding Arizona not "irregular" in application of procedural default rules); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (same).

Nonetheless, because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the Court will not review the merits of a procedurally defaulted claim unless the petitioner demonstrates legitimate cause for his failure to exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Generally, "cause" for a procedural default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Coleman*, 501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a petitioner bears the burden of showing not merely that the errors at his trial were possibly prejudicial, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Because the acts of a petitioner's counsel are not external to the defense, they are generally attributable to the petitioner, and negligence, ignorance, or inadvertence on counsel's part does not qualify as "cause." *Coleman*, 501 U.S. at 752–54 (citing *Carrier*, 477 U.S. at 488). However, where the ineffective assistance of counsel amounts to an independent constitutional violation, it can establish cause. *Id.* at 753–54; *Ortiz*, 149 F.3d at 932.

Because "[t]here is no constitutional right to an attorney in state post-conviction proceedings . . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). Consequently, any ineffectiveness of PCR counsel will ordinarily not establish cause to excuse a procedural default. The Supreme Court, however, has recognized a "narrow exception" to *Coleman*'s procedural default principle: "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has declined to extend the *Martinez* exception to claims of ineffective assistance of appellate counsel. *Davila v. Davis*, --- U.S. ---, 137 S. Ct. 2058, 2062–2063 (2017).

Under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez,* 566 U.S. at 14); *accord Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015); *Dickens v. Ryan,* 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc); *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

The court examines the question of whether an ineffective assistance of counsel claim is substantial under the standard stated in *Strickland*, 466 U.S. 668. Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Additionally, not just any error or omission of counsel will be deemed "deficient performance" that will satisfy *Martinez;* if post-conviction counsel "in the initial-review collateral proceeding did not perform below constitutional standards," that attorney's performance does not constitute "cause." 566 U.S. at 15–16. Most notably, counsel "is not necessarily ineffective for failing to raise even a *non-frivolous* claim," much less a frivolous claim. *Sexton*, 679 F.3d at 1157 (emphasis added). A court need not address both components of the inquiry, or follow any particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is easier to dispose of a claim on just one of the components, then that course should be taken. *Id.*

Finally, a federal habeas court may reject a claim on the merits without reaching the question of exhaustion. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under § 2254(b)(2) as "plainly meritless"); *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005) (holding that a federal court may deny an unexhausted petition on the merits when the petition does not raise a colorable federal claim).

## II. STANDARD FOR HABEAS RELIEF

Under AEDPA, this Court may not grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in state court proceedings unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Renico v. Lett*, 559 U.S. 766, 778–79 (2010)); *see Carey v. Musladin*, 549 U.S. 70, 76-77 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410

(emphasis in original). Under AEDPA, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101. Accordingly, to obtain habeas relief from this Court, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see Frost v. Pryor*, 749 F.3d 1212, 1225–1226 (10th Cir. 2014) ("[I]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable. . . . If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.").

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341–342 (2006); *see Hurles*, 752 F.3d at 778 (explaining that on habeas review a court "cannot find that the state court made an unreasonable determination of the facts in this case simply because [the court] would reverse in similar circumstances if th[e] case came before [it] on direct appeal").

As the Ninth Circuit has explained, to find that a factual determination is unreasonable under § 2254(d)(2), the court must be "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). "This is a daunting standard—one that will be satisfied in relatively few cases."

*Id.*

The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1). The Supreme Court has not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), but has clarified "that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *See Burt v. Titlow*, 571 U.S. 12, ---, 134 S. Ct. 10, 15 (2013) (citing *Wood*, 558 U.S. at 293, 301).

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011); *see Murray*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n. 6 (9th Cir. 2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n. 7). Therefore, as the court explained in *Gulbrandson*:

> [F]or claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993–94.

## III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel ("IAC") are governed by the principles set forth in *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

To satisfy *Strickland*'s first prong, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

strategy.'" *Id.* at 689. With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task."); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). When the standards created by *Strickland* and § 2254(d) apply in tandem, review is "doubly" deferential. *Richter*, 562 U.S. at 105 (citations and quotations omitted). "[T]he question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* "[E]ven when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the 'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689) (internal quotations omitted).

## DISCUSSION

Petitioner sets forth twenty-seven claims in his habeas petition, along with numerous sub-claims. (Doc. 28.) Respondents concede that eighteen of the claims are properly exhausted in whole or in part. They contend that Claims 1, 5(B), 7–8, and 21–26 are procedurally barred. In his motion for evidentiary development Petitioner seeks expansion of the record, discovery, and an evidentiary hearing on Claims 1 and 2. (Doc. 38.)

## I.  CLAIMS 1 AND 2

In Claim 1, Petitioner alleges that counsel performed ineffectively at sentencing by presenting a denial of responsibility defense which was logically inconsistent with the

theory of mitigation, failing to advise Petitioner regarding the risk of such a defense for the sentencing phase, choosing to forego investigation into Petitioner's mental state at the time of the offense, and failing to sufficiently investigate and present all reasonably available mitigation evidence, or to explain the significance of such evidence. (Doc. 28 at 147–161.) Petitioner asserts this claim is unexhausted and procedurally defaulted, but urges the Court to find that the deficient performance of PCR counsel establishes cause to excuse the default under *Martinez*. Petitioner further asserts *Martinez* entitles him to develop and present evidence to prove this claim against trial counsel and PCR counsel. Petitioner moves this Court for an evidentiary hearing and evidentiary development of Claim 1. (Doc. 38.)

In Claim 2, Petitioner asserts that the state court's summary denial of his claim that sentencing counsel performed ineffectively by failing to investigate and present mitigation evidence during the penalty phase constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of facts under § 2254(d)(1) and (2). (Doc. 28 at 189–199.) Petitioner asserts that he is entitled to de novo review and an evidentiary hearing on this claim. (Doc. 38 at 51.) Petitioner seeks to present the witnesses and evidence proffered in the state court proceedings, and requests leave to conduct the depositions of trial counsel prior to an evidentiary hearing. (*Id.*) Respondents argue that evidentiary development is foreclosed under *Pinholster* because the state court addressed the claim on the merits. (Doc. 42 at 2–3.)

A. Factual and Procedural Background

**1. Mitigation Investigation and Presentation**

On July 29, 2003, the Pima County Public Defender, initially appointed to represent Petitioner, moved to withdraw, citing Petitioner's dissatisfaction and his desire to be represented by attorney Brick Storts. (ROA 33.)[5] The trial court granted the motion

---

[5] "ROA" refers to the 17-volume record on appeal from trial and sentencing. "RT" refers to the reporter's transcripts from Petitioner's state court proceedings. "APP" refers to the record on appeal from direct review to the Arizona Supreme Court. The original transcripts and certified copies of the state trial and post-conviction records on appeal were provided to this Court by the Arizona Supreme Court on May 29, 2015.

and appointed Storts and attorney David Basham to represent Petitioner. (ROA 36.) Counsel assured the court that the defense team met all the qualifications for defense counsel in death penalty cases, as specified in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, with the exception of obtaining a mitigation expert, but would "examine the propriety of obtaining a mitigation expert to be involved in the representation of the defendant at such time as same becomes necessary and/or appropriate." (ROA 40.) Subsequently, counsel filed motions requesting the appointment of mitigation specialist Mary Durand. (ROA 48, 76.) Durand indicated in her declaration that the case could require up to 1500 hours, but counsel advised the court that the defense team would work to minimize those hours. (ROA 76.) On October 6, 2003, the trial court appointed Durand as mitigation specialist and authorized the first 800 hours of mitigation investigation. (ROA 84; RT 10/06/03 at 42.) On October 27, 2003, the court reaffirmed Durand's appointment and set a trial date of September 7, 2004. (ROA 109.)

At a pre-trial conference on February 2, 2004, counsel represented that he had not received anything from his mitigation expert, and at counsel's request, the trial court ordered the defense to provide the mitigation report to the prosecutor by April 30, 2004. (RT 2/2/04 at 26–27; ROA 172 at 3.)

At a hearing on March 22, 2004, counsel expressed to the trial court his frustration with Durand in regard to the April 30 deadline for mitigation disclosure. (RT 3/22/04 at 40–41.) Counsel suggested, and the court agreed, that it would be good to hear from Durand directly at the next scheduled hearing. (*Id.*) Before that hearing occurred, Petitioner provided notice to the court that he would be exercising his right to a speedy trial, while simultaneously seeking to continue the trial date from September 7 to mid-October, recognizing that "all of the required mitigation testimony with the related witnesses cannot be available" by September 7, 2004. (ROA 206.) Petitioner explained that his request for a speedy trial was being made in conjunction with his previously filed motion for change of venue. (*Id.*)

Petitioner then filed a motion for a continuance of trial, explaining the continuance was necessary to obtain the necessary mitigation. (ROA 207.) Petitioner anticipated that he would be able to supply the majority of mitigation disclosure by June 18, 2004. (*Id.*) In his reply, Petitioner explained his strategy for the apparently inconsistent motions:

> The Defendant has made it clear that if the motion for change of venue is denied and the efforts to select a jury within Pima County are unsuccessful, the Defendant will not agree to an extended continuance in order to seek an out-of-county venue for purposes of trial. That is, if a fair and impartial Pima County Jury cannot be selected, the Defendant will not agree to a continuance of unreasonable duration in order to allow the court to secure the facilities for an out-of-county trial. . . . [T]he Defendant has made his position clear that he is unwilling to "give it a try" here in Pima county and then delay the trial in order to secure an out-of-county courtroom once it becomes apparent, which it will, that a fair and impartial Pima County Jury cannot be selected.

(ROA 214 at 4.)

At the hearing held on April 26, 2004, Durand asserted that she could not comply with constitutional mitigation requirements under the June 30 mitigation disclosure deadline, explaining that she usually has eighteen months to complete a mitigation investigation, and that she thought the trial should be set for April, 2005. (RT 4/26/04 at 58–61, 66–67.) Storts informed the court that he had explained to Durand that an April 2005 trial was not acceptable. (*Id.* at 62.) The court reset the trial to November 16, 2004, with a mitigation disclosure deadline of July 16, 2004. (ROA 219 at 2.)

On June 7, 2004, Storts informed the court that he would be prepared to make mitigation disclosure by the July 16 deadline, and try the case in November. (RT 6/7/04 at 15–16.) On July 16, 2004, Petitioner filed his mitigation disclosure, disclosing six expert witnesses, and numerous family members and others familiar with Petitioner. (ROA 240.)

At the next status conference on July 26, 2004, Storts informed the court that Durand had been fired, and that the defense team had put together the mitigation in three weeks. (RT 7/26/04 at 21.) Storts conveyed that Petitioner was "more than satisfied" with the mitigation efforts, and that "[f]or the record," since May 1996, he had tried "34 first

degree murder cases. Twelve of them were death cases. I have nobody on death row." (*Id.* at 22.) He represented that Basham, had tried "at least, I don't know, ten or twelve death penalty cases" in which he was involved in the mitigation aspects "from start to finish." (*Id.*) Storts explained to the court that the idea of mitigation investigation in a capital case taking up to a year and a half "just doesn't make a whole lot of sense." (*Id.* at 23.)

Thereafter, the State moved to continue the trial based on insufficiencies in the mitigation disclosure. (ROA 251.) At a hearing on the motion, Basham admitted that their experts had not completed their work. (RT 8/12/04 at 16, 18.) The court set a new disclosure deadline for September 17, 2004, and a new trial date of January 19, 2005. At a second status conference on October 4, 2004, Basham again admitted that he had not fulfilled his disclosure obligations, and the court set a new disclosure deadline of November 1. (RT 10/4/04 at 17.)

The jury returned a guilty verdict on March 10, 2005. During the next phase of trial, the penalty phase, defense counsel presented testimony from eleven lay and five expert witnesses. First, defense counsel presented testimony from family members and others who knew Petitioner. Father Ricardo Ford, a Catholic priest who knew Petitioner's family, though his recollection was "pretty foggy," testified that Petitioner grew up in Barrio Hollywood, a neighborhood with a lot of drug problems. (RT 3/1/05 at 54–55, 58–59, 63.) Ford recalled Petitioner as a "stressed out" little boy, and described Petitioner's mother's family as "constantly pretty dysfunctional." (*Id.* at 63, 67). Ford was aware that Petitioner's maternal uncles had serious drug addiction problems and that Petitioner's mother had been abused by her father and was an extremely nervous person. (*Id.* at 61, 65). He described Petitioner's mother as very motivated, likeable and a respected nurse, who had good values which she would have passed on to her son, though she had big problems and may have been overdoing medication. (*Id.* at 65, 71–72.)

Petitioner's mother, Julie Lingenfelter, testified she was sexually abused at the hands of her own father from a very young age, until she was 15 years old. (RT 3/1/05 at 80, 82, 84.) She developed anorexia and bulimia when she was 10 to 11 years old and

attempted to commit suicide three times by age 15. (*Id.* at 82, 92.) Petitioner's mother was also physically and emotionally abused by Petitioner's father, John Cruz, Sr. (*Id.* at 97–98, 100–101, 120.) Petitioner witnessed this abuse and was also a victim; Petitioner's mother recalled an incident when Petitioner was eight years old and his father hit him "like 60 to 80 times" with a belt. (*Id.* at 102–04.) Petitioner's mother was later diagnosed with PTSD and bipolar disorder. (*Id.* at 106.) Although Petitioner's mother was close to Petitioner when he was a baby, when he got bigger she "didn't really touch him, hug him, kiss him, hold him as much as a mother should have." (*Id.* at 92.) Petitioner's parents eventually divorced, and Petitioner's mother allowed Petitioner's father to have custody "with the condition he would not beat him." (RT 03/01/05 at 110, 121.) When Petitioner was 13 years old, Petitioner's father remarried a 15- or 16-year-old girl who locked Petitioner out of the house and did other abusive things to Petitioner. (*Id.* at 110–11.) When Petitioner was 15 years old his father suffered a brain aneurysm and died. (*Id.* at 112.) Petitioner was very depressed and his grades declined. (*Id.* at 115.) Petitioner's mother sent him to a psychologist, but it didn't really help him. (*Id.*)

Petitioner's mother married Steve Lingenfelter in 1986 in Los Angeles, California. (RT 03/01/05 at 109.) Petitioner's mother agreed that she and Steve were willing to give Petitioner a home and provide him with anything he wanted. (*Id.* at 123.) After living with his father for three years, Petitioner moved to California to live with his mother and Steve. (*Id.* at 111.) He lived with them until he was 17 years old. (*Id.* at 117.) Petitioner's mother testified that Petitioner wanted to return to Tucson, so Petitioner was sent to live with his maternal grandmother in Tucson. (*Id.*) Petitioner's mother acknowledged that Petitioner's adult uncles, Eddie and Luis, who had alcohol and drug problems, also lived with his grandmother. (*Id.* at 85–87, 118.)

Susan Alcaraz, Petitioner's maternal aunt, testified that she cared for Petitioner when his mother worked, at times for days, weeks, and months. (*Id.* at 136.) Susan Alcaraz testified that Petitioner's mother "had a lot of problems" and "couldn't express and show him . . . love"; she never saw any evidence of physical abuse of Petitioner or his mother, although his father was verbally abusive. (*Id.* at 137, 145, 149–50.) After his

father died, Petitioner changed and "started doing marijuana, and so he was a little bit reckless." (*Id.* at 145.)

Albert Montenegro, Jr., Petitioner's cousin on his mother's side of his family, testified that he and Petitioner went to high school together and drank alcohol and used drugs, including marijuana, cocaine, acid, and mushrooms. (RT 3/02/05 at 145, 148.) Albert testified that Petitioner changed after his father died, becoming isolated and staying inside, not wanting to talk to anybody "for years." (*Id.* at 148–49.) Albert testified Petitioner had been using meth at the time of the offense, and that Petitioner would get paranoid when he used meth. (*Id.* at 150.)

Joe Cruz, Petitioner's paternal uncle, testified that he witnessed no verbal or physical abuse between Petitioner's mother and father, although his brother was kind of a "prankster," not knowing when to stop, and upsetting Petitioner's mother. (RT 3/02/05 at 19–20, 31.) Joe was not aware of any abuse of Petitioner by his father, and thought Petitioner's mother treated Petitioner well. (*Id.* at 32.) Joe Cruz testified that after Petitioner's father re-married, Petitioner's step-mother "would do cruel things" to Petitioner. (*Id.* at 37.) Joe Cruz agreed that Petitioner's mother and father treated Petitioner well (*id.* at 32), but testified that it was hard on Petitioner to lose his father, and that he wished Petitioner could have lived with the Cruz side of the family. (*Id.* at 24, 27, 32.) Since Petitioner's mother had custody, however, the Cruz family had to respect her wishes to have Petitioner live with his grandmother Montenegro in Barrio Hollywood, a neighborhood that "had a reputation of gangs and drug activity." (*Id.* at 26–27.)

Delia Cruz, Petitioner's paternal aunt, testified that Petitioner's mother had problems and was not really there for Petitioner "[p]hysically or mentally," but agreed that his mother showed and shared love with him, and tried to instill family values in him. (RT 3/02/05 at 42–43, 58.) In contrast, Petitioner's stepmother was an insecure teenage bride with bipolar disorder, and "wasn't that much of a loving person" towards Petitioner. (*Id.* at 45, 59.) Delia also described Petitioner's father as a prankster, but agreed that he was a loving father to his son, showed him affection and provided for him, and had good values that he would have tried to impart to his son. (*Id.* at 41, 56–57.) Delia testified that

- 19 -

Petitioner was filled with "so much pain and devastation and . . . just emptiness" following the death of his father. (RT 3/02/05 at 46.)

Romelia Cruz Holguin, Petitioner's paternal aunt, testified that Petitioner's mother was not "very comforting" and his stepmother "didn't like [Petitioner] very much" and would repeatedly lock him outside of the house, but had no evidence corroborating the allegations that Petitioner's father was abusive. (RT 3/02/05 at 83, 85.) Holguin was aware that the Montenegros "partied a lot," and she suspected Petitioner used drugs. (*Id.* at 87, 92.) She recalled that Petitioner had a lot of problems in school. (*Id.* at 94.) Holguin described an occasion in May 2003 when Petitioner came to her house and appeared "nervous and edgy" and "paranoid," and was limping after jumping out a window to avoid the police. (*Id.* at 94–96.)

Tara White, Petitioner's wife, testified that she married Petitioner in 1996, and their son was born in 2000. (RT 3/02/05 at 107–08.) White testified that she and Petitioner smoked marijuana, and Petitioner used cocaine. (*Id.* at 111.) Petitioner had mood swings and was sad and depressed. (*Id.* at 112.) A few months after they were married, Petitioner was arrested in Illinois for a marijuana offense. (*Id.* at 113.) After Petitioner's release from prison in 1998, the couple moved to Zuni, New Mexico, where Petitioner helped to run the White family businesses. (*Id.* at 115–16.) In 2001, Petitioner started using drugs and "went nuts." (*Id.* at 117–18, 129.) Petitioner's use of drugs caused the marriage to disintegrate, and White and Petitioner mutually agreed he should leave. (*Id.* at 130, 132.) Petitioner moved back to Tucson, leaving White and their eight-month-old son. (*Id.* at 129–30.)

Lora Galioto, the mother of one of Cruz's children, also testified. (RT 3/03/05 at 119.) Galioto testified that, during high school, Petitioner lived with his grandmother, used pot and LSD, and dropped out of school. (*Id.* at 122, 124.) Galioto recalled that the members of his grandmother's household used drugs, mostly cocaine, while Petitioner lived there. (*Id.* at 125–26.) Even after he moved out of the home, he maintained contact with his drug-using uncles. (*Id.* at 129.) Galioto testified Petitioner's drug use resulted in his decline and culminated in the termination of their relationship. (*Id.* at 130–31.)

In addition to the family witnesses, the defense also presented mitigation testimony from Sergeant Sean Stewart and James Maccarelli. Sergeant Stewart, a sergeant with the Corrections Bureau of the Pima County Sheriff's Department, testified that Petitioner's disciplinary record during his pretrial incarceration revealed nothing indicating Petitioner was a threat to other inmates or staff. (RT 3/02/05 at 69.) Maccarelli, Petitioner's neighbor, testified that he was with Petitioner in April or May 2003 when someone shot at them from a car. (RT 03/04/05 at 5–8.) A few days later they were shot at again. (*Id.* at 10.) Maccarelli stated that the police did not respond to the first incident and "never took the call" for the second. (*Id.* at 9, 12.)

The defense also presented testimony from a number of expert witnesses: a clinical psychologist (Dr. Hector Barillas), a developmental psychologist (Dr. Laura McCloskey), a specialist in addiction medicine (Dr. Mike Austein), a pharmacologist (Dr. Edward French), and the president of a private correctional consulting firm (James Aiken). (RT 3/3/05 at 5–36, 36–118; RT 3/4/05 at 18–106, 106–36, 136–73.)

Dr. Barillas interviewed Petitioner for over five hours, reviewed records, and conducted interviews of family members and Petitioner's ex-wife. (RT 3/3/05 at 37–39.) Dr. Barillas gave Petitioner a variety of tests to assess intelligence and memory, and to determine whether Petitioner had any kind of brain dysfunction. (*Id.* at 40–41.) In writing his report, Dr. Barillas reviewed and relied on a report of neuropsychologist Shannah Biggan. (*Id.* at 40, 47.) Dr. Barillas reported that Dr. Biggan found Petitioner had no serious memory deficits or learning disorders. (*Id.* at 47, 106.)

Dr. Barillas assessed Petitioner's history of drug and alcohol abuse as "significant" and "quite extensive," starting in his teens after his father's death, becoming worse after the age of 21, and culminating in his use of drugs just 24 to 48 hours before Officer Hardesty's murder. (RT 3/3/05 at 49–50, 56.) Petitioner's use of LSD was extensive; he also used hallucinogenic mushrooms and marijuana, then later on cocaine, and, after the age of 21, methamphetamine. (*Id.*) Dr. Barillas diagnosed Petitioner with intoxicant abuse disorder. (*Id.* at 51.) Dr. Barillas opined that factors that may have influenced Petitioner's involvement with drugs included the loss of his father and lack of emotional

support from his mother, in addition to negative peer and family influences, specifically from the Montenegro side of Petitioner's family. (*Id.* at 53, 58–59.) Dr. Barillas commented on Petitioner's childhood environment, stating that Petitioner's father was a poor role model, with a history of marital problems and domestic violence, and that the lack of affection Petitioner received from his mother made him feel "pretty abandoned." (*Id.* at 59–61.) Dr. Barillas suggested that Petitioner's poor school performance was attributable to the divorce; there was no clear evidence of learning problems. (*Id.* at 61–62.) Additionally, Dr. Barillas stated that being the object of physical abuse is considered a risk factor for violent recidivism and can contribute to a decision to use drugs. (*Id.* at 63.)

On cross-examination, Dr. Barillas acknowledged that Petitioner never told him he had been physically abused by his father, that there was some evidence of a close, loving relationship between Petitioner and his father, and that Petitioner's mother was possibly lying about the father's abuse. Dr. Barillas didn't remember if Petitioner reported that there was domestic violence in the home. (*Id.* at 87–89.) Dr. Barillas testified that Petitioner reported that he was emotionally abused by his father and his mother "wasn't there" for him. (*Id.* at 112.)

Dr. Barillas also diagnosed Petitioner with PTSD, stemming from incidents in which he was shot at and beaten by people who wanted to kill him. (RT 3/3/05 at 67, 69.) According to Dr. Barillas, Petitioner's PTSD affects the way he perceives events in his life and causes him to overreact in certain situations, a condition which would be exacerbated by the use of drugs, especially stimulants. (*Id.* at 73.) Dr. Barillas explained that Dr. Biggan's report contradicted his findings in part, because, in addition to finding no current evidence of depression, Dr. Biggan also found no evidence of anxiety, and PTSD is an anxiety disorder. (*Id.* at 105–06, 118.) When questioned about Petitioner's ability to conform his conduct to the law, Dr. Barillas testified that he could not specifically render an opinion on Petitioner's state of mind at the time of Officer Hardesty's murder because he never spoke to Petitioner about the crime, but within a

larger framework, he opined that Petitioner's ability to conform his conduct to the requirements of the law was impaired. (*Id.* at 83.)

Dr. McCloskey, a developmental psychologist, reviewed records, including child custody records from Petitioner's parents' divorce proceedings, interviewed some family members, and spoke with Petitioner the day before she testified. (RT 3/4/05 at 23, 53.) Dr. McCloskey opined that Petitioner was abused psychologically and physically and was neglected from middle childhood on. (*Id.* at 25.) McCloskey further detailed Petitioner's family history of abuse. She testified that the domestic violence in the Cruz household affected all aspects of Petitioner's life:

> Yes, I think the domestic violence, especially that cloud of that—the kind of horrible shadow of that marriage which was so brutal, you know, this woman was hit all the time. John witnessed it. She was thrown on the ground. She was afraid he was going to kill her and the child at one point. It was—it was chronic and it was severe, and I think it did really at some time—this boy—it stunted his growth. Then the lack of really a functional family for him to go back to after the divorce really solidified I think his—his drug use and problems.

(*Id.* at 44.)

According to Dr. McCloskey, the point at which Petitioner "snapped" was when his father died. (*Id.* at 34–35.) Dr. McCloskey explained:

> So John was not in a good situation, but this was a stressor he couldn't possibly cope with. He did not have the natur[al] coping skills for and started doing drugs to—to self-medicate. I think the year his father died he told me he took, I don't know, hundreds of acid trips and this is just really a sign because acid does kind of mimic the state of psychosis. So this is kind of a sign of a child, he's very, very disturbed who wants to escape into another world of—of almost schizophrenia.

(*Id.* at 35.)

Dr. Austein, an internal medicine and addiction medicine specialist, did not interview Petitioner, but reviewed interviews with Petitioner, documents regarding Petitioner's history, and the reports of Drs. Biggan and Barillas. (RT 3/3/05 at 7–8.) Dr. Austein testified about general principles of addiction, including that drug addiction

causes familial, job, and financial problems, and often leads to crime; many addicts would not be involved in crime if it were not for their addiction. (*Id.* at 16–17.) He testified that drug addiction is often the result of attempts at self-medication; the need to self-medicate can stem from mental illness or lack of self-worth and lack of affection and love from family. (*Id.* at 13–14, 19–20.) Dr. Austein added that amphetamine use in particular is associated with amphetamine psychosis that may lead to violence and paranoia. (*Id.* at 21–22.) After reviewing Petitioner's records, Dr. Austein classified Petitioner as a drug addict. (*Id.* at 23.) Although Dr. Austein could not specifically opine whether Petitioner was under the influence during the murder, or what role drugs played in his conduct on that day, Petitioner's drug history combined with the presence of drugs in his system suggested that, at a minimum, he could have been in a "fog" at the time of the murder as a result of his habitual drug use. (*Id.* at 33–35.)

Dr. French, a pharmacologist, testified regarding the effects of certain drugs. Dr. French testified that cocaine is a stimulant that induces the "fight or flight" response. Crystal methamphetamine produces similar behavioral effects and also leads to neurotoxicity, meaning it damages brain cells. (RT 3/4/05 at 113–14, 117.) Dr. French reviewed records from Petitioner's hospitalization after the murder indicating he had a high level of methamphetamine in his system, suggesting he had used within the past two to three days, or even a few hours earlier. Dr. French explained methamphetamine users are "hyper, they can be very jittery. . [and] restless . . . they can also feel anxious, they can become irritable, they can become impulsive, which can lead to bad things." (*Id.* at 123–24.) Additionally, "the danger with methamphetamine" was that when using the drug, a person might overreact to certain situations. (*Id.* at 128.) Finally, Dr. Austein testified that methamphetamine and cocaine users were at their most dangerous when "starting to crash" from a high, because "they are really irritable, they can get really paranoid and then all of a sudden something can set them off. They can be startled, they can be confronted and they can have unpredictable violence." (*Id.* at 130.)

Aiken, a former warden and correctional consultant, testified that from his review of Petitioner's prison and jail records, Petitioner would not be considered predatory,

would be categorized as among the least dangerous prisoners, and would remain in strict confinement where he could be effectively managed for the rest of his life. (RT 3/4/05 at 137, 152, 157, 161–62.) On cross-examination, Aiken admitted he had testified similarly on behalf of three to four other defendants in the past year or so, and had given similar testimony in favor of a defendant who had assaulted other inmates and a guard. (*Id.* at 163.)

At the end of the penalty phase, the jury unanimously determined to impose a death sentence. (ROA 630.)

## 2.    Petition for Post-Conviction Relief

Gilbert Levy was appointed to represent Petitioner in state PCR proceedings. (Doc 31, Ex. G.) Levy retained DiFrank, the mitigation investigator in Petitioner's case, to investigate mitigation for the post-conviction phase.[6] DiFrank concluded that significant mitigation investigative tasks not conducted prior to Petitioner's sentencing still needed to be completed. (*See id.*, Ex. L.) Storts and Basham objected to DiFrank's appointment alleging that there was a conflict of interest created by DiFrank's dual role as the original sentencing mitigation investigator and her renewed role in that capacity for the PCR proceedings. (*Id.*, Ex. O.) Levy initially requested a hearing regarding the conflict of interest allegations and filed a motion to conduct the deposition of Storts but he later withdrew his requests. (*Id.*, Exs. O, S, T.)

On January 27, 2012, Levy filed an amended PCR petition, alleging that Petitioner's sentencing counsel failed to conduct an adequate mitigation investigation, failed to provide their experts with highly relevant mitigation evidence, failed to present a comprehensive history of drug abuse, failed to show how Petitioner's drug abuse was related to the crime, failed to have mental health experts opine on Petitioner's mental state at the time of the offense, failed to present appropriate expert testimony to explain

---

[6] DiFrank was the fact investigator employed by Petitioner's trial team, and took over Durand's responsibilities after Durand was fired. (Doc. 31, Ex. X at Ex. 4.) Though she had no training and experience as a mitigation specialist she was assigned the task of interviewing mitigation witnesses that Durand failed to interview. (*Id.*) After Petitioner's sentencing DiFrank received training and several years of work experience as a mitigation specialist. (*Id.*)

the causal connection between Petitioner's social history and the crime, and failed to prevent their client from denying responsibility for the crime in front of the jury at sentencing.[7] (Doc. 31, Ex. W at 29–35.) Petitioner supported his petition with statements from family members, the declaration of DiFrank, an affidavit from mitigation specialist Teresa McMahill, and reports from Drs. McCloskey, Barillas, and Cunningham. (Doc. 31, Ex. X.)

DiFrank explained that her role in the initial mitigation investigation was to interview witnesses and that mitigation records were not shared with her. (Doc. 31, Ex. X: Ex. 4 at ¶5.) DiFrank stated that her ability to identify and develop mitigating factors was severely compromised as a result of her lack of experience, limited responsibilities, lack of coordination with incoming records, and unrealistic time constraints. (*Id.* at 3.) During her investigation in the post-conviction phase she contacted family members, some of whom had not been contacted during the initial mitigation investigation, and obtained information that Petitioner's trial counsel had failed to discover. (Doc. 31, Ex. X: Ex. 4 at ¶ 11, Exs. 20–33, 36–37.)

Mitigation specialist McMahill summarized the new evidence DiFrank gathered that would have been helpful to Petitioner at sentencing:

> Most significantly with regard to records, the post-conviction relief mitigation specialist retrieved the voluminous mental health file that existed on Mr. Cruz's mother. These records outlined his mother's long history of serious and debilitating mental illness, which undoubtedly adversely affected Mr. Cruz as he was growing up and about which the jury heard very little.
>
> From the interviews the . . . mitigation specialist conducted, she learned that Mr. Cruz's father and paternal grandfather were cruel and sadistic; his mother habitually abused drugs when he was a young boy and snorted cocaine in his presence; his maternal grandfather sexually abused Mr. Cruz's cousin (as well as Mr. Cruz's mother); several relatives had serious drug and/or alcohol problems; the extent of the drug dealing and use that

---

[7] During sentencing proceedings, Petitioner read a statement in which he denied killing Officer Hardesty, but apologized nonetheless, acknowledging "indirect[] responsibil[ity]" for Hardesty's death because "I ran away. He chased me." (RT 3/8/05 at 30.)

occurred in Mr. Cruz's maternal grandmother's home—where he frequently lived—was much greater than revealed at trial; a number of relatives suffered from mental illness; Mr. Cruz was physically abused by his mother—not just his father; his mother became very promiscuous after divorcing Mr. Cruz's father, and several relatives were aware of the abuse [of] Mr. Cruz and his mother by his father. At trial, the sole source of information about this abuse was Mr. Cruz's mother, and her testimony was discredited because there was no corroboration.

(Doc. 31, Ex. X: Ex. 16 at 7–8.) Additionally, interview notes and declarations from family members suggested that the family had experienced instances of police brutality. (*Id.*, Ex. X: Ex. 23–25.)

Petitioner also submitted a report from Dr. McCloskey. (Doc. 31, Ex. X: Ex. 38.) Dr. McCloskey reviewed the interviews and statements of Petitioner's family that DiFrank had obtained during post-conviction proceedings. (*Id.* at 2.) Dr. McCloskey opined that the new interviews corroborated earlier reports of domestic violence and abuse of Petitioner by his father. (*Id.*) Dr. McCloskey noted that the "child abuse descriptions in the current report add different perpetrators and different types of maltreatment; the severity and duration are also worse than revealed several years ago." (*Id.* at 3.) Dr. McCloskey concluded that Petitioner "was abused and abandoned at an early age; he was the victim of physical assaults from his father, stepfather, and maternal uncles, and he was socialized into a world of drug dealing while living with his uncles." Dr. McCloskey stated that the "extraordinary neglect and abuse explains how [Petitioner's] life became embedded in criminal activities and how violence was the main currency of the world in which he lived. . . . A raft of traumatic events and bad influences compounded to shape John Cruz's development. The choices John Cruz made emanated from this history, and in part were determined by forces well beyond his control for much of his early life." (*Id.* at 13.)

Dr. Barillas reviewed the new information provided to him by PCR counsel and DiFrank, and concluded that the information raised the question of a possible Attention Deficit/Hyperactivity Disorder (ADHD), which was not addressed during the direct testimony of Dr. McCloskey, and, if found, could make a link between the impulsivity

associated with this problem and its high correlation with intoxicant abuse problems in adolescence. (Doc. 31, Ex. X: Ex. 39 at 2.) Dr. Barillas noted that he was not asked about Petitioner's mental state at the time of the offense during his testimony at trial, but was now of the opinion that Petitioner was probably under the influence of cocaine and amphetamine at or shortly before the time of his arrest. (*Id.*) Thus, "his judgment was probably impaired to conform his conduct to the requirement of the law." (*Id.*) Dr. Barillas concluded that Petitioner "had symptoms and conditions that were not self-evident at the time of trial." (*Id.* at 3.)

Dr. Mark Cunningham, a clinical and forensic psychologist, analyzed 27 different developmental and environmental risk factors based on the prevailing developmental perspective in 2005 that adult outcome is a function of the interaction and balance of risk factors and protective factors in childhood. Dr. Cunningham explained in his report that as risk factors increase, and protective factors decrease, there is an increasing probability of adult maladjustment, substance abuse and dependence, personality disturbance, delinquency, criminality, and criminal violence. Dr. Cunningham identified several risk factors Petitioner was exposed to as a child, including: (1) transgenerational family dysfunction and hereditary predisposition to psychological disorder, personality pathology, and alcohol and drug abuse and dependence; (2) neurodevelopmental issues including probable fetal substance exposure, learning problems in school, chronic stress in childhood, and head injuries; (3) parenting and family influence characterized by Petitioner's mother's psychological disorders and substance abuse, parental conflict and neglect, domestic violence and family modeling of aggression and crime; and (4) childhood onset of alcohol and drug abuse, teen onset of psychological disorders, and cocaine and methamphetamine abuse, with accompanying paranoia and psychological decompensation at the time of the offense. (Doc. 31, Ex. X: Ex. 41 at 12–13.) Dr. Cunningham explained that the jury was deprived of critical evidence regarding "the logical nexus between the adverse developmental factors in [Petitioner's] background and the capital offenses." (*Id.* at 52.)

In response, the State argued that DiFrank's level of experience and skill and overall competency for mitigation work were well documented, and that Petitioner was responsible for any time limitations placed on the investigation and preparation of the case in mitigation. (Doc. 31, Ex. LL at 23.) The State supported these assertions with the affidavits of trial counsel. (*See id.*) Basham represented that he, together with Storts, had handled over 250 homicide cases, including at least 50 capital cases and that "[i]t was the consistent demand of [Petitioner] to exercise his right to a speedy trial." (Doc. 31, Ex. NN: Ex. K at 2, 4.) Storts objected to the petition, stating it contained so many false statements and libelous comments they were too numerous to list, and were "not worthy" of a detailed response. (Doc. 31, Ex. NN: Ex. J at 3–4.)

The State also argued that much of the evidence PCR counsel presented was cumulative, and thus counsel was not ineffective for omitting the evidence. The State argued that there was no prejudice because Petitioner could not establish a link between any of the cumulative evidence and Officer Hardesty's murder and because he failed to make a connection between his conduct and any history of substance abuse given that his abilities to reason, make decisions, control his behavior, and engage in acts of self-preservation remained fully intact. (*Id.* at 23–32.) The State also asserted that counsel was not ineffective for omitting evidence of an untreated learning disability and possible diagnosis of ADHD because none of the experts recommended further investigating these possibilities, and Dr. Barillas had testified there was nothing to suggest that Petitioner had a learning disability. (*Id.* at 28.) The State attributed the failure to suggest a possibility of a learning disability or ADHD to both Petitioner and his mother because neither mentioned Petitioner's learning difficulties. (*Id.* at 29.) Additionally, the State argued that the evidence would not have changed the verdict because there was no clear connection between the learning disability and possible ADHD, and the offense. The State also argued that evidence of past instances of police brutality experienced by the family was known to the family, and conceivably known to Petitioner, but not shared with his counsel. Regardless, the State argued it would not have changed the verdict.

Without holding an evidentiary hearing, the PCR court dismissed Petitioner's sentencing IAC claim relying extensively on Basham's and Storts' affidavits. (Doc. 31, Ex. RR at 14–15.) The PCR court identified the relevant *Strickland* IAC analysis, and found that counsels' choices in connection with mitigation were reasonable because they were "[f]aced with a client charged with the murder of a police officer in the line of duty, a client who declined to acknowledge responsibility for any action other than 'running away,' and who maintained his right to a speedy trial, coupled with his own knowledge of his background, experiences and family." (*Id.* at 14.) The PCR court had prefaced its ruling by identifying "some of its salient considerations, including a finding that Storts and Basham had handled over 250 homicide cases and at least 50 capital cases, and that Storts engaged DiFrank after terminating Durand because Durand had not completed mitigation and ignored deadlines for disclosure, and because her "apparent method was to take as much as a year and a half on a case and [Petitioner] 'wanted to get on with his trial.'" (*Id.* at 3.) The Court acknowledged DiFrank's declaration which indicated "that she '…did not feel that [she] had sufficient time to complete . . . assignments. . .' and attributed the desire to '. . . take the case to trial as quickly as possible. . .' to trial defense counsel." (*Id.* at 15.) However, relying on Basham's affidavit, the PCR court rejected DiFrank's conclusion that trial counsel was responsible for rushing the case to trial and found that "[i]n fact, 'It was the consistent demand of Defendant Cruz to exercise his right to a speedy trial." (*Id.* at 15.) The PCR court further found:

> In maintaining his right to a speedy trial, defendant placed himself in the position of cutting short the mitigation investigation, a time constraint of which he now complains. Further, the defendant himself would have been aware of the majority of the newly-discovered facts about his childhood, family history, and abuse at the time of his decision to exercise his right to a speedy trial. Defendant certainly could have informed trial counsel of the existence of such evidence.

(*Id.* at 15.) The PCR court also found that prejudice was lacking under *Strickland* because Petitioner's new mitigation evidence was cumulative. Additionally, the PCR court found that, even if the evidence was not merely cumulative, "[g]iven the weight to be afforded

the 'missing' mitigators, as against the aggravating factor of the murder of a law enforcement officer, defendant can demonstrate no prejudice." (*Id.* at 17.) The PCR court further concluded that "none of the factors addressed by defendant, either alone or in connection with other mitigation, would alter the sentence of death as found by the jury." (*Id.* at 17.) The PCR court emphasized the Arizona Supreme Court's consistency in declining to give much weight to factors distant in time from the crime, unrelated to the crime, or that suggest an inability to appreciate the wrongfulness of the conduct. (*Id.*)

The Arizona Supreme Court denied Petitioner's request for review of the PCR court's decision. (Doc. 31, Ex. XX.)

B.      Claim 1: New Evidence

In Claim 1 Petitioner presents new allegations and proffers new evidence in support of an expanded claim of deficient performance and prejudice as a result of trial counsels' ineffectiveness at sentencing. (Doc. 28 at 97–137.) The new allegations are as follows:

(1)      Counsel encouraged Petitioner to assert a denial of responsibility defense despite knowing Petitioner had amnesia for the events surrounding the offense and without explaining to Petitioner that this strategy was untenable and would greatly increase the risk of a death sentence. (Doc. 28 at 98–99.)

(2)      Counsel failed to investigate Petitioner's mental state at the time of the offense. (*Id.* at 99.)

(3)      Petitioner's mother consumed alcohol while pregnant with Petitioner, Petitioner has cognitive defects consistent with a neurodevelopmental disorder, including Fetal Alcohol Effects, and Petitioner's cognitive defects manifested in elementary school when he was diagnosed with a learning disability and placed in special education. (*Id.* at 99–100.)

(4)      Dr. Biggan reviewed her billing records and concluded that she had spent no time in consultation with Petitioner's counsel regarding the implications of the testing results described in the report she prepared prior to sentencing in 2004. She reviewed her 2004 report and concluded that Petitioner presents with neurological impairments and

brain damage, though not severe. Dr. Biggan reviewed evidence of Petitioner's learning disability and evidence that Petitioner's mother drank alcohol during pregnancy, and stated that this evidence warranted further exploration by a neuropsychologist. Dr. Biggan indicated Petitioner's cognitive functioning would have the tendency to significantly degrade and ripen into significant neuropsychological deficits under highly stressful conditions, and Petitioner's amnesia suggests severe cognitive degradation and brain dysfunction at the time of the offense. (*Id.* at 101–05.)

(5) Petitioner's early onset substance abuse and inability to overcome addiction relate to the fact he was born with an untreated neurodevelopmental disorder in combination with the fact that since childhood he has suffered from clinical depression. Further, prior to his addiction to methamphetamine—an addiction he had resisted until early 2002—Petitioner had no reputation for aggressiveness or violence, but lost control of his life after becoming addicted to meth. (*Id.* at 106–09.)

(6) Neuropsychological testing conducted by Dr. Kenneth Benedict in 2014 indicated that Petitioner's cognitive deficits, identified both in Dr. Benedict's testing and the earlier testing of Petitioner, were strongly indicative of brain damage, and are associated with and compounded by problems that are developmental in nature, i.e., Petitioner was born with them. Dr. Benedict also concluded that Petitioner had compounded his neurodevelopmental defects with acquired brain injury from other trauma, e.g., polysubstance abuse and his history of psychosocial trauma. Dr. Benedict concluded that Fetal Alcohol Effects are among the causes involved in Petitioner's historical and present pattern of neurodevelopmental and cognitive problems. Dr. Benedict also concluded that Petitioner's functioning deteriorates when he is confronted with emotional arousal. He determined, to a high degree of certainty, that under conditions of emotional arousal, Petitioner would display rapid deterioration in planning, judgment, the ability to alter behavior based on incoming information from his environment, and his capacity to regulate impulses. Significant neuropsychological impairments would present with "absolute certainty" if emotional arousal was combined with the presence of psychoactive substances. Dr. Benedict also found that, in the context

of Petitioner's disturbed psycho-social environment, Petitioner's pre-existing brain impairment contributed to his educational failure, depression, drug abuse, and difficulty in overcoming addiction. Considering Petitioner's brain dysfunction, substance use, and sleep deprivation at the time of the offense, Dr. Benedict concluded it was "highly probable" that Petitioner would have difficulty recalling specifics related to the crime or had complete amnesia for the time period surrounding the crime. (*Id.* at 109–16.)

(7)     After reviewing evidence demonstrating Petitioner's mother consumed alcohol during pregnancy and school records that demonstrated Petitioner was identified as learning disabled, Dr. Barillas concluded that all of the prior opinions she offered in this case, including those presented to the jury, were incomplete, inaccurate, and ultimately unreliable. Dr. Barillas found that the new evidence suggested a strong possibility that Petitioner may have suffered from a much more severe form of childhood neglect which, combined with a neurodevelopmental disorder, may have contributed to Petitioner's suffering from a clinical depression. (*Id.* at 116–21.)

(8)     Dr. Cunningham confirmed that, in 2004, he was not asked to review Dr. Biggan's 2004 neuropsychological report. Having now reviewed that report in addition to evidence that Petitioner's mother drank during pregnancy, Dr. Cunningham concludes that had he been provided with this evidence, he would have alerted PCR counsel that Petitioner suffers from brain dysfunction and abnormality that could be associated with Fetal Alcohol Effects. (*Id.* at 121–22.)

(9)     Dr. Robert Smith, a psychologist, interviewed Petitioner in 2014 and concluded that he suffered from a history of severe childhood trauma, persistent depressive disorder, hallucinogen use disorder, stimulant use disorder, alcohol use disorder, and neurocognitive impairment. Dr. Smith concluded that, at the time of the offense, these disorders were sufficient to significantly impair his emotions, cognition, perceptions, and behavior at the time of the offense. (*Id.* at 122–34.)

(10)    Finally, Petitioner presents evidence that counsel's representation to the state court regarding their homicide and capital case experience were admittedly untrue, that Basham had relevant capital case sentencing experience in only two cases, in which

his participation was minimal, and that Storts had never participated in a capital sentencing proceeding. (*Id.* at 134–37.)

### C.    Claim 1: Procedural Status

Because *Martinez* applies only to procedurally defaulted IAC claims, the Court must first determine whether Claim 1 has been procedurally defaulted. The parties dispute whether this claim was exhausted in state court. Petitioner argues that Claim 1, presented only in part to the state courts, relies on "new and substantial supporting evidence" which dramatically changes the claim as presented in state court, rendering Claim 1 unexhausted and procedurally defaulted. (*See* Doc 28 at 144; Doc. 37 at 105) (citing *Dickens*, 740 F.3d at 1319). Respondents contend that Claim 1 consists of four sub-parts: two that are unexhausted and procedurally defaulted, and two that were exhausted in Petitioner's state post-conviction proceedings. The Court disagrees, in part, with both arguments. As discussed below, Claim 1 is properly considered as a single IAC claim with a unified legal theory, and, despite the new allegations and evidence presented for the first time in this Petition, it is fully exhausted and not procedurally defaulted.

Claims with separate identities and separate elements of proof are unrelated for purposes of exhaustion. *See Kimmelman v. Morrison*, 477 U.S. 365, 374–75 (1986) (noting the difference between substantive claim underlying an IAC claim and the IAC claim itself, stating "the two claims have separate identities and reflect different constitutional values"). In the context of IAC claims, each unrelated allegation of counsel's ineffectiveness is generally considered a separate claim for purposes of exhaustion. *Gulbrandson*, 738 F.3d at 992 (citing *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005)). Although all IAC claims are analyzed under the two-prong test established in *Strickland*, this shared analytical framework does not necessarily establish that the claims are related. *See, e.g.*, *Moormann*, 426 F.3d at 1056 (petitioner's claim that "counsel was ineffective for failing to investigate and present a viable defense" did not fairly present the more specific claim that counsel was ineffective in "presenting the insanity defense").

In this case, Respondents have identified four "sub-claims" in Claim 1, and analyzed the procedural status of each separately as follows:

Claim 1(A): Ineffective assistance of counsel for contesting guilt during the guilt phase of trial, where this defense "carries strong risks for imposition of a death sentence in the penalty phase" (Doc. 28, at 147–49, 188);

Claim 1(B): Ineffective assistance for presenting a non-responsibility defense at the guilt phase without adequately advising Cruz of the potential effect of this defense at sentencing (*Id.* at 149–51, 188);

Claim 1(C): Ineffective assistance for failing to adequately investigate Cruz's mental state at the time of the offense (*Id.* at 151–56, 185–88);

Claim 1(D): Ineffective assistance for failing to investigate and present all reasonably available mitigation evidence and to explain the significance of such evidence (*Id.* at 156–70, 171–84).

The Court finds, however, that all of the allegations in Claim 1 represent one related claim of ineffective assistance of counsel alleging a failure to investigate and present mitigation evidence. These sub-claims "are <u>not</u> separate claims of ineffective assistance of counsel," rather, all of the deficiencies in counsel's performance as described in the sub-claims arise from counsel's sentencing-phase mitigation strategies and the reasonableness of those strategic decisions that result in a "singular form of prejudice"—"a single claim that seeks relief for counsel's failure to investigate and present mitigation." (*See* Doc. 37 at 9–10.) (emphasis in original). These sub-claims share a single identity and common elements of proof: whether counsel's strategy resulted in a failure to investigate and present mitigation and was therefore deficient, and whether there was a reasonable probability that the mitigation evidence would have changed the outcome. *Cf. Williams*, 529 U.S. at 397–98 (when measuring prejudice in a capital case for failure to present mitigation, courts must "evaluate the totality of the available mitigation evidence"). Thus, for purposes of this exhaustion analysis, the Court examines Claim 1 in its entirety, as a single ineffective assistance of sentencing counsel claim alleging a failure to investigate and present mitigation.

Ordinarily, *Martinez* would not apply to a claim, such as Claim 1, that was adjudicated on the merits in state court. *See Detrich*, 740 F.3d at 1246. As discussed in

more detail below, however, the IAC at sentencing claim that the PCR court reviewed was in a weaker evidentiary position than Petitioner proposes in support of Claim 1 in this Court. (Doc. 28 at 97–137.) Petitioner asserts that, to the extent the claim is rendered unexhausted by new evidence, the lack of exhaustion is due to PCR counsel's ineffectiveness, and therefore any default is excused under *Martinez* and the Ninth Circuit's decision in *Dickens*. (Doc. 28 at 144.) The Court considers the new evidence Petitioner proffers in support of Claim 1 for purposes of making this determination. *See Dickens*, 740 F.3d at 1319 ("[A] district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*.").

D.    Fundamentally Altered Claim

A claim has not been fairly presented in state court if new evidence fundamentally alters the legal claim already considered by the state court or places the case in a significantly different and stronger evidentiary posture than it was when the state court considered it. *See Dickens*, 740 F.3d at 1318–19 (citing, *inter alia*, *Vasquez v. Hillary*, 474 U.S. 254, 260 (1986); *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988); *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988)).

In *Dickens*, the petitioner argued in state court that his sentencing counsel provided ineffective assistance by failing to direct the work of a court-appointed psychologist and to adequately investigate the petitioner's background. *Dickens*, 740 F.3d at 1317. These general allegations did not identify any specific conditions that sentencing counsel failed to uncover. The state court denied the claim on the merits, finding that counsel's performance was not deficient and that the petitioner had failed to demonstrate he was prejudiced. *Id.* In his federal habeas petition, however, the petitioner "changed his claim to include extensive factual allegations suggesting Dickens suffered from FAS [Fetal Alcohol Syndrome] and organic brain damage." *Id.*

In determining whether the petitioner's claim was unexhausted, the court in *Dickens* found that factual allegations not presented to a state court may render a claim unexhausted if the allegations "fundamentally alter" the legal claim presented and

considered by the state courts. *Id.* at 1318 (citing *Vasquez*, 474 U.S. at 260). New evidence fundamentally alters a claim if it places the claim in a *significantly different and stronger evidentiary* posture than it had in state court. *Dickens*, 740 F.3d at 1318 (emphasis added) (citing *Aiken*, 841 F.2d at 883, 884 n.3).

Applying these principles, the court found that Dickens's "new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts." *Id.* at 1319. It further noted that the claim urged in state court only "generally alleged that sentencing counsel did not effectively evaluate whether Dickens 'suffer[ed] from any medical or mental impairment'" and that specific conditions like FAS and organic brain damage placed the claim in a "significantly different" and "substantially improved" evidentiary posture. *Id.* Having determined that Dickens's fundamentally altered IAC sentencing claim was unexhausted and procedurally barred, the court remanded for consideration of cause and prejudice under *Martinez*. *Id.* It further instructed that § 2254(e)(2) did not bar the district court from hearing new evidence to determine the existence of cause and prejudice.

Under *Dickens*, the question of whether *Martinez* applies to Claim 1 hinges on whether the claim, as presented in these federal proceedings, is fundamentally different from the one presented in state court. The new evidence Petitioner proffers to this Court is indeed "stronger." It does not, however, place Petitioner's case in a *significantly different or stronger evidentiary* posture than it was when the state courts considered it, because, unlike the new evidence presented in *Dickens*, Petitioner did present to the state courts evidence of specific conditions and mental impairments, as well as his mental state at the time of the offense.

To determine if Claim 1 is fundamentally different than the IAC claim presented in state court, the Court compares the IAC claim raised in his PCR to Claim 1 of Petitioner's federal habeas petition. In his PCR, Petitioner presented evidence obtained through interviews, records and expert reports that helped to establish how "forces well beyond [Petitioner's] control for much of his early life" contributed to his drug addiction—including evidence corroborating and elaborating on the abuse witnessed and

experienced by Petitioner as well as the possibility that Petitioner suffered from a learning disorder (ADHD) that could be related to his intoxicant abuse and impulsivity. (Doc. 31, Ex. X: Ex. 38 at 13.) Petitioner provided evidence suggesting that he likely used cocaine and amphetamine at or shortly before the time of the offense, which impaired his judgment and ability to conform his conduct to the requirements of the law. Petitioner also presented evidence that he was at risk for neurodevelopmental issues including probable fetal substance exposure, learning problems in school, chronic stress in childhood, and head injuries, and alleged that there was a logical nexus between these adverse developmental factors and the capital offenses.

Petitioner now seeks to expand the record to include evidence indicating that: (1) he suffers from fetal alcohol exposure, (2) he suffers from neuropsychological and cognitive deficits, (3) brain impairments contributed to his drug addiction, (4) his brain impairments would have been exacerbated by stressors at the time of the offense, and (5) he was under the influence of cocaine and methamphetamine at the time of the offense. The Court agrees with Respondents that, while Petitioner presents new factual allegations that he suffered from additional specific medical or mental impairments, he also presented evidence of specific conditions to the state court from which the same conclusions could be drawn—essentially, that factors outside Petitioner's control contributed to his drug use, and his impairments were exacerbated leading up to the offense. Accordingly, while Petitioner's allegations are somewhat strengthened by the evidence that Petitioner suffered from the specific conditions of fetal alcohol exposure and cognitive impairments that were not uncovered by trial counsel, this claim is not "significantly different" than what he presented to the state courts.

Accordingly, the Court finds the IAC claim presented in Claim 1 is exhausted, but not fundamentally altered by the new evidence presented in support of the claim, and thus it does not fall under the umbrella of *Martinez*. This Court reviews Petitioner's ineffective assistance of sentencing counsel claim under the strict evidentiary standards of AEDPA, which, subject to the exceptions set forth in § 2254(e)(2) and discussed below, precludes further evidentiary development and limits habeas review to the record

made in the state court. *See Pinholster*, 563 U.S. at 180–186. Accordingly, Petitioner's motion to expand the record, to conduct discovery, and for an evidentiary hearing on Claim 1 is denied, with the exception of granting Petitioner's motion to expand the record in part as to Exhibits 1–27 attached to Petitioner's Motion for Evidentiary Development. The parties agree these exhibits were part of the state court record that Respondents were unable to provide. Moreover, Petitioner does not assert, in Claim 1, that the state court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Thus, Petitioner has not established he is entitled to relief under AEDPA as to Claim 1, and the Court denies this claim.

E.     Claim 2

Petitioner does assert in Claim 2 that the state court's denial of his claim that sentencing counsel performed ineffectively by failing to investigate and present mitigation evidence during the penalty phase constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of facts under § 2254(d)(1) and (2). (*See* Doc. 28 at 189–199.) Because Petitioner's IAC at sentencing claim, as alleged in Claim 2, was denied on the merits in state court, this Court's review is limited to the state court record and Petitioner is entitled to evidentiary development only if his claim satisfies § 2254(d). *Pinholster*, 563 U.S. at 180–81, 185; *see, e.g.*, *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013) (explaining that *Pinholster* bars evidentiary hearing unless petitioner satisfies § 2254(d)). Accordingly, before taking up Petitioner's motion for evidentiary development, the Court first addresses whether Petitioner has cleared the § 2254(d) hurdle. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2283 (2015).

When conducting its analysis, this Court must review the "last reasoned state court opinion." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). When the state's highest court denies the claim summarily, the federal court looks through to the last reasoned decision.

*See Johnson v. Williams (Tara)*, 568 U.S. 289, 297 n.1 (2013). The last reasoned decision here is that of the PCR court.

### 1. Deficient Performance

#### a. *Unreasonable Determination of the Facts (§ 2254(d)(2))*

Petitioner argues that the state court premised its decision on the erroneous findings that: (1) trial counsel had vast experience in handling 250 homicide and at least 50 capital cases, (2) Petitioner was aware of, and could have informed counsel of, the existence of the majority of the new mitigation evidence, and (3) Petitioner imposed a demand for a speedy trial on his counsel and therefore "placed himself in a position of cutting short the mitigation investigation."

A challenge to a factual determination "based entirely on the state record" is governed by § 2254(d)(2), and is termed an "intrinsic" challenge. *Murray*, 745 F.3d at 999. A successful intrinsic challenge may be based on a claim that (1) the state-court decision rests on a finding unsupported by sufficient evidence, (2) the process employed by the state court was defective, (3) or no finding was made by the state court at all, when it was required to make a finding. *Id.* (citing *Taylor*, 366 F.3d at 999). The Court applies § 2254(d)(2) to "intrinsic review of a state court's processes, or situations where petitioner challenges the state court's findings based entirely on the state record." *Kesser v. Cambra*, 465 F.3d 351, 358 n. 1 (2006) (en banc) (quoting *Taylor*, 366 F.3d at 999-1000). *But see Miller-El v. Dretke*, 545 U.S. 231 240 (2005) (reciting, without distinguishing, both § 2254(d)(2) and § 2254(e)(1)). An intrinsic review requires that a federal court "be particularly deferential to our state-court colleagues." *Murray*, 745 at 999 (citing *Taylor*, 366 F.3d at 1000). New evidence may be considered only on de novo review, subject to the limitations of § 2254(e)(2). *Id.* at 1000 n.1.

State-court factual determinations are accorded substantial deference, and may not be characterized as unreasonable because this Court would reach a different conclusion in the first instance. *Brumfield*, 135 S. Ct. at 2277 (citing *Wood*, 558 U.S. at 301). However, the Court affords this deference only if the state court's fact finding process survives "intrinsic" review pursuant to AEDPA's "unreasonable determination clause." *Hurles*,

752 F.3d at 790 (citing *Taylor*, 366 F.3d at 1000). "[D]eference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief." *Brumfield*, 135 S. Ct. at 2277 (quoting *Miller-El*, 537 U.S. at 340) (internal quotation marks omitted). Before a federal court can determine that the state court's fact-finding process is defective in some material way, or perhaps non-existent, it "must more than merely doubt whether the process operated properly." *Taylor*, 366 F.3d at 1000. Rather, it "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* "To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim." *Taylor*, 366 F.3d at 1001.

The state court's determination, in the absence of a hearing, that defense counsel had handled at least 50 capital cases was not unreasonable.

The number of capital cases counsel represented to the court that they had handled ranged from 14 to 22, to 30, and finally, based on Basham's affidavit, 50 capital cases.[8] (Doc. 28 at 197–98.) Petitioner never challenged counsel's capital case experience in state court, and thus the trial court could conclude, whether it was 14 or 50 capital cases, that counsel had the requisite experience to supervise and direct DiFrank. Under these circumstances, Petitioner cannot establish that a reviewing court "could not reasonably conclude that the finding is supported by the record." *See Taylor*, 366 F.3d at 1000. Furthermore, though the PCR court considered this factual finding to be "salient," the court ultimately based its reasonableness determination on a finding that counsel had the experience to supervise DiFrank and the additional expertise required to "relate the pieces of mitigation to each other." (Doc. 31, Ex. RR at 15.)

Next, Petitioner contends that the PCR court unreasonably determined that Petitioner was aware of the new mitigation evidence prior to his sentencing. Petitioner

---

[8] Petitioner also refers to newly-discovered factual allegations that the capital case experience of counsel was drastically inflated in the state-court record. Because this information was not part of the state-court record, the Court does not consider it in this proceeding. *See Pinholster*, 563 U.S. at 185; *see also* 28 U.S.C. § 2254(d)(2).

argues that the finding was unreasonable because it required assumptions about facts outside the record without giving Petitioner an opportunity to present evidence as to those facts and, indeed, refusing to look at evidence he did present. (Doc. 28 at 198.) The Court finds that in the absence of an evidentiary hearing, and in light of the evidence in the record supporting Petitioner's position and the lack of sufficient evidence supporting the State's position, the PCR court's conclusion that Petitioner could have informed counsel of the existence of the majority of mitigation presented in his PCR at the time of his decision to exercise his rights to a speedy trial was an unreasonable determination of fact.[9]

The Court rejects Respondents' assertion that "common sense" supported the PCR court's finding that Petitioner would have been aware of mitigation involving his own life. Neither does the Court agree that Petitioner's statement to the court—that he was happy with the mitigation so far produced by the defense—leads to the obvious conclusion that counsel had discussed mitigation with Petitioner. (Doc. 30 at 90) (citing RT 7/26/04 at 25-26) (Petitioner stating he was "very satisfied with the mitigation they have obtained for me so far"). First, even if Petitioner had discussed mitigation with his counsel, this does not establish that counsel considered Petitioner a source of mitigation. Second, even if Petitioner was considered to be a source of information, it's not evident that Petitioner was in a position to have full knowledge of the new evidence presented in the PCR. For example, the record does not indicate Petitioner would have been aware of his mother's history of mental illness and drug abuse, especially during the time of her pregnancy with him and during his early childhood.

The fact that Petitioner was aware of the mitigating evidence was critical to the PCR court's determination that counsel did not perform deficiently. The PCR court suggested Petitioner made strategic choices with full knowledge of the mitigation he

---

[9] Because the Court finds Petitioner has satisfied §2254(d)(2), this analysis does not address Petitioner's related argument that counsel had a duty to investigate and present evidence irrespective of information provided by Petitioner. *See Vega v. Ryan*, 757 F.3d 960, 966 (9th Cir. 2014) ("state court's holding that counsel had no responsibility to obtain information known to his client is an unreasonable application of Supreme Court precedent") (citing *Rompilla v. Beard*, 545 U.S. 374, 387–89 (2005)).

chose not to share with counsel. This finding was "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

Finally, Petitioner asserts that the PCR court reached a factual conclusion—Petitioner masterminded the idea to demand a speedy trial and was thus responsible for deficiencies in the mitigation investigation—that, without a hearing, could not be made on the version of the record before the court. (Doc. 28 at 195.) The Court finds that the examination of the record before the state court establishes that the critical factual determination made by the state court—that Petitioner was responsible for the time constraints placed on his mitigation investigation—was unreasonable under § 2254(d)(2) because the state court's fact-finding process was deficient.

The state court's failure to conduct an evidentiary hearing does not necessarily "render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *See Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). The ultimate question is "whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record." *Id.* (emphasis in original); *cf. Brumfield*, 135 S. Ct. 2279–81 (holding that state habeas court's refusal to grant petitioner an evidentiary hearing on his intellectual disability claim, as permitted by state law, was based on an unreasonable determination of the facts within the meaning of § 2254(d)(2)). Petitioner does not argue that the failure to hold an evidentiary hearing was per se unreasonable; rather, he argues that in light of the record before the state court, the evidence required further factual development. The Court agrees.

The evidence before the PCR court was neither sufficient to resolve the factual question, nor were Petitioner's allegations incredible in light of the record. *See Perez v. Rosario*, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are incredible in light of the record, or when the record already before the court establishes a fact conclusively); *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (noting that a state court is not required to hold an evidentiary hearing

when it is possible to resolve the factual question based on documentary testimony and evidence in the record) (citation omitted). In the PCR proceedings, Petitioner alleged that counsel conducted an inadequate mitigation investigation, resulting in the failure to bring relevant information to the attention of the mental health experts. Petitioner asserted this lapse in performance was due to defense counsel's failure to have a trained mitigation specialist on the team before trial and failure to provide their investigator, DiFrank, with adequate time to conduct the investigation. (*See* Doc. 31, Ex. W at 32, 35.) Petitioner supported these allegations with, among other things, a declaration from DiFrank that she was not trained as a mitigation specialist and did not have an adequate amount of time to investigate and prepare the case. (*See* Doc. 31, Ex. X, Ex. 4 at 2–3.) In response, the State argued that counsel did not perform deficiently because it was Petitioner himself who was responsible for any time limitations placed on the investigation and preparation of the case in mitigation. (Doc. 31, Ex. II, at 51.) The PCR court agreed, despite acknowledging that DiFrank attributed to lead counsel Storts the desire to take the case to trial as quickly as possible. (Doc. 31, Ex. RR at 15.)

DiFrank indicated in her declaration that she was aware that Storts desired a quick trial, and further asserted that when she expressed her concerns about having sufficient time to complete her assignments, Basham stated there was "nothing he could do because lead counsel Storts was very strict about time limits." (Doc. 31, Ex. X: Ex. 4 at 3.) Rejecting DiFrank's assertion, however, the state court adopted "as fact" Basham's avowal that it was Petitioner who consistently demanded to exercise his right to a speedy trial, and that this demand had been incorporated into the record by defense counsel on numerous occasions. (Doc. 31, Ex. NN: Ex. K at 4.) The PCR court, while seemingly acknowledging DiFrank's testimony was central to Petitioner's claim, failed to explain how it reconciled this evidence with the contradictory affidavits submitted by counsel, thus casting "doubt on the process by which the finding was reached, and hence on the correctness of the finding." *Taylor*, 366 F.3d at 1007–08 (citations omitted). There is nothing in the record, aside from Basham's affidavit, that indicates this strategic idea *originated* with Petitioner with the understanding that by "maintaining his right to a

speedy trial" he would be "cutting short the mitigation investigation." (Doc. 31, Ex. RR at 15.) Although Petitioner had in fact notified the court, through counsel, that he was pursuing a speedy trial strategy for the purpose of forcing a change of venue if a jury could not be seated in Pima County under speedy-trial deadlines (*see* ROA. 206–07, 214), this does not establish that it was Petitioner's idea to pursue a speedy-trial strategy, or that Petitioner's unwavering demand for "no delay" in the proceedings precipitated counsel's strategic decision.

There is some evidence in the record suggesting that even if the speedy trial strategy did not originate with Petitioner, he may have adopted this strategy with knowledge of the resulting limitations it would place on the scope of mitigation. Respondents identify two items that would support this finding: (1) trial counsel's statement that "Cruz felt Durand's extended timeline for preparing mitigation was 'not acceptable,'" and (2) Petitioner's statement "that he wanted 'no delays' in going to trial." (*See* Doc. 31 at 86) (citing RT 4/26/04 at 62–63 and RT 7/26/04 at 25). Nonetheless, even if Petitioner embraced the "no delay" strategy, the record does not support the conclusion that he did so after being informed of its advantages and disadvantages.

"An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 690–91). As Petitioner points out, as early as October 2003, before any mitigation investigation had commenced, Storts represented to the court that if the change of venue motion was granted, he would be ready to go to trial during the summer of 2004. (RT 10/6/03 at 9.) The timing of this decision suggests that, whether it was Petitioner or counsel who was responsible for the decision, it was made before any inquiry into the need for mitigation was made. It was apparent from the record that, as of April 2004, Durand had provided little, if any, information to counsel regarding the mitigation investigation. (RT 4/26/04 at 60–61.) At that time, the state court acknowledged that if Petitioner wished to pursue his speedy trial rights, he would "probably have to have an acknowledgement waiver he's not going to want to have the kind of mitigation this expert's indicating that she needs to do adequately." (*Id.* at 62.) Storts agreed. (*Id.*) At the

next hearing in July 2004, Petitioner stated that he had spoken with counsel about the "whole thing": "I want no delays in my trial, and I'm very satisfied with my defense, and I'm very satisfied with the mitigation they have obtained for me so far." (RT 7/26/04 at 25.) According to DiFrank's declaration, however, when Petitioner made this statement she had not even begun to interview witnesses, though some records had been obtained. (Doc. 31, Ex. X: Ex. 4 at 3.) In the context in which Petitioner made both of these statements, his assertions do not provide sufficient evidence from which the state court could have concluded, without a hearing, that Petitioner either was the originator of this strategy, or adopted it fully informed of the inherent risks in cutting short his mitigation investigation in a case where "there [was] absolutely no doubt" that Petitioner killed Officer Hardesty. (Doc. 31, Ex. RR at 3.)

"[W]here a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient . . . .'" *Hurles*, 752 F.3d at 790–91 (quoting *Taylor*, 366 F.3d at 1001 ("If for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an unreasonable determination of the facts." (internal quotation marks omitted)). The PCR court's determination that Petitioner was the driving force behind the abandonment of his own right to an effective mitigation investigation relieved the court of making a determination whether counsel performed deficiently by placing the fault for any unreasonable performance squarely at the feet of Petitioner. Although the Court does not accept Petitioner's suggestion that DiFrank's declaration was dispositive of this issue, the allegations contained therein raised a critical factual dispute that could not be resolved on the record. The PCR court's determination, made without a hearing, and ignoring critical evidence in the record, resulted in an "unreasonable determination" of the facts, and therefore does not bar Petitioner's claim for habeas relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

//

### b.    *De Novo Review*

To state a claim for ineffective assistance of counsel, a petitioner must establish that counsel performed deficiently. *Strickland*, 466 U.S. at 687–88. Counsel is constitutionally tasked with attempting to discover "'*all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis in original) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(c), p. 93 (1989)); *see also Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.").

Counsel has a "duty to investigate and present mitigating evidence of mental impairment." *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998). Counsel should also consider "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citations and emphasis omitted). Furthermore, in preparation for the penalty phase, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (citing *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999)). "The defendant's history of drug and alcohol abuse should also be investigated." *Summerlin v. Schriro*, 427 F.3d 623, 630 (2005) (citing *Jennings v. Woodford*, 290 F.3d 1006, 1016–17 (9th Cir. 2002)).

 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. However,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91; *see Wiggins*, 539 U.S. at 521; *see also Jennings*, 290 F.3d at 1016 (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

If counsel conducts a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence, counsel cannot be faulted for failing to locate and present it. *Babbit v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1998). In addition, "a lawyer may make reasonable decisions that render particular investigations unnecessary." *Id.*

Petitioner alleges that trial counsel's mitigation investigation was inadequate because: counsel failed to conduct a thorough investigation of Petitioner's history; failed to obtain the assistance of a qualified mitigation expert; and failed to provide accurate or complete social history data to their mental health experts. Petitioner asserts that counsel's decision to forego mitigation investigation in favor of pursuing a speedy trial strategy was not at Petitioner's insistence, and was made before any mitigation investigation had even commenced. As discussed above, these allegations are not inherently incredible or conclusively refuted by the existing state court record. Accordingly, this Court cannot reject Petitioner's ineffective assistance of counsel claim without holding an evidentiary hearing. *See Earp*, 431 F.3d at 1167; *cf. Hibbler*, 693 F.3d at 1149.

## 2. Prejudice

### a. Unreasonable Determination of the Facts (§2254(d)(2))

Petitioner also asserts that the PCR court's determination of a crucial fact, central to the prejudice prong of its analysis, was unreasonable. Specifically, Petitioner disputes the PCR court's determination that the proffered mitigation was "not new evidence, but rather additional, cumulative evidence." *See Andrews v. Davis*, 798 F.3d. 759, 779 (9th Cir. 2015) ("[U]nder *Strickland*'s prejudice prong, cumulative mitigating evidence does

not support a conclusion that there would be a reasonable probability of a different outcome."). Respondents assert that Petitioner has failed to demonstrate he is entitled to habeas relief because he has not supported his conclusory assertion that the PCR court's determination was unreasonable. The Court disagrees.

The PCR court's determination that the proffered mitigation was cumulative blurs the distinction "between direct and corroborating evidence, on one hand, and evidence that unnecessarily proves a point already sufficiently established, on the other." *See Liao v. Junious*, 817 F.3d 678, 695 (9th Cir. 2016) (error for habeas court to label expert testimony "merely cumulative" when it was in fact corroborative). Cumulative evidence is additional evidence that supports a fact established by the existing evidence. *Id.* (citing Evidence, Black's Law Dictionary (10th ed. 2014)). Corroborative evidence, on the other hand, is evidence that differs from but strengthens or confirms what other evidence shows, especially that which needs support. *Id.*; *see State v. Kennedy*, 592 P.2d 1288, 1292 (Ariz. App. 1979) ("Corroborative" evidence is evidence which tends to corroborate or confirm, and is different from "cumulative" evidence, which merely augments or tends to establish a point already proved by other evidence)

As the Arizona Supreme Court found, the mitigating evidence Petitioner presented at trial established only that Petitioner's early life was "not ideal," but did not establish the type of "horrible abuse" often found in capital cases, or that he was suffering from significant mental illness or under the influence of drugs at the time of the crime. *Cruz*, 181 P.3d at 217. Petitioner had argued the following mitigating factors during the penalty phase: impaired capacity to appreciate the wrongfulness of his conduct; impaired capacity to conform his conduct to the law; unusual and substantial duress; unforseeability that the acts would cause death; dysfunctional family; deprivation of "necessary nurturing love" from family; family history of mental disorders; posttraumatic stress disorder ("PTSD"); drug addiction; mental state affected by family history of mental disorders, PTSD, and drug addiction; unfavorable impact on Petitioner's family; existence of family support; compliance with prison rules; lack of propensity for future violence; capability to adapt to prison life; and lack of plan to commit the murder.

Petitioner asserted that his "upbringing, life-style and subculture all made it far more likely that he would find himself in this position." The evidence proffered by PCR counsel, which supported facts that even the Arizona Supreme Court on direct appeal had recognized were not already proven by other evidence, was not "merely cumulative," but corroborated the evidence he presented at sentencing, especially the evidence of early childhood abuse and neglect and exposure to drugs.

The evidence that Petitioner proffered to the state court in his PCR corroborated elements of mitigation that were presented either ineffectively or not at all. For example, PCR counsel presented evidence that Petitioner's mother had severe drug and alcohol problems which, in combination with her severe mental illness, would have altered the jury's understanding of the level of abandonment, neglect, and instability Petitioner faced during his early childhood. The evidence presented at sentencing by trial counsel, on the other hand, suggested Petitioner's mother had "good values" which she would have passed on to her son. Similarly, trial counsel presented evidence that Petitioner was beaten, at least once, by his father, but this evidence was effectively negated by testimony that trial counsel also elicited: Petitioner's father was not verbally or physically abusive but was merely a "prankster." PCR counsel presented evidence corroborating the abuse Petitioner suffered from his father, in addition to suffering beatings from his step-father and his uncles. Because these facts were not established during sentencing, the evidence that tended to establish these facts presented in the PCR court was corroborative, not cumulative. *See Liao*, 817 F.3d at 695.

Additionally, in his PCR, Petitioner presented evidence of his mental state at the time of the offense, including an expert opinion that his judgment and ability to conform his conduct to the requirements of the law were probably impaired, that he was at risk for neurodevelopmental issues, and that there was a logical connection between these adverse developmental factors and the offense. This evidence was also not cumulative, because, as the Arizona Supreme Court found, there was "little or no causal relationship between the mitigating circumstances and the crime." *Cruz*, 181 P.3d at 217.

Next, the PCR court stated that, even if the mitigation evidence was substantive and not cumulative, the new evidence did not warrant relief because Petitioner had not demonstrated he was prejudiced by its omission. The Court finds that this too was based on an unreasonable determination of fact because this decision seems to have ignored some of Petitioner's most compelling new evidence.

When measuring prejudice in a capital case for failure to present mitigation, courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. While the Court is "mindful that the state courts are not required to address every jot and tittle of proof suggested to them," or "'make detailed findings addressing all the evidence,'" *Taylor*, 366 F.3d at 1001 (quoting *Miller-El*, 537 U.S. at 346), "the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id.*

Here, the state court discussed the report prepared by McMahill as it related to the performance prong of the *Strickland* analysis and opined that it identified additional information useful to the expert witnesses. (Doc. 31, Ex. R at 4.) In evaluating prejudice, the court specifically mentioned the evidence gathered by DiFrank in considering whether the new evidence was cumulative. (*Id.* at 16.) There is, however, no mention in the ruling of the expert statements provided by Dr. McCloskey, who opined that the abuse Petitioner suffered as a child was more severe than was discernable at trial; by Dr. Barillas, opining with a high degree of certainty that Petitioner was under the influence of cocaine and amphetamine at or shortly before the offense; or by Dr. Cunningham, who indicated that Petitioner was exposed to a large number of risk factors, including probable fetal substance exposure and head injuries, which predisposed him to mental illness and drug dependence. This evidence suggested that Petitioner's criminal conduct was not simply the product of choice and free will, as argued by the State in its closing remarks to the jury.

These expert opinions formed the cornerstone of Petitioner's claim because they suggested a causal link between his social history and the crime. (*See* Doc. 31, Ex. QQ at 11.) The omission of any mention of these experts is concerning, given that the PCR court emphasized the significance the Arizona Supreme Court placed on establishing a causal connection between the mitigation and the offense, and the PCR court's characterization of Petitioner's claim as the failure to present expert testimony regarding such a connection. (Doc. 31, Ex. RR at 13, 17.) These expert opinions, especially those of Drs. Barillas and Cunningham, were the causal link Petitioner was attempting to draw between the evidence the court characterized as "upbringing, life-style and subculture" and commission of the offense. The PCR court's failure to acknowledge this evidence in its ruling, while carefully reciting the rest of the evidence, suggests this evidence may have been overlooked. Thus, while the PCR court stated that it was considering as "substantive" the mitigation it had previously found "cumulative," there is no support in the record that suggests the PCR court considered the proffered expert witness opinions at all. The record suggests the state court overlooked this evidence, which was highly probative and central to Petitioner's claim. The "state court fact-finding process is undermined where," as here, the state court apparently ignores evidence that supports petitioner's claim. *Taylor*, 366 F.3d at 1001 (citing *Miller-El*, 537 U.S. at 346).

Because no appellate court could reasonably conclude that the state court's finding is supported by the record, the Court concludes that the state court's finding that the new mitigating evidence presented in PCR proceedings was cumulative was an objectively unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2).[10]

//

//

---

[10] Because the Court reaches the conclusion that the state court's ruling was based on an unreasonable determination of fact under § 2254(d)(2), the Court does not reach the question of whether the state court unreasonably applied clearly established law by failing to evaluate the totality of the available evidence or applying an incorrect test under *Strickland*.

*b.      De Novo Review*

To show prejudice from counsel's deficient performance, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In assessing prejudice the court reweighs the aggravating evidence against the totality of the mitigating evidence. *Wiggins*, 539 U.S. at 534. The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536.

In the PCR proceedings Petitioner attempted to establish prejudice by alleging that if counsel had conducted an adequate investigation and presented adequate information to their experts, they could have offered expert testimony establishing that: (1) Petitioner suffered from long term effects of child abuse/neglect, and exposure to drugs, which affected his behavior and predisposed him to criminal conduct as an adult; (2) Petitioner was diagnosed with a possible hyperactivity/attention deficit disorder, which would have predisposed him to intoxicant abuse as an adolescent; (3) Petitioner was probably under the influence of at least cocaine and amphetamine at or shortly before the time of his arrest, and thus probably had impaired capacity to conform his conduct to the requirement of the law; (4) Petitioner was exposed to a large number of risk factors that predisposed him to mental illness and drug dependence—including probable fetal substance exposure, head injuries, physical and psychological abuse, and teen onset of psychological disorders—and thus his choices as an adult were extremely limited; and (5) that there was a logical nexus between these adverse developmental factors and the murder. These allegations, considered to be true, are sufficient to establish a colorable claim of IAC at sentencing. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390–91 (2005) (IAC where counsel failed to discover mitigating information about petitioner that "would have destroyed the benign conception of [petitioner's] upbringing and mental capacity counsel had formed from talking to five family members and from the mental health experts' reports"); *Wiggins*, 539 U.S. at 537 (IAC where counsel failed to present evidence, readily available from school records and medical reports, of defendant's life

history which involved "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother" followed by "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," as well as periods of homelessness and diminished capacities); and *Williams*, 529 U.S. at 395 (IAC where counsel failed to present evidence that: petitioner's parents had been imprisoned for the criminal neglect of petitioner and his siblings, petitioner had been severely and repeatedly beaten by his father, petitioner had been committed to the custody of the social services bureau for two years during his parents' incarceration and also spent time in an abusive foster home, and Petitioner was "borderline mentally retarded" and did not advance in school beyond the sixth grade). Although Petitioner's new evidence does not establish a case in mitigation as strong as the evidence presented in *Wiggins* and *Williams*, the Court cannot say on the record before the court, that there is no reasonable probability that the result of the proceeding would have been different if the new evidence had been presented.

That Petitioner presented some mitigating evidence does not preclude an evidentiary hearing. The Supreme Court has "never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 561 U.S. 945, 955 (2010) (emphasis in original). Because Petitioner's allegations are not plainly meritless, and because the allegations are not inherently incredible or refuted by the existing state court record, the Court cannot reject his ineffective assistance of counsel claim without holding an evidentiary hearing. *See Earp*, 431 F.3d at 1167; *cf. Hibbler*, 693 F.3d at 1149.

## II. MOTION FOR EVIDENTIARY HEARING, AND EXPANSION AND DEVELOPMENT OF THE RECORD

Because the state court's decision "was based on an unreasonable determination of the facts," the claim is evaluated de novo, and the court may consider evidence properly presented for the first time in federal court. *See Hurles*, 752 F.3d at 778; *see also Pinholster*, 563 U.S. at 185 (if a claim has been adjudicated on the merits by a state court,

a federal habeas petitioner must overcome the limitation of § 2254(d) on the record that was before the state court in order to be entitled to an evidentiary hearing).

### A.  Request for Evidentiary Hearing

If a court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, it may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the petitioner has not failed to develop the factual basis of a claim in state court, the court considers whether a hearing is appropriate or required under the criteria set forth in *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *See Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999). Because AEDPA did not change the standards by which a federal court exercises that discretion, *see Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), the Supreme Court's decision in *Townsend* governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing. *See Hibbler*, 693 F.3d at 1147.

The Court concludes that Petitioner is entitled to an evidentiary hearing to determine whether he was denied the effective assistance of counsel at sentencing. *See Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("Where a petitioner has not failed to develop the factual basis of his claim in State court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing is required where the petitioner's allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of *Townsend*.") (citing *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 & n.6 (9th Cir. 2005)).

First, Petitioner has not "failed to develop the factual basis of [the] claim in State court proceedings," as § 2254(e)(2) requires.[11] Petitioner sought and was denied an evidentiary hearing to establish that his trial attorneys failed to conduct an adequate investigation, failed to present a comprehensive history of drug abuse, failed to show how Petitioner's drug abuse was related to the offense, failed to have mental health experts opine on Petitioner's mental state at the time of the offense, failed to present expert

---

[11] Respondents do not contest Petitioner's assertion that § 2254(e)(2) does not limit the availability of an evidentiary hearing on Claim 2. (*See* Doc. 42 at 33.)

testimony to explain the causal connection between Petitioner's social history and the crime, and failed to advise Petitioner to accept responsibility for the crime during his allocution. *See Stanley*, 598 F.3d at 623–24 (finding petitioner did not fail to develop the factual basis of the claim when state court found, without holding an evidentiary hearing or making findings regarding the investigation underlying trial counsel's decision, that Petitioner's determination not to waive physician-client privilege was a matter of reasoned trial strategy); *see also Hurles*, 752 F.3d at 791 ("A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim.") (citing *Stanley*, 598 F.3d at 624).

Second, under *Townsend*, an evidentiary hearing is justified where, as in this case, "the state factual determination is not fairly supported by the record as a whole" and "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." 372 U.S. at 313. The Court finds an evidentiary hearing is justified in this case based on the same factors the Court considered above in finding the state court's factual determinations unreasonable under § 2254(d)(2). *See Hibbler*, 693 F.3d at 1147 (framework for considering whether a district court erred in failing to conduct an evidentiary hearing provides guidance in determining what sort of procedural deficiencies will render a state court's fact-finding unreasonable). Finally, Petitioner has alleged facts which, if true, present a colorable claim for relief. *See Landrigan*, 550 U.S. at 474; *Stanley*, 598 F.3d at 624.

Finally, Respondents argue that an evidentiary hearing is unnecessary because this Court may rely on the evidence presented in state court. (Doc. 42 at 33) (citing *Landrigan*, 550 U.S. at 474). For reasons previously discussed, the Court disagrees that the performance prong of Petitioner's IAC claim may be resolved on the record. Petitioner's allegations of deficient performance were not patently incredible, and, in light of disputed factual claims before the state court, could not be resolved in the absence of a hearing. The Court also finds that Petitioner's untested proffer of additional mitigating evidence that could have been presented is insufficient for resolving the prejudice prong on the record before the Court.

Accordingly, having established: (1) that Petitioner did not fail to develop the factual basis of the claim in state court proceedings as § 2254(e)(2) requires; (2) that "the state factual determination is not fairly supported by the record as a whole" and "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing," *see Townsend*, 372 U.S. at 313; and (3) that Petitioner has alleged facts which, if true, would present a colorable claim for relief, and cannot be resolved solely by reference to the state court record, *see Landrigan*, 550 U.S. at 474, this Court grants Petitioner's motion for an evidentiary hearing on his IAC at sentencing claim.

## B.     Request for Discovery

Petitioner makes one specific discovery request: that he be granted leave to conduct the depositions of trial counsel prior to the hearing on Claim 2. Respondents opposed this request as it was raised in Claim 1 (*see* Doc. 42 at 31), but did not specifically address Petitioner's request to depose counsel in the event Petitioner established a violation of § 2254(d) in Claim 2. (*See* Doc. 42 at 33.) Accordingly, counsel should be prepared to discuss Petitioner's request to depose trial counsel during pre-hearing discovery proceedings.

Petitioner also asserts that he may supplement his claim with additional evidence within the limits that exhaustion allows (Doc. 38 at 51) and that discovery is not barred under the circumstances of this case (Doc. 46 at 34). These requests are denied.

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery is authorized upon a showing of good cause, but the "party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Rule 6(a) and (b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use

federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United States Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus is not a fishing expedition for petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a habeas court to determine the essential elements of the substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Petitioner fails to show good cause because his vague assertion that discovery is not barred lacks the specificity required by Rule 6. *See Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007) (denying discovery request because petitioner "did not comply with the specific requirements of Rule (6)(b); his request for discovery is generalized and does not indicate exactly what information he seeks to obtain. A habeas proceeding is not a fishing expedition"). Petitioner's generalized statement that discovery is not barred does not constitute "good cause."

### C.    Request to Supplement the Record

To the extent Petitioner seeks to supplement his claim with additional evidence "within the limits that exhaustion allows" (Doc. 38 at 51), this request is denied because it also lacks the requisite specificity. To the extent Petitioner intends to offer additional evidence in the form of exhibits at the evidentiary hearing, the Court will address the propriety of specific evidentiary offerings during the pre-hearing discovery proceedings.

### D.    Request to Expand the Record

Exhibits 1-27 of Petitioner's Motion for Evidentiary Development were part of the state court proceedings that Respondents were unable to provide, and this Court expands the record to include these exhibits.

In conclusion, Petitioner has established that the state court's ruling on his IAC at sentencing claim was based on unreasonable determinations of fact and, for purposes of this Court's de novo review of the claim, is entitled to an evidentiary hearing to resolve disputed issues of fact presented by the claim. Petitioner may also be entitled to obtain the depositions of trial counsel. The Court denies all other requests for discovery and expansion of the record, without prejudice to making appropriate requests during pre-hearing proceedings on this claim.

## III.    CLAIMS 3–8, AND 27

Petitioner argues that he was denied his right to due process, a fair trial, and reliable sentencing because the trial court failed to strike biased jurors for cause; Petitioner was improperly restrained; prejudicial testimony was admitted; relevant mitigating evidence was precluded; misconduct by the prosecutor, "coercive instructions," and juror improprieties.

### A.    Claim 3

Petitioner asserts that the trial court failed to strike Jurors 136, 150, 169 and 170 for cause, requiring Petitioner to use his peremptory challenges to remove these four jurors, and leaving Petitioner with no peremptory challenges available to remove four other biased jurors, Jurors 62, 123, 127 and 193. (Doc 28 at 200–07.)

#### 1.    Factual and Procedural Background

During jury selection, Petitioner moved to strike Juror 136 based on her connection to a member of the Tucson Police Department (RT 1/25/05 at 160–61), Juror 150 because defense counsel represented a defendant charged with murdering the juror's children's pediatrician (*id.* at 123, 156–57), Juror 169 because she had formed opinions about the case and had expressed a dislike of guns (RT 1/26/05 at 160), and Juror 178 based on his statements concerning mental impairments and his opinion of mental health experts (*id.* at 214). The trial court denied Petitioner's motions to strike these four jurors for cause. (RT 1/25/05 at 124, 160, 162; RT 1/26/05 at 161, 215.) Petitioner removed these jurors using peremptory strikes. (*See* RT 1/28/05 at 28; *Cruz*, 181 P.3d at 205.)

During *voir dire*, the prosecutor questioned Juror 62 regarding a response on his

questionnaire indicating that he could "maybe" follow the court's instruction that the verdict of either life or death cannot be based on anger, prejudice, or sympathy. (RT 1/20/05 at 112.) Juror 62 explained his response: "I think that I was looking for - - for proof, for evidence. I guess if I understand the question, you couldn't make a decision out of anger, right?" (*Id.*) The prosecutor noted some hesitancy in the juror's response and probed further, asking if Juror 62 could follow the instruction, and what might be causing his hesitance. The following statements were made:

> Juror 62: What I was thinking of, at the time I think that I can - - I think I can do that, I just think that that's an instruction, right? I couldn't do it for those reasons.

> Prosecutor: Basically, if you're going to have any difficulty participating in this trial, you feel like emotions or other factors are going to play a part, that's fine, you're entitled to feel that way. We just need to know that, we just need to know that now rather than later if you're going to have some problems.

> . . .

> Juror 62: I think it's an emotional issue.

> . . .

> Juror 62: I think I would have - - I would have to think about what's happening, you know. I think that I can be a fair individual, that's what I hope anyway, that's what I'm striving to do. I think that if I don't think [sic] have a decision, I guess is what I'm saying about - - about this trial, anything about it, I guess so, I'm hoping to - - whatever information I get, then I'll have to make a decision on my own. I don't know if that answers your question.

(*Id.* at 112–14.)

During follow-up by defense counsel, Juror 62 stated that he thought he could follow the instruction and did not think he had feelings of anger or prejudice, "but perhaps later on in trial that might become a factor." (*Id.* at 120–21.) Juror 62 did not believe it was anger or prejudice he was thinking about when he filled out the

questionnaire, but "[p]robably sympathy." (*Id.* at 121.) Juror 62 felt he could be a fair juror in the case. (*Id.* at 120–23.)

Defense counsel noted Juror 62 had also responded in the questionnaire that the death penalty would be appropriate in very special types of cases, and followed up by asking him what types of cases the juror would classify as special cases deserving of the death penalty.

> Juror 62: Well, this has come up, I thought about that and the cases, the situations that I envision are situations where there was torture involved or there was multiple stabbings when someone was just not killed but repeatedly - - repeatedly injured, that is what came to my mind.
>
> Defense Counsel: You also responded that there are crimes for which the death penalty should always be imposed, do you recall that question and making that response?
>
> Juror 62: I don't recall that, but I probably did.
>
> Defense Counsel: Okay. Sounds fair. And, again, would those crimes be basically what you were referring to?
>
> Juror 62: Yeah, the same situations.

(*Id.* at 124–25.) Defense counsel then attempted to ask Juror 62 hypothetical questions concerning when he would impose the death penalty, but the trial court interrupted him, calling counsel to the bench.

> Defense Counsel: What if his attitude is that he feels the death penalty should be automatically imposed?
>
> The Court: You can ask him if he feels that - - I think I already asked that question, he already said, no. . . .  I got a negative answer to whether he thinks the death penalty would be imposed in a case, one of the questions I ask that he would automatically vote for death, he automatically would not. . . .

(*Id.* at 125–26.) Defense counsel challenged Juror 62 for cause (*id.* at 135), but the trial court denied his challenge, stating:

> I'm going to deny the challenge for cause on him. I have listened to him, I heard him say over and over again I'm - - he's fair I'm open to getting the information deciding - - I can follow the instructions, I can be fair. . . . And I think based on all of his responses that - - that - - that he can be fair and impartial, that's been my observation of him.

(RT 1/20/05 at 136). Juror 62 served on the jury. (RT 1/28/05 at 57.)

Juror 123's brother was a police officer in Peoria. (*See* RT 1/25/05 at 18–19.) Nonetheless, she assured the court that she could follow the law as provided by the instructions, judge the testimony of all the witnesses by the same standards, keep an open mind, and be fair and impartial to both sides. (*Id.* at 20–22.) The trial court denied Petitioner's motion to strike Juror 123 for cause, explaining he had observed her at the bench and "her answers demonstrate that she can be fair and impartial, so I'm going to deny the challenge for cause." (*Id.* at 73.) Petitioner asserted that he would have used a peremptory strike on Juror 123, but had no strikes remaining, having used them on jurors who should have been struck for cause. (RT 1/28/05 at 51–52.) Juror 123 served on the jury. (RT 1/28/05, at 58.)

Petitioner did not challenge Juror 127 for cause, but stated if he had peremptory strikes left he would have used them on this juror because she had law enforcement connections, had read and heard about the case, believed in "an eye for an eye," and was concerned about the cost to maintain prisoners. (RT 1/28/05 at 51–52.) Juror 127 served on the jury. (RT 1/28/05 at 58.)

During *voir dire*, Juror 193 stated that her husband, now retired, had been a police sergeant in New Jersey from 1968 to 1988. (RT 1/27/05 at 8.) She stated that the fact that a police officer was the victim in the case would "absolutely not" affect her in any way, and that she could be fair and impartial. (*Id.*) When asked if she were placed in Petitioner's position, would she be comfortable having herself on the jury, Juror 193 responded "he probably would not want me." (RT 1/27/05 at 37.) Defense counsel explained that wasn't the question he had asked, and asked if she were Petitioner, would she be comfortable knowing she was on the jury. (*Id.*) Juror 193 answered "yes." (*Id*) Petitioner did not challenge Juror 193 for cause but asserted to the trial court that he

would have used a peremptory strike, but had no strikes left after using them on the other four jurors who should have been struck for cause. (RT 1/28/05 at 51–52.) Juror 193 served on the jury. (RT 1/28/05, at 58.) After the penalty phase verdict, Juror 193 made a statement to the press that if the sentence "deters a criminal and saves a peace officer's life in the future, then the message we sent in our decision is positive. The message is, 'It is not OK to take a peace officer's life because they try to stop your illegal lifestyle.'" (*See* ROA 644, Ex. 3); *Cruz*, 181 P.3d at 206.

Petitioner argued on appeal that the trial court erred by failing to strike Jurors 136, 150, 169, and 178 for cause, and that he was prejudiced because he was forced to use peremptory strikes to remove these jurors. (APP 51 at 55–58.) Petitioner also argued that the trial court erred by not excusing Jurors 62, 123, 127 and 193 for cause. (*Id.* at 58.)

The Arizona Supreme Court found that Petitioner had waived any argument regarding Juror 127 by failing to set forth any reason to strike the juror in his opening brief. *Cruz*, 181 P.3d at 205 n.3.

Because Petitioner had not moved to strike Juror 193 for cause during jury selection, the court reviewed this claim only for fundamental error and found none:

> When questioned, she stated that she could be fair and impartial to both sides. Cruz's concerns that sympathies based on her husband's former job might influence her decisions exemplify why a defendant is given peremptory strikes: to remove a qualified juror whom the defendant does not wish to have on the jury.

*Id.* at 206. The court rejected Petitioner's request to consider Juror 193's statement made following the trial as evidence of her bias, noting that the out-of-court statement was not admissible to contradict the verdict. *Id.* at 206.

The court found that the trial court did not abuse its discretion by refusing to strike the other six jurors for cause because upon questioning, "all of these jurors unequivocally stated that they could fairly evaluate the evidence, follow the court's instructions, and set aside any preconceived notions of guilt." *Id.* at 205. The court declined Petitioner's request to hold that an erroneous failure to excuse a juror for cause in a capital case always constitutes reversible error regardless of prejudice: "As the United States

Supreme Court stated . . . '[s]o long as the jury that sits is impartial . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* at 206 (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000)).

### 2.     Exhaustion and Procedural Default

The Court finds that Claim 3, as it relates to Jurors 62, 123, 136, 150, 169, 170, and 193, was exhausted in state court. The Court further finds that Claim 3, as it relates to Juror 127, is procedurally defaulted because it was not exhausted in state court and Petitioner has not demonstrated cause and prejudice to excuse the default of this claim.

Respondent asserts Claim 3 is fully exhausted. Petitioner agrees that Claim 3, as it relates to Jurors 136, 150, 169, 170, 62, and 123, is exhausted but contends that the portions of Claim 3 relating to Jurors 127 and 193 are unexhausted and procedurally defaulted. The Court disagrees. Though Petitioner argued on direct appeal that the trial court erred by failing to strike Juror 193 for cause, the Arizona Supreme Court reviewed this claim for fundamental error because trial counsel had failed to move to strike Juror 193 during jury selection. *Cruz*, 181 P.3d at 206. The court then reviewed the dismissal of this juror under applicable federal law and concluded there had been no error. *Id*. That review exhausted this claim; therefore, the portion of Claim 3 related to Juror 193 will be reviewed on the merits.

Petitioner failed to properly raise the portion of Claim 3 related to Juror 127 in state court. Though Petitioner summarily raised the claim that the trial court erred in not excusing Juror 127 in his opening brief, the Arizona Supreme Court found any argument regarding Juror 127 waived because Petitioner failed to set forth any explanation in support of his claim in his opening brief. *Cruz*, 181 P.3d at 205 n.3. In Arizona, failure to argue a claim in an opening brief on appeal, supported by authority and setting forth the appellant's position on the issues raised, usually constitutes abandonment and waiver of that claim. *State v. Carver*, 771 P.2d 1382, 1390 (Ariz. 1989). Because Petitioner failed to argue his claim in his opening brief, he failed to present his claim "in a procedural context in which [the] merits" of that claim could be considered. *See Roettgen v.*

*Copeland*, 33 F.3d 36, 38 (9th Cir. 1994).

Petitioner erroneously contends that he can demonstrate good cause to overcome the procedural default under *Martinez* because post-conviction counsel was ineffective in failing to raise the substantive merits of the claims related to Juror 127. (Doc. 37 at 178–180.) The *Martinez* exception, however, applies only to claims of ineffective assistance of trial counsel. *Davila*, 137 S. Ct. at 2062–63. Recognizing that only the Supreme Court can expand the application of *Martinez* outside the context of ineffective assistance of counsel claims, the Ninth Circuit has declined to extend *Martinez* to claims of trial court error. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (declining to extend *Martinez* to cover claims of trial error); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (acknowledging that only the Supreme Court may extend the scope of *Martinez*). Because Claim 3, as it relates to Juror 127, is not an ineffective assistance of counsel claim, PCR counsel's deficient performance may not serve as cause to excuse a procedural default of this portion of the claim. *See Pizzuto*, 783 F.3d at 1176–77. Thus, to the extent this claim is unexhausted and procedurally defaulted, it is denied.

### 3.    Merits

The Court further finds that the Arizona Supreme Court's resolution of claims related to Jurors 62, 123, 136, 150, 169, 178, and 193 was neither contrary to, nor an unreasonable application of, clearly established federal law, nor did it rest on an unreasonable determination of the facts under § 2254(d).

#### a.    *Legal Standard*

A criminal defendant is entitled to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (superseded on other grounds by AEDPA). A prospective juror may be excluded for cause because of his or her views on capital punishment "if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

Actual bias is "bias in fact"—"the existence of a state of mind that leads to an

inference that the person will not act with entire impartiality." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (citation and internal quotation marks omitted). Actual bias is typically found when a prospective juror states that he cannot be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view. *Id.*

Although "[t]he Constitution . . . does not dictate a catechism for *voir dire* . . . part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (citations omitted). A juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause. *Id.* at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

Finally, the Supreme Court has, with few exceptions, adhered to the "the near-universal and firmly established common-law rule in the United States flatly prohibit[ing] the admissibility of juror testimony to impeach a jury verdict." *Tanner v. United States*, 483 U.S. 107, 117 (1987). Exceptions to this rule have been "recognized only in situations in which 'extraneous influence' . . . was alleged to have affected the jury" *Tanner*, 483 U.S. at 117 (quoting *Mattox v. United States*, 146 U.S. 140 (1892)) (internal citation omitted), or when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt, *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Thus, although the Supreme Court has permitted inquiry into extraneous influences on jurors concerning whether they heard and read prejudicial information not admitted into evidence, *Mattox*, 146 U.S. at 149, and the influence on jurors by outsiders, *Turner v. Louisiana*, 379 U.S. 466 (1965), it has declined to require inquiry or consideration of evidence with regard to the internal processes of the jury. *Tanner*, 483 U.S. at 119–124.

b. *Analysis*

(i) ***Peremptory Challenges: Jurors 136, 150, 169 and 178***

In this case, even if the trial court erred in failing to strike Jurors 136, 150, 169,

and 178 for cause, Petitioner is not entitled to relief on the grounds that he used his peremptory challenges on these jurors. The Supreme Court rejected such an argument in *Ross v. Oklahoma*, holding that any claim that the jury was not impartial must focus on the jurors who ultimately sit on the jury. 487 U.S. at 86. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* at 88.

### (ii) Challenges for Cause: Jurors 62 and 123

Petitioner cannot show that the state court's decision rejecting Petitioner's challenge to Jurors 62 and 123 was based on an unreasonable application of clearly established Federal law, as stated in *Morgan.* In *Morgan*, the Court noted, "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." 504 U.S. at 735. The Court therefore concluded that a defendant is "entitled, upon his request, to inquiry discerning those jurors who . . . had predetermined . . . whether to impose the death penalty." *Id.* at 736.

*Morgan* is distinguishable from this case. In *Morgan*, the Court was concerned with a trial court limiting a petitioner's ability, "*through questioning*" to "lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction." 504 U.S. at 733 (quoting *Witt*, 469 U.S. at 423) (emphasis in original). In this case, Petitioner asserts that the state court "failed to search beyond the promise to be fair, to follow instructions, [and] to inquire into the dogmatic beliefs of the jurors." (Doc. 28 at 208.) Petitioner, however, has never asserted that the trial court, in violation of *Morgan*, improperly limited his ability to inquire into any juror's "dogmatic beliefs." (*See* Doc. 28 at 208; APP 51 at 55–63.) Rather, the record demonstrates that the trial court allowed Petitioner to make relevant, searching, and thorough inquiries into the jurors' claims that they could follow the law as instructed. (*See e.g.*, RT 1/20/05 at 116–25.)

### (iii) Impartiality: Juror 62

The state court's finding that Juror 62 was impartial was not based on an

unreasonable determination of fact. *See* 28 U.S.C. § 2254(d)(2). Petitioner argues that the state court unreasonably found that Juror 62 was impartial because his statements were either internally inconsistent and unbelievable, or equivocal.[12] (Doc. 28 at 208–09.) Federal habeas relief may be granted based on a state court's failure to strike a juror for cause only where there is no fair support in the record for the court's determination that the juror was unbiased. *Witt*, 469 U.S. at 424. A state court's determination of juror impartiality is entitled to a presumption of correctness on federal habeas review. *Id.* at 429; *see Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

In light of the record in the state court proceedings, Petitioner has not shown that the trial court unreasonably found that Juror 62 was impartial. *See Bashor v. Risley*, 730 F.2d 1228, 1237 (9th Cir. 1984) (holding that a juror who initially equivocated as to her impartiality could be found impartial after she affirmatively said she thought she could be fair). Nor has Petitioner shown that the Arizona Supreme Court's decision was based on an unreasonable determination of the facts.

The trial court is in a superior position to observe a juror's physical appearance and demeanor, *Perez v. Marshall*, 119 F.3d 1422, 1427 (9th Cir. 1997), and is "best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). Here, the trial judge determined that Juror 62 could be impartial based not only on the juror's answers but also on his observation of the juror's demeanor. (*See* RT 1/20/05, at 136; RT 1/26/05, at 161.) Juror 62's responses reflect the thinking processes of an honest and conscientious juror. Juror 62 acknowledged that he understood he couldn't make a decision out of anger, prejudice or sympathy, that despite the fact it was an emotional issue he thought he could be a "fair individual," that he was "striving" to be

---

[12] Petitioner raises the same allegations as to Juror 169. (*See* Doc. 28 at 209.) Because Juror 169 did not sit on the jury, this Court need not examine Juror 169's qualifications. *See Ross v. Oklahoma*, 487 U.S. at 86.

fair, and would "make a decision on his own" based on the information he had. He did not believe that the death penalty should always be imposed, but only in "very special cases," such as cases involving torture or repeated injury. The trial court denied the challenge for cause, stating that based on the juror's responses, and the court's own observations, Juror 62 could be fair and impartial. The Arizona Supreme Court upheld the trial court's decision, stating that Juror 62 "unequivocally stated that [he] could fairly evaluate the evidence, follow the court's instructions, and set aside any preconceived notions of guilt." *Cruz*, 181 P.3d at 205.

Viewing the record in its entirety, given the juror's statements that he thought he could be, and was "striving to be," a "fair individual," and the deference due to the trial court's assessment of the juror's demeanor, Petitioner has not shown that the trial court's decision finding Juror 62 could be fair and impartial, and the Arizona Supreme Court's affirmance of that decision, was based on an unreasonable determination of facts.

### (iv)     *Implied Bias: Juror 123*

The trial court's failure to remove Juror 123 for cause was neither contrary to or an unreasonable application of clearly established Federal law, nor was it based on an unreasonable determination of facts. Petitioner asserts that Juror 123 should have been removed for cause because her brother was a police officer and because she initially agreed she would tend to favor the prosecution. (Doc. 28 at 205–06.) The Supreme Court has not explicitly adopted the doctrine of implied bias. *See Fields*, 503 F.3d at 768 (stating that "the Supreme Court has never held that a juror was impliedly biased in the absence of juror dishonesty"). Thus, there is no Supreme Court precedent that creates "clearly established federal law" relating to the issue of implied bias in this context. Although bias can be "presumed from the potential for substantial emotional involvement, adversely affecting impartiality, inherent in certain relationships," *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1997)), such bias should be presumed "[o]nly in 'extreme' or 'extraordinary' cases." *Tinsley*, 895 F.2d at 527 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)); *see also United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th

Cir. 2000) ("[T]he relevant question is whether the case presents a relationship in which the potential for substantial emotional involvement, adversely affecting impartiality, is inherent.") (internal quotation marks omitted). The doctrine has been successfully invoked only "on rare occasions." *See Fields*, 503 F.3d at 768. Courts have declined to find implied bias when a juror works in law enforcement or is related to a police officer. *See Tinsley*, 895 F.2d at 529 (citations omitted). The Court finds that Juror 123's relationship to a family member involved in law enforcement is not an "extreme" or "extraordinary" circumstance that warrants a presumption of bias. *See Tinsley*, 895 F.2d at 527.

### *(v)* *Actual Bias: Juror 123*

Because Petitioner also failed to demonstrate that Juror 123 was actually biased, *see Fields*, 503 F.3d at 767, the trial court's failure to remove Juror 123 for cause was neither contrary to or an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of facts. The primary safeguard against bias is *voir dire*. "In most situations, *voir dire*, 'the method we have relied on since the beginning,' should suffice to identify juror bias." *Id.* at 528 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). Indeed, in this case, Petitioner did not argue that Juror 123 was actually biased. Nor could he; the record demonstrates that during *voir dire* Juror 123 explained her response to the questionnaire that the information she had read or heard about in the case would make her favor the prosecution because "the newspaper assumed that he was guilty. That doesn't mean that I assume that he is." (RT 1/25/05 at 19.) Upon further questioning, Juror 123 unequivocally agreed that she could be fair and impartial, make a determination based only on the facts presented at trial, follow the law as provided, and judge the testimony of a police officer by the same standard as any witness because she "know[s] there's two sides to every story." (*Id.* at 20–22.) Petitioner has failed to demonstrate that Juror 123 was presumptively or actually biased.

//

//

//

*(vi)* ***Implied Bias: Juror 193***[13]

Petitioner fails to demonstrate that Juror 193 was presumptively biased. Juror 193's marriage to a police sergeant, retired from service in New Jersey in 1988, is not the type of personal experience that warrants a finding of implied bias. *See Tinsley*, 895 F.2d at 527; *see also Gonzalez*, 214 F.3d at 1112.

*(vii)* ***Actual Bias: Juror 193***

Petitioner fails to demonstrate that Juror 193 was actually biased. He asserts that Juror 193's statement that Petitioner "would probably not want me" sitting on his jury was a deeply concerning and "horrifying revelation." (Doc. 28 at 206–07.) Again, Petitioner takes this statement out of context and exaggerates the significance of Juror 193's response. Defense counsel, addressing this response, commented that Juror 193 had misunderstood the question that was asked, and, after the question was clarified, Juror 193 indicated that if she were Petitioner she would be comfortable knowing she was on the jury. (*See* RT 1/27/05 at 37.) Juror 193 also proclaimed that the fact that a police officer was the victim in the case would "absolutely not" affect her in any way and that she could be fair and impartial. (RT 1/27/05 at 8.) *See Gonzalez*, 214 F.3d at 1112 n. 3.

Petitioner asserts that the state court erred in not taking into consideration Juror 193's statement to the press after trial, asserting that review of the statement is essential to Petitioner's demonstration of a federal constitutional violation. (Doc 28 at 209.) Petitioner argues that the state court's ruling was inconsistent with federal law. (*Id.*) (citing *Doan v. Brigano*, 237 F.3d 722, 728 (6th Cir. 2001), *abrogation on other grounds recognized by Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003)).

Petitioner has failed to demonstrate that the state court's decision was contrary to or an unreasonable application of Supreme Court precedent. With few exceptions not applicable here, the Supreme Court prohibits the admission of juror testimony to impeach a jury verdict. *See Tanner*, 483 U.S. at 117, 119–121; *see also Pena-Rodriguez*, 137 S.

---

[13] Petitioner also asserts in Claim 24(B) that his trial counsel was ineffective for failing to move to strike Juror 193 for cause. (Doc. 28 at 261–62). This assertion is addressed in Section VIII, below.

Ct. 855. The Sixth Circuit's holding in *Doan* does not undermine this conclusion. The *Doan* court held that a state court could not rely on an evidentiary rule to prevent consideration of any evidence that would demonstrate that Petitioner's federal constitutional right to a fair and impartial jury was violated. (*See* Doc. 28 at 209.) The *Doan* court concluded that, by refusing to allow consideration of evidence of improper, out-of-court, juror experimentation, the state rule of evidence rendering petitioner's evidence of misconduct inadmissible failed to adequately protect petitioner's constitutional right to a fair trial and therefore, "[t]he state court's use of this rule to decide [petitioner's] constitutional claim is 'contrary to' clearly established Supreme Court precedent recognizing the fundamental importance of this right." *Id.* at 733. *Doan*, however, is neither binding on this Court, nor does it constitute clearly established federal law as determined by the Supreme Court. Accordingly, it cannot provide the basis for habeas relief under § 2254. *See, e.g.*, *Williams*, 529 U.S. at 412. Given the Supreme Court's decisions permitting juror testimony to impeach a verdict only when such testimony involves "outside influences," it cannot be said on this record that the Arizona court's ruling was contrary to, or an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court. Nor did the state court's proceeding result in a decision that was based on an unreasonable determination of the evidence presented.

Petitioner contends that Respondents "misappropriated" his argument related to Juror 193's statements, that Petitioner did not offer the post-trial statement as evidence to impeach the verdict, but as evidence that Juror 193 was a biased juror. (*See* Doc. 37 at 182.) In fact, in both Petitioner's motion for new trial and direct appeal, Petitioner conflated these two arguments: that the statement Juror 193 gave was "indicative of juror bias" and was "clearly contrary to the instructions" of the court. (ROA 644 at 14; *see also* APP 51 at 59 (same)). To the extent Petitioner offered the statement as evidence that the jurors acted contrary to the court's instruction, the state court properly declined to consider the evidence. *See Warger v. Shauers*, 135 S.Ct. 521, 529 (2014); s*ee also State v. Dickens*, 187 Ariz. 1, 15 (1996) (a judge may consider juror testimony when a juror

receives outside evidence not properly admitted during trial, but may not consider testimony which inquires into the subjective motives or mental processes of the juror), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012). Petitioner now submits the statement as evidence of juror bias, suggesting that Juror 193's "avowals to set aside her biases and prejudice cannot be believed." (*see* Doc. 37 at 182.) Petitioner failed to argue in his Petition that this statement was direct evidence of Juror 193's bias. (*See* Doc. 28 at 208.) Rather, Petitioner asserted that this statement demonstrated the impact of biased jurors seated on the jury. (*Id.*) Petitioner did not directly assert this claim until he filed his reply in this habeas proceeding. (*See* Doc. 37 at 182.) Accordingly, the Court does not consider that claim. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("[D]istrict court need not consider arguments raised for the first time in a reply brief.").

## B.    Claim 4

Petitioner argues that the use of a shock belt during trial as a form of physical restraint violated his right to due process and a fair trial. (Doc. 28 at 214–17.) The Court finds that this claim is plainly meritless.

Petitioner partially exhausted Claim 4. He asserted on appeal that the shock belt "made it difficult for [Petitioner] to focus and communicate with defense counsel during proceedings." (Doc. 31, Ex. A at 102.) Petitioner did not argue on appeal that the belt was visible to jurors. (*see* Doc. 31 at 109) (citing *Cruz*, 181 P.3d at 214). Petitioner acknowledges that on direct appeal he failed to raise the claim that the shock belt was visible to the jury, but asserts that appellate counsel's failure to raise the unexhausted portion on direct appeal, and PCR counsel's subsequent failure to assert appellate counsel's ineffectiveness, establishes cause for the procedural default under *Martinez*, 566 U.S. 1. Respondents argue that the claim fails on the merits in its entirety. (Doc. 31 at 112–14.) The Court does not determine whether cause exists under *Martinez* to excuse any procedural default of this claim, because the claim is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Cassett*, 406 F.3d at 623-24.

On the first day of trial, prior to commencement of jury selection, defense counsel

noted that in addition to three security officers in the courtroom, Petitioner was restrained by the use of an electronic belt and a leg brace. (RT 1/19/05 at 4.) Counsel objected to use of the shock belt, indicating that it "makes it extremely uncomfortable if not impossible for [Petitioner] to sit up in any kind of way that doesn't indicate to the jury that he is in an uncomfortable situation, and, frankly, restrained." (*Id.*) At counsel's request, the trial judge agreed to confer with Judicial Security regarding the purpose of the restraints. (*Id.* at 4–5; ROA 447 at 1.)

Thereafter, Petitioner filed a motion *in limine* requesting that the court order that Petitioner not be required to wear the shock belt. (ROA 451 at 2.) Petitioner argued that the belt is "extremely uncomfortable and makes it difficult for [him] to focus and communicate with counsel." (*Id.* at 4.) Additionally, Petitioner argued that if the jurors saw and recognized the shock belt, they "might . . . conclude, from these additional security measures, that [he] has a prior criminal history, constituted an extreme escape risk and, at any time, might bolt from the table and begin taking hostages." (*Id.* at 3–4.) Petitioner asserted that there was "nothing beyond the nature of the charges" that supported a requirement that he wear the shock belt. (*Id.* at 4.)

On the fourth day of jury selection the court informed defense counsel that it had made inquiries regarding the use of restraints. (RT 01/25/05 at 77–78.) Jail personnel had informed the court that Petitioner was at a "Cuff 2" level of security, and that based on the jail personnel's experience with the belt, "it's not all that uncomfortable" and there had "been no complaints about the way the belt is on." (*Id.* at 78.) The court further commented that "[t]here's just practically no chance that . . . the shackles and what have you would be observed." (*Id.*)

The court explained that Petitioner's security level was based on somebody who "came to jail personnel and told about an escape," though the information was "somewhat dated." (RT 01/25/05 at 80.) Two memoranda from the Pima County Sheriff's Department detailing how jail officials came to know of the possible escape attempt from a prisoner at the jail, as well as the results of the investigation into that information, were sealed and placed in the record. (ROA 454.) After counsel requested a

hearing, the court suggested setting one as early as that afternoon; counsel, however, stated he wasn't ready at that time. (*Id.* at 81, 83.) The court left it to counsel to "figure out a time." (*Id.* at 83.) The court denied any change in the Petitioner's restraints. (ROA 457 at 2.)

On day six of jury selection, the court informed counsel that Petitioner's leg shackles, but not the belt, would be removed the following day to allow Petitioner to stand up, turn around, and look at the jurors. (RT 01/27/05 at 214.) Counsel stated Petitioner couldn't stand up with the belt on because it was "very noticeable." (*Id.*) Petitioner stated the belt was "sticking out" with a "lump in the back." (*Id.* at 214–15.) The trial judge replied that he didn't think it was "obvious at all." (*Id.* at 215.) Counsel indicated they still needed to set a hearing, but after the court reminded counsel that counsel was going to figure out the time and place, counsel responded that he "hadn't thought about it." (*Id.*)

The next day the court asked Petitioner to stand up so he could determine whether the belt was noticeable:

> The Court: You know, I don't see that that's really obvious from that close, and so I think that they are very concerned, security, I'm just saying that so—
>
> Mr. Cruz: It makes me look fat in front.
>
> The Court: Certainly not obvious from the back, as I saw it yesterday, so I think we'll continue with where we are on that. I know you may still raise an issue . . . .

(RT 1/28/05 at 3.) The issue was not revisited.

On direct appeal, Petitioner argued that the use of the shock belt violated his rights to due process and a fair trial. (SCA 51 at 101–04.) Petitioner asserted that the shock belt made it "difficult for [Petitioner] to focus and communicate with defense counsel" and was not supported by anything in the record or evidence suggesting any security concerns aside from the nature of the charges in the case. (*Id.* at 102.)

The Arizona Supreme Court denied the exhausted portion of Claim 4, noting that

the trial court, in response to Petitioner's objection to the security measures, reviewed two reports detailing a possible escape attempt involving Petitioner, offered to conduct an evidentiary hearing on the necessity of the restraints, and informed Petitioner that he would schedule an evidentiary hearing at Petitioner's request. *Cruz*, 181 P.3d at 214–15. The court noted that "security procedures are left to the discretion of the trial court," and while "a defendant generally has the right to be free from restraints in the courtroom, concerns for courtroom safety and security may make the use of restraints appropriate." *Id.* at 215. The court acknowledged that a court should "not simply defer" to the State's policy, request or preference for the use of restraints; instead, the trial court must have grounds for ordering restraints, and upon establishing a need for restraints, should order restraints that are in proportion to the security risk posed. *Id.* at 215. Additionally, the court noted that a trial court should schedule a hearing at the defendant's request regarding the necessity of restraints. *Id.*

The court rejected Petitioner's argument that it should adopt the "heightened standard" employed in *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003).[14] The court concluded that a "trial judge's independent determination that use of the belt is appropriate and supported by the record will not be disturbed absent an abuse of discretion." *Cruz*, 181 P.3d at 215 (citing *State v. Davolt*, 84 P.3d 456, 476 (Ariz. 2004)).

Considering the facts of this case, the court found no abuse of discretion, noting that "the trial court properly offered [Petitioner] an evidentiary hearing, but [Petitioner] declined. The court's decision was based on a documented threat of escape, not merely on security personnel's preference for the shock belt." *Id.*

Petitioner alleges the Arizona Supreme Court's ruling was contrary to or an unreasonable application of clearly established federal law because the trial court failed to consider less restrictive alternatives to the shock belt. (Doc. 28 at 216.) Petitioner also

---

[14] In *Gonzalez v. Pliler*, the Ninth Circuit held that before the court may order the use of physical restraints on a defendant at trial, the court must be persuaded by compelling circumstances that some measure is needed to maintain the security of the courtroom, and "must pursue less restrictive alternatives before imposing physical restraints." *Id.* at 901 (quoting *Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir. 1994)).

alleges the Arizona Supreme Court's ruling was based on an unreasonable determination of the facts because the shock belt was visible on Petitioner and impacted his ability to participate in his defense. (*Id.*) The Court disagrees.

The Due Process Clause forbids the routine use of physical restraints visible to the jury in either the guilt or penalty phase of a trial. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). The use of visible restraints requires a determination by the trial court that the restraints are justified by a specific state interest particular to the defendant's trial. *Id*. at 629; *see also Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002) (criminal defendant has a constitutional right to be free of shackles in the presence of the jury absent an essential state interest that justifies the physical restraints). The trial court "may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." *Deck*, 544 U.S. at 629.

There is no clearly established federal law requiring a trial court to consider the least restrictive alternative manner of restraint. *See Crittenden v. Ayers*, 624 F.3d 943, 972 (9th Cir. 2010) (*Deck* "does not itself mandate specific procedures or evidence that must be considered before imposing restraints. *Deck* leaves this to the discretion of the trial court . . . [which] 'may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.'") (citing *Deck*, 544 U.S. at 629). Thus, the Arizona Supreme Court's decision declining to apply a "least restrictive" standard to use of the shock belt was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner fails to show that the state court's decision was an unreasonable determination of the facts nor has he rebutted this factual determination with clear and convincing evidence. Here, the state appellate court found that the trial court's decision "was based on a documented threat of escape, not merely on security personnel's preference for the shock belt." *Cruz*, 181 P.3d at 214. The trial court was aware that the deputies were unable to verify the alleged escape plan, but this alone did not require the court to nullify the report as a viable security concern. Moreover, the report of a planned escape was not the only fact relied on by the trial court to conclude that additional

restraints were necessary. The trial court reported that jail personnel had determined that Petitioner was at a heightened "Cuff 2" security status. *See Hedlund v. Ryan*, 815 F.3d 1233, 1243 (9th Cir. 2016) *amended by* 854 F.3d 557 (9th Cir. 2017) ("The trial court could have used the jail's security-based decision as support for its conclusion that [defendant] posed an escape risk, because such decisions are subjective and discretionary."). There is no clearly established federal law suggesting a trial court's decision based on hearsay coming from within a jail is impermissible. *Id.*

Even if the accuracy of the reports regarding an escape attempt or any other viable security threat were never confirmed, Petitioner did not challenge the trial court's finding that the shock belt was not visible to the jury, and Petitioner did not contend on appeal that the belt was visible. There is no clearly established federal law requiring a trial court to make a finding that *non-visible* shackling is justified by a compelling state interest. *See Ghent*, 279 F.3d at 1132 (to obtain habeas relief a court must find that the restraint was seen by the jury). The Arizona Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law. See *Richter*, 562 U.S. at 101; *Musladin*, 549 U.S. at 77.

Additionally, even if the trial court's imposition of physical restraints violated Petitioner's right to due process, Petitioner's claim fails on the ground that he has not shown that he was prejudiced by wearing the device during his trial. Contrary to Petitioner's assertion that the use of the shock belt on Petitioner was "inherently prejudicial," this Court must assess whether any error "had substantial and injurious effect or influence in determining the jury's verdict." *See Larson v. Palmateer*, 515 F.3d 1057, 1064 (2008) ("Review for harmless error under *Brecht* [*v. Abrahamson*, 507 U.S. 619, 623 (1993)] is 'more forgiving' to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions.") (citing *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht* whether or not the state court recognized the error and reviewed it for harmlessness)). Considerations guiding the

prejudice inquiry include "the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson*, 515 F.3d at 1064.

Petitioner cannot establish prejudice from the alleged visibility of the restraint because Petitioner has not presented any evidence that the jury was ever aware that Petitioner was wearing the shock belt. Petitioner stated that the belt made him "look fat in front" and counsel remarked it was "very noticeable"— observations with which the trial court disagreed upon viewing Petitioner standing. Petitioner's counsel, however, declared Petitioner would not stand in front of the jury. Thus, it is not evident from the record that the belt was visible as Petitioner apparently never stood in front of the jury in a way that would have revealed its presence. Moreover, even if he had stood, and looked "fat in front," there is no evidence that the jurors would have recognized and understood that he was wearing a security device. There is no factual basis in the record from which to conclude that any juror observed or recognized the significance of the shock belt. Furthermore, the nature of the crime and the strength of the evidence in this case weigh against a finding of prejudice.

Petitioner also fails to present any factual basis in support of his assertion that the shock belt interfered with his ability to participate in his defense. He has not established that he was unable to communicate with counsel or was otherwise prejudiced by the restraints. *See Williams v. Woodford*, 384 F.3d 567, 592–93 (2004) (concluding that unjustified restraints are harmless error if the jury did not see the restraint); *Packer v. Hill*, 291 F.3d 569, 583 (9th Cir. 2002) (concluding no prejudice resulted from defendant's leg brace when no juror interviewed after trial remembered seeing a leg brace on the defendant), *rev'd on other grounds sub nom. Early v. Packer*, 537 U.S. 3 (2002). Accordingly, the state court's conclusion that Petitioner's constitutional rights were not violated by the use of the restraints is not clearly contrary to or an unreasonable application of federal law, nor is it based on an unreasonable determination of facts, and Petitioner is not entitled to habeas relief on this claim.

//

<u>C.     Claim 5</u>

Petitioner argues that the trial court's admission of testimony by a criminalist with the Tucson Police Department, indicating the murder weapon had been modified for purposes of concealment, violated Petitioner's right to due process because it was character evidence and had not been properly disclosed under state law. (Doc. 28 at 218–22.) This claim ("Claim 5(a)") was raised on direct appeal and denied by the Arizona Supreme Court. *Cruz*, 181 P.3d at 213.

Petitioner also argues, for the first time to this Court, that the criminalist offered an improper expert opinion, and that trial and PCR counsels' deficient performance excuses any procedural default of this claim ("Claim 5(b)"). (Doc. 28 at 222–23.)

### 1.     Factual and Procedural Background

Frank Powell, a crime lab supervisor and firearms analyst with ten years' experience in the field of firearm analysis, testified that the revolver he was asked to analyze, which he determined was the weapon used to shoot Officer Hardesty, had been altered by removing the spur from the hammer. (RT 2/10/05 at 192–94, 202–05.) "The most likely reason" for removing that portion of the weapon, Powell testified, "is for concealment. . . . [I]f the gun is drawn out quickly, [t]he hammer spur won't get caught on the clothing." (*Id.* at 202.) Counsel did not object to Powell's testimony at the time, but the following day moved for a mistrial, arguing that the testimony regarding the modification had not been disclosed and that the testimony implied bad character—that the person who possessed the weapon was engaging in illegal behavior. (RT 2/11/05 at 3–4.) Counsel explained that he did not object contemporaneously because he believed it would have drawn more attention to the testimony. (*Id.* at 3.) The trial court denied the motion, finding counsel waived the issue, and, additionally, that there was no disclosure violation because the testimony was within the knowledge of the defense; Petitioner had the reports, had the opportunity to interview Powell, and had the weapon in his possession for the purpose of examination. (*Id.* at 8–9.) The trial court found no prejudice that would rise to the level of a mistrial. (*Id.* at 9.)

Counsel alternatively requested a curative instruction (*id.* at 4), and the court

stated it would consider a "purpose specific instruction" at the time of instructions (*id.* at 9). The record does not reflect that counsel proffered the requested instruction at any time. (*See* Doc. 28 at 220.)

During closing arguments, the prosecutor referred to the testimony in support of a finding of knowledge or intent, arguing that, "You shoot somebody five times after you pull the gun, this gun that has a sawed off hammer so it doesn't catch on your clothing as you pull it, five times at close range, did he intend or know his actions would cause death? Absolutely." (RT 2/24/05 at 27.) During rebuttal the prosecutor remarked that the gun was in Petitioner's "front pocket with the hammer sawed off so that he could get it out of there quickly." (*Id.* at 101.)

On direct appeal, Petitioner argued that the undisclosed testimony was prejudicial and violated his rights to a fair trial and timely pretrial disclosure. (APP 51, at 94–95.) The Arizona Supreme Court, noting Petitioner's failure to object contemporaneously to the testimony, reviewed the claim for fundamental error. *Cruz*, 181 P.3d at 213. The court denied the claim, finding that the testimony did not render Petitioner's trial fundamentally unfair:

> It is unlikely that the jury concentrated on the filed-off hammer . . . when no evidence was presented that Cruz modified the gun and the trial was focused on other, more serious issues.

*Id.*

### 2.    Merits – Claim 5(a)

Petitioner alleges the Arizona Supreme Court's ruling was contrary to or an unreasonable application of clearly established federal law because Powell's testimony deprived Petitioner of a fundamentally fair trial in violation of Petitioner's due process rights. (Doc. 28 at 220–21.) Petitioner also alleges the Arizona Supreme Court's ruling was based on an unreasonable determination of the facts in finding that it was unlikely the jury concentrated on the modification to the revolver. (*Id.*) The Court disagrees.

A state court's fact-finding process may be defective, resulting in an unreasonable determination of the facts in light of the evidence presented, where the state court "plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the

misapprehension goes to a material factual issue that is central to the petitioner's claim." *Taylor*, 366 F.3d at 1001 (discussing § 2254(d)(2)) (citations omitted).

### a. Factual Determination – Alteration of the Weapon

Petitioner contends that the record before the state court does not support the Arizona Supreme Court's finding that it was unlikely the jury concentrated on the filed-off hammer. Petitioner asserts, first, that the "clear intimation" was that Petitioner or a criminal associate "altered the weapon." (Doc. 28 at 221.) In support, Petitioner points to the state calling as a witness a previous owner of the revolver, Dr. Gallagher, to testify that the hammer was not modified when Dr. Gallagher owned it.[15] (*Id.* at 221–22 (citing RT 2/15/05 at 81).) Petitioner misstates the record. Dr. Gallagher was called to testify as a witness for the defense. (*See* RT 2/15/05 at 2, 78.) And, on cross-examination the state elicited testimony from Dr. Gallagher that he had no knowledge of who he sold the gun to, and whether it had since been resold or stolen after it left his possession, thus intimating that any number of persons, not just Petitioner, could have modified the weapon. (*Id.* at 85.) Petitioner fails to identify any evidence in the record that suggests Petitioner was responsible for modifying the weapon.

### b. Factual Determination – Jury Focus on the Weapon

Petitioner also asserts the state court's finding that the trial was focused on "other, more serious issues" is an incorrect determination of the facts because the "jury's attention was drawn to [the] fact" that the gun was modified, both in closing argument and in rebuttal. (Doc. 28 at 221.) Based on this Court's review of the record, the state court's determination was not objectively unreasonable. Although the prosecutor mentioned the modification in closing arguments and rebuttal, it was never the focus of his argument and was never presented to the jury as a crucial piece of evidence. Rather, it was a mere "snippet of testimony." *See Cruz*, 181 P.3d at 213.

//

---

[15] The Petitioner states that the previous owner testified that the hammer *was* modified when he owned it. This is presumably a typographical error, as the previous owner testified that the gun was not modified when he owned it. (*See* RT 2/11/05 at 78–82.)

## c. *Legal Determination - Admission of Testimony*

This Court's review of a habeas claim based upon the improper admission or exclusion of evidence is guided by the principle that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The issue for the federal habeas court "is whether the state proceedings satisfied due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919–920 (9th Cir. 1991)).

To the extent Petitioner argues that admission of Powell's testimony violated Arizona's disclosure or evidentiary rules regarding experts, the claim is denied because "federal habeas corpus relief does not lie for errors of state law." *McGuire*, 502 U.S. at 67. A state trial court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation of the petitioner's due process rights. *Jammal*, 926 F.2d at 919. "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." *Id.*

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101. It has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." *McGuire*, 502 U.S. at 75 & n. 5 (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Further, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101 (citing *Musladin*, 549 U.S. at 77). In the absence of clearly established law that admission of even overtly prejudicial evidence constitutes a due process violation, the Court cannot conclude that the state court's ruling was an "unreasonable application." *Id.*; *see also Larson*, 515 F.3d at 1066 (holding that because

the Supreme Court has expressly reserved the question of whether using evidence of a defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process, the state court did not unreasonably apply clearly established law in determining that the admission of defendant's criminal history did not violate due process). Under the strict standards of AEDPA, Petitioner's claim that Powell's testimony was unfairly prejudicial is foreclosed because a federal court is "without power" to grant a habeas petition based solely on the admission of evidence. *Id.*

Even if the state court's rulings were in error under Arizona law, the error did not rise to the level of a due process violation. *See McGuire*, 502 U.S. at 67–68. Petitioner cannot demonstrate that the admission of the testimony had a "substantial and injurious effect" on the verdict. *See Brecht*, 507 U.S. at 637–38. As Petitioner concedes, the evidence against him was overwhelming. (*See* Doc. 28 at 49.) Further, the impact of the evidence during the penalty phase was minimal in comparison with the strength of the aggravating factor: murder of a police officer in the line of duty. Thus, the state court's ruling regarding Powell's testimony was not contrary to or an unreasonable application of Supreme Court precedent. Claim 5(a) is denied.

### d. *Merits – Claim 5(b)*

In Claim 5(b), Petitioner argues that the criminalist offered an improper expert opinion, and that trial counsel's failure to object and PCR counsel's failure to raise this issue constitutes deficient performance and excuses any procedural default of this claim. (Doc. 28 at 222–23.) As previously noted, *Martinez* has not been expanded to include defaulted claims of trial error. *See Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1294–96 (9th Cir. 2013); *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Because Petitioner's claim that the expert offered an improper opinion is not an ineffective assistance of counsel claim, PCR counsel's deficient performance may not serve as cause to excuse the procedural default. *See Pizzuto*, 783 F.3d at 1176–77. Accordingly, Claim 5(b) is denied.

### D. Claim 6

In Claim 6, Petitioner argues that the trial court's preclusion of mitigation testimony from the Chairman of the Arizona Board of Executive Clemency ("Clemency

Board") deprived Petitioner of a fair sentencing in violation of the Eighth Amendment. (Doc. 28 at 223.) The Arizona Supreme Court denied this claim on the merits. *Cruz*, 181 P.3d at 207. Petitioner contends the Arizona Supreme Court's denial of the claim was contrary to, or involved an unreasonable application of, clearly established federal law. Alternatively, Petitioner asserts that it was an unreasonable determination of the facts in light of the evidence presented.

Counsel sought to offer the testimony of Duane Belcher, Chairman of the Clemency Board, to testify that if Petitioner was given a natural life sentence, he would never be eligible for any type of parole status and that if he received a sentence of life with the possibility of release after twenty-five years, the Clemency Board could only make a recommendation but had no power or authority to commute a sentence. (RT 1/10/05 at 62; ROA 427 at 3.) The trial court precluded the testimony (RT 3/1/05 at 6), and denied a motion for reconsideration (ROA 611 at 3) and a motion for new trial raised on these grounds (ROA 669 at 8–9).

The Arizona Supreme Court affirmed the trial court's ruling, stating that the trial court did not abuse its discretion in precluding Belcher's testimony:

> The witness would have been asked to speculate about what the Board might do in twenty-five years, when Cruz might have been eligible for parole had he been sentenced to life. The trial court could reasonably have concluded that testimony on what the Board might do in a hypothetical future case would have been too speculative to assist the jury.

*Cruz*, 181 P.3d at 207.

The Arizona Supreme Court's decision was not contrary to, or an unreasonable application of law. Once a determination is made that a person is eligible for the death penalty, the sentencer must consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the

offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)). The Supreme Court has explained that "the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a 'low threshold for relevance,' which is satisfied by 'evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" *Smith v. Texas*, 543 U.S. 37, 44 (2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004)). Courts may, however "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12.

Belcher was contacted in order to ascertain "what action, if any, the board would take on applications for parole or early release filed by inmates serving 25 to life in the natural life sentences." (ROA 427 at 3.) Belcher would have testified that an inmate serving a natural life sentence will never be released from prison and the Clemency Board could only recommend parole for inmates serving twenty-five years to life. (*Id.*)

Petitioner cites no authority supporting his contention that Belcher's testimony was relevant mitigating evidence. The anticipated testimony did not relate to Petitioner as an individual, or to circumstances surrounding this particular offense. In *Eddings*, the Supreme Court recognized that the rule in *Lockett* flowed from earlier decisions rejecting mandatory death sentencing, because "the fundamental respect for humanity underlying the Eighth Amendment" requires individualized determinations. *Eddings*, 455 U.S at 111–12 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). Thus, the rationale behind *Eddings* and *Lockett* does not support an expansion of the *Lockett* doctrine to factors, such as the proposed testimony from Belcher, that have no bearing on an individualized determination or on the circumstances of the offense.

The Arizona Supreme Court's decision was not an unreasonable determination of the facts. Petitioner asserts that the trial court record establishes that the testimony would not have been speculative, because there was a detailed proffer regarding Belcher's testimony. (Doc. 28 at 225.) The Court disagrees. While there may have been no

speculation as to what Belcher would say if called to testify, Belcher's testimony itself would have been speculation as to what the law might allow or require the Board to do twenty-five years in the future, if Petitioner were sentenced to life. Because "reasonable minds" could agree with the Arizona Supreme Court's determination, its decision did not rest on an unreasonable determination of the facts under § 2254(d)(2). *See Wood*, 558 U.S. at 301. Further, as Respondents assert, whether Belcher's testimony was speculative or not is irrelevant, as no clearly established federal law required the admission of his testimony.

Moreover, even if Petitioner could demonstrate the Court's ruling on Belcher's testimony violated the Eighth Amendment, Petitioner cannot show he was prejudiced by the ruling under *Brecht*. *See Fry*, 551 U.S. at 121 (2007) (holding that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*). Petitioner supports his argument with a citation to a press release, submitted with Petitioner's motion for a new trial, issued by three jurors stating: "we were not given the option to vote for life in prison without the possibility of parole." (ROA 644, Ex. 9.) The jury was not, and could not be, tasked with "voting" for life in prison without the possibility of parole. Under Arizona law, the jury is tasked with deciding whether aggravating circumstances exist, and whether the mitigating factors warrant a sentence less than death, but is not tasked with deciding what lesser sentence is to be imposed in the event the jury finds mitigating circumstances sufficient to call for leniency.

To the extent that, under Arizona's parole statutes, parole may have been unavailable to Petitioner even if sentenced to life with the possibility of parole, *see* A.R.S. § 41-1604.09(I),[16] Petitioner cannot argue that he was denied the right to so

---

[16] In *Lynch v. Arizona*, 136 S. Ct. 1818, 1819–20 (2016) (per curiam), the Supreme Court found that, under Arizona law, parole is available only to individuals who committed a felony before January 1, 1994. The Court clarified that *Simmons* expressly rejected the argument that the possibility of clemency diminishes a capital defendant's right to inform a jury of his parole ineligibility and rejected the State's argument that the potential for future "legislative reform" could justify refusing a parole-ineligibility instruction.

inform the jury through instruction or argument. On the contrary, the trial court considered the possibility of instructing the jury, instead of allowing Belcher's testimony, but counsel rejected this suggestion, asserting that "a jury instruction says one thing whereas the testimony of the head of the Board of Executive Clemency is quite another. To say that doesn't have more impact rather than reading something sterile on a piece of paper doesn't make sense." (RT 1/10/05 at 16-17.)

In addition to precluding Belcher's testimony, the trial court also rejected defense counsel's request that, prior to the jury's decision in the penalty phase, the trial court should decide and inform the jury whether the court would elect a life, or natural life, sentence in the event death was not imposed by the jury, because "nothing has been presented to suggest that the defendant would not be eligible for release if a life sentence was imposed." (ROA 65, 77, 184.) Petitioner argued on direct appeal that this was a due process violation under the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994) ("[W]here the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."). Petitioner did not raise this due process argument in his federal habeas petition, but even if he had, this case is distinguishable from *Simmons*; Petitioner's future dangerousness was never put at issue by the State,[17] and Petitioner never requested to inform the jury, through instructions or argument, that, under state law, he was ineligible for parole. *See Lynch v. Arizona*, 578 U.S. ---, 136 S. Ct. 1818, 1819–20 (2016) (per curiam). Claim 6 is denied.

E.    Claim 7

Petitioner contends that the prosecutor committed misconduct during the penalty phase closing argument by informing the jury that a causal nexus must exist between the mitigation and the crime and by asking the jury to consider the circumstances of Officer Hardesty's murder as aggravation. (Doc. 28 at 226–30.) Petitioner concedes his prosecutorial misconduct claim was not exhausted in state court, but argues that appellate

---

[17] Petitioner alleged as a mitigating factor the lack of propensity for future violence. The State did not contest this factor.

counsel's failure to raise the claim on appeal, and PCR counsels' failure to raise appellate counsel's ineffectiveness constitutes deficient performance excuses any procedural default of the claim. (*Id.* at 226 (citing *Martinez*, 566 U.S. 1).)

As previously noted, *Martinez* has not been expanded to include defaulted claims of trial error. *See Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Because Claim 7 is not an ineffective assistance of counsel claim, PCR counsel's deficient performance may not serve as cause to excuse the procedural default. *See Pizzuto*, 783 F.3d at 1176–77. Claim 7 is denied.

Because Petitioner also argues, in Claim 24, that trial counsel was ineffective for failing to object to the prosecutor's remarks, the Court also addresses the merits of Claim 7 in this section but finds that Petitioner's individual claims of prosecutorial misconduct fail. The Court also concludes that, considered cumulatively, the totality of the misconduct allegations do not establish entitlement to habeas relief.

### 1. Factual and Procedural Background

During the penalty phase argument, the prosecutor addressed Petitioner's submission of evidence of his dysfunctional family as a mitigating factor:

> [I]t was almost two decades before this man shot and killed Patrick Hardesty that his father died and his parents divorced, and we're still using that as an excuse? We're still using that as an excuse to show this man leniency? He doesn't want to accept responsibility for anything in his life. He wants us to feel sorry for him and show him leniency because 20 years ago his father died and his mother divorced his father. And what does that have to do with what he did on May 26th of 2003? It has absolutely nothing to do with what he did. It has absolutely nothing to do with him killing Patrick Hardesty. It's an excuse. It's an excuse that he wants you to look at and feel sorry for him because his father died 20 years ago and his mother wasn't a nurturing mother.
>
> . . .
>
> It's an excuse for what he did, and it should carry no weight at all.

(RT 3/8/05 at 54–55.)

Later, the prosecutor argued:

> It's not simply that there is one aggravator and a counting of how many

mitigators there might be. It's the quality of each. It's the quality of whatever we might find to be mitigating in this man's life as the defendant, things that happened to him when he was 10 or 11 or 12. It's the quality of the aggravating factor for taking the life of Patrick Hardesty. Not just taking the life, but the manner in which he took the life: five shots, two of them hitting the vest, two others hitting his torso, and an execution to the head. It was the quality of what he did.

(*Id.* at 58.) Petitioner did not object to either argument.

The trial court instructed jurors that they could only consider as an aggravating circumstance the single aggravating factor the jury had unanimously found—the murder of an on-duty peace officer:

This is the only aggravating circumstance that may be considered by you during this penalty phase. The murder itself is not an aggravating circumstance. The absence of any particular mitigating factor is not an aggravating factor.

(*Id.* at 77–78.)

The trial court further instructed the jurors regarding mitigating circumstances:

You must consider any evidence presented in the penalty phase as well as any evidence you heard at the previous two phases that relates to any mitigating circumstances to decide whether there are any mitigating circumstances and to assess what weight to give to any mitigating circumstance. A mitigating circumstance is any factor that is relevant in determining whether to impose a sentence less than death that relates to any aspect of the defendant's character, propensities, history, record, or circumstances of the offense.

(*Id.* at 78–79.)

## 2. Legal Standard

The appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). A petitioner is not entitled to relief in the absence of a due process violation even if the prosecutor's comments were undesirable or even universally condemned. *Id.* Therefore, in order to succeed on this claim, Petitioner

must prove not only that the prosecutor's remarks and other conduct were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice); *see also Phillips*, 455 U.S. at 219 ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.") In the event a petitioner can establish a due process violation, the petitioner must also establish that the violation resulted in a "substantial and injurious" effect under the standard set forth in *Brecht* to be found eligible for relief. *Fry*, 551 U.S. at 121–22 (2007).

In determining if Petitioner's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [remarks] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances: whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, and "the weight of the evidence against petitioner." 477 U.S. at 181–82. Moreover, state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly*, 416 U.S. at 645; *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006).

### 3. Merits – Causal Nexus Claim

Petitioner argues that, by telling the jury that Petitioner's family background had "nothing to do with" the commission of the murder, the prosecutor impermissibly urged the jury to apply a "causal nexus" test to Petitioner's mitigating evidence. (Doc. 28 at 226–29.) The Court disagrees and finds that the prosecutor's remarks were not impermissible because the prosecutor did not argue that the jury should not consider the

mitigation; rather, he argued that the jury should consider the evidence but find that it carried "no weight."

In *Tennard v. Dretke*, the Supreme Court rejected a "nexus test" that would find mitigating evidence relevant only where it bears a causal nexus to the crime. 542 US. 274, 287 (2004). "[A] state court may not treat mitigating evidence of a defendant's background or character as "irrelevant or nonmitigating as a matter of law" merely because it lacks a causal connection to the crime." *Poyson v. Ryan*, 879 F.3d 875, 888 (9th Cir. 2018) (citing *Towery v. Ryan*, 673 F.3d 933, 946 (9th Cir. 2012), *overruled on other grounds by McKinney*, 813 F.3d at 824); *see also Tennard*, 542 U.S. at 287 ("[W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime."); *Eddings*, 455 U.S. at 114 (explaining that a sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence")(emphasis in original). A sentencer however "is free to assign whatever weight, including *no* weight, that mitigating evidence deserves under the facts of the case, as long as the sentencer does not exclude from his consideration relevant mitigating evidence as a matter of law." *McKinney*, 813 F.3d at 834 n.22 (emphasis in original).

The trial court in this case properly instructed the jurors, as a matter of law, by telling them they "must consider any evidence presented in the penalty phase as well as any evidence you heard at the previous two phases that relate to any mitigating circumstances. (RT 3/08/05 at 78–79) Though the prosecutor asked the jury to consider that Petitioner's family background had "nothing to do with" Petitioner's conduct and therefore should "carry no weight at all" (RT 03/08/05 at 54–55), the prosecutor's remarks did not act as an impermissible screening mechanism preventing the jurors from considering the evidence as a matter of law. *See Eddings,* 455 U.S. at 214 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence.") *McKinney*, 813 F.3d at 834 n.22 ("A sentencer is free to assign whatever weight, including *no* weight, that mitigating evidence deserves under the facts of the case . . . ")(emphasis in original). The prosecutor's remarks were a permissible argument for

assigning less weight to the dysfunctional family mitigating factor because it had no influence on Petitioner's conduct at the time of the crime. Petitioner has failed to demonstrate that the prosecutor's remarks were impermissible.

Moreover, Petitioner cannot demonstrate that the prosecutor's remarks had a "substantial and injurious effect" on the verdict. *See Brecht*, 507 U.S. at 637–38. The prosecutor's remark was brief, and the trial court instructed the jury consistent with *Lockett*, 438 U.S. 586, and *Eddings*, 455 U.S. 104, that a mitigating circumstance was any "aspect of the defendant's character, propensities, history, record, or circumstances of the offense" that "weighs against imposing the death penalty." (RT 3/8/05, at 77.) This argument is plainly meritless.

### 4. Merits – Consideration of Circumstances of the Offense

Next, Petitioner argues that the prosecutor improperly argued that the manner and circumstances of the offense were to be weighed as aggravation, thus misleading the jury to believe it could weigh the actual circumstances of Officer Hardesty's killing as part of the aggravating circumstance. (Doc. 28 at 229–30.) Petitioner contends that the prosecutor's remarks misled the jury into believing it could weigh and consider factors precluded under Arizona law.

Arizona law provides that "[t]he trier of fact shall consider as mitigating circumstances any factors proffered by the defendant *or the state* that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and *any of the circumstances of the offense*." A.R.S. § 13-703(G) (emphasis added). Because the purpose of a capital sentencing is to shed light on factors such as the egregious nature of the crime, the manner in which the defendant committed the crime, and the defendant's motivation, Arizona has interpreted the phrase "any of the circumstances of the offense" in § 13-703(G) to relate to such factors as "how a defendant committed first degree murder." *State v. Harrod*, 183 P.3d 519, 531 (Ariz. 2008); *see also State v. Carlson*, 351 P.3d 1079, 1094 (Ariz. 2015) (rejecting argument that A.R.S. § 13-751(G), formerly A.R.S. § 13-703(G), "provides that the trier of fact must consider the circumstances of the offense as mitigating

circumstances, but may not consider those circumstances to show that the defendant does not deserve leniency"); *State v. Anderson*, 111 P.3d 369, 390 (Ariz. 2005) ("The only issue at the aggravation phase is whether any aggravating circumstances have been proved; the only issue during the penalty phase is whether death is the appropriate sentence.").

Similarly, Arizona law also provides that at the penalty phase:

> [T]he state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency. In order for the trier of fact to make this determination, *the state may present any evidence that demonstrates that the defendant should not be shown leniency.*

A.R.S. § 13-703.01(G) (emphasis added). Construing this language, the Arizona Supreme Court has held that, even in the absence of the presentation of mitigating evidence, the state may offer evidence of the circumstances of the crime. *See State v. Nordstrom*, 280 P.3d 1244, 1249 (Ariz. 2012) ("[A]ny evidence that meets [§ 13-703.01(G)'s] criterion is admissible regardless of whether the evidence was admissible at a prior stage of the trial."); *see also Carlson*, 351 P.3d at 1094 (recognizing jurors' duty to evaluate all the relevant evidence when determining the defendant's sentence); *State v. Prince*, 250 P.3d 1145, 1156 (Ariz. 2011) (citing *Kilpatrick v. Superior Court*, 466 P.2d 18, 21 (Ariz. 1970)).

Here, by asking the jury to consider the circumstances of Officer Hardesty's murder, the prosecutor's remarks were consistent with Arizona law allowing the state to present evidence that demonstrates the defendant should not be shown leniency. *See* A.R.S. § 13-703.01(G); *Nordstrom*, 280 P.3d at 1249. This was not prosecutorial misconduct.

Petitioner argues that the unacceptable consideration of nonstatutory aggravators violated the Eighth Amendment's requirement of reliable and nonarbitrary sentencing in a weighing state. (Doc. 28 at 230 (citing *Stringer v. Black*, 503 U.S. 222, 237 (1992); *Sochor v. Florida*, 504 U.S. 527, 532 (1992)).) In *Stringer*, the Supreme Court held that the "[u]se of a vague or imprecise aggravating factor in the weighing process invalidates

the sentence and at the very least requires constitutional harmless-error analysis or reweighing in the state judicial system." 503 U.S. at 237. In this case, unlike the invalid aggravating factor at issue in *Stringer*, the aggravating factor that the jury was instructed to consider—the killing of an on-duty police officer—was not vague or imprecise, had not been invalidated, and provided sufficient guidance to the jury in deciding whether to impose the death penalty.

Finally, even if the prosecutor's alleged misconduct is considered cumulatively, there was no due process violation. The prosecutor's remarks, in the context of the sentencing, did not deprive Petitioner of a fair trial. The remarks were brief, consisted of only a few sentences of the closing argument, and drew on evidence previously admitted in the guilt phase of the trial. *Cf. Clemons v. Mississippi*, 494 U.S. 738, 754 n.5 (1990) (distinguishing the reliance on invalidated and inadmissible factors from the circumstances surrounding a murder that had been aired during the guilt phase of trial, and which a jury is "clearly entitled to consider" in imposing sentence). The prosecutor's argument did not manipulate or misstate the evidence. The trial court instructed the jurors that there was only one aggravating circumstance that they could consider, that the "murder itself" was not an aggravating circumstance, and that a mitigating circumstance was "any factor that is relevant in determining whether to impose a sentence less than death that relates to any aspect of the defendant's character, propensities, history, record, or circumstances of the offense." (RT 3/8/09 at 77, 79.) Considering the context in which the remarks were made, and in light of the instructions given, no due process violation occurred whether or not the prosecutor misstated the law. *Cf. Boyde*, 494 U.S. at 384–85 ("[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court."). Claim 7 is denied.

F.     Claim 8

Petitioner argues that the trial court provided coercive instructions to the jury during the penalty phase of his capital case, in violation of his Sixth and Fourteenth Amendment rights. (Doc. 28 at 231–37.) Respondents assert this claim is procedurally defaulted. (Doc. 31 at 135.) Petitioner concedes this claim was not exhausted as a federal

claim in state court, but argues that appellate and PCR counsels' deficient performance excuses any procedural default of the claim. (Doc. 28 at 231.)

As previously noted, *Martinez* has not been expanded to include defaulted claims of trial error. *See Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Because Claim 8 is not an ineffective assistance of counsel claim, PCR counsel's deficient performance may not serve as cause to excuse the procedural default. *See Pizzuto*, 783 F.3d at 1176–77. Claim 8 is denied.

### G.    Claim 27[18]

Claim 27 consists of four sub-claims. Petitioner argues that he was denied his rights to a fair and impartial jury and due process of law by the trial court's failure to conduct a sufficient inquiry into allegations that jurors: (A) violated the admonition; (B) observed a witness hugging members of the victim's family; (C) were exposed to media coverage during the trial; and (D) demonstrated bias before sentencing. (Doc. 28 at 275–82.) Petitioner also alleges that the Arizona Supreme Court's resolution of Claims 27(C) and (D) was based on an unreasonable factual determination. (*Id.* at 279, 282.) Petitioner is not entitled to relief, because the Arizona Supreme Court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, and was not based on an unreasonable factual determination.

#### 1.    Factual and Procedural Background

Following the second day of testimony in the guilt phase of trial, the Jury Commissioner informed the trial court that a juror had contacted her with concerns regarding another juror who was talking about the case in the jury room and in the elevator, in the presence of other jurors. (*See* RT 2/3/05 at 5.) The trial court addressed the issue by conducting an individualized inquiry of all 16 jurors. (*Id.* at 17, 22–95.)

During the inquiry, Juror 118 informed the court that she had overheard "several things" that concerned her, but a conversation she had heard on the elevator was her

---

[18] Petitioner labels Claim 27 as Claim 28 in his Table of Contents, with no Claim 27 listed. (Doc. 28, at viii.) The claim is correctly identified as Claim 27 in the body of the text.

"breaking point." (*Id.* at 49–50.) The conversation involved one juror asking another if the trial was open to the public because she thought it would be good for her son to observe the trial. (*Id.* at 50.) Juror 118 heard a second juror, later identified as Juror 7, respond that she should "ask the Judge about that because I don't know if that would be okay." (*Id.*)

Additionally, Juror 118 said Juror 7 and other jurors were talking in the jury room about how scared two young witnesses appeared (*id.* at 51, 57); that Juror 7 stated to other jurors that the woman sitting behind the prosecutor's table was the victim's wife (*id.* at 51); that Juror 7 told another juror that there would be 92 trial witnesses (*id.* at 52); that Juror 7 said her boyfriend was asking her about the trial because he had seen it on television (*id.*); that Juror 7 informed the other jurors how alternates were to be chosen (*id.* at 53); and that during a bench conference, Juror 7 attempted to whisper something about a witness to Juror 118 (*id.* at 53–54).

Juror 118 believed all of these instances violated the court's admonition. She believed that Juror 7 would not have known the number of witnesses unless she had been watching the news, and that Juror 7's boyfriend would not have known what trial she was in unless she had told him. (*Id.* at 52.) Juror 118 believed the information Juror 7 provided about choosing alternates was wrong, and she was not comfortable with "someone sitting there giving wrong information about how our justice system works." (*Id.*) Juror 118 felt "tainted" knowing who the victim's wife was. (*Id.* at 51.)

When the trial judge and counsel interviewed the jurors, three jurors responded that they had heard, or were involved in, the conversation on the elevator. (*Id.* at 23, 25–26, 63–64, 87–88.) Four jurors responded they heard a comment made in the jury room about how nervous the young witnesses appeared. (*Id.* at 69–72, 74–76, 81–86). The court, with counsel's agreement, excused Jurors 7 and 118. (*Id.* at 95, 100, ROA 492 at 2.) During the inquiry, the remaining 14 jurors indicated there was no substantive discussion of the case made, or overheard, by any of the jurors. (RT 2/3/05 at 30–33, 36, 38–40, 43–46, 63–64, 69–70, 76–78, 81, 84, 86, 90, 92.) The remaining jurors further indicated they were taking the admonition seriously and could abide by the admonition.

(*Id.* at 31, 34, 36–37, 40–41, 44, 45, 64–65, 73, 76, 78–79, 83, 86, 88, 91, 94.)

Later that afternoon, defense counsel informed the court that State's witness Alejandro Ruiz was greeted and hugged by the Hardesty family in the presence of the jury after his testimony. (RT 2/3/05 at 176–77.) Both the prosecutor and the trial court observed an interaction between Ruiz and family members, but the court stated that this occurred "behind the wall where the jury wouldn't see." (*Id.* at 177–78.) Defense counsel disagreed with the court about where the interaction occurred. (*Id.* at 177.) The trial court offered to give an instruction, but defense counsel stated that he just did not "want that happening anymore." (*Id.* at 178.)

The following morning, defense counsel notified the court that, after Juror 118 had been dismissed, she gave an interview to the news media. (*See* ROA 501 at 3; RT 2/4/05 at 3–4; Court Ex. 7.)[19] Defense counsel requested a copy of the reporter's notes and a recording of the interview. Counsel for the news station agreed to voluntarily provide a tape of Juror 118's interview to the court (RT 2/4/05 at 159, 169), but indicated that the notes would require a subpoena, explaining that "every factual statement made in the notes appear . . . to be statements that were made on tape." (*Id.* at 166–67). Later, after defense counsel had interviewed Juror 118, the trial court quashed Petitioner's subpoena to obtain the reporter's notes, finding that "as [Petitioner] has interviewed the source [Juror 118] there is nothing material or relevant to be gained from the notes." (ROA 642 at 3.)

The trial court and counsel viewed the entirety of the interview (*see* RT 2/4/05 at 177), portions of which were aired on the evening of February 4, 2005. (*See* ROA 501 at 3; Ex. 2.) Petitioner moved for a mistrial based on the content of the news reports (ROA 500, 501; RT 2/4/05 at 6, RT 2/8/05 at 15–21) and the interaction between Ruiz and the Hardesty family (ROA 501 at 3–4).

Petitioner argued in his motion for mistrial that there was "little likelihood that

---

[19] Court Ex. 7 refers to the "sealed envelope marked as containing 'VCR tape KVOA-TV interview'" filed and viewed by court and counsel during Petitioner's trial. (Doc. 512; RT 2/4/05 at 177).

additional inquiry would be productive" (ROA 500 at 5), that any such inquiry would be "meaningless" and "make matters worse" since it would require jurors to admit they had not only violated the admonition but had untruthfully responded to the court's previous inquiry, and would frustrate and anger the jurors. (ROA 497 at 4; *see also* ROA 500 at 8.) Contrary to the position taken in his motion, Petitioner filed a request to provide the jurors with a special interrogatory to inquire into whether they had discussed the case. (ROA 490.) The trial court denied Petitioner's motion for mistrial based on the statements Juror 118 provided to the media and denied Petitioner's request for further inquiry. (ROA 503; RT 2/8/05 at 54.) The court found that the allegations raised by the jury and the media had already been addressed, and concluded "upon the investigation that we did in questioning of jurors in this case . . . that there was no material breach or incident in this case of the admonition that would unfairly affect or prejudice the defendant." (RT 2/8/05, at 47, 54.) Additionally, the trial court observed that when the Ruiz incident occurred the jury was "on their way out of the courtroom. That is just very hard for me to understand that very many jurors could have seen, and— where there [sic] were when Ruiz was excused," and found that there was "no prejudice by the witness[] Ruiz['s] conduct or contact with the family members of Officer Hardesty." (*Id.* at 54.)

When the defense interviewed Juror 118, she agreed that basically what she had told the news media in her interview was exactly what she had told the trial court: "Everything I told them is the same thing." (ROA 561, Ex. 1 at 2, 5.) Juror 118 also informed counsel that she had forgotten to tell the trial court that one day in the jury room "one of the men said I saw it in the paper and I immediately said I don't want to hear it, uh, I was plugging my ears. And, then he said oh, but I turned it—the paper over." (*Id.* at 2.)

Petitioner again moved for a mistrial, arguing that this statement was evidence of a violation of the admonition by at least one juror. (ROA 569 at 3.) Petitioner argued in the alternative that the court should inquire whether any jurors had been exposed to media accounts of the trial. (*Id.* at 5; *see also* ROA 579.) The court denied both requests, noting that Juror 118's statement indicated that the jurors did precisely what the admonition

- 99 -

instructed "and that is to avoid press coverage." (RT 2/24/05 at 52; ROA 588 at 3.)

After the jury returned a guilty verdict, Petitioner reurged the motion for mistrial, in part on the grounds that, according to Juror 118, at least one member of the jury had been exposed to media accounts. (ROA 582.) The trial court denied the motion. (ROA 601 at 2.)

During the penalty phase of the trial, Tara White, Petitioner's wife, testified on behalf of the defense. (RT 3/2/05 at 104–39.) After a recess, defense counsel advised the court that White indicated that, during a break in testimony, she overheard a conversation from the jury room. (RT 3/2/05 at 133.) The trial judge observed that during the break, he overheard the jurors and asked his clerk to advise the jurors to lower their voices. (*Id.* at 134.) The trial court also heard White ask "Why are they laughing at me?" or words to that effect. (*Id.* at 134–35.) The court conducted a hearing out of the presence of the jurors to investigate the allegation. White testified that after the jurors left the courtroom and shut the door, they all started talking and said: "I can't believe they're keeping us this long. They don't have a chance" and then started laughing. (*Id.* at 136.) The trial court allowed counsel to question several persons who were seated in the vicinity regarding White's allegation, but all testified that they did not hear any discussion or laughter from the jury during the recess. (*Id.* at 155, 162, 170–71, 175, 177, 179, 183–84.)

The trial court posed an interrogatory to the jurors, asking "did you say or hear another juror say to the effect, 'I can't believe they are keeping us this long, they don't have a chance.'" (ROA 600.) All the jurors responded negatively to the trial court's interrogatory. (ROA 611 at 4.)

Petitioner filed a motion for mistrial based on the alleged jury statement related by White, in addition to the previously raised issues surrounding Juror 118. (ROA 603.) The trial court, skeptical of White's credibility and relying on the court's previous rulings, denied the motion. (ROA 611 at 4; RT 3/3/05 at 158.)

Petitioner argued on direct appeal that the trial court abused its discretion by denying Petitioner's request for a hearing to make additional inquiry of the jury members to determine whether Juror 118's statements regarding the jury members had merit (APP

51 at 75), what effect Ruiz's conduct had on them (*id.* at 77–78), and the nature of the jurors' exposure to newspapers (*id.* at 90, 92). Petitioner also argued that the trial court erred by failing to grant Petitioner's motions for mistrial. (APP at 75, 77–78, 90, 92, 97.)

The Arizona Supreme Court rejected Petitioner's claim that the jurors had violated their admonition. The court addressed Juror 118's concerns and concluded: "there was nothing inappropriate about the conversation in the elevator, nothing was said about the case"; the comments regarding the jurors expression of sympathy towards the young witnesses "did not affect the jury or the fairness of the trial" because "the jurors did not discuss the substance of the testimony and the witness's testimony related only to tangential matters"; Juror 7's alleged statements identifying Officer Hardesty's wife, that there would be 92 witnesses testifying,[20] and describing how alternate jurors would be selected were not recalled by any jurors other than Juror 118 and thus, "if made, had no effect on the other jurors"; and all of the jurors other than Jurors 7 and 118 "uniformly stated that they were unaware of any inappropriate conversations, and all jurors affirmed that they were assiduously following the admonition." *Cruz*, 181 P.3d at 210–11. Furthermore, the court concluded that Juror 118's interview to the news media "largely repeated her allegations to the judge" and that transcripts of the interviews revealed that the excused juror "had a distorted view of what constituted a violation of the admonition." *Id.* at 211. The court concluded that "[n]othing in the record on these issues demonstrates a violation of the admonition." *Id.*

The Arizona Supreme Court also rejected Petitioner's claim that the jury was prejudiced by Ruiz's conduct, stating that "even if the jury observed this incident, Cruz suffered no undue prejudice from it." *Id.* at 211.

The Arizona Supreme Court rejected Petitioner's assertions that the jurors had been exposed to the newspaper, noting that, in addition to filing an untimely motion, Petitioner had also failed to show he was prejudiced because nothing in Juror 118's

---

[20] The trial court surmised that Juror 7 had made this statement based on the list of 92 witnesses provided to the potential jurors during jury selection. Substantially fewer than 92 witnesses actually testified during all phases of the trial.

statements to defense investigators indicated that the paper contained any information about the case. *Id.* at 211–12. Additionally, the court found that the newspaper found in the jury room contained nothing about the trial, and counsel did not object when the trial court suggested throwing it away. *Id.* at 212.

Finally, the Arizona Supreme Court rejected Petitioner's assertion that the trial court abused its discretion by denying Petitioner's motion for mistrial based on Tara White's testimony, because the trial court "fully investigated the matter and responded appropriately" and "found no support for White's assertions." *Id.* at 213.

### 2. Discussion

Petitioner argues that the Arizona Supreme Court's factual findings regarding the issues raised in Claim 27 were based on an insufficient inquiry by the trial court, and thus the Arizona Supreme Court's reliance on an inadequate record was an unreasonable application of clearly established Federal law as set forth in *Remmer v. United States*, 347 U.S. 227 (1954) and *Phillips*, 455 U.S. at 217. (Doc. 28 at 276–77.) Petitioner also asserts that the Arizona Supreme Court's decision regarding the issues in Claims 27(C) and (D) was based on an unreasonable determination of facts.

### a. Legal Standard

Because the Arizona Supreme Court did not directly address Petitioner's allegations in Claims 27(A)–(C), that the trial court abused its discretion by failing to make a sufficient inquiry into all of his claims of juror misconduct or bias, this Court must apply the *Richter* presumption and determine what arguments or theories supported or could have supported the state court's decision. See *See Williams (Tara)*, 568 U.S. at 301 ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). As to Claim 27(D), the Arizona Supreme Court found that the trial court conducted a full investigation and responded appropriately, and thus the Court applies AEDPA deference to this decision

The Sixth Amendment guarantees a criminal defendant the right to a "fair trial by

a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722 (1961); *Dyer v. Calderon*, 151 F.3d. 970, 973 (9th Cir. 1998). However, a new trial is not required "every time a juror has been placed in a potentially compromising situation." *Phillips*, 455 U.S. at 217. Instead, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

The United States Supreme Court decisions cited by Petitioner—*Remmer* and *Phillips*—"do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias." *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003); *see also Sims v. Rowland*, 414 F.3d 1148, 1155 (9th Cir. 2005).

### b. *Failure to Conduct a Sufficient Inquiry under* Remmer *and* Phillips

Under the circumstances of this case, neither the trial court's alleged failure to investigate allegations of juror misconduct nor the Arizona Supreme Court's denial of Petitioner's claims on the merits was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Remmer*. *See* 28 U.S.C. § 2254(d)(1).

To the extent Petitioner asserts that the Arizona Supreme Court's decision rested on an unreasonable application of *Remmer*, the facts of that case are readily distinguishable from those at issue here. In *Remmer*, the petitioner learned after the trial that "a person unnamed" had communicated with a juror during trial "that he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 228. Such communication, the Supreme Court found, was presumptively prejudicial. The Supreme Court held that the trial court erred by denying the petitioner's motion for mistrial without conducting a hearing to determine the effect, if any, of the communication on the jury. *Id.* at 229–30. As the Ninth Circuit explained in *Sims*, allegations of "incidental and unintentional juror influence" are categorically different from the "outright jury tampering" at issue in *Remmer*. *Sims*, 414 F.3d at 1156; *see also United States v. Dutkel*,

192 F.3d 893, 894–95 (9th Cir. 1999) (finding that *Remmer* announced a special rule dealing with jury tampering).

In this case, there is no allegation of jury tampering and no presumption of prejudice; thus, the rule announced in *Remmer* has "little application." *See Sims*, 414 F.3d at 1154. Additionally, the defendant in *Remmer* explicitly requested that the trial court conduct a hearing on the issue of juror bias. *See Sims*, 414 F.3d at 1154 (finding that the rule announced in *Remmer* has little application in a case where defendant not only fails to request a hearing, but, through counsel, ostensibly approves of the manner in which the trial judge responds to evidence of juror bias). In this case, Petitioner's request for further inquiry of the jurors was equivocal at best in light of the equally explicit position taken by Petitioner that further inquiry would be harmful. (*Compare* ROA 500 at 5,8; ROA 497 at 4 *with* ROA 490, ROA 569, ROA 579; *see also* RT 3/3/05 at 145 (trial court noting that on a couple of occasions the defense requested further inquiry and at other times asked not to put the jury in that difficult position)).

Because the Arizona Supreme Court did not apply a rule that contradicts the governing law set forth by the Supreme Court or arrive at a different result when confronted by a set of facts that are materially indistinguishable from a decision of the Supreme Court, the Court finds that the state court's decision is not contrary to clearly established federal law as determined by the Supreme Court in *Remmer*. *See* 28 U.S.C. § 2254(d)(1).

Nor was the state court's decision an "unreasonable application" of *Phillips*. Petitioner has not demonstrated that he did not have a sufficient opportunity to prove actual bias as required by Supreme Court law, or that the trial court conducted an inadequate inquiry into the allegations of juror misconduct.

The Supreme Court has never held that a trial court's failure to investigate possible juror bias is a structural error requiring a new trial even in the absence of prejudice. *See Sims*, 414 F.3d at 1153. Nonetheless, Petitioner submits that *Phillips* supports his contention that a hearing was called for because in that case there was no allegation of jury tampering but the Court nonetheless found that a hearing was proper to

address allegations that a juror had applied for a job with the prosecution. Petitioner's argument is unpersuasive. The general rule set forth in *Phillips* is that a defendant must have an "opportunity to prove actual bias." 455 U.S. at 215. However, *Phillips* left "open the door as to whether a hearing is always required." *See Tracey*, 341 F.3d at 1044. The Supreme Court held that determinations of juror impartiality "*may* properly be made at a hearing like that ordered in *Remmer*," but did not hold that a hearing was the only proper safeguard. *Phillips*, 455 U.S. 218 (emphasis added).

"[I]n determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Tracey*, 341 F.3d at 1044 (citing *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)). The trial court has discretion to determine the extent and nature of the hearing. *United States v. Shryock*, 342 F.3d 948, 973–74 (9th Cir. 2003); *Price v. Kramer*, 200 F.3d 1237, 1254 (9th Cir. 2000); *see Dyer*, 151 F.3d at 975 ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.").

### *(i)     Claim 27(A)*

As to Claim 27(A), Juror 118 agreed that in statements given during her interview with the news media she had raised no issues beyond those she had previously brought to the attention of the trial court. Those issues were meticulously and thoroughly investigated by the trial court, and defense counsel was satisfied with the removal of Jurors 7 and 118 as a result of that inquiry. Juror 118 made several statements and assumptions regarding her belief that the admonition had been violated; however, with the possible exception of a statement Juror 7 attempted to make to Juror 118, and which Juror 118 did not hear, there is no support for Petitioner's contention that the jurors actually violated their admonition. As the Arizona Supreme Court concluded, Juror 118's understanding of the admonition was "distorted" and the record did not demonstrate any violation of the admonition. *Cruz*, 181 P.3d at 211.

//

### *(ii)    Claim 27(B)*

As to Claim 27(B), the trial court stated that at the time the incident with witness Ruiz occurred, defense counsel's position was that it was a "minor enough matter" that "could just be dealt with by an admonition." (RT 3/8/05 at 54.) The trial court found it difficult to believe Petitioner's argument regarding the degree of commotion the Ruiz situation might have caused because the focus was on the discussion at the bench while the jurors were on their way out of the courtroom. (*Id.*) Moreover, Petitioner rejected the offer of a curative instruction. Thus, the trial court properly considered the seriousness of the alleged misconduct and took appropriate steps to ensure nothing similar occurred in the future.

### *(iii)    Claim 27(C)*

As to Claim 27(C), the trial court's inquiry, which established that the jurors were not aware of any discussions regarding the case and confirmed that they each could abide by the admonition to avoid discussing the case and to avoid the media, was sufficient to address Juror 118's subsequent revelation to defense counsel that she believed a juror had been exposed to media coverage. Because Juror 118 was dismissed immediately after the inquiry, her allegation that a juror had been exposed to media necessarily implied that this occurred prior to the court's individualized inquiry of all the jurors. It is extremely unlikely that a second inquiry into the jury's alleged failure to abide by the admonition would have yielded different results. The trial court's inquiry and defense counsel's full participation in questioning the jurors in the first inquiry adequately safeguarded Petitioner's right to a fair and impartial jury.  Moreover the content of the allegation itself did not support the need for further inquiry. There was no evidence that a juror committed misconduct. Instead, the record demonstrates that the juror complied with the admonition by turning over the paper to avoid seeing its contents.

### *(iv)    Claim 27(D)*

As to Claim 27(D), the trial court, recognizing the possibility that the jurors had expressed bias, conducted a thorough investigation into the matter with full participation by the defense. The judge recounted his personal observations, interviewed several

witnesses, and submitted an interrogatory to the jurors. The response confirmed the testimony of the witnesses—that nobody, not even the jurors present in the jury room, claimed to hear the statement White alleged a juror had made. Moreover, the trial court, which had an opportunity to view the witnesses and to observe White, both during the hearing on the juror misconduct and in her testimony during the penalty phase of trial, was skeptical of White's credibility. The trial court could properly take this into account in denying a request for further inquiry and the motion for mistrial.

The Court finds that Petitioner has not shown that the Arizona Supreme Court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *See Richter*, 562 U.S. at 103. The Court next reviews Petitioner's challenge under § 2254(d)(2).

### c.  *Unreasonable Determination of Facts*

#### (i)  *Claim 27(C)*

In Claim 27(C), Petitioner asserts that the Arizona Supreme Court's ruling was an unreasonable determination of the facts because the court based its findings on the merging of two separate occurrences: Juror 118's assertion that a juror was exposed to media coverage, and the discovery of a newspaper in the jury room. To the extent the state appellate court may have conflated these two issues, this error was invited by Petitioner's presentation of the issue in a similarly conflated manner to the Arizona Supreme Court. (*See* APP 51 at 86–89.) Petitioner's appellate presentation was simply factually incorrect. Petitioner argued in his direct appeal that Juror 118 saw a newspaper in the jury room and therefore the evidence demonstrated that at least one juror had in his possession in the jury room a newspaper *concerning this case*. In fact, Juror 118 never stated that a juror had possession of a newspaper in the jury room, and had conveyed to defense counsel only that another juror attempted to tell her, not about the case, but about the fact that, when the juror saw "it" in the paper, the juror had turned the paper over.

Regardless, as Respondents correctly assert, the reviewing court's conclusion that Juror 118's statements did not indicate that the paper to which she referred contained any

information about the case was not unreasonable. Juror 118 did not state that the other juror reported that the article contained information about the trial, the murder, or anything else about the case. This Court is convinced that an appellate panel could not reasonably conclude that the finding is unsupported by the record. *See Taylor*, 366 F.3d at 1000.

Moreover, even if the state court's findings were a misapprehension or misstatement of the record, any misapprehension about whether the newspaper the juror was referring to contained information about this case did not go to a material factual issue that is central to Petitioner's claim. *See id.* at 1001.

### (ii)    *Claim 27(D)*

Also without merit is Petitioner's assertion in Claim 27(D) that the Arizona Supreme Court's findings of fact regarding White's statement were unreasonable. Petitioner asserts that the Arizona Supreme Court's findings were unreasonable because, while four witnesses claimed to have heard *nothing*, the trial court itself heard *something*, and thus the court erred in relying on the witnesses' statements which were contrary to the court's recollection. This argument misstates the court's findings. The Arizona Supreme Court found that none of the witnesses heard "what White claimed to have heard." *Cruz*, 181 P.3d at 213. This was not an unreasonable factual determination, and was supported by the trial court's recollection. Though several witnesses, including the court, heard noise or laughter coming from the jury room, no witness, including the trial court, ever heard a juror stating "I can't believe they're keeping us this long. They don't stand a chance."

The Court finds that the state court's decision regarding potential juror misconduct or bias was not based on an unreasonable determination of the facts. Claim 27 is denied.

## IV.    CLAIMS 9–20

Petitioner raises a series of constitutional challenges to the death penalty and to Arizona's death penalty scheme. (Doc. 28 at 238–58, 271–72.) The Arizona Supreme Court rejected these claims on direct appeal. *Cruz*, 181 P.3d at 218–19. For the reasons set forth below, the Court will deny the claims.

A.    Claim 9

Petitioner challenges the aggravating circumstance used to render him death-eligible. Petitioner argues that A.R.S. § 13-703(F)(10), which establishes eligibility for the death penalty based on the murder of a law enforcement officer in the line of duty, impermissibly fails to narrow the class of persons eligible for the death penalty by "double counting" a factual element necessary to establish first-degree murder under A.R.S. § 13-1105(A)(3). (Doc. 28, at 238–241.) The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts.

A capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Lowenfield*, 484 U.S. at 244. Such a circumstance must meet two requirements. First, "the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa*, 512 U.S. at 972; *Arave v. Creech*, 507 U.S. 463, 474 (1993). Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972.

Petitioner was indicted on one count of first-degree murder under A.R.S. § 13-1105(A)(3): "Intending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty." *Cruz*, 181 P.3d at 203, 216. The only aggravating circumstance the State alleged required proof of nearly identical facts: "The murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer." A.R.S. § 13-703(F)(10); *Cruz*, 181 P.3d at 216.

Petitioner acknowledged in his opening brief that the United States Supreme Court

has held that it is constitutional for a capital aggravating circumstance to duplicate an element of the offense, but nonetheless urged the Arizona Supreme Court to hold that, as a matter of Arizona Constitutional law, A.R.S. § 13-703(F)(10) is unconstitutional because any conviction of murder under A.R.S. § 13-1105(A)(3) will necessarily satisfy the (F)(10) aggravating circumstance. (Doc. 31, Ex. A at 105–07.) The Arizona Supreme Court rejected Petitioner's argument:

> [A]s with all cases in which an aggravating circumstance is found, no presumption arises that a capital sentence should be imposed. . . . Killing a person one knows to be a peace officer who is acting in the line of duty adequately narrows the class of persons subject to the death penalty.

*Cruz*, 181 P.3d at 217 (citing *Lowenfield*, 484 U.S. at 244). Contrary to Petitioner's argument, the Arizona Supreme Court's rejection of this claim was not an unreasonable application of clearly established federal law. Petitioner argues that the Arizona Supreme Court's holding demonstrates that there is no genuine narrowing performed by the (F)(10) aggravator because "[n]othing more is required to prove the (F)(10) aggravating circumstance, which renders a defendant eligible for a death sentence" and merely repeats factors that distinguish first-degree murder from other categories of murder. (Doc. 28 at 240) (quoting *Cruz*, 181 P.3d at 216). Petitioner misconstrues the Supreme Court's holding in *Zant*. The Constitution requires no more than a genuine narrowing of the class of death-eligible persons and reasonable justification for the imposition of a more severe sentence on the defendant "compared to others found guilty of murder." *Zant*, 462 U.S. at 877. The "narrowing function" may be performed "by jury findings at either the sentencing phase of the trial or the guilt phase." *Lowenfield*, 484 U.S. at 244–45. If the legislature narrows the definition of capital offenses—and thus the "narrowing function" is performed by the jury at the guilt phase—the "fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process." *Id.* at 246. Thus, the fact that an aggravating circumstance duplicates one of the elements of the crime does not make the sentence constitutionally infirm. *Id.*

Arizona's first-degree murder statute and capital sentencing scheme, which, as Petitioner acknowledges, treats "the defendant who kills a police officer in the line of duty . . . more severely" accomplishes the requisite narrowing function. The fact that the murder victim was a peace officer performing his regular duties may be properly regarded as an aggravating circumstance because "[t]here is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property." *Roberts v. Louisiana*, 431 U.S. 633, 636 (1977). Thus, Arizona's (F)(10) aggravating circumstance narrows "the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more." *See Lowenfield*, 484 U.S. at 246. Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, Claim 9 is denied.

B.      Claim 10

Petitioner argues that the death penalty is categorically cruel and unusual punishment because it no longer serves the goals of retribution or deterrence and should be abolished pursuant to the "evolving standards of decency that mark the progress of a maturing society." (Doc. 28 at 242) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The Supreme Court has held otherwise, *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and thus the Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established law.

The Arizona Supreme Court's rejection of this claim was also not based on an unreasonable determination of the facts. Petitioner cites two law journals in support of his argument that empirical evidence has eroded the two principle social purposes of the death penalty—"retribution and deterrence." (Doc. 28 at 242.)[21] But Petitioner presented no empirical evidence to the Arizona Supreme Court regarding this claim, nor did he cite

---

[21] The two articles are: Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005); John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791 (2005).

to the articles he now includes in this Petition. (*See* Doc. 31, Ex. A at 3–6, 112; Doc. 31, Ex. C at 2.) Under *Pinholster*, review of such claims "is limited to the record that was before the state court that adjudicated the claim on the merits." *Gulbrandson*, 738 F.3d at 993 n.6 (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7).

Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts, Claim 10 is denied.

### C.    Claim 11

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the death penalty. (Doc. 28 at 242.)

The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts. Prosecutors have wide discretion in making the decision whether to seek the death penalty. The fact that a prosecutor has discretion in charging and deciding whether to ask for the death penalty does not render the imposition of capital sentences unconstitutionally arbitrary. *Gregg*, 428 U.S. at 199; *Jurek v. Texas*, 428 U.S. 262, 274 (1976); *Proffitt v. Florida*, 428 U.S. 242, 254 (1976). Additionally, the Ninth Circuit has rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998). Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts, Claim 11 is denied.

### D.    Claim 12

Petitioner argues that Arizona's death penalty scheme discriminates against poor young males. (Doc. 28 at 243–44.) The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of facts.

Clearly established federal law holds that "a defendant who alleges an equal

- 112 -

protection violation has the burden of proving the existence of purposeful discrimination" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim Petitioner "must prove that the decision makers in his case acted with discriminatory purpose." *Id.*

Petitioner's statistical claim that male murderers are overrepresented on Arizona's death row in comparison to the population of murderers generally is insufficient to meet this burden. *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (9th Cir. 1990) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove that decision makers in petitioner's case acted with discriminatory purpose) *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993). Petitioner failed to allege any facts to suggest that decision makers in *his* case acted with discriminatory purpose. The Arizona Supreme Court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts, Claim 12 is denied.

E.    Claim 13

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth Amendment because it denies capital defendants the benefit of proportionality review. (Doc. 28 at 244–45.) There is no federal constitutional right to proportionality review of a death sentence. *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43–44 (1984)). The Ninth Circuit has explained that the interest implicated by proportionality review—the "substantive right to be free from a disproportionate sentence"—is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Because the Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, Claim 13 is denied.

F.    Claims 14–16 and 20[22]

Petitioner argues that Arizona's death penalty scheme is unconstitutional because it does not require the State to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances (Claim 14) and because it fails to provide the jury with objective standards to guide the weighing of aggravating and mitigating circumstances (Claim 15). (Doc. 28 at 245–47.)

The Arizona Supreme Court's rejection of these claims was not contrary to, and did not involve an unreasonable application of, clearly established law, nor was it based on an unreasonable determination of the facts. There is no Supreme Court authority which constitutionally requires that a jury be instructed on a burden of proof in the sentence selection phase of a capital case. Further, "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Harris v. Pulley*, 692 F.2d 1189, 1195 (9th Cir. 1982), *rev'd on other grounds*, 465 U.S. 37 (1984). Nor is there any Supreme Court authority which would require a burden of proof or persuasion be assigned to any of the jury's penalty phase determinations.[23] On the contrary, the Supreme Court has held that a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa*, 512 U.S. at 979; *see Franklin v. Lynaugh*, 487 U.S. 164,

---

[22] Petitioner withdraws Claim 16, having unintentionally duplicated the arguments raised in Claim 14.  Claim 20 also appears to be substantially identical to Claim 15. Petitioner asserts that Claim 20 was raised on direct appeal as Claim V.18. Although Petitioner argues that Claim 20 was raised on direct appeal, the Court's review of the record indicates that Claim V.18 alleged that Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence, which is the same argument made in Claim 22 of this petition. Accordingly, Claim 20 is denied by the Court as duplicative of Claim 15. To the extent Claim 20 presents an argument regarding the juror's full consideration of the mitigating evidence, the Court rejects such argument for the same reasons it rejects Claim 22, *infra*.

[23] Neither are Petitioner's claims supported by the supplemental authority cited in Document 57. *Hurst v. Florida*, 136 S. Ct. 616 (2016), does not hold that a jury is required to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. *Hurst* held only that Florida's scheme, in which the jury rendered an advisory sentence but the judge made the findings regarding aggravating and mitigating factors, violated the Sixth Amendment. 136 S. Ct. at 620. *Hurst* did not address the process of weighing the aggravating and mitigating circumstances.

179 (1988) ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."); *Zant*, 462 U.S. at 875, n.13 (explaining that "specific standards for balancing aggravating against circumstances are not constitutionally required"). Because the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts, Claims 14–15 are denied. Claim 16 is withdrawn.

### G.  Claim 17

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the discretion of the sentencing authority. (Doc. 28 at 249.) The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts. The Ninth Circuit has rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart*, 140 F.3d at 1272. The Arizona sentencing scheme requires proof of a specific "aggravating circumstance" before a sentence of death may be imposed. *See* A.R.S. § 13-703.1(D). This is an accepted "means of genuinely narrowing the class of death-eligible persons." *See Lowenfield*, 484 U.S. at 244. Claim 17 is denied.

### H.  Claims 18–19

In Claim 18, Petitioner argues that Arizona's sentencing scheme is unconstitutional because it presumes that death is the appropriate punishment by requiring the imposition of the death penalty if one aggravating factor is found and no mitigating factors are established.[24] (Doc. 28 at 250–51 (citing A.R.S. § 13-703(E) ("the

---

[24] Petitioner also asserts that mitigating evidence is frequently not considered because of the use of "a screening mechanism designed to prevent the sentencer from considering such evidence." (Doc. 28 at 251 (*citing State v. Ramirez*, 871 P.2d 237, 252-53 (Ariz. 1994) (affirming trial court's rejection of defendant's mitigating factors because defendant failed to prove, by a preponderance of the evidence, that he was remorseful and had an excellent prison record).) This issue is addressed in the Court's discussion of Claim 22.

trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency.")).) In Claim 19, Petitioner argues that Arizona's capital sentencing scheme is unconstitutional because it shifts the burden of persuasion to Petitioner to affirmatively prove mitigating circumstances sufficiently substantial for the sentencing body to spare his life. (Doc. 28 at 252 (citing A.R.S. § 13-703(C) ("The burden of establishing the existence of . . . mitigating circumstances . . . is on the defendant.")).)

The Arizona Supreme Court's rejection of these claims was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts. The Supreme Court has rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty. *Walton v. Arizona*, 497 U.S. 639, 651–52 (1990) (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990); *Boyde*, 494 U.S. at 370), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith v. Stewart*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply a beyond-a-reasonable-doubt standard). Furthermore, the Supreme Court in *Walton*, recognizing that a state may not impose restrictions on "what mitigating circumstances may be considered in deciding whether to impose the death penalty," held that Arizona's allocation of the burdens of proof in a capital sentencing proceeding does not violate the Constitution. *Walton*, 497 U.S. at 649–50. "So long as a State's method of allocating the burdens of proof does not lessen the State's burden . . . to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.* Because the Arizona Supreme Court's rejection of these claims was not contrary to or an unreasonable application of clearly established

law, nor was it based on an unreasonable determination of the facts, Claims 18 and 19 are denied.

## V.    CLAIM 21

Petitioner argues that Arizona's capital sentencing scheme fails to provide meaningful appellate review of death sentences. (Doc. 28 at 254–56.) Respondents contend that the claim was not properly exhausted on direct appeal because Petitioner failed to raise it in the state courts, and, consequently, it is procedurally defaulted. (Doc. 31 at 164.) Regardless of its procedural status, the Court will address this claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Cassett*, 406 F.3d at 623-24.

For offenses committed after August 1, 2002, the Arizona Supreme Court is required to review all death sentences to determine "whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-703.05(A); *see also* 2002 Ariz. Sess. Laws 5th Spec. Sess. CH.1 (S.B. 1001) (stating that A.R.S. § 13-703.05 applies to offenses committed on or after August 1, 2002). Under this standard of review, the court upholds a decision if there is "any reasonable evidence in the record to sustain it." *See State v. Morris*, 160 P.3d 203, 220 (Ariz. 2007) (citing *State v. Veatch*, 646 P.2d 279, 281 (Ariz. 1982)). Petitioner asserts that this review is inconsistent with the Supreme Court's decisions mandating meaningful "independent" appellate review as a necessary "check against the random or arbitrary imposition of the death penalty." (Doc. 28 at 255 (quoting *Gregg*, 428 U.S. at 206).)

While "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in an arbitrary or irrational fashion, *Pulley v. Harris*, 465 U.S. at 54 (Stevens, J., concurring); *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated. The Constitution requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Clemons*, 494 U.S. at 749. Claim 21 is not supported by clearly established federal law and is denied.

# VI. CLAIM 22

Petitioner argues that Arizona's requirement that defendants prove mitigating factors by a preponderance of the evidence is unconstitutional because it prevents the jury from considering any aspect of the defendant's character or record that counsels in favor of a sentence other than death. (Doc. 28 at 256–57 (citing *Smith v. Texas*, 543 U.S. 37 (2004); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604).) This claim is procedurally defaulted because it was not raised in the state courts. The Court addresses this procedurally defaulted claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Cassett*, 406 F.3d at 623-24.

The Supreme Court has specifically rejected the argument that the Arizona statute is unconstitutional because it imposes on defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency. *Walton*, 497 U.S. at 649–51. According to Petitioner, recent case law undermines *Walton*'s conclusion and calls for a different result, so that once he establishes relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." (Doc. 37 at 215 (quoting *Tennard*, 542 U.S. at 285).) The Court disagrees. *Walton* controls the outcome of this claim.

Since its decision in *Tennard*, the Supreme Court has subsequently reaffirmed that the reasoning in *Walton* still controls regarding burdens of persuasion—"a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances." *Kansas v. Marsh*, 548 U.S. at 173. Thus, once the government has properly carried its burden of establishing death eligibility, "it [does] not offend the Constitution to put the burden on [defendant] to prove any mitigating factor by a preponderance of the evidence." *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007) (citing *Kansas v. Marsh,* 548 U.S. 163; *Walton*, 497 U.S. at 649; *Jeffers v. Lewis*, 38 F.3d 411 (9th Cir 1994)). Petitioner is not entitled to relief on this claim.

//

## VII. CLAIM 23

Petitioner alleges that his constitutional rights will be violated because he will not receive a fair clemency proceeding. In particular, he alleges the proceeding will not be fair and impartial based on the Clemency Board's selection process, composition, training, and procedures, and because the Attorney General will act as the Board's legal advisor and as an advocate against Petitioner. (Doc. 28 at 257–59.) Petitioner acknowledges the claim is unripe for adjudication. (Doc. 37 at 216.) The Court denies Claim 23 because it is not cognizable in this habeas proceeding.

Habeas relief can only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's challenge to state clemency procedures does not represent an attack on his detention and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam) ("A habeas petition must allege the petitioner's detention violates the constitution, a federal statute or a treaty."); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law). Accordingly, Claim 23 is denied.

## VIII. CLAIM 24

In Claim 24, Petitioner argues that trial counsel performed ineffectively in the guilt and sentencing phases of his trial. (Doc. 28 at 259–65.) This claim consists of five sub-claims, labelled 24(A) through (E) by Respondents, that Petitioner concedes were not exhausted in state court. Petitioner asserts that PCR counsel's ineffectiveness for failing to raise these IAC claims constitutes cause under *Martinez*. Respondents contend that Petitioner is not entitled to relief because these claims are without merit and not substantial under *Martinez*. The Court concludes that these claims are not substantial, and thus the procedural default cannot be excused under *Martinez*. Additionally, these claims are all without merit.

In Claim 24(A), Petitioner asserts that trial counsel failed to request a hearing in order to investigate and "offer up the evidence they claimed to possess" demonstrating excessive security precautions were being employed during Petitioner's trial. Petitioner,

however, offers nothing more than speculation that such evidence exists. Even if trial counsel performed unreasonably by failing to request a hearing on the use of the shock belt, as stated in the Discussion Section II.B, this Court has determined that Petitioner fails to allege facts that would establish that use of the shock belt was prejudicial. Petitioner has not presented any factual basis for concluding that the jurors ever observed that he was wearing the shock belt. He also fails to present any factual support for his assertion that the shock belt interfered with his ability to participate in his defense. As a result, Petitioner cannot establish a reasonable probability of a different result at trial, even if counsel had successfully challenged the use of the shock belt. *See Strickland*, 466 U.S. at 694. Because this claim lacks merit, Petitioner is not entitled to relief. For the same reason, there is no cause to overcome its procedural default because it is not substantial under *Martinez* and PCR counsel was not ineffective for failing to raise it. *See Clabourne*, 745 F.3d at 377.

In Claim 24(B), Petitioner asserts that his trial counsel was ineffective for failing to move to strike Juror 193 for cause. (Doc. 28 at 261–62.) Petitioner asserts that it is "probable" that had counsel challenged Juror 193, the court would have removed the juror for cause, or, at a minimum, ensured that this error was not reviewed under the "onerous" fundamental error standard of review when raised on direct appeal. Claim 24(B) is without merit. Counsel did not perform ineffectively because a challenge to Juror 193 would have been rejected, and there is no reasonable probability that the Arizona Supreme Court's ruling would have been any different under harmless error review. As this Court has already concluded, in the Discussion Section II.A.3.b.(viii)–(ix), there is no merit to Petitioner's challenge to Juror 193, because Juror 193 was neither presumptively nor actually biased. *See Sexton*, 679 F.3d at 1157 ("[C]learly we cannot hold counsel ineffective for failing to raise a claim that is meritless."). Because this claim lacks merit, Petitioner is not entitled to relief. Because the claim is not substantial under *Martinez*, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, and default of the claim is not excused. *See Clabourne*, 745 F.3d at 377.

In Claim 24(C), Petitioner argues that trial counsel failed to timely object to Frank Powell's testimony regarding the missing hammer on the gun Petitioner used to kill Officer Hardesty. (Doc. 28 at 262–63.) Petitioner's claim is without merit because he has not established deficient performance. The record demonstrates that counsel had a strategic reason for deciding not to object contemporaneously, choosing instead to move for a mistrial after the testimony: "[A]t the time I did not make an objection, I felt like objecting the [sic] to it at that point would probably draw even more attention to this witness's answer, that the purpose for the modification indication [sic] was for reasons of concealment." (RT 2/11/05, at 3.) This is precisely the type of strategic choice that the Supreme Court has characterized as "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Counsel's performance was not deficient. *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (counsel's decision not to object to comments during opening statements, "possibly to avoid highlighting them, was a reasonable strategic decision").

Nor can Petitioner establish prejudice. There is no reasonable probability of a different trial outcome even if Petitioner raised this claim contemporaneously. As Petitioner concedes, the evidence against him was overwhelming, and the impact of the evidence during the penalty phase was minimal in comparison with the strength of the aggravating factor. Because this claim lacks merit, Petitioner is not entitled to relief. For the same reason, there is no cause to overcome its procedural default. The claim is not substantial under *Martinez* and PCR counsel was not ineffective for failing to raise it. *See Clabourne*, 745 F.3d at 377.

In Claim 24(D), Petitioner asserts that trial counsel rendered deficient performance by failing to object to acts of prosecutorial misconduct during sentencing proceedings, specifically, by failing to object to arguments that Petitioner needed to establish a causal nexus between his mitigation and the offense, and directing the jury to weigh the manner of Officer Hardesty's murder as part of the aggravating circumstance. (Doc. 28 at 263–64.) Petitioner asserts that the prosecutor's arguments were contrary to both Arizona and federal law. As this Court has already determined in the Discussion Section C.5, however, there is no merit to Petitioner's prosecutorial misconduct claim. The

prosecutor's remarks regarding a causal nexus were not misconduct because the prosecutor permissibly argued that the jury should consider the evidence, but find that it carried "no weight." The prosecutor's remarks regarding the circumstances of the murder were also consistent with Arizona law. Because Petitioner's prosecutorial misconduct claims have no merit, counsel cannot be ineffective for failing to object to the remarks. *See e.g., Rupe v. Wood*, 93 F.3d 1434, 1444–45 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.").

This Court also concluded that given their brevity and the context in which they were made, even if the remarks constituted misconduct on behalf of the prosecutor, they did not deprive Petitioner of a fair trial. Consistent with this finding, the Court also finds that there is no probability of a different outcome had counsel objected to the remarks. *See State v. Pandeli*, 161 P.3d 557, 569 (Ariz. 2007) (finding any potential error in prosecutor's closing argument cured by jury instruction). Because this claim lacks merit, Petitioner is not entitled to relief. For the same reason, there is no cause to overcome its procedural default because it is not substantial under *Martinez* and PCR counsel was not ineffective for failing to raise it. *See Clabourne*, 745 F.3d at 377.

In Claim 24(E), Petitioner asserts that counsel was ineffective for failing to tell the jury, or advising Petitioner to tell the jury during his allocution, that if the jury recommended a life sentence, Petitioner would request that the trial court impose a sentence that was not parole eligible. (Doc. 28 at 264.) Based on the record in this case, the Court concludes that Petitioner has failed to rebut the presumption of adequate assistance. There is a broad range of legitimate defense strategies and counsel has wide latitude in deciding how best to represent a client in closing argument. *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003). Choosing "which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id.* at 6. In some circumstances, counsel may forgo closing argument altogether. *See Bell*, 535 U.S. at 701–02. The availability of another potential argument does not establish that counsel acted unreasonably in failing to make it. There are many reasonable strategic reasons for not telling jurors, or not advising Petitioner to tell the jurors, that, if sentenced to life,

Petitioner would request a natural life sentence. Such an argument might ring hollow and cost credibility with the jury, and the jurors might believe that the argument was not binding on Petitioner and presume that he intended to later ask the judge for a parole eligible sentence, especially in light of the jury instructions which clearly stated that the court would have that option. The Court finds that Petitioner has not overcome the "strong presumption" that counsel's performance was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Nor can Petitioner establish a reasonable likelihood that the jury would not have sentenced him to death had counsel made this argument. Petitioner again refers to a press release, issued by three jurors, stating: "we were not given the option to vote for life in prison without the possibility of parole." (ROA 644, Ex. 9.) But as this Court previously remarked in the discussion of Claim 6, it was not a certainty that if the jurors had rejected the death sentence, the trial court would have imposed a natural life sentence. This holds true even if Petitioner argued for a natural life sentence. Thus, assuming that the jurors would have actually rejected a death sentence if they were able to affirm that any life sentence would have been served without the possibility of parole, counsel's argument, or Petitioner's allocution, would not have changed the outcome because it would not have provided any such assurance to the jury. Because this claim lacks merit, Petitioner is not entitled to relief. For the same reason, there is no cause to overcome its procedural default because it is not substantial under *Martinez* and PCR counsel was not ineffective for failing to raise it. *See Clabourne*, 745 F.3d at 377.

## IX.    CLAIM 25

In Claim 25, Petitioner argues that appellate counsel performed ineffectively. (Doc. 28 at 265–73.) This claim consists of seven sub-claims, Claims 25(A) through (G), that Petitioner concedes were not exhausted in state court and are now procedurally defaulted. Petitioner asserts that PCR counsel's ineffectiveness for failing to raise these IAC claims constitutes cause under *Martinez*, 566 U.S. 1, and *Nguyen*, 736 F.3d at 1294–96, to excuse the default. When this Petition was filed, the Ninth Circuit in *Nguyen* had extended *Martinez* to include defaulted claims of ineffective assistance of counsel on

direct appeal. *See Nguyen*, 736 F.3d at 1295. Since this Petition was filed, the Supreme Court has made clear that the *Martinez* exception cannot be extended to claims of ineffective assistance of appellate counsel. *Davila*, 137 S. Ct. at 2062–63 (2017). Because Petitioner has demonstrated no other grounds upon which the default might be excused, he cannot overcome the procedural default of these IAC claims. Accordingly, Claims 25(A) through (G) are denied.

## X. CLAIM 26

In Claim 26, Petitioner argues that, even if the trial errors committed during Petitioner's trial and sentencing proceeding do not warrant habeas relief standing alone, the cumulative effect of multiple errors is sufficiently prejudicial to warrant habeas relief. (Doc. 28 at 273–74.) Petitioner did not exhaust this claim on direct appeal, and now argues, as cause for the procedural default of this claim under the holdings in *Martinez* and *Nguyen*, that appellate counsel was ineffective for failing to raise this claim, and PCR counsel performed deficiently in failing to raise appellate counsel's ineffectiveness.

Because Claim 26 is not an ineffective assistance of counsel claim, PCR counsel's deficient performance may not serve as cause to excuse the procedural default. *See Pizzuto*, 783 F.3d at 1176–77. Accordingly, Claim 26 is denied.

To the extent that this claim presents a separate ineffective assistance of appellate counsel claim, this claim is also procedurally defaulted and Petitioner cannot establish cause for the default under *Martinez*. *See Davila*, 137 S. Ct. at 2062–63 (2017).

The Court disagrees with Petitioner's unsupported argument that he was prejudiced as a result of cumulative error. Although "the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal," *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973)), "the fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence.'" *Parle*,

505 F.3d at 928 (internal citations omitted). As set forth above, the Court has addressed each of the "errors" asserted by Petitioner and has found that no error occurred. Thus, unlike in *Parle*, 505 F.3d at 930, there is no cumulative trial error. Therefore, there is no basis for finding that Petitioner's defense was rendered less persuasive or that his trial was "infected" with unfairness resulting in a due process violation. *See id.* at 927 (citation omitted). Even if there were error, it would be harmless under *Brecht* because the evidence of Petitioner's guilt was overwhelming and the impact of any error during the penalty phase was minimal in comparison with the strength of the aggravating factor. In *Parle*, the Ninth Circuit explained that the errors were uniquely symmetrical, "each … amplified the prejudice caused by the other—and their direct relation to the sole issue contested at trial." *See id.* at 933. Here, however, Petitioner has failed to explain how the "unique symmetry" of otherwise harmless error amplifies the prejudice caused by other error, in relation to a key contested issue of fact. *See id.*

Petitioner cannot sustain his claim for ineffective assistance of appellate counsel because the issues he asserts appellate counsel should have raised are without merit. *See Turner v. Calderon*, 281 F.3d at 872; *Wildman*, 261 F.3d at 840. Accordingly, to the extent Claim 26 presents a separate IAC claim, it is procedurally defaulted, and, alternatively, without merit.

## CONCLUSION

For the reasons set forth above, Petitioner is not entitled to relief on Claim 1 or on Claims 3–27, and additional evidentiary development of Claim 1 is neither required nor warranted.

Petitioner has established that the state court rejection of Claim 2 was based on an unreasonable determination of facts. 28 U.S.C. § 2254(d)(2). Petitioner has further established he is entitled to an evidentiary hearing on Claim 2. The Court will hold a status conference to address the scope of the evidentiary hearing. The Court will direct Petitioner to file a proposed witness and exhibit list and both parties shall be prepared to discuss the need for an evidentiary hearing on the prejudice prong of Petitioner's IAC at sentencing claim, in addition to Petitioner's request to depose trial counsel, at the status

conference.

## CERTIFICATE OF APPEALABILITY

Although this is not a final order in these proceedings, the Court has endeavored to determine, if judgment is ultimately entered against Petitioner, whether a certificate of appealability (COA) should be granted on the issues addressed herein.

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of Claim 1. For the reasons stated in this order, the Court finds that reasonable jurists could not debate its resolution of the remaining claims.

Accordingly,

**IT IS HEREBY ORDERED** denying Claim 1 and Claims 3-27.

**IT IS FURTHER ORDERED** granting in part and denying in part Petitioner's motion for evidentiary hearing and development (Doc. 38). Petitioner's motion for evidentiary development and an evidentiary hearing as to Claim 1 is granted in part as to Petitioner' motion to expand the record to include Exhibits 1-27 of Petitioner's Motion for Evidentiary Development (Doc. 38, Exs. 1-27), and denied in all other respects.

**IT IS FURTHER ORDERED** that Petitioner's motion for an evidentiary hearing as to Claim 2 is granted. Petitioner's request to supplement the record and for evidentiary development of Claim 2 is denied at this time as to all requests with the exception of Petitioner's request to depose trial counsel. The Court will consider this matter further during pre-hearing proceedings after the Court directs the parties to file a joint proposed discovery schedule identifying all discovery each wishes to conduct and setting forth good cause pursuant to Rule 6 of the Rules Governing Section 2254 Cases.

//

1    **IT IS FURTHER ORDERED** that an evidentiary hearing to determine whether
2 sentencing counsel were ineffective, as asserted in Claim 2, shall take place as soon as is
3 practicable. The Court will issue a separate order setting this matter for a scheduling
4 conference.
5    **Dated this 27th day of March, 2018.**

_____
Honorable Jennifer G. Zipps
United States District Judge