1    **WO**

6              **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

9    John Montenegro Cruz,                    No. CV-13-00389-TUC-JGZ

10                      Petitioner,           **ORDER**

11   v.                                       <u>DEATH PENALTY CASE</u>

12   David Shinn, et al.,

13                      Respondents.

15        Petitioner John Montenegro Cruz is an Arizona death row inmate who has filed for
16   habeas relief in this Court. The Court held an evidentiary hearing on Claim 2 of Cruz's
17   habeas petition, alleging ineffective assistance of counsel at sentencing. The hearing was
18   ordered upon this Court's determination that the state court's rejection of Claim 2 was
19   based on an unreasonable determination of facts.[1] (Doc. 60 at 125.) Accordingly, the
20   Court's review of Claim 2 is *de novo*. For the reasons set forth below, the claim is denied.

21   **I.    OVERVIEW**

22        Cruz was convicted and sentenced to death for the 2003 murder of Tucson Police
23   Officer Patrick Hardesty. Though he contested his guilt at trial, Cruz admits in these
24   proceedings that he was responsible for Officer Hardesty's murder and does not contest the

---

27,28   [1] Under 28 U.S.C. § 2254(d)(2), a habeas petitioner is not entitled to relief on a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

facts establishing his guilt. (RT 5/13/19 at 4-5; *see* Doc. 112.)[2] The following facts concerning the crime are based on the Arizona Supreme Court's opinion in *State v. Cruz*, 181 P.3d 196, 202-03 (Ariz. 2008), this Court's review of the record, and the parties' stipulation of material facts (Doc. 112 at 2–18).[3]

On May 26, 2003, Tucson police officers Patrick Hardesty and Benjamin Waters responded to a hit-and-run accident. The investigation led them to a nearby apartment occupied by two women and Cruz, who fit the description of the hit-and-run driver. The officers asked Cruz to step outside and identify himself. Cruz gave his name as "Frank White." Officer Hardesty contacted police dispatch but was unable to verify the identity. He asked Cruz for identification. Cruz replied that he had left it in the car.

As Officer Hardesty and Cruz approached the car, Cruz leaned in as if retrieving something, then "took off running." Officer Hardesty chased Cruz on foot, while Officer Waters drove his patrol car around the block in an attempt to cut Cruz off.

When Officer Waters turned the corner, he saw Cruz throw a gun to the ground. Officer Hardesty was nowhere in sight. Officer Waters got out of his car and drew his service weapon on Cruz. Cruz refused Waters' order to lie on the ground and told Waters to "just do it, just go ahead and kill me now, just kill me." When Officer Waters holstered his weapon, Cruz leapt over a fence and continued to flee until Waters apprehended Cruz, after a brief struggle.

Officer Hardesty's body was discovered immediately. He had been shot five times. Two bullets were stopped by his protective vest, two bullets entered his abdomen below the vest, and a fifth bullet entered his left eye, killing him almost instantly. Four of the five shots were fired from no more than twelve inches away.

The handgun thrown down by Cruz was a .38 caliber Taurus revolver holding five cartridges. All five had been fired. The five slugs recovered from Officer Hardesty's body

[2] "RT" refers to the reporter's transcripts from Cruz's state court proceedings (in 2005) and the evidentiary hearing in federal court (in 2019).

[3] The facts are described in greater detail in this Court's previous order (Doc. 60).

1    and vest had been fired from the Taurus revolver. Five unfired .38 cartridges matching the

2    cartridges fired from the Taurus were found in Cruz's pocket when he was apprehended.

3        Cruz was indicted on one count of first-degree murder. The State filed a notice of

4    intent to seek the death penalty alleging a single aggravating factor: "The murdered person

5    was an on duty peace officer who was killed in the course of performing the officer's

6    official duties and the defendant knew, or should have known, that the murdered person

7    was a peace officer." A.R.S. § 13-703(F)(10) (2003) (currently found at § 13-751(F)(8)).

8    A jury convicted Cruz of first-degree murder and found the (F)(10) aggravating factor.

9        In the penalty phase, Cruz alleged a number of mitigating factors. Defense counsel

10   presented testimony from eleven lay witnesses and five expert witnesses, including Dr.

11   Hector Barillas, a clinical psychologist; Dr. Laura McCloskey, a developmental

12   psychologist with a focus on children and violence; Dr. Mike Austein, a specialist in

13   addiction medicine; and Dr. Edward French, a pharmacologist. The jury did not find the

14   proffered mitigation sufficiently substantial to call for leniency and determined that Cruz

15   should be put to death.

16       On direct appeal, the Arizona Supreme Court affirmed Cruz's conviction and death

17   sentence. *Cruz*, 181 P.3d at 218. The court found that Cruz was neither suffering from any

18   significant mental illness nor under the influence of drugs at the time of the crime. *Id.* at

19   217. The court held that the jury did not abuse its discretion by determining that Cruz

20   should be sentenced to death, concluding:

21       Although Cruz's early life was certainly not ideal, absent is the type of
         horrible abuse often found in our capital jurisprudence. Cruz was neither
22       suffering from any significant mental illness nor under the influence of drugs
         at the time of the crime. The evidence presented on most of these mitigating
23       circumstances was weak, and Cruz established little or no causal relationship
24       between the mitigating circumstances and the crime. Moreover, much of the
         mitigating evidence offered by Cruz was effectively rebutted by the State.
25

26   *Id.* at 217–18.

27       Cruz filed a petition for post-conviction relief ("PCR") raising allegations of

28   ineffective assistance of counsel, including a claim that counsel performed ineffectively at

sentencing by failing to conduct an adequate mitigation investigation, thereby failing to bring relevant information to the attention of the mental health experts. (Doc. 31-3, Ex. W at 32.) The PCR court rejected this claim as not colorable because trial counsel's choices in connection with mitigation were reasonable and represented sound trial strategy and "none of the factors addressed by defendant, either alone or in connection with other mitigation, would alter the sentence of death as found by a jury." (Doc. 32-6, Ex. RR. at 13–18.) The Arizona Supreme Court denied review on May 29, 2013. (Doc. 32-6, Ex. XX.)

Cruz filed his petition for writ of habeas corpus in this Court on May 1, 2014. (Doc. 28.) In Claim 2 of his habeas petition, Cruz alleged that the PCR court's denial of his claim that sentencing counsel performed ineffectively by failing to investigate and present mitigation constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of facts under 28 U.S.C. § 2254(d)(1) and (2). (Doc. 28 at 189–199.) Cruz also asserted that he was entitled to *de novo* review and an evidentiary hearing on this claim. (Doc. 38 at 51.) The Court agreed and ordered an evidentiary hearing, which was held on May 13–17 and 20, 2019. (Doc. 60.)

## II.   DISCUSSION

Cruz contends that counsel performed ineffectively at sentencing by undertaking a speedy trial strategy focused on the guilt phase of trial in acquiescence to Cruz's claim of innocence despite his purported inability to remember the event. He contends that the resulting mitigation investigation was significantly truncated, omitting key mitigation evidence as a result of the push to enforce Cruz's speedy trial rights. According to Cruz, the most prominent omission was evidence of a neurodevelopmental disorder and brain damage, most likely caused by prenatal alcohol exposure, paired with evidence that witnesses had observed his mother drinking while she was pregnant with him. Also omitted or downplayed, according to Cruz, was evidence of his lifelong depression; his learning disability, as identified in elementary school records; his chaotic upbringing among drug-using and drug-selling family members; and evidence of his mother's mental health issues and her poor treatment of Cruz. Finally, Cruz faults trial counsel for failing to present direct

1  evidence of his state of mind at the time of the crime—namely, that his capacity to conform
2  his conduct to the law was significantly impaired.

3  **A.    Applicable law**

4      Claims of ineffective assistance of counsel ("IAC") are governed by the principles
5  set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Cullen v. Pinholster*, 563 U.S.
6  170, 189 (2011). To obtain relief, a prisoner must show that "counsel's conduct so
7  undermined the proper functioning of the adversarial process that the trial cannot be relied
8  on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland*'s two-pronged
9  test requires a showing that counsel performed deficiently and that the deficient
10  performance prejudiced the defense. *Id.* at 687. To satisfy *Strickland*'s first prong, a
11  defendant "must overcome the presumption that, under the circumstances, the challenged
12  action 'might be considered sound trial strategy.'" *Id.* at 689. With respect to *Strickland*'s
13  second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a
14  reasonable probability that, but for counsel's unprofessional errors, the result of the
15  proceeding would have been different. A reasonable probability is a probability sufficient
16  to undermine confidence in the outcome." *Id.* at 694.

17      In assessing prejudice in a capital sentencing, the evidence in aggravation is
18  reweighed against "the totality of available mitigating evidence." *Wiggins v. Smith*, 539
19  U.S. 510, 534 (2003). The totality of the evidence includes "both that adduced at trial, and
20  the evidence adduced in the habeas proceedings." *Id.* at 536 (quoting *Williams v. Taylor*,
21  529 U.S. 362, 397–98 (2000)) (internal quotation marks and emphasis omitted).

22      Whether counsel's allegedly deficient performance was prejudicial is necessarily a
23  fact-driven determination that hinges on the difference between what mitigation was
24  presented at trial and what mitigation could have been presented. In *Apelt v. Ryan*, 878
25  F.3d 800, 832 (9th Cir. 2017), the Ninth Circuit described this prejudice analysis as a three-
26  part test:

27
28      First, the court evaluates and weighs the totality of the available
       mitigating evidence; second, it evaluates and weighs "the aggravating

evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced"; and third, it reweighs "the evidence in aggravation against the totality of available mitigating evidence . . . to determine 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"

*Id.* (quoting *Andrews v. Davis*, 866 F.3d 994 (9th Cir. 2017), *on reh'g en banc*, 944 F.3d 1092 (9th Cir. 2019)).

"In the context of the penalty phase of a capital case, it is enough to show 'a reasonable probability that at least one juror would have recommended a sentence of life instead of death." *Andrews*, 944 F.3d at 1108 (quoting *Wiggins*, 539 U.S. at 537). "The likelihood of that result must be 'substantial, not just conceivable.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

A court need not address both components of the *Strickland* inquiry or follow any particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is easier to dispose of a claim on just one of the components, then that course should be taken. *Id.* Here, the Court focuses on the prejudice prong of *Strickland*. *See Jackson v. Calderon*, 211 F.3d 1148, 1155 n.3 (9th Cir. 2000); *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998). For purposes of this analysis, the Court assumes, without deciding, that trial counsel's performance at sentencing was deficient. The Court also assumes that if trial counsel had performed competently, there is a reasonable probability that Cruz would have (1) agreed to permit counsel to offer at sentencing the mitigation evidence presented at the evidentiary hearing and (2) would have agreed to the development of an integrated defense theory, i.e., holding the State to its burden of proof, while not overtly denying his responsibility for the crime. (Doc. 144 at 71.)

Cruz asserts that "a properly conducted mitigation investigation would have explained how numerous events outside of [his] control shaped and limited his choices over a lifetime," and "would have helped the jury understand [his] 'choices' in a very different light." (Doc. 28 at 182.) The evidence Cruz alleges was omitted from his

sentencing proceeding can be categorized in various ways, as it has been in the parties'
briefs. For simplicity, the Court has divided discussion of the evidence into two categories:
(1) evidence of Cruz's drug addiction, his mental state at the time of the offense, and the
nexus of these circumstances to the crime; and (2) evidence about Cruz's background,
including his social history and his neurodevelopment and mental health issues. The Court
will assess the evidence in that order, considering both the mitigating evidence that was
presented and the evidence that could have been presented but was not.

**B.      Cruz's mental state at the time of the offense**

Cruz asserts that counsel's truncated investigation and ineffectual use of experts,
including the failure to provide the experts with all the relevant facts, meant that the
diminished capacity defense offered by the defense at sentencing "was a nullity." (Doc. 28
at 185.) The Court disagrees. The diminished capacity mitigation presented at the penalty
phase was far from a nullity. The jury heard evidence that Cruz was a drug addict who used
cocaine and methamphetamine at or near the time of the offense; that these drugs could
and likely did predispose him to criminal behavior, impulsivity, paranoia, and poor
judgment; and that his ability to conform his conduct to the law or appreciate the
wrongfulness of his conduct was impaired as a result of his drug use and mental health
issues.

**1.      Mitigation evidence presented during sentencing**

At the sentencing hearing, Tara White, Cruz's wife, testified that she married Cruz
in 1996 and their son was born in 2000. (RT 3/2/05 at 107–08.) A few months after they
were married, Cruz was arrested in Illinois for a marijuana offense. (*Id.* at 113.) After
Cruz's release from prison around 1998, the couple moved to Zuni, New Mexico, where
Cruz helped to run the White family businesses. (*Id.* at 115–16.) In 2001, Cruz started using
drugs and "went nuts."[4] (*Id.* at 117–18, 129.) Tara testified that she and Cruz smoked

---

[4] To the extent the development of evidence of Cruz's drug use and addiction is
informed by his social history and background, the jury heard such evidence during the
penalty phase, as discussed in more detail below. This section addresses Cruz's drug use

marijuana and that Cruz used cocaine. (*Id.* at 111, 117.) Cruz had mood swings and was sad and depressed. (*Id.* at 112.) Cruz, whose father died when Cruz was fifteen, told Tara that "since his dad died of a brain aneurysm, he was going to die, too," and "his mom didn't care." (*Id.* at 120.) Cruz's use of drugs caused the marriage to disintegrate, and Tara and Cruz mutually agreed that he should leave. (*Id.* at 130.)

Romelia Cruz Holguin, Cruz's paternal aunt, described an occasion near the beginning of May 2003, close in time to the offense, when Cruz came to her house and appeared "nervous and edgy," "angry," and "paranoid," as well as sad, depressed and withdrawn. (*Id.* at 94–95.) Cruz was limping and explained he had jumped out of a second- or third-story window to avoid the police. (*Id.* at 94–96, 100.) Albert Montenegro, Jr. ("Albert Jr."), Cruz's cousin on his mother's side, testified Cruz had been smoking "meth" before he was arrested on May 26, 2003, and that when Cruz used "meth" he would usually get paranoid. (*Id.* at 150–51.)

Dr. Barillas assessed Cruz's history of drug and alcohol abuse as "significant" and "quite extensive," starting in his teens after his father's death, becoming worse after the age of twenty-one, and culminating in his use of drugs just twenty-four to forty-eight hours before Officer Hardesty's murder. (RT 3/3/05 at 49–50, 56.)

Dr. Barillas also told the jury that Cruz had Post-Traumatic Stress Disorder ("PTSD") stemming from incidents in which he was shot at and beaten by people who wanted to kill him. (*Id.* at 67, 69.) According to Dr. Barillas, Cruz's PTSD affected the way he perceived events in his life and caused him to overreact in certain situations; this condition was exacerbated by Cruz's use of drugs, especially stimulants. (*Id.* at 73.) Dr. Barillas acknowledged that the report of Dr. Shannah Biggan, a neuropsychologist, contradicted his findings in part because she did not find any evidence of anxiety, and PTSD is an anxiety disorder. (*Id.* at 105–06, 118.) He questioned her results, however, because she had reached that conclusion without performing any specific tests for anxiety.

---

at or near the time of the offense, from which an inference as to his state of mind during the offense might be drawn.

(*Id.* at 106–07.)

When questioned about Cruz's ability to conform his conduct to the law, Dr. Barillas testified that he could not specifically render an opinion on Cruz's state of mind at the time of Officer Hardesty's murder because he never spoke to Cruz about the crime. (*Id.* at 83.) He did opine however, that within a larger framework Cruz's ability to conform his conduct to the requirements of the law was impaired. (*Id.*)

After reviewing Cruz's records, Dr. Austein classified Cruz as a drug addict. (*Id.* at 23.) Although Dr. Austein could not specifically opine whether Cruz was under the influence during the murder, Cruz's drug history combined with the presence of drugs in his system at the time of his arrest suggested that, at a minimum, he could have been in a "fog" at the time of the murder as a result of his habitual drug use. (*Id.* at 33–35.)

Dr. French, a pharmacologist, testified about the effects of certain drugs. He testified that cocaine is a stimulant that induces the "fight or flight" response. (RT 3/04/05 at 109.) Crystal methamphetamine produces similar effects and also leads to neurotoxicity, or damage to the brain cells. (*Id.* at 113–14, 117.) Dr. French reviewed records from Cruz's hospitalization after the murder indicating he had a high level of methamphetamine in his system, suggesting he had used within the past two to three days, or even as little as a several hours earlier. (*Id.* at 121.) Dr. French explained that methamphetamine users are "hyper, . . . they can be very jittery. . . [and] restless . . . they can also feel anxious, they can become irritable, they can become impulsive, which can lead to bad things." (*Id.* at 123–24.) Additionally, "the danger with methamphetamine" was that when using the drug, a person might overreact to certain situations. (*Id.* at 128.) Methamphetamine and cocaine users were at their most dangerous when "starting to crash" from a high, because "they are really irritable, they can get really paranoid and then all of a sudden something can set them off. They can be startled, they can be confronted and they can have unpredictable violence." (*Id.* at 130.)

### 2.     New evidence presented during post-conviction proceedings

During the PCR proceedings, Defendant submitted the preliminary report of

1    additional findings by Dr. Barillas who wrote that although he was not asked at trial about

2    Cruz's mental state at the time of the offense, he was then of the opinion that Cruz was

3    probably under the influence of cocaine and amphetamine at or shortly before the time of

4    his arrest. (Doc. 31-6, Ex. X, Ex. 39 at 2.) Thus, Cruz's "judgment was probably impaired

5    to conform his conduct to the requirement of the law." (*Id.*)

6         Dr. Mark Cunningham, a clinical and forensic psychologist retained during the PCR

7    proceedings, submitted a report in which he opined that adult outcome is a function of the

8    interaction of risk factors and protective factors in childhood. Dr. Cunningham explained

9    that as risk factors increase, and protective factors decrease, there is an increasing

10   probability of adult maladjustment, substance abuse, personality disturbance, delinquency,

11   criminality, and criminal violence. Dr. Cunningham identified several risk factors Cruz

12   was exposed to as a child, including (1) transgenerational family dysfunction and

13   hereditary predisposition to psychological disorder, personality pathology, and alcohol and

14   drug abuse and dependence; (2) neurodevelopmental issues including probable fetal

15   substance exposure, learning problems in school, chronic stress in childhood, and head

16   injuries; (3) parenting and family influence characterized by Cruz's mother's psychological

17   disorders and substance abuse, parental conflict and neglect, domestic violence and family

18   modeling of aggression and crime; and (4) childhood onset of alcohol and drug abuse, teen

19   onset of psychological disorders, and cocaine and methamphetamine abuse, with

20   accompanying paranoia and psychological decompensation at the time of the offense.

21   (Doc. 31-6, Ex. X, Ex. 41 at 12–13.) Dr. Cunningham discussed Cruz's risk factors and

22   concluded that the jury was deprived of critical evidence regarding "the logical nexus

23   between the adverse developmental factors in Cruz's background and the capital offenses."

24   (*Id.* at 52.)

25              **3.     New evidence presented during federal habeas proceedings**

26         At the 2019 evidentiary hearing before this Court, Cruz called seventeen witnesses,

27   including members of the defense team, family members, and six mental health experts.

28         David Basham, one of Cruz's trial attorneys, testified that Cruz maintained his

innocence and pressed for a speedy trial. (RT 5/13/19 at 28.) Counsel did not attempt to dissuade Cruz from his commitment to this approach. (*Id.* at 29–30, 36–37, 127, 141.) Basham did not attempt to explain to Cruz that he was likely to be convicted given the strength of the evidence against him. (*Id.* at 80.)

Dr. Robert Smith, a psychologist, testified that he evaluated Cruz in 2014, and diagnosed Cruz with severe early onset depressive disorder and severe hallucinogen and stimulant use disorder. (RT 5/17/19 at 20.) Based on the reports of other experts, Dr. Smith also included rule-out diagnoses of PTSD, neurodevelopmental disorder, and brain damage. (*Id.*)

Dr. Smith found that Cruz had a number of risk factors for substance addiction, including genetic factors; the circumstances of his childhood, with family members who were addicted to drugs and alcohol; rejection by parents and stepparents; the death of his father; abandonment; lack of stability; and absence of adult supervision. (*Id.* at 23–25.) Dr. Smith also testified that Cruz was at risk for self-medication through drugs. (*Id.* at 25–26.)

Dr. Smith concluded that at the time of the murder Cruz's capacity to conform his conduct to the law was "definitely impaired":

> I think that if we take a look at the environment, at that point we know that John had been using substances. His depression was not treated. He had never received any treatment for his neurocognitive disorders. He had been up for many, many days and he's highly stressed, and he's now in a situation in which he's facing charges. Police officers are present.
>
> So in a highly stressful situation like this, all of these factors, the substances, the depression, the neurocognitive disorders together with the sleep deprivation and his history, he's not going to be able to cope and make very conscious and thoughtful decisions about his actions. Instead, what he did is he reacted.

(*Id.* at 36–37.)

Dr. Cunningham testified that Cruz had been exposed to a total of twenty-eight damaging or limiting childhood developmental factors. (RT 5/20/19 at 46.) These adverse factors, which were known and he could have testified to in 2005 (*id.* at 39), consisted of family dysfunction and distress (*id.* at 69–76), hereditary predisposition to psychological

disorder and personality pathology (*id.* at 77–78), and hereditary predisposition to substance abuse and dependence (*id.* at 78–81); neurodevelopmental factors, principally fetal alcohol exposure (*id.* at 81–86); family and parenting factors, including the mother's psychological disorders and substance abuse (*id.* at 86–90), parental marital conflict and domestic violence (*id.* at 90–91), emotional and supervisory neglect (*id.* at 92–96), physical and psychological abuse (*id.* at 96–98), household and caretaker instability (*id.* at 98–99), death of his father (*id.* at 99–102), and corruptive and criminal modeling by maternal uncles (*id.* at 102); and a "disturbed trajectory"—that is, the outcome that resulted from the above adverse factors, including teen onset drug abuse, cocaine and methamphetamine abuse, and stimulant-induced agitated psychological status at the time of the offense (*id.* at 103–104).

### 4.      Cruz was not prejudiced by counsel's alleged failure to investigate Cruz's mental state at the time of the offense

Cruz contends that counsel's strategy to forgo any investigation into his mental state, including his abuse of drugs, at the time of the offense constituted ineffective assistance. He argues that counsel's "acquiescence in Petitioner's denial of responsibility; then using that uninformed decision to forgo investigation of Petitioner's mental state, and then failing to engage in a continuing dialogue with the Petitioner so he was able to comprehend the risks of this strategy to the penalty phase, was contrary to prevailing professional norms and unreasonable." (Doc. 144 at 29.) According to Cruz, this strategy prevented counsel from presenting evidence of Cruz's diminished capacity at the time of the crimes. (*Id.*) Assuming counsel's performance was deficient, however, the Court concludes that it was not prejudicial.

Trial counsel presented evidence of Cruz's mental state at the time of the murder. Specifically, during trial the defense presented evidence of Cruz's drug use and how it could have affected him at the time of the murder. This evidence was proffered by testimony from family members that Cruz was using methamphetamine around the time of the murder and that he was "paranoid" when under its influence. (RT 3/2/05 at 150–51.) Testimony during sentencing showed that Cruz appeared paranoid near in time to the

1   murder (*Id.* at 95, 100–101). Dr. Barillas testified that Cruz's ability to conform his conduct
2   to the law was impaired primarily by drug use. (RT 3/3/05 at 81–83.) The jury also heard
3   that Cruz had methamphetamine and cocaine metabolites in his system shortly after the
4   murder. (RT 3/4/05 at 119–22.)

5        Dr. Austein, the addiction specialist, testified that the use of methamphetamine can
6   induce paranoia and violent behavior, and that Cruz's drug history and drug use around the
7   time of the offense suggested that he could have been in a "fog" during the murder. (RT
8   3/3/05 at 21–22, 33–35.) Dr. French, the pharmacologist, testified about the negative
9   cognitive effects that cocaine and methamphetamine intoxication can produce. (RT 3/4/05
10  at 109–10, 113–14, 123–24, 128–130.)

11       The evidence offered by the experts at the evidentiary hearing was largely
12  cumulative to the evidence presented at sentencing. *See Leavitt v. Arave*, 646 F.3d 605,
13  615 (9th Cir. 2011) ("[C]umulative evidence is given less weight because it is not as likely
14  to have affected the outcome of the sentencing.").  Moreover, the experts Cruz called at the
15  evidentiary hearing drew no more of a causal nexus between Cruz's drug use and the
16  murder than was established by the experts at the original trial.

17       Dr. Smith and Dr. Cunningham testified at the evidentiary hearing that Cruz did not
18  make very conscious or thoughtful decisions; instead he "reacted," and was in a stimulant-
19  induced agitated psychological state at the time of the offense. But Drs. Austein and French
20  had similarly testified at sentencing that use of stimulants like cocaine and
21  methamphetamine can lead to impulsivity, paranoia, overreaction to situations, psychosis,
22  and violent behavior. Likewise, Drs. McCloskey and Barillas testified at sentencing that
23  Cruz's childhood, mental issues, and drug use were related to the murder because they
24  predisposed Cruz to criminal behavior, impulsivity, and poor judgment. Notably, the jury
25  may not have looked favorably on additional evidence of Cruz's drug abuse, especially in
26  close proximity to the time of the murder. *See Mayfield v. Woodford*, 270 F.3d 915, 931
27  n.17 (9th Cir. 2001) ("We note that juries are unlikely to favor defenses based on abuse of
28  dangerous drugs in evaluating a defendant's culpability for violent behavior."); *see also*

1   *Hayes v. Woodford*, 301 F.3d 1054, 1071 n.15 (9th Cir. 2002) (courts "cannot assume that

2   all juries would be sympathetic" to substance abuse), *on reh'g en banc sub nom. Hayes v.*

3   *Brown*, 399 F.3d 972 (9th Cir. 2005) (panel decision reversed on other grounds); *Duvall v.*

4   *Reynolds*, 139 F.3d 768, 782 (10th Cir. 1998) (jury may have viewed substance abuse

5   history as aggravating rather than mitigating).

6        Most importantly, evidence from both the guilt and penalty phases of trial, as well

7   as evidence admitted during these proceedings regarding Cruz's actions at the time of the

8   crime itself, suggest that Cruz was not in a "fog" or unable to appreciate the wrongfulness

9   of his conduct or conform his conduct to the law. *See Apelt*, 878 F.3d at 832 ("[The court]

10  evaluates and weighs 'the aggravating evidence and any rebuttal evidence that could have

11  been adduced by the government had the mitigating evidence been introduced.'"). The

12  Arizona Supreme Court recently explained that "substance abuse and mental health issues

13  are entitled to little weight when there is no connection to the crime and no effect on the

14  defendant's ability to conform to the requirements of the law or appreciate the

15  wrongfulness of his conduct." *State v. Poyson*, 475 P.3d 293, 298 (Ariz. 2020) (citations

16  omitted).[5] The court stated that in considering impairment as a mitigating circumstance, it

17  "will not find that a defendant's ability to conform or appreciate the wrongfulness of his

18  conduct was impaired when the defendant's actions were planned and deliberate, or when

19  the defendant seeks to cover up his crime." *Id.*

20       In *Poyson*, the court found "scant evidence" that the defendant was "actually

21  _____

22       [5] Although *Poyson* involved the independent review of mitigating evidence by the

    Arizona Supreme Court, the Court cites the case as an example of the minimal weight given

23  to an expert's "state of mind" evidence in light of evidence adduced from the crime itself

24  that negates a defendant's suggestion that he could not conform his conduct to the

    requirements of the law or appreciate the wrongfulness of his actions. The Court is

25  cognizant that "capital sentencing requires 'an individualized determination on the basis of

26  the character of the individual and the circumstances of the crime.'" *Shinn v. Kayer*, 141

    S.Ct. 517, 526 (2020) (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)) ("Because the

27  facts in each capital sentencing case are unique, the weighing of aggravating and mitigating

28  evidence in a prior published decision is unlikely to provide clear guidance about how a

    state court would weigh the evidence in a later case.").

intoxicated" on the day of the murders even though he had smoked marijuana to allay effects of a hangover from heavy drinking the night before. *Id.* The court noted that the defendant took substantial preparatory steps before the murders and made conscious attempts to conceal his crimes afterwards, indicating his drug and alcohol use neither rendered him unable to conform his conduct to the requirements of the law nor left him unable to appreciate the wrongfulness of his actions. *Id.* at 299. The court also found, despite evidence that Poyson suffered from mental health issues, no evidence suggesting that these difficulties significantly impaired him because he took "deliberate and calculated steps to ensure that his murderous plot and flight . . . would be successful and that he would avoid capture by law enforcement." *Id.* Accordingly, the court assigned little weight to Poyson's mitigation evidence. *Id.*

Like *Poyson*, Cruz "exhibited numerous examples of 'goal-oriented' behavior" at the time of the murder "that belie a claim of substantial impairment." *Id.* At the time of the offense, Cruz had a warrant for his arrest. (RT 5/20/19 at 120–21.) During this same time, Cruz was using methamphetamine and cocaine, not getting enough sleep, using aliases, and carrying a gun. (RT 5/17/19 at 49–52; RT 5/20/10 at 122–23.) Cruz also told people that he was running from the police (RT 5/17/19 at 57), and that if he was ever charged with murdering a police officer, it would be a setup. (RT 3/2/05 at 96–97.)

The night before the murder, Cruz met a woman named Myra Moore at her apartment and used the name of Frank as an alias. (RT 2/3/05 at 199.) Moore and Cruz smoked methamphetamine together and engaged in sexual activity. (RT 5/17/19 at 58.) Cruz spent the night at Moore's apartment and Moore later testified that Cruz was in possession of a gun. (RT 2/3/05 at 202–03.)

The following day, Cruz and his friend Chuck Bevilacqua went to a nearby Food City to eat. (RT 5/17/19 at 58.) While exiting the parking lot, Cruz caused a traffic accident while driving Bevilacqua's car. (*Id.* at 59.) To avoid contact with the police, Cruz drove back into the parking lot, parked the car, and left the scene. He then walked to and sought refuge in Moore's apartment. (*Id.* at 59.)

Officers Hardesty and Waters were dispatched to investigate the collision. After speaking to witnesses, the officers went to Moore's apartment. (*Id.*) On entering the apartment, they noticed Cruz sitting on a mattress. (*Id.* at 60.) Because Cruz resembled the description of the driver provided to the officers, Officer Waters asked him to step outside the apartment to speak with him. (*Id.*) Cruz was not combative. Rather, he cooperated with police but gave a false name of Frank White to avoid being arrested on the outstanding warrant. (*Id.*) When police could not verify his identity, Cruz created a ruse, calmly asking to go to a car (that was not his own) to retrieve his identification. (*Id.* at 61.) By doing so, he created distance between himself and the officers. Cruz walked to the driver's side of the car, leaned in toward the center console, looked back at Officer Hardesty, and then ran through a gap in a fence of a residence. (*Id.*)

Cruz's conduct was not consistent with a man in a fog or spiraling out of control. Rather, his behavior suggests a deliberate, calculated attempt to escape from the police so he would not be arrested on the warrant.

Officer Hardesty chased Cruz on foot, while Officer Waters got in his patrol car and drove to an area where he anticipated Cruz would eventually arrive. (*Id.* at 62.) Cruz was armed at the time, a fact of which the officers were unaware. (RT 2/1/05 at 114–115.) Nevertheless, at that point, Cruz made the decision to try to run away from rather than engage in an armed confrontation with police.

From the evidence, it is reasonably inferred that when Cruz realized he could not outrun Hardesty, he made the decision to draw his weapon and shoot. He was able to fire five shots at Officer Hardesty before Officer Hardesty could even draw his weapon. (RT 2/2/2005 at 27–28.) All five shots struck Officer Hardesty; two rounds were stopped by his vest; two rounds entered his abdomen; and one round entered his left eye. (5/17/19 at 63.) Four of the five shots were fired at a distance of no more than a foot away. *Cruz*, 218 Ariz. at 155–56, 181 P.3d at 202–03.

After shooting Hardesty, Cruz continued to run to try to evade arrest. When Officer Waters spotted Cruz, Cruz promptly threw his gun to the ground, (RT 5/17/19 at 65), which

suggests awareness that he had shot Officer Hardesty and his intent not to be caught with the murder weapon. Cruz continued to flee through the property (*id.*), moving away from the murder weapon while still trying to find a way to escape.

Waters exited his car and confronted Cruz with his weapon drawn. Cruz refused Waters' order to lie on the ground (RT 2/1/05 at 117–19) and told Waters to "just do it, just go ahead and kill me now, just kill me," (*id.* at 120), again demonstrating awareness that "his actions were wrong, morally and legally." *Poyson*, 475 P.3d at 299. When Officer Waters then holstered his weapon, Cruz leapt over a fence and continued to flee until Waters tackled him and placed him in handcuffs. (RT 2/1/05 at 121–123.)

Further demonstrating his continued awareness of the wrongfulness of his actions and an intent to avoid responsibility, after his arrest, Cruz continued to provide the false name of Frank White to police and paramedics (EH Ex. 7 at Bates 3445; EH Ex. 3 at Bates 3009) and the false story that he was in town visiting his sister and that a man named Arturo Sandoval shot the police officer.

On these facts, there is not a reasonable probability that at least one juror would have recommended a sentence of life instead of death had the new evidence regarding state of mind been presented at sentencing. The evidence supported the conclusion that Cruz's behavior was motivated by his goal of avoiding going back to prison and also of escaping responsibility for killing Officer Hardesty. It is unlikely that a reasonable juror would have concluded that his behavior resulted from paranoia or a lack of cognition or neurological deficits; Cruz understood that if his identity was discovered, the officers would place him under arrest. He understood that if he was associated with Officer Hardesty's killing, his freedom would be curtailed. Whatever effects his drug use had on his behavior at the time of the murder, they did not impair his ability to appreciate the wrongfulness of his conduct or conform his conduct to the law.

## C.    Social history, neurodevelopment and mental health issues

Cruz asserts that counsel's failure to complete a mitigation investigation prevented the jury from hearing evidence of his tragic social history, neurocognitive impairments,

and depression. This evidence, he alleges, would have helped the jury understand Cruz's "choices" in a very different light. Instead, Cruz asserts, his jury "heard absolutely none of that evidence, evidence which 'might well have influenced the jury's appraisal of [Petitioner's] moral culpability.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 398); *see Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (explaining that evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable).

### 1. Mitigation evidence presented during sentencing

During sentencing, defense counsel presented testimony from family members and others who knew Cruz regarding his childhood, young adult life, and social history. Father Ricardo Ford, a Catholic priest who knew Cruz's family, testified that Cruz grew up in Barrio Hollywood, a neighborhood Ford knew well with marvelous "old traditional families," but "also huge addiction problems." (RT 3/1/05 at 54–55, 58–59.)

Cruz's mother, Julie Lingenfelter (née Montenegro)[6], testified that she was sexually abused by her father, Albert Montenegro, from a very young age until she was fifteen years old. (*Id.* at 80, 82, 84.) Albert was a "terrible person," a "real pervert," who physically abused his children, sometimes "just for fun." (*Id.* at 81, 82.) Julie developed anorexia and bulimia when she was ten or eleven years old and attempted to commit suicide three times by age fifteen. (*Id.* at 82, 92.) Though Albert was no longer "in the picture" when Ford first knew the family, Julie had talked to Ford in generalities about the abuse. Later, Ford learned from others about Albert's abuse of his children. (*Id.* at 65–66.) Father Ford described Maria Montenegro, Julie's mother, as a good, patient person, with good values, who was a hard worker, ran several businesses, and struggled to try to "put back together [a] constantly pretty dysfunctional situation." (*Id.* at 59–60, 62, 67, 68.) Julie testified,

---

[6] Because many of Cruz's family members share the same last name, the Court refers to most of Cruz's family members by their first names.

however, that Maria was not often in the house and it "broke [Maria's] heart" when she found out about Albert's abuse of Julie. (*Id.* at 83–84.)

Despite Julie's early difficulties, Ford described her as very likeable and motivated; after she married Cruz's father, she graduated from nursing school and became a highly respected nurse working at Kino hospital. (RT 3/1/05 at 65, 69.) Nonetheless, over time, Ford explained, she became an extremely nervous person, whom he remembered "trembling a lot." (*Id.* at 65.) Though Ford agreed Julie was a "woman of good values," he questioned whether she would have actually passed those on to Cruz because "there were absentee problems there." (*Id.* at 70.)

Julie testified that she was close to Cruz when he was a baby but explained that when he got older, she "didn't really touch him, hug him, kiss him, hold him as much as a mother should have"; she didn't love him and "kept [her] distance" from him. (*Id.* at 92, 109.) When Cruz was four or five years old, Julie left him—without thinking of the consequences—with her mother-in-law and sister for nearly a year while she took care of a sick brother. (*Id.* at 88.)

Susan Alcaraz, Cruz's maternal aunt, testified that she cared for Cruz when his mother was going to school or working, and during his parents' subsequent divorce, for days, weeks, or months at a time. (*Id.* at 136.) Father Ford confirmed that both of Cruz's parents would be away and Cruz's "[A]unt Susie" would take care of him. (*Id.* at 73.) Susan testified that Cruz needed his mom's love, but Julie "had a lot of problems" and "couldn't express and show him . . . love." (*Id.* at 145, 149–50.) Similarly, Delia Cruz, Cruz's paternal aunt, testified that Julie "had a lot of problems" and wasn't there physically or mentally for her son, who was mostly "left with the sitter," though Julie did show him love and tried to instill family values in him. (RT 3/2/05 at 42–43, 58.) Romelia, Cruz's paternal aunt, also testified that Julie was "[n]ot a very comforting" mother, and that she, Romelia, took care of Cruz "so much so to the point . . . he would call [Romelia] 'Mommy.'" (*Id.* at 80, 83.)

Julie testified that she was also physically and emotionally abused by her husband, Cruz's father, John Cruz, Sr. (RT 3/1/05 at 97–98, 100–101, 120.) Cruz Sr. began

physically abusing Julie the day after their marriage and during her pregnancy, and it "just kept on going"; he would hit her for anything she didn't do perfectly. (*Id.* at 97–98, 104–05, 120.) Later, Cruz witnessed this abuse and was also a victim. Julie testified that Cruz's father spanked Cruz when he was little "for any little thing he did wrong," leaving a lot of bruises. (*Id.* at 97–98, 104.)

Julie didn't seek a divorce at the time because she was brought up to believe that you "just stay married" no matter what. (*Id.* at 100.) She realized this belief system was "not normal" after taking psychology courses during nursing school. (*Id.*) When Julie rebelled against Cruz Sr.'s wishes by finishing nursing school, he became more violent, hitting her more often. (*Id.* at 100–01.) When Julie threatened him with divorce, he kicked her; she hit the wall, fell down, and he hit her on the nose. (*Id.* at 101.) That weekend, when Cruz was eight-years old, Cruz Sr. went off "out of control," and beat Cruz with a belt for "just normal punishment," hitting him "like 60 to 80 times" on his face, head, back shoulders, arms, "everywhere on the body." (*Id.* at 101–04.)

Julie testified that she did not go to the authorities, or to any shelter other than her mother's house, because it was "not in [her] culture" at the time, and she was also submissive and scared because Cruz Sr. had a rifle and she feared he would "do something worse to me." (*Id.* at 102, 120–21.) Julie testified that it "just got to the point where I couldn't let [Cruz Sr.] hit [her] son like this" and the next day she went back and told him she was going to get a divorce. (*Id.* at 103, 121.) Julie told Cruz Sr. she was leaving, took Cruz by the hand and walked to the car. (*Id.* at 103.) Cruz's father came outside with a loaded rifle and pointed it at her, but she and Cruz ran to the car and left. (*Id.*)

At Cruz's sentencing, some witnesses testified they were aware of this physical abuse but none testified that they had personally witnessed it. Susan testified that Cruz Sr. was emotionally and verbally abusive, and though she remembered hearing Julie complaining to her about the physical abuse, she never saw evidence of such abuse against Cruz or his mother. (*Id.* at 137, 149.) Romelia testified that one time when she visited Cruz and Julie's apartment when Cruz was young, she saw Cruz's bassinet was "thrown by the

side." (RT 3/2/05 at 82–83.) Cruz's father explained to her that he and Julie were just "rough-housing." (*Id.* at 83.) Though Romelia did not testify she witnessed any physical abuse, she told Dr. Barillas that she knew it had happened. (RT 3/3/05 at 86.) Joe Cruz, Cruz's paternal uncle, testified that he witnessed no verbal or physical abuse between Cruz's mother and father, although his brother was kind of a "prankster" and would upset Cruz's mother. (RT 3/2/05 at 19–20, 31.) Joe was not aware of any abuse of Cruz by his father and believed Cruz's mother treated him well. (*Id.* at 32.) Delia also described Cruz's father as a prankster but agreed that he was a loving father who showed Cruz affection, provided for him, and had good values that he would have tried to impart to his son. (*Id.* at 41, 56–57.)

Julie and Cruz Sr. went through a "very messy divorce," fighting over the custody of Cruz. (RT 3/1/05 at 103.) Father Ford was asked to testify as a witness in the divorce proceedings and recalled Cruz as a "stressed out" child at the time who cared about both of his parents. (*Id.* at 62–64.) Julie testified that, despite not reporting the beatings, her mother and sister reported at the custody hearing about "all the bruises [they] saw" on both her and Cruz. (*Id.* at 105, 121.)

After Cruz's parents divorced, Ford believed Julie, though not a "bad person," may have been "overdoing" her medications. (*Id.* at 71–72.) Ford described this as a "distinct change" that occurred sometime into her nursing career, where he "saw her as kind of coming apart." (*Id.* at 72.) Julie testified that "[f]rom the beginning" she took a "big bag full of medications." (*Id.* at 107.) Julie testified that around 1992, she had a "nervous breakdown" due to the sexual abuse and was later diagnosed with PTSD and bipolar disorder. (*Id.* at 82, 106.) Julie testified that, though she didn't know it, she had some of the same kind of mental issues and symptoms from the time she was married. (*Id.* at 108.)

Despite the contentious custody battle, Julie testified that "no matter what" Cruz "just adored his father," and loved him even though he beat him, so she let Cruz go back to his father "with the condition he would not beat him." (RT 3/1/05 at 110, 121.) Susan also testified that Cruz "adored" and "loved" his dad, and that the divorce "devastated"

him. (*Id.* at 138.) Delia also confirmed that the divorce "devastated" Cruz. (RT 3/2/05 at 45.)

When Cruz was thirteen years old, his father remarried a fifteen- or sixteen-year-old girl who was jealous of Cruz, locked him out of the house, and was cruel and abusive towards him. (RT 3/1/05 at 110–11, 148; RT 3/2/05 at 37.) Delia described her as an insecure child bride with a "bipolar personality" who "wasn't that much of a loving person" towards Cruz. (RT 3/2/05 at 44–45, 59.) Romelia recalled Cruz telling her that when his stepmother wouldn't let him in the house, he would stay at the park, and that is how "he spent the majority of his life, like an outcast." (*Id.* at 86.) She recalled that Cruz had a lot of problems in school. (*Id.* at 94.)

After living with his father for three years, Cruz moved to California to live with his mother and Steve Lingenfelter, whom Julie had married in Los Angeles in 1986. (RT 3/1/05 at 109, 111.) Julie testified that she and Steve agreed to give Cruz a home and provide him with anything he wanted. (*Id.* at 123.) A month after Cruz moved to California, when Cruz was fifteen, his father suffered a brain aneurysm and died. (*Id.* at 111–12.) Cruz became very depressed and his grades declined. (*Id.* at 115.) Cruz's mother sent him to a psychologist, but it didn't really help. (*Id.*) Cruz became concerned that he had the same problem as his father and that he was going to die at a young age as well. (RT 3/1/05 at 115, 130–31.) Delia testified that Cruz was filled with "so much pain and devastation and . . . just emptiness" after the death of his father. (RT 3/2/05 at 46.)

Albert Jr. testified that he and Cruz went to high school together and drank alcohol and used drugs, including marijuana, cocaine, acid, and mushrooms. (RT 3/2/05 at 145, 148.) He testified that Cruz changed after his father died, becoming isolated and staying inside, not wanting to talk to anybody "for years." (*Id.* at 148–49.) Susan also noted a marked difference in his behavior after his father died, testifying that Cruz changed and "started doing marijuana, and so he was a little bit reckless." (RT 3/1/05 at 145.) Susan also noted that at that time Cruz was lonely and didn't have his mother's "special love" because Julie had a "lot of problems" and had "had a breakdown." (*Id.*)

1   Cruz lived with his mother and Steve in California until he was seventeen years old.
2   (*Id.* at 117.) Cruz's mother explained that he lived on the first floor of their house until he
3   had some "women or girls over" and she found "a little bit of pot in the garage." (*Id.* at
4   117, 124–25.) Julie wanted him to live upstairs where she could keep a close eye on him
5   but Cruz did not want to do that. (*Id.*) Susan also described "some problems" and a falling
6   out between Cruz and Steve. (*Id.* at 154.) Julie testified that Cruz wanted to return to
7   Tucson, so Cruz was sent to live with his maternal grandmother. (*Id.* at 117, 125.) Cruz's
8   adult uncles, Eddie and Luis, both of whom had alcohol and drug problems, also lived with
9   his grandmother. (*Id.* at 85–87, 118.) Romelia was aware that the Montenegros "partied a
10  lot" and suspected that Cruz also used drugs. (RT 3/02/05 at 87, 92.) She recalled that Cruz
11  had a lot of problems in school. (*Id.* at 94.) Lora Galioto, the mother of one of Cruz's
12  children, testified that Cruz used pot and LSD during high school and dropped out of
13  school. (RT 3/3/05 at 119, 124.) Galioto recalled that the members of the Montenegro
14  household used drugs, mostly cocaine, while Cruz lived there. (*Id.* at 125–26.) Even after
15  he moved out of the home, Cruz maintained contact with his drug-using uncles. (*Id.* at 129.)

16      At sentencing, the defense also presented expert testimony from Drs. Barillas,
17  McCloskey, Austein, and French regarding Cruz's social history, neurodevelopment and
18  mental health.

19      Dr. Barillas interviewed Cruz several times, reviewed records, and conducted
20  interviews of family members. (RT 3/3/05 at 38–39.) He gave Cruz a variety of tests to
21  assess intelligence and memory and to determine whether Cruz had any kind of brain
22  dysfunction. (*Id.* at 40–41.) In writing his report, Dr. Barillas reviewed and relied on the
23  report of Dr. Biggan, who had determined that although Cruz had some weaknesses in his
24  memory, he had no serious memory problems or learning disorders that were so prominent
25  as to be a real deficit.[7] (*Id.* at 40, 47–48, 106.) After conducting various performance

26  —————————

27      [7] Dr. Barillas noted weaknesses in Cruz's memory when he was assessing Cruz but
28  could not finish the testing due to an incident at the jail. He suggested that a
    neuropsychological evaluation was warranted to "answer that question" and to "look

1   measures, Dr. Barillas incorporated Dr. Biggan's conclusion that Cruz was performing

2   within the average range of intellectual functioning and had no deficits suggestive of

3   significant organic or neuropsychological impairment. (RT 3/3/05 at 104, 107; EH Ex. 218

4   at Bates 12540.) Dr. Barillas noted that Cruz's use of LSD was extensive; Cruz also used

5   hallucinogenic mushrooms and marijuana, then later cocaine, and, after the age of twenty-

6   one, methamphetamine. (*Id.* at 49–50, 56.) Dr. Barillas diagnosed Cruz with intoxicant

7   abuse disorder. (*Id.* at 51.)

8        Dr. Barillas opined that factors that may have influenced Cruz's involvement with

9   drugs included the loss of his father and lack of emotional support from his mother, in

10   addition to negative peer and family influences, specifically from the Montenegro side of

11   the family. (*Id.* at 53, 57–59.) Dr. Barillas commented on Cruz's childhood environment,

12   stating that Cruz's father was a poor role model, with a history of marital problems,

13   domestic violence, and possibly alcohol abuse, and that the lack of affection Cruz received

14   from his mother made him feel "pretty abandoned." (*Id.* at 59–61.) Such lack of affection

15   for a child was "absolutely" a significant psychological event. (*Id.* at 60.) Dr. Barillas found

16   that there was no clear evidence of learning problems; suggesting that Cruz's poor school

17   performance was attributable to the divorce. (*Id.* at 61–62.) Additionally, Dr. Barillas stated

18   that being the object of physical abuse is considered a risk factor for violent recidivism and

19   can contribute to a decision to use drugs. (*Id.* at 63.) Similarly, witnessing abuse in the

20   household could make a person insecure with respect to their own well-being. (*Id.* at 62–

21   63.)

22        Dr. Barillas acknowledged that Cruz never told him he had been physically abused

23   by his father and that there was some evidence of a close, loving relationship between the

24   two. (*Id.* at 87.) He also admitted that it was possible Cruz's mother might have been trying

25   to make excuses for him. (*Id.* at 88.) Nonetheless, Dr. Barillas opined, based on how open

26   _____

27   further into the possibility of malingering." (RT 3/3/05 at 40, 47.) Dr. Biggan conducted a
    full neuropsychological assessment and concluded Cruz was not malingering. (*Id.* at 48.)

28   Dr. Barillas also reported that Cruz tended to minimize his mental health issues, reporting
    only that he had "a lot of anxiety." (RT 03/3/05 at 80–81.)

Julie was in discussing her own faults, that she was trying to be truthful. (*Id.*) Dr. Barillas did not remember if Cruz reported that there was domestic violence in the home. (*Id.* at 87, 89.) He testified that Cruz reported that he was emotionally abused by his father and that his mother "wasn't there" for him. (*Id.* at 112.) Dr. Barillas agreed that Cruz's tendency to minimize his problems might explain why he would not talk about physical abuse. (*Id.* at 113.)

Dr. McCloskey reviewed records, including child custody records from Cruz's parents' divorce proceedings, interviewed family members, and spoke with Cruz. (RT 3/4/05 at 23.) Dr. McCloskey testified that in 1979 a restraining order was issued against Cruz's father because the court believed there was apparently a "violent threat to the mother." (*Id.* at 25–26.) A custody report from 1980 confirmed that there was domestic violence in Cruz's home based on interviews with Cruz's mother and grandmother. (*Id.* at 26.) The author of the report recognized that Cruz's father "had terrible anger, that was visible in her interview with him," consistent, in Dr. McCloskey's opinion, "with a batterer." (*Id.* at 27.) Based on the evidence she reviewed, Dr. McCloskey opined that Cruz was abused psychologically and physically and was neglected from middle childhood on. (*Id.* at 25.) Cruz was also exposed to chronic, severe domestic violence from the time he was an infant. (*Id.*) Dr. McCloskey explained that because children's brains aren't fully developed, "exposure to domestic violence under the age of six results in real impairments in children." (*Id.* at 36.)

Dr. McCloskey opined that in adulthood Cruz's mother showed "very profound pathologies, mental health problems" that don't just "crop up overnight . . . she must have had [them] when she was younger." (*Id.* at 33.) Dr. McCloskey testified that Julie created a terrible anxiety problem for Cruz by "screaming at her kid one minute" and being "very withdrawn" at other times. (*Id.* at 34.)

Dr. McCloskey reported that the records also indicated, consistent with Father Ford's testimony regarding the divorce, that Cruz showed "extremely unusual levels of anxiety" and was "terrified of taking sides of one parent or another." (*Id.* at 29.)

Dr. McCloskey explained that Cruz's failure to recollect much of his childhood, known as "childhood amnesia," is fairly common in people that have been abused. (*Id.* at 29–30, 100.)

Dr. McCloskey further detailed Cruz's family history of abuse. She testified that the domestic violence in the Cruz household affected all aspects of Cruz's life:

> Yes, I think the domestic violence, especially that cloud of that—the kind of horrible shadow of that marriage which was so brutal, you know, this woman was hit all the time. John witnessed it. She was thrown on the ground. She was afraid he was going to kill her and the child at one point. It was—it was chronic and it was severe, and I think it did really at some time—this boy— it stunted his growth. Then the lack of really a functional family for him to go back to after the divorce really solidified I think his—his drug use and problems.

(*Id.* at 44.) Dr. McCloskey suggested the "terribly high level of anxiety" that Cruz had experienced during the divorce proceedings was "potential clinical evidence of . . . potentially some post-traumatic stress disorder in childhood." (*Id.* at 29.)

According to Dr. McCloskey, the point at which Cruz "snapped" was when his father died. (*Id.* at 34–35.) Dr. McCloskey explained:

> So John was not in a good situation, but this was a stressor he couldn't possibly cope with. He did not have the mature coping skills for and started doing drugs to—to self-medicate. I think the year his father died he told me he took, I don't know, hundreds of acid trips and this is just really a sign because acid does kind of mimic the state of psychosis. So this is kind of a sign of a child, he's very, very disturbed who wants to escape into another world of—of almost schizophrenia.

(*Id.* at 35.)

Dr. Austein did not interview Cruz but reviewed interviews with Cruz, documents regarding Cruz's history, and the reports of Drs. Biggan and Barillas. (RT 3/3/05 at 7–8.) Dr. Austein testified about general principles of addiction, including that drug addiction causes familial, employment, and financial problems, and often leads to crime. (*Id.* at 16– 17.) He testified that drug addiction is frequently the result of attempts at self-medication, which can stem from mental illness or lack of self-worth and lack of affection and love

from family. (*Id.* at 13–14, 18–19.) Dr. Austein added that amphetamine use in particular is associated with psychosis that may lead to violence and paranoia. (*Id.* at 21–22.)

### 2. New evidence presented during post-conviction proceedings

Margaret DiFrank, who conducted mitigation interviews during the trial after the original mitigation specialist left the case, also conducted a mitigation investigation during the PCR proceedings. She contacted family members, some of whom had not been contacted during the initial mitigation investigation, and obtained information that Cruz's trial counsel had failed to discover. (*See* Doc. 112 at 15.)

Mitigation specialist Teresa McMahill summarized the new evidence DiFrank gathered that would have been helpful to Cruz at sentencing:

> Most significantly with regard to records, the post-conviction relief mitigation specialist retrieved the voluminous mental health file that existed on Mr. Cruz's mother. These records outlined his mother's long history of serious and debilitating mental illness, which undoubtedly adversely affected Mr. Cruz as he was growing up and about which the jury heard very little.
>
> From the interviews the new mitigation specialist conducted, she learned that Mr. Cruz's father and paternal grandfather were cruel and sadistic; his mother habitually abused drugs when he was a young boy and snorted cocaine in his presence; his maternal grandfather sexually abused Mr. Cruz's cousin (as well as Mr. Cruz's mother); several relatives had serious drug and/or alcohol problems; the extent of the drug dealing and use that occurred in Mr. Cruz's maternal grandmother's home—where he frequently lived—was much greater than revealed at trial; a number of relatives suffered from mental illness; Petitioner was physically abused by his mother—not just his father; his mother became very promiscuous after divorcing Mr. Cruz's father, and several relatives were aware of the abuse [of] Mr. Cruz and his mother by his father. At trial, the sole source of information about this abuse was Mr. Cruz's mother, and her testimony was discredited because there was no corroboration.

(Doc. 31-4, Ex. X: Ex. 16 at 7–8.)

Cruz submitted reports from Dr. McCloskey and Dr. Barillas. Dr. McCloskey reviewed the interviews and statements of Cruz's family that DiFrank had obtained during the PCR proceedings. (Doc. 31-6, Ex. X: Ex. 38 at 2.) Dr. McCloskey opined that the new interviews corroborated earlier reports of domestic violence and abuse of Cruz by his

father. (*Id.*) Dr. McCloskey noted that the "child abuse descriptions in the current report add different perpetrators and different types of maltreatment; the severity and duration are also worse than revealed several years ago." (*Id.* at 3.) Dr. McCloskey concluded that Cruz "was abused and abandoned at an early age; he was the victim of physical assaults from his father, stepfather, and maternal uncles, and he was socialized into a world of drug dealing while living with his uncles." Dr. McCloskey opined that:

> The extraordinary neglect and abuse explains how Cruz's life became embedded in criminal activities and how violence was the main currency of the world in which he lived. . . . A raft of traumatic events and bad influences compounded to shape John Cruz's development. The choices John Cruz made emanated from this history, and in part were determined by forces well beyond his control for much of his early life.

(*Id.* at 12–13.)

Dr. Barillas reviewed the new information provided to him by PCR counsel and DiFrank and concluded that it raised the question of a possible Attention Deficit/Hyperactivity Disorder (ADHD) diagnosis, which was not addressed during the direct testimony of Dr. McCloskey and could establish a link between the impulsivity associated with the condition and its high correlation with intoxicant abuse in adolescence. (Doc. 31-6, Ex. X: Ex. 39 at 2.) Dr. Barillas concluded that Cruz "had symptoms and conditions that were not self-evident at the time of trial." (EH Ex. 213 at Bates 14478; Doc. 112 at 17.)

### 3.     New evidence presented during federal habeas proceedings

Among the lay witnesses who testified on Cruz's behalf at the federal evidentiary hearing, Ana Montenegro, Cruz's maternal aunt, and Romelia, his paternal aunt, testified that they observed Cruz's mother Julie consume alcohol while she was pregnant with him. Ana testified that Julie drank regularly when she was pregnant with Cruz. (RT 5/17/19 at 71–72.) Ana testified that she remembered this because she was pregnant with her own child at the same time Julie was pregnant with Cruz. (*Id.* at 72.) On cross-examination, however, Ana admitted her son was thirteen months younger than Cruz, so she could not

have been pregnant at the same time as Julie. (*Id.* at 80, 87.) Romelia testified that she saw Julie drinking alcohol at her wedding when she was pregnant with Cruz. (RT 5/16/19 at 129.) Romelia, who was thirteen years old at the time, could not recall anything specific about the type of drink or the quantity. (*Id.* at 153.) Susan Alcaraz testified that she spent a lot of time with Julie and while she did not recall whether Julie drank at her wedding, Susan never saw her drink while she was pregnant. (*Id.* at 34–35.)

Irma Dominquez, Cruz's cousin, testified that, contrary to the presentation at trial, Steve Lingenfelter did not try to be a good stepfather to Cruz, nor did he and Julie welcome Cruz into their home with open arms. (*Id.* at 86.) Irma also testified that she believed Cruz suffered from depression. (*Id.* at 90.)

Lora Hastings, the mother of one of Cruz's children, testified about Julie's substance abuse and Cruz's depression. (RT 5/17/19 at 94, 98–100.)

As far as expert witnesses, Dr. Barillas testified that his 2004 evaluation of Cruz was "tainted and not complete" and unreliable because it was based on missing information. (RT 5/15/19 at 35.) For example, Dr. Barillas was never provided with school records establishing Cruz had been placed in adaptive education classes, indicating he had been designated learning disabled and placed in the learning disability resource room. (*Id.* at 23, 36; EH Ex 31 at Bates 185.) Dr. Barillas also testified that he was not provided with information that Cruz's mother drank while pregnant (*id.* at 29) or information about Cruz's depression (*id.* at 34–35). Dr. Barillas also testified that at trial he provided inaccurate testimony regarding Cruz's grades, incorrectly describing Cruz's grades as As and Bs. (*Id.* at 32.)

Dr. Biggan, the neuropsychologist, examined Cruz in 2004 but did not testify at his trial. At the evidentiary hearing, she testified that she diagnosed Cruz with neuropsychological deficits, namely deficits in working memory and processing speed, albeit not serious ones. (*Id.* at 68–69.) She noted there was possible significance in the measured disparity between Cruz's IQ scores. (*Id.* at 70–71.)

Dr. Biggan would have recommended additional testing if she had been aware of

Cruz's learning disability, potential prenatal exposure to alcohol, reported amnesia, and motor skills deficits. (*Id.* at 79–81.) She would have performed further testing to evaluate whether these deficits would degrade when Cruz was under stress. (*Id.* at 81.)

Dr. Paul Connor, a psychologist, diagnosed Cruz with neurodevelopmental disorder with prenatal alcohol exposure. He testified that Cruz's "pattern of current neuropsychological functioning, the history of report of prenatal exposure to alcohol, and the historical records, both testing that's been done over the last ten or so years and some childhood records, are very much consistent with a fetal alcohol spectrum disorder." (*Id.* at 96–97.)

Dr. Connor further testified that Cruz suffers from brain impairments consistent with fetal alcohol spectrum disorder (FASD), explaining that "his pattern of functioning was entirely consistent with the diagnosis of a neurodevelopmental disorder associated with prenatal alcohol exposure, ND-PAE."[8] (*Id.* at 138–39.) Finally, Dr. Connor testified that the impairments he had identified were likely to "become much more problematic for [Cruz]" when he was in "higher stress, higher speed situations." (*Id.* at 143–44.)

Dr. Connor also testified that Cruz "exhibited secondary disabilities, disabilities that are typically secondary to a fetal alcohol spectrum disorder," including trouble at school, early substance abuse, and troubles with the law. (*Id.* at 142–43.)

Dr. Thomas Hyde, a neurologist, evaluated Cruz in 2014. (RT 5/20/19 at 8.) Dr. Hyde testified that his findings on physically examining Cruz were consistent with defects shown by the neuropsychological testing. (*Id.* at 9.) Dr. Hyde found some of the abnormalities to be consistent with a developmental disorder such as a fetal alcohol disorder. (*Id.* at 10–12, 15–19, 29.)

---

[8] Dr. Connor explained that ND-PAE is a diagnostic label from the Diagnostic and Statistical Manual (DSM) V. In 2004, under the applicable DSM IV, or DSM-4TR, his diagnosis for Cruz would have been "cognitive disorder not otherwise [specified]," which was "a little bit more of a broad category." (RT 5/15/19 at 98.) Dr. Connor would have noted that there was a pattern of performance with a fetal alcohol spectrum disorder to be left for a medical doctor for their diagnosis. (*Id.*)

Dr. Cunningham testified about the basis for his conclusion that Cruz suffered from prenatal exposure to alcohol:

> Well, there are three things that have happened. First, there are now two family witnesses that describe observing [Cruz's mother] drinking during the pregnancy, and then there is a much more refined neuropsychological assessment . . . that identifies deficits that are consistent with fetal alcohol exposure. And so those, added to the inferential factors that I identified previously, significantly increase the indicia of support for fetal alcohol exposure.

(*Id.* at 82.)

### 4.    Cruz was not prejudiced by counsel's alleged failure to investigate his social history, mental health and neurodevelopment

"Under clearly established federal law, consideration of the defendant's life history is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *Andrews*, 944 F.3d at 1117 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)). "Evidence of abuse inflicted as a child is especially mitigating, and its omission is particularly prejudicial." *Id.* "A jury's consideration of abuse and disadvantage suffered during [childhood] is especially critical, given our society's 'long held' belief that 'defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.'" *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)) (emphasis omitted).

This is not, however, a case where the jurors who sentenced Cruz to death did so "knowing hardly anything about him." *Id.* (quoting *Porter*, 558 U.S. at 33 (internal citation omitted)). As detailed in this Order, substantial mitigating evidence was presented at sentencing regarding Cruz's childhood and social background. The Court finds that the additional evidence of Cruz's upbringing is largely cumulative to the evidence already presented and would have made little difference to the jury's sentencing determination. *See Wong v. Belmontes*, 558 U.S. 15, 22–23 (2009) (finding no prejudice where additional evidence was cumulative to that presented at trial); *Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998), *as amended* (Aug. 27, 1998) (finding no prejudice where evidence

1   omitted from sentencing was "largely cumulative of the evidence actually presented").

2   Much of the most significant newly discovered mitigating evidence related to Julie.

3   The evidence presented at the evidentiary hearing established that she suffered from

4   lifelong addictions to alcohol and drugs as well as mental illness, and that these conditions

5   contributed to the severe neglect and emotional abuse of Cruz throughout his childhood

6   and thereafter. Additionally, evidence from the hearing established that not just one, but

7   both of Cruz's stepparents severely neglected and emotionally abused Cruz.

8   The new evidence regarding the circumstances of Cruz's life presented at the

9   hearing, though more detailed and thorough, was consistent with the mitigating evidence

10  presented at sentencing. At sentencing, the jury heard that Cruz was physically and

11  psychologically abused and that his mother neglected and abandoned him. Both she and

12  two experts testified to that effect. The jury also was presented with testimony that Cruz's

13  stepparents were unloving, and, in the case of Cruz's stepmother, abusive.

14  The jury heard that Julie suffered an abusive childhood and had several mental

15  health issues. She testified that she was sexually abused by her father (RT 3/1/2005 at 79–

16  80); in her teens she suffered from anorexia and bulimia and tried to commit suicide

17  multiple times (*id.* at 82); and she had been diagnosed with PTSD and bipolar disorder (*id.*

18  at 105–107).

19  Cruz maintains that the new evidence shows that his mother "suffered from lifelong

20  addictions to alcohol and drugs as well as mental illness," contributing to "a severe form

21  of neglect and emotional abuse of [Cruz] throughout his childhood and thereafter." (Doc.

22  144 at 49.) To the extent the evidence painted a more complete picture of Julie's serious

23  mental health issues and substance and alcohol addictions, this did not conflict with the

24  evidence presented at trial that Julie was a functioning adult for much of Cruz's childhood,

25  attending nursing school when Cruz was a boy and practicing as a nurse for eighteen years.

26  (RT 3/1/05 at 100, 107.) And, testimony from Romelia supports the conclusion that Julie's

27  problems with alcohol were noticeable only *after* Cruz's father passed away. (RT 5/16/19

28  at 130.) The additional evidence that Julie's mental health seriously deteriorated in 1994,

(*see* RT 3/1/05 at 106), would have had minimal mitigating effect because she was older, Cruz was out of the house, and it occurred more than a decade before Cruz murdered Officer Hardesty.

The jury was led to infer that Julie, suffering from her own mental health issues, was incapable of providing a sound home and family environment for Cruz. The jury was aware that Julie admitted to neglecting Cruz emotionally, at least when he was an older child. She testified that although she felt close to Cruz when he was a baby, "[w]hen he got a little bit bigger, like 7, 8, 9, [she] didn't really touch him, hug him, kiss him, hold him as much as a mother should have." (RT 3/1/05 at 92.) She "kind of kept [her] distance more than [she] should have." (*Id.* at 109.) She admitted she didn't even "love him." (*Id.*) She later realized that it was "terribly wrong to have children when I couldn't give them the kind of closeness that they should have." (*Id.* at 92.) Though there was testimony during sentencing that Cruz's mother made some effort to show him love and tried to instill family values in him, both Cruz's maternal and paternal aunts corroborated the testimony that Julie had a lot of problems, was not physically or mentally supportive or very comforting to Cruz, and couldn't express or show him love—perhaps from a younger age than Julie was willing to admit. (RT 3/1/05 at 136, 145, 149–50; 3/2/05 at 42–43, 58, 83.) Father Ford suggested that Julie may have been "overdoing medicines." (RT 3/1/05 at 71.)

Testimony at sentencing from Dr. McCloskey also corroborated Julie's testimony. Dr. McCloskey explained that Cruz was neglected and "essentially abandoned at different points in his childhood." (RT 3/4/05 at 25, 34.) Dr. Barillas similarly testified that Cruz "had practically no affection from his mother, and that made him feel pretty abandoned." (RT 3/3/05 at 60.) Dr. McCloskey also opined that, in addition to being neglected from middle childhood on, Cruz was psychologically and physically abused and exposed to chronic, severe domestic violence from the time he was an infant. (RT 3/4/05 at 25.)

The jury heard that when Cruz's parents divorced, Cruz left his mother's custody as she moved to California and remarried. (*Id.* at 109.) Julie explained that she let Cruz go with his father "with the condition that he would not beat him." (*Id.* at 110.) Though

1    conflicting testimony was presented, the jury was aware of testimony that Cruz's father

2    had violent propensities and a history of physically abusing both Cruz and his mother.

3    While Cruz did not report that he was abused, Dr. McCloskey testified that it was "fairly

4    common" for children to develop "childhood amnesia" and fail to recollect any abusive

5    events. (RT 3/4/05 at 29–30, 100.)

6          Cruz maintains that the new evidence demonstrated that both stepparents "severely

7    neglected and emotionally abused [him]." (Doc. 144 at 49.) The jury, however, heard

8    Cruz's mother testify that Cruz's stepmother, just a child herself, locked Cruz out of the

9    house and was abusive toward him. (RT 3/1/05 at 110–11.) This testimony was also

10   corroborated by Cruz's paternal aunt. (RT 3/2/05 at 84–85.) Moreover, although Julie

11   testified that she and Steve welcomed Cruz to live with them and agreed to provide him

12   with a home and anything he wanted, at trial Dr. McCloskey provided contrasting

13   information about Cruz's family situation in California, stating that Steve "did not like

14   him" and that Cruz had a lonely existence with his mother and stepfather. (RT 3/4/05 at

15   35.) Dr. Barillas similarly testified that Cruz "had practically no affection from his mother,

16   and that made him feel pretty abandoned." (RT 3/3/05 at 60.)

17         From this testimony presented at trial, the "sentencing jury was thus 'well

18   acquainted' with" Cruz's "background and potential humanizing features." *Belmontes*, 558

19   U.S. at 23 (citing *Schriro v. Landrigan*, 550 U.S. 465, 481 (2007)). "Additional evidence

20   on these points would have offered an insignificant benefit, if any at all." *Id.* In Arizona,

21   "[a]n abusive family background is usually given significant weight as a mitigating factor

22   only when the abuse affected the defendant's behavior at the time of the crime." *State v.*

23   *Mann*, 934 P.2d 784, 795 (Ariz. 1997) (citations omitted). Cruz was thirty-three years old

24   and significantly distanced from his abusive childhood when he murdered Officer

25   Hardesty. He had not lived with his mother since he was a teenager and had fathered three

26   children and married in the meantime, living for some time with his wife's family in New

27   Mexico. *See Poyson*, 475 P.3d at 300 ("When childhood abuse is established by a

28   preponderance of the evidence, its mitigating weight depends on the age of the defendant

at the time of the murder and the causal connection between the abuse and crime committed."); *State v. Pandeli*, 161 P.3d 557, 575 (Ariz. 2007) ("Pandeli murdered [the victim] when he was in his late twenties, reducing the relevance of his traumatic childhood."); *State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006) (weight of "horrendous" childhood lessened where defendant was 30 years old at time of the murder.) Cruz's failure to show a causal connection between the abuse and the murder entitles this mitigating factor to little weight. Further, while the new evidence went into much greater detail regarding Julie's background, including her mental health issues, sexual and physical abuse, and drug and alcohol addiction, and may have provided a causative explanation for Julie's treatment of Cruz, it would not have carried substantially more weight than what was presented to the jury at sentencing because it did not substantially enlarge, in strength or subject matter, the evidence of abuse and neglect suffered by Cruz that was presented to the jury. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."). Finally, evidence about a defendant's family, including serious substance abuse, mental illness, and criminal problems is "by no means clearly mitigating" as a jury may conclude that the defendant is "simply beyond rehabilitation." *Pinholster*, 563 U.S. at 201; *cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (recognizing that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness).

    The Court also concludes that Cruz was not prejudiced by counsel's alleged failure to discover and present evidence of Cruz's "brain damage and its corresponding relation to a fetal alcohol spectrum disorder." (Doc. 144 at 48.) Cruz contends that counsel performed ineffectively by failing to present evidence that he suffered from brain impairment.[9] This

---

[9] Relying on the Court's assessment of Claim 1 of Cruz's habeas petition (Doc. 60), Respondents assert that the jury heard evidence of Cruz's brain damage. (*See* Doc. 143 at 27.) This is incorrect. The Court compared the evidence presented during PCR proceedings to the evidence supporting Claim 1 of the habeas petition for purposes of determining whether the claim was fundamentally altered. The evidence was not before the jury.

1   includes evidence that Cruz's mother consumed alcohol while pregnant with him and

2   evidence that "trial counsel had in their possession a school record demonstrating that

3   Petitioner's third grade teacher recommended he be tested for a learning disability because

4   his 'motor skills were very poorly developed and his memory was poor.'" (*See* Doc. 144

5   at 42.) Cruz argues that, "In the hands of effective counsel, this record would have

6   precipitated further investigation to determine if Petitioner had ever been diagnosed with a

7   learning disability." (*Id.*) Cruz notes that, "Trial counsel's own file[] already contained a

8   school record establishing that Petitioner was diagnosed with a learning disability and

9   placed in adaptive education classes." (*Id.*) Yet defense counsel failed to provide this

10  information to the defense team's mental health experts, Dr. Barillas, Dr. McCloskey, and

11  Dr. Biggan.

12       Assuming without deciding that counsel performed deficiently in failing to discover

13  and share the information that Cruz was diagnosed with a learning disability in elementary

14  school and that his mother may have used alcohol during pregnancy, Cruz was not

15  prejudiced by this failure. First, based on Romelia's age at the time, and the inconsistencies

16  in Ana's testimony, there is no reasonable probability that an objective fact-finder would

17  have found credible the new evidence that Julie consumed alcohol during her pregnancy.

18  *See Correll v. Ryan*, 539 F.3d 938, 952 n.6 (9th Cir. 2008) (a district court errs by drawing

19  conclusions as to the sufficiency of a petitioner's new evidence of brain damage and should

20  decide only whether there exists a "reasonable probability" that "an objective fact-finder"

21  in a state sentencing hearing would be persuaded by the new evidence).

22       In addition, Dr. Biggan testified that fetal alcohol exposure often creates severe

23  neuropsychological impairment, often with reductions in IQ and intellectual function, but

24  Cruz's IQ was average. (RT 5/15/19 at 83.) And both Dr. Biggan and Dr. Connor noted

25  that Cruz did not appear to have facial dysmorphia, a necessary feature to support a

26  diagnosis of fetal alcohol syndrome. (*Id.* at 83, 103.) Thus, the Court finds that there is not

27  a reasonable probability that "an objective fact-finder" in a state sentencing hearing would

28  have concluded, based on the evidence presented, that Cruz's pattern of functioning was

1    most consistent with a neurodevelopmental disorder associated with prenatal alcohol
2    exposure.

3         Next, these additional pieces of evidence would have had minimal relevance to the
4    murder. Cruz did not suffer from a learning disability when Dr. Biggan administered her
5    neuropsychological evaluation. (RT 3/3/05 at 106.) Neuropsychological testing performed
6    by Dr. Biggan demonstrated "no severe deficits in [Cruz's] cognitive functions reflected in
7    the current testing [that] might suggest significant organic or [] neuropsychological
8    impairment." (*Id.* at 107.) Dr. Biggan's evaluation of Cruz demonstrated that he performed
9    within the average range of intellectual functioning and that his current test scores did not
10   reflect a learning disability. Instead, her academic achievement measures were consistent
11   with his measured IQ, both of which were within the normal range. (*Id.* at 106–07.)

12        At the evidentiary hearing, Dr. Barillas agreed that the additional information
13   concerning suspected fetal alcohol exposure did not change the results of his testing, but
14   only provided a potential cause of the deficits that were previously noted in the scores
15   presented to the jury. (RT 05/15/19 at 37–38.) Those deficits, moreover, were not strongly
16   suggestive of fetal alcohol exposure.

17        Though fetal alcohol exposure could provide a potential cause for Cruz's deficits in
18   working memory and processing speed, Dr. Hyde could not rule out other causes for Cruz's
19   deficits—such as head trauma or Cruz's extensive use of drugs. (RT 5/20/19 at 19–20, 25–
20   28.) Dr. McCloskey also explained to the jury that exposure to domestic violence under the
21   age of six before a child's brain is fully developed, such as Cruz experienced, results in
22   real impairments. (RT 3/04/05 at 36.)

23        Finally, as previously discussed, at trial the jury did hear testimony from Dr. Barillas
24   that Cruz's ability to conform his actions to the law was impaired—not just at the time of
25   Officer Hardesty's murder, but within a larger framework.

26        Cruz also was not prejudiced by counsel's alleged failure to offer evidence of his
27   depression. (*See* Doc. 144 at 58, 71.) The record shows that the new evidence resembled
28   the evidence the jury was presented with that Cruz suffered from depression and self-

medicated as a result. *See Belmontes*, 558 U.S. at 22; *Babbitt*, 151 F.3d at 1176. Dr. McCloskey testified about Cruz's depression and its effects: "something else that has come up in both the records and in the interviews is that he has very dark moods, he's very depressed and it's not that uncommon for people to do drugs to sort of self-medicate to treat their depression . . . ." (RT 3/4/05 at 49.)

Cruz's assertions that his jury "heard absolutely none of the evidence" of his remarkably tragic social history, coupled with the evidence of neurocognitive impairments and resulting depression, and that his "choices were predicated on factors that shaped his development, over which he had no control," contributing to the tragic events of May 26, 2003, (Doc. 144 at 73) (quoting *Porter*, 558 U.S at 41), are contravened by the evidence. While the evidence that Cruz says his trial counsel should have offered at the sentencing hearing would have done more than "barely . . . alter[] the sentencing profile" presented to the jury, *see Strickland*, 466 U.S. at 77, the jury was not presented with an entirely innocuous picture of Cruz's homelife or an inaccurate picture of his cognitive condition. *See Ramirez v. Ryan*, 937 F.3d 1230, 1246 (2019) (finding a reasonable probability of a different outcome where the picture of mitigation presented at sentencing was relatively innocuous compared to the details of "privation and abuse" that later emerged about Ramirez's life as well as the fact that he was "borderline mentally retarded").

The differences between the mitigating evidence presented to Cruz's jury and the new evidence stands in contrast to the stark differences between the old and new evidence in cases where relief was granted on claims of ineffective assistance of sentencing counsel. For example, in *Rompilla v. Beard*, 545 U.S. 374, 391–93 (2005), the new evidence of organic brain damage, extreme mental disturbance, neglect, and mental retardation bore "no relation to the few naked pleas for mercy actually put before the jury." In *Wiggins v. Smith*, 539 U.S. 510, 512 (2003), "powerful" new evidence contrasted sharply with the "halfhearted mitigation case" counsel presented to the jury. The omitted evidence included the severe privation and abuse Wiggins experienced during the first six years of his life while in the custody of his alcoholic, absentee mother; physical torment, sexual

molestation, and repeated rape during his subsequent years in foster care; time spent homeless; and diminished mental capacities. *Id.* at 535. In *Williams v. Taylor*, 529 U.S. 362, 398 (2000), trial counsel argued in mitigation that Williams turned himself in, cooperated with police, and expressed remorse for his actions. New evidence offered a graphic description of Williams's childhood, which was filled with abuse and privation. *Id.* He was "borderline mentally retarded" and did not advance beyond sixth grade in school. *Id.* at 396. Prison records documented his commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, and prison officials described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Id.* Finally, in *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005), counsel presented no affirmative evidence in mitigation, relying entirely on a guilt-phase psychiatric report concluding that no insanity defense was available. *Id.* at 635, 642. A minimal investigation would have revealed a tortured family history, including the fact that Summerlin's alcoholic mother beat him frequently and punished him by locking him in a room filled with ammonia fumes; that at his mother's behest he received electroshock treatments to control his explosive temper; that he had a learning disability that left him functionally mentally retarded; and that he had been diagnosed as a paranoid schizophrenic and treated with anti-psychotic medication. *Id.* at 631. In contrast to these cases, the new mitigating information Cruz has developed from both lay and expert witnesses is largely consistent with or cumulative of, but not substantially stronger or more compelling than, the evidence presented to the jury.

### D.     Conclusion

The Court has considered the totality of the available evidence, both that adduced at trial and in subsequent proceedings, weighed it against the aggravating factor, and determined that there is not a reasonable probability that the sentencer, presented with that evidence, "would have recommended a sentence of life instead of death." *See Andrews*, 944 F.3d at 1108 (quoting *Wiggins*, 539 U.S. at 537).

While "[t]here will always be more documents that could be reviewed, more family

members that could be interviewed and more psychiatric examinations that could be performed," *Leavitt*, 646 F.3d at 612, the new evidence of Cruz's social history, neuropsychological development, mental health, and state of mind at the time of the crime does not have significant mitigating value in view of what was already available to the sentencing jury. This is especially true given the absence of a relationship between the mitigating circumstances and the murder of Officer Hardesty. The aggravating factor—the murder of an on-duty police officer killed in the course of his official duties—"carries significant weight. The unprovoked murder of a peace officer, so the defendant can avoid his obligation under the law, is really no less than a personal declaration of war against a civilized society." *Martinez v. Ryan*, 926 F.3d 1215, 1237 (9th Cir. 2019).

Accordingly, even if counsel "had been professionally deficient in failing to investigate and present these additional facts, it is not reasonably probable that the outcome of the aggravation/mitigation balancing would have been different." *Miles v. Ryan*, 713 F.3d 477, 494 (9th Cir. 2013). Even if counsel's mitigation investigation were deficient, Cruz has failed to meet his burden of showing that he was prejudiced. *See Strickland*, 466 U.S. at 694.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*,

529 U.S. 473, 484 (2000). The Court finds that reasonable jurists could debate its resolution of Claim 2.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Cruz's Petition for Writ of Habeas Corpus (Doc. 28) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claim 2.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 31st day of March, 2021.

Honorable Jennifer G. Zipps
United States District Judge

- 41 -